## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| EVERYWARE GLOBAL, INC., *et al.*,[1] | ) Case No. 15-10743 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## MOTION OF EVERYWARE GLOBAL, INC., *ET AL.*, FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, OTHER COMPENSATION, AND REIMBURSABLE EMPLOYEE EXPENSES, (B) PAY AND HONOR EMPLOYEE MEDICAL AND OTHER BENEFITS, AND (C) CONTINUE EMPLOYEE AND RETIREE BENEFIT PROGRAMS, AND (D) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"), authorizing the Debtors to (a) pay prepetition wages, salaries, reimbursable employee expenses, and other compensation described below, (b) pay and honor obligations relating to employee medical, insurance, and other benefits programs, (c) continue employee and retiree benefit programs in the ordinary course of business on a postpetition basis and in a manner consistent with prepetition practices, and (d) granting related relief. In further support of this Motion, the Debtors respectfully state as follows.[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Anchor Hocking, LLC (6923); Buffalo China, Inc. (9731); Delco International, Ltd. (7553); EveryWare, LLC (2699); EveryWare Global, Inc. (4553); Kenwood Silver Company, Inc. (2286); Oneida Food Service, Inc. (7321); Oneida International Inc. (4774); Oneida Ltd. (5700); Oneida Silversmiths Inc. (6454); Sakura, Inc. (9359); THC Systems, Inc. (9103); Universal Tabletop, Inc. (4265). The location of the Debtors' service address is: 519 North Pierce Avenue, Lancaster, Ohio 43130.

[2] The facts and circumstances supporting this Motion are set forth in the *Declaration of Joel Mostrom in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court")
has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended
Standing Order of Reference from the United States District Court for the District of Delaware*,
dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C.
§ 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy
Practice and Procedure of the United States Bankruptcy Court for the District of Delaware
(the "Local Rules") to the entry of a final order by the Court in connection with this Motion to
the extent that it is later determined that the Court, absent consent of the parties, cannot enter
final orders or judgments in connection herewith consistent with Article III of the United States
Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested in this Motion are sections 105(a), 362, 363, and
507(a)(4)-(5) of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004
of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-
1(m).

## Relief Requested

4.      The Debtors seek entry of the Interim Order and Final Order, authorizing, but not
directing, the Debtors to (a) pay certain prepetition wages, salaries, reimbursable employee
expenses, and other compensation, (b) pay and honor obligations relating to employee medical,
insurance, and other benefits programs (each of (a) and (b) as defined herein, and collectively,
the "Employee Obligations"), (c) continue employee and retiree benefit programs (each as
defined herein, and collectively, the "Employee Programs") in the ordinary course of business on

2

a postpetition basis and in a manner consistent with prepetition policies, and (d) granting related relief. In addition, the Debtors request that the Court schedule a final hearing within approximately 21 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

5.      Given that the Debtors' employees are integral to the Debtors' ability to operate their businesses during these chapter 11 cases, the Debtors' failure to satisfy certain Employee Obligations within the first 21 days of these chapter 11 cases would jeopardize employee loyalty, morale, and trust, possibly causing employees to leave the Debtors' employ and thereby significantly harming the Debtors' operations at this critical juncture. Accordingly, pursuant to the Interim Order, the Debtors seek authority to continue to honor, pay, satisfy, or remit all claims and prepetition obligations related to Employee Obligations subject to the limitations discussed herein. The Debtors also seek authority, solely upon entry of the Final Order, to honor, pay, satisfy, or remit certain claims and prepetition obligations owing under the following programs (each as defined and discussed herein):   (a) the Severance Program, and (b) the Incentive Compensation Plans.

6.      To enable the Debtors to carry out the relief requested, the Debtors request that the Court (a) authorize and direct all applicable banks, financial institutions, and the Payroll Processor (as defined herein) to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtors related to the Employee Obligations, whether such checks were presented or electronic-payment requests were submitted before or after the date hereof, and (b) modify the automatic stay to the extent necessary to permit the relief requested in this Motion with respect to the Debtors' workers' compensation program.

3

## Introduction[3]

7.      The Debtors commenced these chapter 11 cases to implement a consensual, prepackaged chapter 11 plan of reorganization—i.e., the Plan.[4] The restructuring transactions contemplated by the Plan will significantly deleverage the Debtors' balance sheet, reducing the Debtors' funded debt obligations by approximately 72.4% by converting the entire $248.7 million term loan facility (the "Term Loan Facility") into 96.0% of the reorganized Debtors' new equity (the "New Common Stock"). All other creditors, including holders of general unsecured claims, are "riding through" these chapter 11 cases. The Plan has support from the Debtors' primary stakeholders, including term loan lenders holding more than 65.0% of the loans outstanding under the Term Loan Facility (the "Consenting Term Lenders"), and equity holders holding more than 84.0% of EveryWare common stock and 100% of EveryWare preferred stock (the "Consenting Equity Holders") pursuant to a restructuring support agreement (the "Support Agreement"). As of the Petition Date, holders of more than 68.1% in amount of Class 5 Term Loan Facility Claims—the only class entitled to vote on the Plan—already have voted to accept the Plan.[5]

---

[3]   For more information regarding the Debtors' history, operations, and financial performance, see the First Day Declaration. On April 7, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have filed a motion seeking joint administration of their chapter 11 cases under Bankruptcy Rule 1015(b). The Debtors are operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

[4]   For additional information, please refer to the *Debtors' Joint Prepackaged Chapter 11 Plan* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") and the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan*, filed contemporaneously herewith.

[5]   See *Preliminary Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Joint Prepackaged Chapter 11 Plan,* filed contemporaneously herewith. The Debtors commenced solicitation of the Plan on April 3, 2015. Solicitation will remain open until April 17, 2015.

4

## Background

8.      The Debtors are leading global marketers of tabletop, food preparation, and storage products for the consumer, foodservice, and specialty markets.  The Debtors' primary operating subsidiaries, Oneida Ltd. and Anchor Hocking, LLC, were founded in 1848 and 1873, respectively.  In 2011, investment funds affiliated with Monomoy Capital Partners completed their acquisition of these companies and, in March 2012, integrated them under the EveryWare brand.  The Debtors completed a subsequent merger transaction in May 2013, resulting in their existing capital structure today.  As of September 30, 2014, the Debtors reported total assets of approximately $237.8 million and total liabilities of approximately $380.4 million.  As of the Petition Date, the Debtors' funded debt obligations include a $250.0 million term loan facility— i.e., the Term Loan Facility—and $60.0 million asset-based revolving facility (the "ABL Facility"), with outstanding principal balances of approximately $248.7 million and $43.6 million,[6] respectively.  For the year ended December 31, 2014, the Debtors preliminarily reported $354.0 million of total revenue.

9.      Since the early part of 2014, the Debtors have explored and implemented a series of out-of-court financial and operational restructuring initiatives to stabilize the business and create long-term value.  A number of these initiatives succeeded, including the satisfaction of certain performance targets under a revised business plan in the second-half of 2014.  The Debtors' 2015 business plan projected compliance with the financial covenants under the term loan credit agreement (the "Term Loan Agreement").  Nevertheless, in early March 2015, the Debtors were informed that they may receive a "going concern" qualification from their independent auditors in connection with the filing of their annual report.  If uncured within 30

---

[6]      In addition, approximately $10.2 million of standby letters of credit have been issued under the ABL Facility.

5

days, the going concern qualification could have ripened into an event of default under the Term Loan Agreement and a cross-default under the ABL loan agreement. If such event a default occurred, liquidity issues arising from the resultant, foreseeable contraction of trade terms from the Debtors' vendor and supplier base could have jeopardized the Debtors' ongoing operations. Accordingly, the Debtors engaged their primary equity holders, a steering committee of term loan lenders, and the ABL agent regarding various restructuring alternatives—both out-of-court and in-court—to strengthen the Debtors' balance sheet, provide short-term liquidity support, and create a sustainable capital structure to position the Debtors for the future. On March 31, 2015, after extensive, hard fought negotiations, the Debtors, the Consenting Term Lenders, and the Consenting Equity Holders entered into the Support Agreement, whereby the parties thereto have agreed to support the restructuring transactions described herein.

10.    As noted above, these restructuring transactions will significantly deleverage the Debtors' balance sheet, reducing the Debtors' funded debt obligations by approximately 72.4% by converting the entire $248.7 million Term Loan Facility into 96.0% of the New Common Stock. The Plan provides that the other 4.0% of New Common Stock will be allocated to all existing equity holders in exchange for the Consenting Equity Holders' support of the proposed restructuring. Importantly, holders of allowed general unsecured claims will be paid in full in cash under the Plan. The Debtors have also received commitments for a $40.0 million new money DIP term facility and continued access to their $60.0 million ABL Facility to ensure the smooth continuation of operations during the in-court proceedings. The Debtors and the parties to the Support Agreement believe that the Plan and the transactions contemplated thereunder will right-size the Debtors' balance sheet, improve liquidity, and strengthen go-forward operations, positioning the Debtors for long-term success.

6

## The Debtors' Workforce and Employee Obligations

I.      **The Debtors' Workforce.**

11.      The Debtors currently employ approximately 1,557 employees (collectively, the "Employees"), nearly all of whom are full-time employees.  Approximately 1,325, or 85%, of the Employees are paid on an hourly basis, and the remaining approximately 232, or 15%, are paid on a salaried basis.  A substantial number of the Employees, approximately 1,200, are represented by unions that are party to three collective bargaining agreements with United Steelworkers (collectively, the "CBAs").  In addition to the Employees, the Debtors supplement their workforce by utilizing Independent Contractors (as defined herein) and Temporary Employees (as defined herein) procured through an employment agency during various periods throughout the year.

12.      The Employees perform a variety of critical functions, including operating the Debtors' manufacturing and distribution facilities, and providing sales and marketing, finance and accounting, information technology, human resources, management, and other related support services.  The Employees' valuable skill sets, institutional knowledge, customer relationships, and understanding of the Debtors' operations make them essential to the success of these chapter 11 cases.  Further, just as the Debtors depend on the Employees to operate their businesses on a daily basis, these individuals also depend on the Debtors for their livelihood. Indeed, the vast majority of the Employees rely exclusively on payments received from the Debtors for their basic living necessities.  The Employees will be exposed to significant financial difficulties if the Court does not permit the Debtors to pay the Employee Obligations in the normal course of business.

DOCS_DE:199264.1 24689/001

## II.    Wages and Compensation.

### A.    Compensation.

13.    In the ordinary course of business, the Debtors pay the Employees' wages, salaries, commissions, incentive bonuses, reimbursable expenses, and certain other forms of compensation described herein (collectively, the "Compensation"). The Employees are paid on either a salaried or hourly basis. Salaried Employees are paid bi-weekly on Fridays, on a current basis, and hourly Employees are paid bi-weekly on Fridays, two weeks in arrears. As a result, there may be prepetition amounts on account of Compensation that have accrued but remain unpaid as of the Petition Date on behalf of the Employees.

14.    While the Employees are paid bi-weekly, the Debtors process payroll on a weekly basis, with a certain subset of the Employees being paid each week. The split in payroll is mainly geographic, with all Employees, both salaried and hourly, who work in the Debtors' Lancaster facilities, as well as the sales representatives in the retail or specialty businesses paid together (the "Lancaster Payroll"), and all Employees, both salaried and hourly, who work in the Debtors' Monaca, Oneida, Savannah, and Toronto facilities, as well as the sales representatives in the food service business paid together (the "Monaca Payroll"). On average, the Debtors gross weekly payroll for the Lancaster Payroll and the Monaca Payroll on an aggregate basis is approximately $1.6 million.

15.    As of the Petition Date, the Debtors estimate that they owe Employees an aggregate amount of approximately $3.7 million on account of Compensation earned prior to the Petition Date (collectively, "Unpaid Compensation"), all of which will become due and owing during the interim period between the Petition Date and entry of the Final Order (the "Interim Period"). Additionally, some Employees may be entitled to Compensation because (a) discrepancies may exist as to amounts paid, and (b) some payroll checks issued before the

8

Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.

16.    Accordingly, the Debtors seek authority, but not direction, to continue to pay Compensation in the ordinary course of business on a postpetition basis, and to pay Employees any Unpaid Compensation; *provided however*, that no Employee will be paid in excess of $12,475 on account of Unpaid Compensation during the Interim Period.

**B.    Commission Payments.**

17.    In addition to the wage and salary obligations, certain of the Employees are entitled to earn commission payments.    In particular, the Debtors pay commissions to certain Employees in the sales and marketing department (the "Sales Representatives").[7]    Sales Representatives are responsible for building and maintaining customer relationships, with the goal of increasing sales opportunities.    The Sales Representatives receive commission payments based on a percentage of the sales generated each month either to a particular customer or in a particular product area such as glassware or bakeware (the "Sales Commissions").    The Sales Commissions are paid monthly in arrears and processed in the Debtors' normal payroll.    As of the Petition Date, the Sales Commissions outstanding are estimated to be in the aggregate amount of approximately $80,000 (the "Unpaid Sales Commissions"), all of which will become due and owing within the Interim Period.

18.    The Debtors seek authority, but not direction, to continue to pay the Sales Commissions in the ordinary course of business on a postpetition basis, and to pay Employees any Unpaid Sales Commissions; *provided however*, that no Employee will be paid in excess of $12,475 on account of the Unpaid Sales Commissions and Unpaid Compensation during the

---

[7]    Approximately 25% of the Sales Representatives are paid commissions in addition to their salary.  The other 75% of the Sales Representatives participate in the Sales Incentive Plan (as defined herein).

9

Interim Period.

### C.    Payroll Processor.

19.    The Debtors use the services of Automatic Data Processing, Inc. (the "Payroll Processor") to administer payroll checks to Employees and process direct deposit transfers. The Debtors pay approximately 40% of their Employees by check and the remainder by direct deposit. The Debtors pay approximately $29,000 per month to the Payroll Processor for the payroll-related services it provides to the Debtors and related administrative costs (the "Payroll Processor Fees"). As of the Petition Date, the Debtors estimate that approximately $29,300 is outstanding on account of amounts owed to the Payroll Processor (the "Unpaid Payroll Processor Fees"), all of which will become due and owing within the Interim Period.

20.    It is critical that the Debtors be able to compensate Employees on the historical payroll schedule. The Debtors will be unable to stay on the historical payroll schedule without the Payroll Processor because the Payroll Processor is responsible for administering Employees' paychecks and replacing the Payroll Processor would take a significant amount of time. Thus, the Debtors seek authority to pay the Unpaid Payroll Processor Fees, and to continue paying the Payroll Processor Fees in the ordinary course of business on a postpetition basis.

### D.    Incentive Compensation Plans.

21.    Historically, the Debtors have maintained certain Employee bonus programs to help drive sales efforts and reward Employees for their efforts in helping the Debtors to reach certain financial targets. In 2014, the Debtors adjusted the bonus programs outlined below (collectively, the "Incentive Compensation Plans"), such that Employees eligible under the Incentive Compensation Plans would receive bonuses based on fourth quarter 2014 and first quarter 2015 financial results, with any amounts earned under the Incentive Compensation Plans

10

scheduled to be paid in May 2015. As a result, there may be prepetition amounts that have accrued and remain unpaid as of the Petition Date.

22. ***Sales Incentive Plan.*** The Debtors have historically offered additional compensation to certain Employees in the sales and marketing department through a sales incentive plan (the "Sales Incentive Plan"). Approximately 66 non-insider Employees are eligible to participate in the Sales Incentive Plan. The Sales Incentive Plan has two components, a performance component and a discretionary component. The performance component, which accounts for 70% of an Employee's potential payout, is based on achieving target increases in gross margin (net sales less the cost of goods sold), which targets are individualized for each participant. The discretionary component, which accounts for 30% of an Employee's potential payout, is recommended by an Employee's manager and approved by the Debtors' chief executive officer. As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Sales Incentive Plan. However, to the extent bonus targets were achieved during the six months ending March 31, 2015, amounts payable under the Sales Incentive Plan may have accrued before the Petition Date and become due and payable thereafter.[8] Based on the Debtors' current projections, they estimate that approximately $661,000 will become due and payable after the Petition Date on account of the Sales Incentive Plan.

23. Importantly, none of the Employees who are eligible to participate in and receive payments from the Sales Incentive Plan are insiders, as defined under section 101(31) of the Bankruptcy Code. The Debtors seek authority to honor payments to any eligible non-insider Employee under the Sales Incentive Plan that become due and payable after the Petition Date.

---

[8]  The Debtors will determine the extent to which the Employees participating in the Sales Incentive Plan achieved their performance targets, and the amount of any discretionary payout, during the month of April 2015. Payments under the Sales Incentive Plan are scheduled to occur on or before May 1, 2015.

The Debtors do not seek authority to make any payments under the Sales Incentive Plan during the Interim Period.

24.    ***Management Incentive Plan.***    The Debtors have historically offered additional compensation to certain Employees in managerial roles through an incentive plan (the "Management Incentive Plan").  Approximately 28 Employees are eligible to participate in the Management Incentive Plan.[9]    The Management Incentive Plan has two components, a performance component and a discretionary component.  The performance component, which accounts for 70% of an Employee's potential payout, is based on achieving certain EBITDA targets.  The discretionary component, which accounts for 30% of an Employee's potential payout, is recommended by an Employee's manager and approved by the Debtors' chief executive officer. As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Management Incentive Plan.  However, to the extent bonus targets were achieved during the six months ending March 31, 2015, the amounts to be paid under the Management Incentive Plan have been accruing prior to the Petition Date, and will become due and payable after the Petition Date.[10]    Based on the Debtors' current projections, they estimate that approximately $400,000 will become due and payable to non-insider Employees after the Petition Date on account of the Management Incentive Plan.  The Debtors seek authority to honor payments to any eligible non-insider Employee under the Management Incentive Plan that become due and payable after the Petition Date.  The Debtors are not seeking authority to make any payments under the Management Incentive Plan during the Interim Period.

---

[9]    Certain of these Employees are insiders of the Debtor.  The Debtors do not seek authority to make payments to any insiders under the Management Incentive Plan.  To the extent the Debtors propose to make bonus or incentive payments to any insiders, the Debtors will seek separate approval from this Court prior to making any such payments.

[10]    The Debtors will determine the extent to which the Employees participating in the Management Incentive Plan achieved their performance targets, and the amount of any discretionary payout, during the month of April 2015.

DOCS_DE:199264.1 24689/001

### E.    Temporary Employees.

25.    From time to time, the Debtors utilize the services of various Temporary Employees to fill gaps in staffing needs.[11]    Temporary Employees are procured through a number of temporary staffing agencies and other vendors (collectively, the "Staffing Agencies"). The Debtors typically pay the Staffing Agencies directly for services rendered by Temporary Employees through their accounts payable system.    The Staffing Agencies, in turn, pay the Temporary Employees.

26.    On average, the Debtors spend approximately $130,000 per month on account of fees paid to Staffing Agencies for compensation owed to Temporary Employees (the "Staffing Agency Fees").    As of the Petition Date, the Debtors estimate that approximately $146,300 is accrued and outstanding on account of the Staffing Agency Fees (the "Unpaid Staffing Agency Fees"), $140,200 of which will become due and owing within the Interim Period.    Accordingly, the Debtors seek authority, but not direction, to continue paying the Staffing Agency Fees in the ordinary course of business on a postpetition basis, and to pay all Unpaid Staffing Agency Fees in the ordinary course of business.

### F.    Independent Contractors.

27.    The Debtors engage approximately 55 independent and small contractors (collectively, the "Independent Contractors") to provide important sales services for the Debtors. The Independent Contractors support the Debtors' sales and marketing department and generally work in a sales representative role, selling the Debtors' products and creating and maintaining customer relationships.    The Independent Contractors' skill set, subject matter expertise, and

---

[11]    The Debtors are also permitted to hire "pre-union" Employees under the CBAs for a short trial period before they are hired as full-time, union Employees.  The number of "pre-union" Employees varies throughout the year, but the Debtors estimate they currently employ approximately 30 such Employees.  These Employees are paid through the Debtors' normal payroll process.  For the avoidance of doubt, the Debtors do not consider such Employees to be Temporary Employees.

13

institutional knowledge with respect to the Debtors' operations, customer relations, and infrastructure are vital to the effective reorganization of the Debtors' business. In addition, many of the Independent Contractors are small companies or individuals that may suffer financial hardship without immediate payment for their services.

28.    On average, the Debtors spend approximately $318,600 per month on account of amounts owed to Independent Contractors (collectively, the "Independent Contractor Fees") through their accounts payable system. As of the Petition Date, the Debtors estimate that approximately $422,000 in Independent Contractor Fees is accrued and unpaid (collectively, the "Unpaid Independent Contractor Fees"). Approximately $342,000 of the Unpaid Independent Contractor Fees will become due and owing during the Interim Period. Accordingly, the Debtors seek authority, but not direction, to continue to pay Independent Contractor Fees in the ordinary course of business on a postpetition basis, and to pay any Unpaid Independent Contractor Fees accrued in the ordinary course of business.

### III.    Reimbursable Expenses.

29.    In the ordinary course of business, the Debtors reimburse Employees for reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment, including those described below.

30.    The Debtors routinely reimburse expenses incurred by Employees for business development initiatives, air travel, meals, and other business-related expenses incurred in the scope of their employment on behalf of the Debtors (collectively, the "Reimbursable Expenses"). The majority of Reimbursable Expenses are paid directly by the Employees.[12] The Debtors pay approximately $120,000 per month on account of Reimbursable Expenses. Although the

---

[12]    The Debtors also utilize a corporate credit card issued by Wells Fargo to pay for airline tickets (the "Corporate Credit Card"). The Debtors pay the Corporate Credit Card balances directly through their accounts payable system.

Debtors request that reimbursement requests be submitted promptly, not all Employees do so and, as a result, it is difficult for the Debtors to precisely estimate the amount of prepetition Reimbursable Expenses outstanding at this time because it is likely that Employees will submit requests for expenses incurred prepetition after the Petition Date. Based on historical practice, the Debtors estimate that, as of the Petition Date, approximately $100,000 in total Reimbursable Expenses have accrued but remain unpaid, all of which will become due and owing within the Interim Period.

31.     Employees have incurred Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that the Debtors would reimburse them. Accordingly, to avoid harming Employees who incurred Reimbursable Expenses, and who may become personally liable for such expenses reasonably incurred at the Debtors' direction, the Debtors request authority to (a) honor any prepetition obligations related to Reimbursable Expenses, (b) pay Employees or applicable credit card companies on account of Reimbursable Expenses that have accrued prepetition or accrue postpetition but relate to the prepetition period, and (c) continue reimbursing Employees for Reimbursable Expenses in accordance with prepetition practices and in the ordinary course of their businesses.

## IV.     Deductions and Withholdings.

### A.     Payroll Taxes.

32.     The Debtors are required by law to withhold from Employees' paychecks amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withheld Amounts"). In addition, the Debtors are required by applicable statutory authority to pay Social Security and Medicare taxes, and based on a percentage of gross payroll, additional

15

amounts for federal and state unemployment insurance (together with the Withheld Amounts, the "Payroll Taxes").

33.    On average, the Debtors withhold approximately $345,000 per week for Payroll Taxes, including both Employee and Debtor-paid portions.  Because the Debtors are statutorily obligated to remit Payroll Taxes, their inability to do so may result in adverse legal consequences that disrupt the reorganization process.  Moreover, the Debtors believe that certain of the Payroll Taxes are generally held in trust by the Debtors and are not property of their estates. Accordingly, the Debtors seek authority to remit any prepetition Payroll Taxes to the appropriate third-party recipients and to continue remitting Payroll Taxes on a postpetition basis (whether or not the Payroll Taxes relate to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

**B.    Deductions.**

34.    In addition to the Payroll Taxes, the Debtors routinely deduct certain amounts from Employees' paychecks during each applicable payroll period on account of miscellaneous items, including (a) garnishments, child support, and other similar deductions, (b) union dues, (c) safety equipment and uniforms, and (d) other pre- and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein, such as an Employee's share of health care benefits, insurance premiums, contributions under flexible spending plans, and 401(k) contributions (collectively, the "Deductions").

35.    On average, the Debtors remit approximately $185,000 per week on account of the Deductions.  The Debtors believe that the Deductions are generally held in trust by the Debtors and are not property of their estates.  Accordingly, the Debtors seek authority to remit any prepetition Deductions to the appropriate third-party recipients and to continue remitting Deductions on a postpetition basis (whether or not the Deductions relate to the prepetition

16

period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

## V.    Vacation, Holiday and Other Leave.

36.    ***Paid Vacation***.  The Debtors provide vacation time (the "Vacation Time") to their Employees as a paid time-off benefit.  The amount of Vacation Time and rate at which Vacation Time accrues varies amongst union and non-union Employees.  Union Employees accrue all of their Vacation Time on January 1 of each year, with the amount of Vacation Time determined based on hours worked during the previous calendar year.  If a union Employee does not use all of his or her Vacation Time in a year, the Employee is entitled to a cash payment at the end of the year for all accrued, unused Vacation Time.  Non-union Employees accrue one-twelfth of their Vacation Time at the end of each month worked, with the amount of Vacation Time determined by an Employee's length of employment and level of seniority.  Non-union Employees may not carry over any accrued Vacation Time to the next year, and are not entitled to a cash payment for any accrued, unused Vacation Time unless they terminate their employment.

37.    Because non-union Employees are only entitled to a cash payment for accrued, but unused Vacation Time if they terminate their employment, and union Employees are only entitled to a cash payment for accrued, unused Vacation Time at the end of the year or if they terminate their employment, the total amount of Vacation Time accrued is typically much larger than any cash payments made by the Debtors on account of Vacation Time.  The Debtors estimate that approximately $1.8 million of earned but unused Vacation Time has accrued as of the Petition Date.

38.    ***Holidays.***  The Debtors recognize either 10 or 12 holidays, including personal holidays, as a paid time-off benefit for their union Employees, and 11 holidays, including

17

personal holidays, for their non-union Employees (each, a "Holiday" and, collectively, the "Holidays"). Generally, eligible Employees are not required to work on designated Holidays and are paid for Holiday time at either their hourly or salaried rate. Employees are not entitled to cash payments for Holidays. Thus, the Debtors do not believe that there are any obligations owing as of the Petition Date on account of Holidays.

39.    *Leave Time*. Employees may also take certain other unpaid leaves of absence for personal reasons (collectively, "Leave Time"). Leave Time includes family medical leave, sick leave, jury duty, military leave, bereavement, jury duty, and long-term unpaid leave. Employees are not entitled to cash payments for unused Leave Time. Thus, the Debtors do not believe that there are any obligations owing as of the Petition Date on account of Leave Time.

40.    The Debtors believe that the continuation of the Vacation Time, Holiday, and Leave Time policies, in accordance with prior practice, is important to maintaining Employee morale during these chapter 11 cases. Accordingly, the Debtors seek authority, but not direction, to allow eligible Employees to use their Vacation Time, Holiday, and Leave Time in the ordinary course of business on a postpetition basis, and to pay any accrued, unused Vacation Time in the ordinary course of business and consistent with past practice.

41.    To be clear, the Debtors anticipate that their Employees will utilize any accrued Vacation Time, Holiday, and Leave Time in the ordinary course of business, and, therefore, the Debtors do not expect there to be any material cash requirements beyond the Debtors' normal payroll obligations on account of the relief requested herein.

## VI.    Employee Benefit Programs.

42.    The Debtors offer Employees the opportunity to participate in one or more insurance and benefit programs, including, medical, dental, and vision plans, flexible spending accounts, term and whole life insurance, long-term disability insurance, accidental death and

18

dismemberment insurance, critical illness insurance, accident insurance, workers' compensation benefits, and a 401(k) plan (collectively, the "Employee Benefit Programs"). The Debtors seek authority to pay prepetition amounts, if any, and continue the Employee Benefit Programs in the ordinary course of business and consistent with past practice.

### A.    Health Benefit Plans.

43.    As described below, the Debtors offer full-time Employees the opportunity to participate in a number of health benefit plans, including medical, dental, and vision plans (collectively, the "Health Benefit Plans"). The medical, dental, and vision plans are provided through Cigna Health and Life Insurance Company ("Cigna").

(a) *Medical Plans*. Approximately 997 Employees are covered under the Debtors' medical plans (collectively, the "Medical Plans"). The Medical Plans are self-insured and require the Debtors to pay for all costs arising under such plans, aside from Employee contribution deductions, including claims payments and associated administrative costs.

(b) *Vision Plan.* The Debtors offer Employees the option of participating in a vision plan (the "Vision Plan"). Approximately 686 Employees are enrolled in the Vision Plan. The Vision Plan is also self-insured and requires the Debtors to pay all costs arising under the plan, aside from Employee contribution deductions.

(c) *Dental Plan.* The Debtors also offer eligible Employees the option to participate in a dental plan (the "Dental Plan"). Approximately 985 Employees are enrolled in the Dental Plan. The Dental Plan is also self-insured and requires the Debtors to pay all costs arising under the plan, aside from Employee contribution deductions.

(d) *Stop-Loss Insurance*. In conjunction with the Health Benefit Plans, the Debtors have purchased stop-loss insurance through Sun Life Financial ("Sun Life"), which provides additional protection against large claims made by Employees under the self-insured Medical Plans (the "Stop Loss Insurance"). Stop Loss Insurance is an integral part of the Debtors' management of the risk of the self-insured Medical Plans and loss of coverage would subject the Debtors to undue risk. The Debtors pay approximately $45,000 per month to Sun Life in premiums for Stop Loss Insurance. As of the Petition Date, the Debtors owe approximately $45,000 on account of Stop Loss Insurance (the "Unpaid Stop Loss Insurance Premiums").

19

44.    Because the Health Benefit Plans are self-insured, claims arising thereunder are funded on a "pay as you go" basis and average approximately $1.34 million per month. The Debtors estimate that, as of the Petition Date, they owe approximately $1.45 million on account of the Health Benefit Plans (the "Unpaid Health Benefits"), all of which will become due and owing within the Interim Period. As such, the Debtors request authority to (a) remit the Unpaid Health Benefits, (b) pay the Unpaid Stop Loss Insurance Premiums, (c) continue the Health Benefit Plans for eligible Employees, and (d) pay any amounts related thereto, including claim amounts and administration fees, to the extent that they remain unpaid as of the Petition Date, in the ordinary course of business and consistent with past practice.

**B.    Flexible Spending Accounts.**

45.    The Debtors offer full-time Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible out-of-pocket health care and dependent care expenses (the "Flexible Spending Accounts"). At the beginning of each year, participating Employees contribute amounts up to the $2,500 limit on the health care Flexible Spending Account and the $5,000 limit on the dependent care Flexible Spending Account. Currently, approximately 97 Employees maintain Flexible Spending Accounts, and the Debtors withhold approximately $152,000 annually on account of Employee contributions to the Flexible Spending Accounts. The Debtors pay a *de minimis* fee to ADP to administer the Flexible Spending Accounts, which amount is included as part of the Payroll Processor Fees. The Debtors seek authority to pay any prepetition amounts owed to ADP for administration of the Flexible Spending Accounts, and to continue offering the Flexible Spending Accounts to its Employees in the ordinary course of business and consistent with past practice.

C.    **Insurance.**

1.    **Life Insurance, AD&D, and Disability Benefits.**

46.    The Debtors provide certain qualified employees with term life insurance, accidental death and dismemberment insurance, and long-term disability insurance through a policy with Life Insurance Company of North America ("LINA"), a division of Cigna. The Debtors provide approximately 1,232 Employees with the term life insurance benefit (the "Life Insurance"). The Debtors also provide approximately 1,276 Employees with accidental death and dismemberment insurance (the "AD&D Insurance"). In addition, the Debtors provide approximately 471 full-time Employees with long-term disability benefits (the "Long-Term Disability Benefits"), in the event an Employee is disabled for more than 180 consecutive days. The Long-Term Disability Benefits pays 60% of the Employee's base pay, up to a maximum of either $5,000 or $12,000 per month, depending on the Employees' level of employment. The Debtors pay 100% of the costs for the Long-Term Disability Benefits.

47.    The coverage provided by these policies costs the Debtors approximately $39,765 per month. As of the Petition Date, the Debtors estimate that they owe approximately $39,765 to LINA on account of the Life Insurance, AD&D Insurance, and Long-Term Disability Benefits (the "Unpaid Life, AD&D, and Disability Insurance Premiums"), all of which will become due and owing within the Interim Period.

48.    The Debtors seek authority to pay the Unpaid Life, AD&D, and Disability Insurance Premiums, and to continue providing the Life Insurance, AD&D Insurance, and Long-Term Disability Benefits in the ordinary course of business and consistent with past practice.

2.    **Supplemental and Voluntary Insurance.**

49.    In addition to the Life Insurance provided by the Debtors, Employees have the option to purchase supplemental term life insurance or whole life insurance (collectively, the

21

"Supplemental Life Insurance") through Unum Group ("Unum").  Premiums for the Supplemental Life Insurance are paid entirely by the participating Employee.  The Debtors estimate that approximately 420 Employees have elected to purchase Supplemental Life Insurance Coverage.  As of the Petition Date, the Debtors do not believe there are any prepetition amounts owed to Unum on account of the Supplemental Life Insurance.

50.    Full-time Employees also have the option to purchase voluntary critical illness and voluntary accident insurance through Unum for themselves and their spouse and dependents (collectively, the "Voluntary Insurance").    Approximately 321 Employees have elected to purchase Voluntary Insurance for critical illness coverage and approximately 611 Employees have elected to purchase Voluntary Insurance for accident coverage.  Premiums for the Voluntary Insurance are paid entirely by the participating Employees.  As of the Petition Date, the Debtors do not believe there are any prepetition amounts owed to Unum on account of the Voluntary Insurance.

51.    The Debtors seek authority to continue providing the Supplemental Life Insurance and Voluntary Insurance in the ordinary course of business and consistent with past practice.

**D.    Workers Compensation.**

52.    The Debtors provide workers' compensation insurance for their Employees at the statutorily-mandated level for each state in the United States in which they operate (collectively, the "Workers' Compensation Program").[13]  The Debtors utilize three third-party administrators to administer the Workers' Compensation Program.  The Debtors pay approximately $4,760 per month to two of the third-party administrators, and an annual fee of $30,000 to the other third-

---

[13]    The Debtors' workers' compensation insurance policies and the premiums associated therewith are addressed in the *Motion of Everyware Global, Inc., et al., for Entry of an Order (A) Authorizing the Debtors to (I) Continue Insurance Coverage Entered Into Prepetition, (II) Enter Into New Insurance Policies, (III) Honor Their Prepetition Insurance Premium Financing Agreement, and (IV) Renew Their Premium Financing Agreement in the Ordinary Course of Business, and (B) Granting Related Relief*, filed contemporaneously herewith.

party administrator (collectively, the "Workers' Compensation Administration Fees").    The Debtors estimate that, as of the Petition Date, they owe approximately $4,760 on account of Workers' Compensation Administration Fees (the "Unpaid Workers' Compensation Administration Fees"), all of which will become due and owing within the Interim Period.

53.    Certain benefits under the Workers' Compensation Program may have accrued prepetition but have yet to be fully paid, and certain other claims may have been filed prepetition but have yet to be resolved (collectively, the "Unpaid Workers' Compensation Claims").  For the claims administration process to operate in an efficient manner and ensure that the Debtors comply with their contractual obligations, the Debtors must continue to assess, determine, and adjudicate Unpaid Workers' Compensation Claims during these chapter 11 cases.  In addition, to the extent any of the Employees assert claims under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers' Compensation Program.  This required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

54.    Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that disrupt the reorganization process.  Thus, the Debtors seek authority, but not direction, to:  (a) continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis, including by paying all Workers' Compensation Administration Fees; (b) pay the Unpaid Workers' Compensation Administration Fees; and (c) modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program.

E.    **The 401(k) Plan.**

55.    The Debtors maintain a retirement savings plan meeting the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan") for the benefit of their Employees. Union Employees are eligible to participate in the 401(k) Plan after 90 days of employment, and non-union, salaried Employees are eligible to participate in the 401(k) Plan on their date of hire. Approximately 1,415 Employees currently participate in the 401(k) Plan, with approximately 500 of these Employees actively making contributions. The Debtors estimate that they withhold approximately $72,000 each week from Employees' paychecks on account of employee 401(k) contributions.

56.    The Debtors currently have a limited matching program under the 401(k) Plan for union Employees at the Debtors' Monaca facility (the "401(k) Matching Obligation"), pursuant to the applicable CBA. Specifically, the Debtors match 100% of the first 2% of Employee contributions, and 50% of the next 1% of Employee contributions.[14] As of the Petition Date, the Debtors estimate that they owe approximately $13,600 on account of the 401(k) Matching Obligation, all of which will become due and owing in the Interim Period.

57.    The Debtors seek the authority to pay any prepetition amounts owed on account 401(k) Matching Obligation, and to continue the 401(k) Plan in the ordinary course of business and consistent with past practice.

VII.    **Retiree Compensation and Benefits.**

58.    The Debtors maintain certain qualified, defined benefit pension plans, non-qualified benefit pension plans, and retiree medical benefits described herein.

---

[14]    Additionally, pursuant to the CBA, the Debtors contribute a guaranteed 1% for all union Employees at the Monaca facility, whether or not such Employees are making 401(k) Plan contributions.

24

### A.    Qualified Defined Benefit Pension Plans.

59.    The Debtors maintain two funded qualified, defined benefit pension plans that provide benefits to eligible former salaried and union Employees of Debtor Buffalo China, Inc. (the "Pension Plans").  The Debtors' Pension Plans are currently frozen, however, certain former Employees receive payments under the Pension Plans.  The Debtors pay approximately $40,000 to administer the Pension Plans (the "Pension Plan Administration Fees").  As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the Pension Plan Administration Fees.

60.    The Debtors seek authority, but not direction, to pay any Pension Plan Administration Fees accrued in the ordinary course of business (whether incurred prepetition or postpetition), and to continue the Pension Plans in the ordinary course of business on a postpetition basis.

### B.    Non-Qualified Benefit Pension Plans.

61.    The Debtors maintain two unfunded non-qualified, legacy pension plans for former executives of Debtor Oneida Ltd.—a supplemental executive retirement plan (the "SERP") and a restoration plan (the "Restoration Plan").  Both of these plans were designed to supplement the retirement benefits for certain key employees of Oneida Ltd.  The SERP and Restoration Plans have been frozen with regard to new participants since at least 2005, but the Debtors continue to make benefit payments under the SERP and Restoration Plans to certain retired employees.

62.    There are currently five remaining participants under the SERP, who receive monthly benefit payments.  The average monthly cost of the SERP payments is approximately $14,700.  As of the Petition Date, the Debtors estimate they owe approximately $14,700 on account of SERP benefits (the "Unpaid SERP Benefits"), all of which will become due and

25

owing within the Interim Period.

63.    There are currently eight remaining participants under the Restoration Plan, who receive monthly benefit payments. The average monthly cost of the Restoration Plan payments is approximately $49,600. As of the Petition Date, the Debtors estimate they owe approximately $49,600 on account of SERP benefits (the "Unpaid Restoration Plan Benefits"), all of which will become due and owing within the Interim Period.

64.    Because the Debtors' Plan contemplates assumption of all retirement benefit and deferred compensation plans, and all general unsecured creditors will be paid in full, the Debtors believe that payment of any Unpaid SERP Benefits and Unpaid Restoration Plan Benefits at this time only affects the timing of payments to the beneficiaries of the SERP and Restoration Plan, and not their recoveries. Further, any disruption in payment of the SERP and Restoration Plan benefits may adversely impact the retired employees who have come to rely on these payments. Accordingly, the Debtors seek authority to pay the Unpaid SERP Benefits and Unpaid Restoration Plan Benefits, and to continue providing SERP benefits and Restoration Plan Benefits in the ordinary course of business and consistent with past practice.

**C.    Retiree Medical Benefits.**

65.    The Debtors sponsor retiree medical benefits (the "Retiree Medical Benefits") for approximately 600 retired Employees, (collectively, the "Retirees"), and in some cases, such Retirees' spouse. Generally, the Retirees meeting the plan eligibility requirements are entitled to a maximum lifetime benefit of $5,000 to cover health care expenses. The Retiree Medical Benefits continue until the $5,000 maximum is depleted, and surviving spouses may continue to utilize the remaining benefit until the $5,000 maximum is exhausted. In 2014, the Debtors paid approximately $25,000 on account Retiree Medical Benefits. Additionally, the Debtors pay approximately $6,500 annually to Cigna to administer the Retiree Medical Benefits (the "Retiree

Medical Benefits Administration Fees"). As of the Petition Date, the Debtors do not believe they owe any prepetition amounts to Cigna on account of the Retiree Medical Benefits Administration Fees.

66.     The Debtors currently are obligated to provide Retiree Medical Benefits under section 1114 of the Bankruptcy Code. In addition, the Debtors believe that it is important that they continue to provide Retiree Medical Benefits to reassure all Employees that the Debtors intend to honor their obligations to Employees—both during and after their tenure with the Debtors. Accordingly, the Debtors seek authority to continue providing the Retiree Medical Benefits, and to pay any Retiree Medical Benefits Administration Fees in the ordinary course of business on a postpetition basis.

## VIII.  Severance.

67.     Certain Employees are entitled to severance payments pursuant to their employment agreements (the "Severance Payments"). The amount of severance varies from agreement to agreement, but is generally reflective of the Employee's position. For example, senior management-level Employees may be entitled to six months of Severance Payments. The Severance Payments are not due and payable until termination. As of the Petition Date, two former Employees are receiving Severance Payments. The Debtors estimate that they owe approximately $280,000 in accrued and unpaid non-insider Severance Payments as of the Petition Date, of which $52,600 will become due and owing in the ordinary course during the Interim Period.

68.     The Debtors believe that it is important that they fulfill their severance obligations to reassure Employees that they intend to honor their obligations to Employees—both during and after their tenure with the Debtors—including obligations incurred postpetition on account of Severance Payments. Accordingly, the Debtors seek to continue the Severance Payments on a

27

postpetition basis solely upon entry of the Final Order, whether or not such Employees were eligible for the Severance Payments before the Petition Date.  Importantly, the Debtors do not seek the authority in this Motion to pay any obligations under the Severance Program to any "insider" (as the term is defined in section 101(31) of the Bankruptcy Code).  The Debtors, therefore, submit that section 503(c)(2) of the Bankruptcy Code with respect to severance payments to insiders does not apply to the relief requested herein.

**Basis for Relief**

I.    **Sufficient Cause Exists to Authorize the Debtors to Honor Employee Wage and Benefit Obligations.**

    A.    **Certain of the Employee Obligations Are Entitled to Administrative or Priority Treatment.**

69.    A significant majority of Unpaid Compensation and other Employee-related obligations are entitled to priority treatment under the Bankruptcy Code.  For example, sections 507(a)(4) and (a)(5) of the Bankruptcy Code afford priority status to wage claims up to $12,475 per individual—including claims for commissions, vacation, severance and sick-leave—and to claims for contributions to employee benefit plans.

70.    In addition, section 1114(e) of the Bankruptcy Code provides that debtors shall timely pay (without modification) any retiree benefits and that such payments will have the status of allowed administrative expenses under the Bankruptcy Code.  *See* 11 U.S.C. § 1114(e)(2); *In re Visteon Corp.*, 612 F.3d 210, 218 (3d Cir. 2010) (finding that "[s]ection 1114(e) provides additional protection for retiree benefits by giving them priority they would not otherwise have.  That provision states: '[a]ny payment for retiree benefits required to be made' during a Chapter 11 proceeding 'has the status of an allowed administrative expense' under 11 U.S.C. § 503, rather than the general unsecured status that would otherwise apply."); *In re Roth Am., Inc.*, 975 F.2d 949, 956 (3d Cir. 1992) (finding that "section 1114, which was enacted to

28

protect retiree benefits, explicitly gives such claims administrative priority."). To confirm a chapter 11 plan, the Debtors must pay priority claims in full and continue to honor the Retiree Medical Benefit obligations. *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including vacation and severance earned by an individual and (b) contributions to an employee benefit plan); 11 U.S.C. § 1129(a)(13) (requiring confirmation of all retiree benefits).

71.     Thus, granting much of the relief sought in this Motion affects only the timing of payments to Employees, and does not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors firmly believe that paying Employee claims at this time enhances value for the benefit of all interested parties.

**B.      Payment of Certain of the Employee Obligations Is Required by Law.**

72.     The Debtors also seek authority to remit Deductions and Payroll Taxes to the appropriate entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain deductions are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b).

73.     In addition, federal and state laws require the Debtors to withhold certain tax payments from Employees' paychecks and to pay such amounts to the appropriate taxing authority. *See* 26 U.S.C. §§ 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust

fund taxes). Failure to remit such amounts to the proper taxing authorities could give rise to personal liability for the Debtors' directors and officers. Accordingly, the Debtors request that the Court authorize them to remit all Deductions and Payroll Taxes to the proper third-parties in the ordinary course of business.

C. **Payment of the Employee Obligations Is Warranted Under the Doctrine of Necessity.**

74. Courts in the Third Circuit and elsewhere generally recognize that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business. *See, e.g., In re Meridian Auto. Sys.-Composite Operations, Inc.*, 372 B.R. 710, 714 (Bankr. D. Del. 2007) (granting the debtor authority to pay prepetition obligations owed to certain critical vendors); *In re Primary Health Sys., Inc.*, 275 B.R. 709, 710 (Bankr. D. Del. 2002) (allowing payment of prepetition wages upon a finding that such relief was "essential to the continued operation of the Debtors' businesses"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (D. Del. 1999) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business). Courts have relied on several legal bases in approving such relief.

75. Courts generally recognize that debtors may pay prepetition claims under section 363(b) of the Bankruptcy Code where there is a sound business purpose for the payment of prepetition obligations, and where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors." *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting debtor authority to pay prepetition wages); *Armstrong World Indus. Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants).

DOCS_DE:199264.1 24689/001

76.     Courts also recognize that payments to prepetition creditors are appropriate pursuant to section 105(a) of the Bankruptcy Code under the "doctrine of necessity" or the "necessity of payment" rule where such payments are necessary to the continued operation of the debtor's business. *See, e.g.*, *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Friedman's Inc.*, No. 09-10161 (CSS), 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) ("[M]ost courts will allow payments [of prepetition claims] under the 'doctrine of necessity,' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business). The rationale for the necessity of payment rule— the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization.").

77.     Here, the relief requested in this Motion will benefit the Debtors' estates and creditors by allowing the Debtors' business operations to continue without interruption. In the absence of such payments, the Debtors believe that their Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would

deplete the Debtors' workforce, hinder the Debtors' ability to meet its customer obligations, and likely diminish creditors' confidence in the Debtors. The loss of valuable individuals and the recruiting efforts that would be required to replace them would be a massive and costly distraction at a time when the Debtors should be focusing on stabilizing their operations. Moreover, the majority of Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor the Employee Obligations.

78.    The importance of a debtor's employees to its operations has been recognized by courts in this district in granting relief similar to the relief requested in this Motion. *See, e.g.*, *In re School Specialty, Inc.*, No. 13-10125 (KJC) (Bankr D. Del. Feb. 25, 2013) (stating that relief requested is in the "best interests of the Debtors"); *In re THQ, Inc.*, No. 12-13398 (MFW) (Bankr. D. Del. Jan. 11, 2013) (same); *In re A123 Sys., Inc.*, No. 12-12859 (KJC) (Bankr. D. Del. Nov. 8, 2012) (same); *In re Vertis Holdings, Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 1, 2012) (same); *In re Neb. Book Co.*, No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011) (same).[15]

## II.    The Debtors Seek a Waiver of the Automatic Stay as it Applies to the Workers' Compensation Program.

79. Section 362(a) of the Bankruptcy Code operates to stay:

> the commencement or continuation, including the issuance or employment of process of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to receive a claim against the debtor that arose before the commencement of the case under this title . . . .

---

[15]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

11 U.S.C. § 362(a)(1).   Section 362, however, permits a debtor or other parties in interest to request a modification or termination of the Automatic Stay for "cause."  *Id.* at § 362(d)(1).

80.    The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their Workers' Compensation Program in the appropriate judicial or administrative forum. Under various state laws, the Debtors must maintain the Workers' Compensation Program to ensure prompt and efficient payment of applicable claims. If the Debtors fail to maintain the Workers' Compensation Program, they may be prohibited by state law from operating in those states without making significant adjustments.  Payment of all amounts due under the Workers' Compensation Program, therefore, is crucial to the continued operation of the Debtors' business.

## III. Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.

81.    The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations, debtor-in-possession financing, and anticipated access to cash collateral.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Obligations and Employee Programs.  Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently.  Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

DOCS_DE:199264.1 24689/001

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

82.     Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm.   Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

83.     The relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and all parties in interest.  Payment of Employee Obligations is vital to reducing risk and preserving the value of the Debtors' assets.   Failure to satisfy Employee Obligations in the ordinary course of business could result in increased cost and risk of loss to the Debtors and their estates and could impede the Debtors' efforts to implement a comprehensive restructuring transaction.   Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003 to support the relief set forth in the Interim Order on the terms described herein.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

84.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Reservation of Rights

85.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Final Order is intended or should be construed as:  (a) an admission as to the validity of any particular claim against a Debtor entity; (b) a waiver of the

34

Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserved their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Notice

86.    The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the ABL Facility; (d)  the administrative agent under the Term Loan Facility; (e) the parties to the Support Agreement; (f) the United States Environmental Protection Agency; (g) the United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; (i) the office of the attorneys general for the states in which the Debtors operate; (j) the Securities and Exchange Commission; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as

required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

87.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

36

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Wilmington, Delaware
Dated:  April 7, 2015

**PACHULSKI STANG ZIEHL & JONES LLP**

_/s/ Laura Davis Jones_

Laura Davis Jones (DE Bar No. 2436)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:            ljones@pszjlaw.com
                      crobinson@pszjlaw.com
                      pkeane@pszjlaw.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Ross M. Kwasteniet (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:            patrick.nash@kirkland.com
                      ross.kwasteniet@kirkland.com

*Proposed Counsel for the*
*Debtors and Debtors in Possession*

DOCS_DE:199264.1 24689/001