## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| EVERYWARE GLOBAL, INC., *et al.*,[1] | ) Case No. 15-10743 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

### DECLARATION OF JOEL MOSTROM IN SUPPORT OF FIRST DAY MOTIONS

I, Joel Mostrom, hereby declare under penalty of perjury:

1.      I am the Interim Chief Financial Officer of EveryWare Global, Inc., a corporation organized under the laws of Delaware, and of each of the other above-captioned debtors and debtors in possession (collectively, the "Debtors").[2]  I have served the Debtors in my current capacity since October 3, 2014.  In such capacity, I am generally familiar with the Debtors' day to day operations, business and financial affairs, and books and records.

2.      Except as otherwise indicated herein, all facts set forth in this declaration (this "Declaration") are based on my personal knowledge of the Debtors' operations and finances, information gathered from my review of relevant documents, or information supplied to me by other members of the Debtors' management and the Debtors' advisors.  I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Anchor Hocking, LLC (6923); Buffalo China, Inc. (9731); Delco International, Ltd. (7553); EveryWare, LLC (2699); EveryWare Global, Inc. (4553); Kenwood Silver Company, Inc. (2286); Oneida Food Service, Inc. (7321); Oneida International Inc. (4774); Oneida Ltd. (5700); Oneida Silversmiths Inc. (6454); Sakura, Inc. (9359); THC Systems, Inc. (9103); Universal Tabletop, Inc. (4265).  The location of the Debtors' service address is:  519 North Pierce Avenue, Lancaster, Ohio 43130.

[2]      Capitalized terms used but not defined herein have the meanings ascribed to such terms in the *Debtors' Joint Prepackaged Chapter 11 Plan* (the "Plan"), filed contemporaneously herewith.

3.      The Debtors have requested a variety of relief in the "first day" motions and applications (collectively, the "First Day Motions") filed concurrently herewith to minimize the adverse effects of the commencement of these chapter 11 cases on the Debtors' businesses and proposed restructuring transactions.  I am familiar with the contents of each of the First Day Motions and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  I further believe that the relief requested in the First Day Motions will minimize disruption to the Debtors' business operations and aid in the implementation of the proposed restructuring transactions, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

4.      Part I of this Declaration describes the Debtors' corporate structure and business operations.  Part II describes the Debtors' prepetition capital structure and indebtedness.  Part III describes the circumstances leading to the commencement of these chapter 11 cases.  And Part IV sets forth the relevant facts in support of each of the First Day Motions.

## Preliminary Statement

5.      The Debtors are leading global marketers of tabletop, food preparation, and storage products for the consumer, foodservice, and specialty markets.  The Debtors' primary operating subsidiaries, Oneida Ltd. and Anchor Hocking, LLC, were founded in 1848 and 1873, respectively.  In 2011, investment funds affiliated with the Monomoy Capital Partners completed their acquisition of these companies and, in March 2012, integrated them under the EveryWare brand.  The Debtors completed a subsequent merger transaction in May 2013, resulting in their existing capital structure today.  As of September 30, 2014, the Debtors reported total assets of approximately $237.8 million and total liabilities of approximately $380.4 million.  As of the

Petition Date, the Debtors' funded debt obligations include an approximately $248.7 million Term Loan Facility and $60.0 million ABL Facility.

6.       The Debtors commenced these chapter 11 cases to implement a consensual, prepackaged chapter 11 plan of reorganization—i.e., the Plan.  The restructuring transactions contemplated by the Plan will significantly deleverage the Debtors' balance sheet, reducing the Debtors' funded debt obligations by approximately 72.4% by converting the entire $248.7 million Term Loan Facility into 96.0% of the Reorganized Debtors' new equity.  The Plan provides that the other 4.0% of New Common Stock will be allocated to existing equity holders in exchange for their support of the proposed restructuring.  Importantly, holders of Allowed General Unsecured Claims will be paid in full in Cash under the Plan.  The Debtors have also received commitments for a $40.0 million new money DIP Term Facility and continued access to their $60.0 million ABL Facility to ensure the smooth continuation of operations during the in-court proceedings.  The Plan has very strong support from the Debtors' primary stakeholders, namely Term Loan Lenders holding more than 65% of the Term Loan Facility Claims and certain equity holders holding more than 84% of EveryWare Common Stock and 100% of EveryWare Preferred Stock.  Moreover, 68.1% of holders of Class 5 Term Loan Facility Claims—the only class entitled to vote on the Plan—already have voted to accept the Plan.[3]  The Debtors and the parties to the Support Agreement believe that the Plan and the transactions contemplated thereunder will right-size the Debtors' balance sheet, improve liquidity, and strengthen go-forward operations, positioning the Debtors for long-term success.

---

[3]     *See Preliminary Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Joint Prepackaged Chapter 11 Plan*, filed contemporaneously herewith.  The Debtors commenced solicitation of the Plan on April 3, 2015.  Solicitation will remain open until April 17, 2015

## PART I

**I.    Corporate History and Structure.**

7.    Headquartered in Lancaster, Ohio and employing approximately 1,557 personnel throughout the United States, the Debtors are leading global marketers of tabletop, food preparation, and storage products for the consumer, foodservice, and specialty markets.  The Debtors' sales and marketing functions are managed from their executive offices in Lancaster, Ohio, with staff located in Melville, New York, New York City, and Oneida, New York.  The Debtors' international sales and marketing functions are overseen by their various offices outside North America.

8.    The Debtors' primary operating subsidiaries, Oneida Ltd. and Anchor Hocking, LLC, were founded in 1848 and 1873, respectively.  Oneida Ltd. traces its roots to the Oneida Silversmiths, members of a religious and social society founded in Oneida, New York, who made silver knives, forks, and spoons.  Anchor Hocking, LLC's predecessor companies began producing glass lamp chimneys in 1873.  In 1905, the Hocking Glass Company was formed and became a manufacturer of plain and decorated, pressed, blown, and machine-made hotel, bar, and kitchen tableware and glass novelties.

9.    Investment funds affiliated with Monomoy Capital Partners acquired Anchor Hocking, LLC in 2007, and Oneida Ltd. in 2011.  In March 2012, these companies were integrated under the company formerly known as EveryWare Global, Inc. ("Former EveryWare"), a Delaware corporation created in 2011.  In May 2013, Former EveryWare became a wholly-owned subsidiary of ROI Acquisition Corp. ("ROI"), a special purpose acquisition company sponsored by affiliates of the Clinton Group, Inc.  In connection with the merger, Former EveryWare was converted to a limited liability company and ROI was

renamed EveryWare Global, Inc.  The chart below illustrates the Debtors' corporate structure after the completion of these transactions and as of the Petition Date.

## Summary Corporate Structure Chart



**II.    Products and Services Overview.**

**A.    Products.**

10.    The Debtors offer a comprehensive line of tabletop, food preparation, and storage products servicing the needs of consumers and chefs.  The Debtors' tabletop products include beverageware, pitchers, flatware, dinnerware, serveware, and hollowware.  The Debtors' food preparation products include products such as bakeware, mixing bowls, measuring cups, food

and pantry storage items, and countertop organization.  The Debtors' licensing relationships extend their brands of cookware and metal bakeware within the food preparation category.  With respect to the specialty segment, the Debtors' products are décor items such as vases, candle jars, and premium spirits bottles.  In addition to their own branded products, the Debtors also market luxury dinnerware, crystal stemware and barware, and buffetware through global distribution agreements.

11.    The following table contains descriptions of the Debtors' products:

| Product | Description |
| --- | --- |
| Consumer | The consumer segment provides a broad array of tabletop, food preparation and pantry products at a variety of price points to retail customers, primarily under the Anchor Hocking® and, through licensing arrangements, ONEIDA® brands.  Consumer segment sale are made to mass merchants, discount retailers, specialty stores, department stores, and grocery stores, as well as to consumers through the Debtors' e-commerce site. |
| Foodservice | The foodservice segment provides flatware, dinnerware, beverageware, barware, hollowware and banquetware to the foodservice industry. Sales in the foodservice segment are made to equipment and supply dealers, broadline distributors, hotels, casinos, and chain restaurants, as well as airlines and cruiselines. |
| Specialty | The specialty segment offers glassware products to candle and floral wholesalers, direct sellers, industrial lighting manufacturers and distillers, and distributors of premium spirits.  The Debtors offer a variety of accessories for taper, pillar, votive and tealite candles, and floral vases in a broad range of styles, patterns and colors.  The Debtors also sell customized spirit bottles to domestic and international premium spirit distillers. |
| International | The Debtors' international segment serves customers in over 65 countries outside the U.S. and Canada, including customers in the European Union, Latin America, the Caribbean, Africa, the Middle East, and Asia.  The Debtors' international segment includes all product categories in the consumer and foodservice markets in the countries in which the Debtors operate. The Debtors sell both their U.S. and United Kingdom manufactured glassware, bakeware and their sourced flatware, dinnerware, barware, hollowware, and banquetware internationally. The Debtors |

| Product | Description |
|---------|-------------|
|  | primarily market their products internationally under the Viners®, Anchor Hocking®, Sant'Andrea®, Mermaid®, George Wilkinson®, Great British Bakeware®, Longlife®, Ana Maria Braga®, W.A. Rogers®, and ONEIDA® brands. |

**B.       Brands.**

12.     The Debtors' iconic brands Anchor Hocking® and ONEIDA® each have over 100-year histories in the market and are among the most recognized tabletop brand names in the United States.  The Debtors own the trademarks Anchor Hocking®, Anchor®, AnchorHome®, FireKing®, ONEIDA®, OneidaCraft®, Buffalo China®, Delco®, Rego® and Sant' Andrea®.  The Debtors also market relevant products under strategic partnerships and distribution agreements with Schönwald®, a luxury dining brand, in the China, Hong Kong and Macau markets, Stölzle®, a high-quality stemware brand, in the United States, Strata®, a banquet system innovator, and Buffet Euro®, a leading buffetware marketer.

13.     The Debtors' owned and licensed brands in their top geographic markets across a range of price points include:



### C.    Manufacturing and Distribution.

14.    The Debtors own and operate two glass manufacturing plants in the United States, one in Lancaster, Ohio, and the other in Monaca, Pennsylvania, which are capable of producing a diverse array of tableware products.  There are three primary production methods employed to manufacture the Debtors' glass products.  The "press and blow" process creates mid-sized items at high speed with great efficiency and forms molten glass into a rough shape using the press portion of the operation followed by blowing the product into its final shape with compressed air.  The "blow and blow" process similarly starts with producing the rough shape by applying compressed air to the molten glass and then using a second stage to blow the product into the final shape.  The "press" process creates articles of all sizes by stamping the molten glass into the final shape in one movement.  After the glass has been formed, it is heat treated in either an

annealing oven or a tempering line, depending on the product's desired attributes before being selected to ensure product quality and then packaged for distribution.  The Debtors also source a variety of tableware products from third parties, primarily in Asia and Europe.

15.     The Debtors have distribution centers located at or near each of their manufacturing facilities.  In addition, the Debtors operate a single point of distribution for broadline food service distributors and e-commerce customers in Savannah, Georgia.

**D.      Markets and Customers.**

16.     The Debtors sell their products globally to a diverse customer base divided into consumer, foodservice, specialty, and international markets.  Approximately 38%, 32% and 27% of the Debtors' 2014 segment revenues and approximately 39%, 32%, and 25% of the Debtors' 2013 segment revenues were derived from sales to the consumer, foodservice, and specialty markets, respectively, with the remainder of revenues being generated principally from international markets.

17.     With respect to the consumer segment, the Debtors sell to mass merchants, specialty stores, department stores, supermarkets, and warehouse clubs.  With respect to the foodservice segment, the Debtors sell to equipment and supply distributors, broadline distributors, hotels, casinos, chain restaurants, airlines, and cruiselines.  With respect to the specialty segment, the Debtors sell to candle and floral wholesalers, direct sellers, industrial lighting manufacturers and distillers, and distributors of premium spirits.  The Debtors' international segment's customers include consumer and foodservice customers.

18.     The Debtors' customers range from Fortune 500 companies to medium and small-sized companies in the consumer, foodservice, business-to-business, and e-commerce channels.  The Debtors' customers are located in over 50 countries and include Wal-Mart, Target, Crate and Barrel, Publix, Bed, Bath & Beyond, Canadian Tire, El Puerto de Liverpool,

Fiesta Americana, Hyatt, Marriott, United Airlines, Royal Caribbean Cruise Lines, Darden Restaurants, Edward Don, and Wasserstrom.

### III. Employees.

19. As of April 1, 2015, the Debtors employed approximately 1,557 individuals, nearly all of whom were employed full time. Debtors Anchor Hocking, LLC and Oneida Ltd. employ the vast majority of the Debtors' employees. The Debtors' full-time employees perform a variety of critical functions, either in corporate-related functions such as store support and back-office administration functions or by working in the Debtors' distribution and manufacturing facilities. The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC represents approximately 1,200 of the Debtors' distribution and manufacturing employees.

### PART II

### I. Prepetition Capital Structure.

20. As of the Petition Date, the Debtors' funded debt is comprised of a $250.0 million term loan facility and a $60.0 million asset-based revolving credit facility. Outstanding principal balances as of the Petition Date are approximately $248.7 million and $43.6 million for the Term Loan Facility and ABL Facility, respectively. Additional details regarding the Debtors' prepetition funded debt obligations are provided below.

#### A. Term Loan Facility.

21. Debtors Anchor Hocking, LLC and Oneida Ltd. are party to that certain Term Loan Agreement, dated May 21, 2013 (as amended, restated, modified, or supplemented from time to time prior to the Petition Date), as borrowers, and Universal Tabletop, Inc. and all wholly-owned domestic subsidiaries of Anchor Hocking, LLC and Oneida Ltd., as guarantors, pursuant to which the lender parties thereto agreed to provide a senior secured term loan facility

in an aggregate principal amount of up to $250.0 million.  The Term Loan Facility refinanced Former EveryWare's previously existing $150.0 million term loan facility.  As of the Petition Date, the aggregate outstanding principal amount under the Term Loan Facility was approximately $248.7 million, excluding accrued and unpaid interest.  The Term Loan Facility matures May 21, 2020.  The Term Loan Agreement requires quarterly amortization payments of principal and interest in the amount of 0.25% of the amount of the Term Loan Facility outstanding on the Term Loan closing date until maturity.  As of December 31, 2014, interest was paid at the Debtors' option as follows:

i.      in the case of base rate loans, a base rate equal to the greatest of (a) the prime rate in effect on such day, (b) the federal funds effective rate in effect on such day plus 0.50% and (c) the Eurodollar rate for a one-month interest period plus 1.0% (provided that the base rate will be deemed to be not less than 2.25%), plus a margin of 7.25%; or

ii.     in the case of Eurodollar loans, a Eurodollar rate equal to (a) LIBOR divided by (b) one minus an applicable reserve requirement (subject to a LIBOR floor of 1.25% per annum), plus a margin of 8.25%.

The Term Loan Agreement requires mandatory prepayments upon the occurrence of certain events, including additional debt issuances, common and preferred stock issuances, certain asset sales, and excess cash flow generation.

22.     Anchor Hocking, LLC's and Oneida Ltd.'s obligations under the Term Loan Agreement are guaranteed on a joint and several basis, by Universal Tabletop, Inc., Buffalo China, Inc. Delco International, Ltd., Kenwood Silver Company, Inc., Oneida Food Service, Inc., Oneida International Inc., Oneida Silversmiths, Inc., Sakura, Inc., and THC Systems, Inc. Additionally, obligations under the Term Loan Facility are secured on a first-priority basis by liens on substantially all of the assets of Universal Tabletop, Inc. and its domestic subsidiaries, other than with respect to the assets securing the ABL Facility on a first-priority basis, which

11

secure the Term Loan Facility on a second-priority basis.  The Term Loan Facility is subject to that certain intercreditor agreement, dated May 21, 2013, by and among, the Term Loan Agent, the ABL Agent, and certain other parties.

23.    On July 30, 2014, Anchor Hocking, LLC, Oneida Ltd., and Universal Tabletop, Inc. entered into that certain Waiver and Amendment No. 1 to Term Loan Agreement (the "Term Loan Amendment") governing the Term Loan Facility, which provides for, among other things, a waiver of the events of default that occurred as a result of the borrowers' failure to comply with the consolidated leverage ratio and interest coverage ratio covenants for the fiscal quarters ended March 31, 2014 and June 30, 2014, and amendments to the Term Loan Agreement.  The Term Loan Amendment gave the Debtors relief under the consolidated leverage ratio covenant and the interest coverage ratio covenants by eliminating the requirement to comply with these covenants until the quarter ending September 30, 2015, and amended the definition of consolidated adjusted EBITDA, which is used in the calculation of certain of the financial covenants.

**B.    ABL Facility.**

24.    Debtors Anchor Hocking, LLC and Oneida Ltd. are party to that certain Second Amended and Restated Loan and Security Agreement, dated May 21, 2013 (as amended, restated, modified, or supplemented from time to time prior to the Petition Date), as borrowers, and Universal Tabletop, Inc. and all wholly-owned domestic subsidiaries of Anchor Hocking, LLC and Oneida Ltd., as guarantors, pursuant to which the lender parties thereto have agreed to provide an asset-based revolving credit facility in an aggregate principal amount of up to $60.0 million, subject to a borrowing base limitation and compliance with a fixed charge coverage ratio financial covenant.  The ABL Facility refinanced Former EveryWare's previously existing $85.0 million revolving credit facility.  As of the Petition Date, the aggregate outstanding borrowings

under the ABL Facility were approximately $43.6 million, excluding accrued and unpaid interest and obligations in respect of certain letters of credit.[4]  Availability under the ABL Facility is subject to an asset-based borrowing formula based on eligible accounts receivable and inventory. The ABL Facility matures on May 21, 2018.  As of December 31, 2014, borrowings under the ABL Facility bore interest at variable rates (with an average of 3.3%), determined by either (a) LIBO Rate plus a margin as described below, or (b) for any day, a rate per annum equal to the greater of (i) the Prime Rate in effect on such day, (ii) the Federal Funds Effective Rate in effect on such day plus 0.50%, and (iii) the LIBO Rate plus 1.0%, in each case plus a margin as described below.  The applicable margin was calculated as follows:

| Tier | Quarterly Average Availability | Applicable LIBO Rate Margin | Applicable Base Rate Margin |
|---|---|---|---|
| 1 | Greater than 30% of the maximum revolver amount | 2.0% | 1.0% |
| 2 | Greater than 15% of the maximum revolver amount but less than 30% of the maximum revolver amount | 2.25% | 1.25% |
| 3 | Less than 15% of the maximum revolver amount | 2.50% | 1.50% |

25.     Anchor Hocking, LLC's and Oneida Ltd.'s obligations under the ABL Loan Agreement are guaranteed, subject to certain customary exceptions and limitations, on a joint and several basis, by Universal Tabletop, Inc., Buffalo China, Inc. Delco International, Ltd., Kenwood Silver Company, Inc., Oneida Food Service, Inc., Oneida International Inc., Oneida Silversmiths, Inc., Sakura, Inc., and THC Systems, Inc.  Additionally, obligations under the ABL Facility are secured on a first-priority basis by liens on substantially all of the assets of Universal Tabletop, Inc. and its domestic subsidiaries, other than with respect to the assets securing the

---

[4]    Approximately $10.2 million of standby letters of credit have been issued under the ABL Facility.

Term Loan Facility on a first-priority basis, which secure the ABL Facility on a second-priority basis. The ABL Facility is subject to that certain intercreditor agreement, dated May 21, 2013, by and among, the Term Loan Agent, the ABL Agent, and certain other parties.

26. On May 14, 2014, Anchor Hocking, LLC and Oneida Ltd. entered into Amendment No. 1 to the ABL Loan Agreement to include a larger percentage of suppressed borrowing base assets in the determination of adjusted availability from May 13, 2014 through May 30, 2014. This amendment allowed the Debtors to borrow up to an additional $4.125 million under the ABL Facility during this period without triggering the requirement to satisfy the fixed charge ratio covenant under the ABL Facility.

27. On May 30, 2014, Anchor Hocking, LLC and Oneida Ltd. entered into Amendment No. 2 to the ABL Loan Agreement to extend this period of availability for this increase. Amendment No. 2 to the ABL Loan Agreement provided that the collateral agent under the ABL Loan Agreement may exercise cash dominion over certain of the borrowers' and guarantors' deposit accounts whether or not an availability triggering event specified in the ABL Loan Agreement has occurred or is continuing.

28. On June 30, 2014, July 15, 2014 and July 22, 2014, the parties entered into further amendments to the ABL Loan Agreement to extend the period of increased availability through July 29, 2014. On July 30, 2014, Anchor Hocking, LLC, Oneida Ltd., and Universal Tabletop, Inc. entered into that certain Amendment No. 6, which amended the ABL Facility to increase the maximum revolver amount available thereunder from $55.0 million to $60.0 million, subject to certain borrowing base limitations.

## PART III

### Events Leading to the Chapter 11 Cases

**I.      The 2014 Out-of-Court Restructuring.**

29.      In late 2013 and early 2014, the Debtors experienced material revenue and margin declines in their foodservice and consumer segments.  In the first quarter of 2014, the Debtors reported EBITDA loss of $7.7 million, down from positive EBITDA of $9.1 million in the first quarter of 2013.  The decrease in EBITDA was primarily due to unfavorable changes in cost absorption resulting from lower production levels, higher factory input costs, margin impact on the decrease in revenues, and higher operating expenses resulting from employee separation, impairment charges, and consulting expenses.

30.      The Debtors' declining revenues and margins in the fourth quarter of 2013 and in the first quarter of 2014 put the Company at risk of noncompliance with the maximum consolidated leverage ratio covenant and the minimum interest coverage ratio covenant under the Term Loan Agreement.  Thereafter, the Debtors explored financial alternatives to restore covenant compliance while concurrently intensifying their efforts to improve product profitability, consolidate their supply base, and further reduce costs.  In March 2014, the Debtors obtained a $12 million conditional equity commitment from the MCP Funds.  Meanwhile, in May 2014, the Debtors initiated a temporary shutdown of their Lancaster, Ohio facilities to conserve costs.

31.      The $12 million equity commitment, however, proved insufficient to cure the covenant issues arising under the Term Loan Agreement.  In May 2014, the Debtors engaged their primary equity holders, certain of the Term Loan Lenders, and other key stakeholders regarding a potential financial and operational restructuring of their businesses.  To address the covenant defaults, the Debtors entered into a series of successive, short-term forbearance

agreements and amendments with lenders under their Term Loan Facility and ABL Facility between May 2014 and July 2014, during which time the parties continued to negotiate an out-of-court restructuring transaction that would enable the Debtors to return to profitability. On July 30, 2014, these negotiations culminated in a $20.0 million equity investment from the MCP Funds to provide the Debtors with additional liquidity to operate their businesses and certain amendments that, among other things, afforded the Debtors additional covenant relief under the Term Loan Facility and $5.0 million of increased availability under the ABL Facility.

32.    The Debtors' secured lenders and largest equity holders agreed to these transactions, in part, because of the Debtors' revised business plan. On February 24, 2014, the Debtors appointed Sam Solomon, a former executive of Sears Holdings with over 20 years of leadership experience in branded consumer, multi-channel businesses, as Interim Chief Executive Officer. Mr. Solomon was named Chief Executive Officer effective as of June 1, 2014. Effective as of October 3, 2014, the Debtors appointed Joel Mostrom, a Senior Director with A&M, as Interim Chief Financial Officer. In the first quarter of 2015, the Debtors added Robert Ginnan, as Senior Vice President and incoming Chief Financial Officer, and Anthony Reisig, as Senior Vice President of Operations and Supply Chain, to the management team. In addition, the Debtors pursued additional measures to boost liquidity and right size their manufacturing capacity, including the sale of their United Kingdom operations for $6.0 million in August 2014.

33.    The 2014 out-of-court restructuring and related implementation of the revised business plan succeeded in improving the Debtors' operational and financial performance during the second-half of 2014. For the year ended December 31, 2014, the Debtors preliminarily reported $354.0 million of total revenue.

## II.    The 2015 In-Court Restructuring.

34.    The Debtors' 2015 business plan projected compliance with the financial covenants under the Term Loan Agreement.  In March 2015, however, the Debtors' independent auditors performed a stress test analysis to evaluate the impact of certain worst-case scenarios on the Debtors' financial condition, including a scenario in which the Debtors' revenue decreased by over 20% in 2015.  Based on this analysis, the Debtors' independent auditors informed the Debtors that their annual report due March 31, 2015 would include an explanatory paragraph regarding the Debtors' ability to continue as a going concern.  Unless cured 30 days thereafter, the inclusion of a going concern qualification would constitute an event of default under the Term Loan Facility.

35.    In response, the Debtors engaged their primary equity holders, a steering committee of the Term Loan Lenders, and the ABL Agent regarding various restructuring alternatives—out-of-court and in-court—to strengthen the Debtors' balance sheet, provide short-term liquidity support, and create a sustainable capital structure to position them for the future.    Initially, the Debtors requested a $15.0 to $20.0 million unconditional equity commitment from their primary equity holders.  The Debtors' primary equity holders declined. Next, the Debtors proposed certain amendments to the Term Loan Facility and requested a $15.0 million draw to term loan facility to avoid the going concern qualification.  The steering committee of Term Loan Lenders likewise was unwilling to provide additional funding on an out-of-court basis.

36.    Meanwhile, the Debtors continued to explore in-court restructuring alternatives with each of their equity sponsors and the steering committee of Term Loan Lenders, and the ABL Agent.  On March 31, 2015, after extensive, hard fought negotiations, the Debtors, certain of the Term Loan Lenders holding more than 65% of the Term Loan Facility Claims and certain

equity holders holding more than 84% of EveryWare Common Stock and 100% of EveryWare Preferred Stock reached an agreement for a consensual, balance-sheet restructuring to be implemented through a prepackaged chapter 11 plan of reorganization—namely, the Plan—that substantially deleverages the Debtors, provides immediate liquidity through a $40 million new money DIP Term Facility, and minimizes the time and expense associated with the restructuring.

## PART IV[5]

37.    The Debtors have filed or will file a number of First Day Motions seeking orders granting various forms of relief.  I believe the forms of relief requested are necessary to enable the Debtors to operate with minimal disruption during the pendency of the chapter 11 cases and to ensure consummation of the Debtors' proposed restructuring transactions.  A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

38.    I have reviewed each of the First Day Motions, including the exhibits thereto. The Debtors believe, and I agree, that the Debtors have satisfied the applicable standards for the relief requested in each of the First Day Motions, and that the Court's grant of the requested relief is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the First Day Motions should be approved.

## I.    All General Unsecured Creditors Motion.[6]

39.    **Relief Requested**.  The Debtors seek entry of the Order authorizing them, in their sole discretion, to pay allowed prepetition Claims (collectively, the "Claims") of certain general

---

[5]    Capitalized terms in this Part IV of this Declaration, to the extent not defined herein, have the meanings ascribed to them in the applicable First Day Motion.

[6]    *See Motion of EveryWare Global, Inc., et al. for Entry of an Order (A) Authorizing the Debtors to Pay Certain Prepetition Claims in the Ordinary Course of Business, and (B) Granting Related Relief*, filed concurrently herewith.

unsecured creditors and creditors whose Claims may give rise to liens under certain state and federal laws (the "Creditors") in the ordinary course of business, including, as applicable, in accordance with the terms and conditions of the Debtors' prepetition contractual relationships with Creditors, and for certain related relief.

40.     Additionally, the Debtors seek that the Order require that (a) a Creditor that is subject to a prepetition contract with the Debtors maintain or apply, as applicable, contractual terms ("Customary Terms") during the pendency of these chapter 11 cases that are at least as favorable as those terms existing as of the date hereof (the "Petition Date") as a condition to receiving any payment under the Order, and (b) if a Creditor, after receiving a payment under the Order, ceases to provide Customary Terms, then the Debtors may, in their sole discretion, deem such payment to apply instead to any postpetition amount that may be owing to such Creditor or treat such payment as an avoidable postpetition transfer of property.

41.     **The Claims**.    The Creditors provide the Debtors goods and services in the ordinary course of business including, among other things, raw materials, parts, and services specific to the Debtors' manufacturing operations, shipping, warehousing, information technology services, financial services, leases of property and equipment, utility services, maintenance and repair services, legal services, human resources services, and other basic business necessities for the operation of the Debtors' businesses.   Correspondingly, the Debtors incur numerous fixed, liquidated, and undisputed payment obligations to the Creditors in the ordinary course of business that aggregated to approximately $25.0 million per month on average for the calendar year 2014.

42.     The following table contains descriptions of the Claims, as well as the Debtors' estimate of the amounts of the Claims accrued as of the Petition Date and, of those amounts, the amounts that are due in the ordinary course of business within 21 days of the Petition Date.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days |
|----------|-------------|:----------:|:----------:|
| Manufacturing | Raw materials, chemical additives, packaging, equipment, proprietary goods, processing services | $7,754,177 | $4,539,705 |
| Logistics | Shipping, warehouse, printing | $3,514,178 | $2,912,739 |
| Real Property | Real estate leasing, facilities maintenance | $201,451 | $201,451 |
| Utilities | Electricity, gas, water and sewer, waste disposal, telecommunications | $1,338,187 | $1,251,915 |
| Legal, Operations, Financial, and Human Resources | Legal firms and services, general operations and human resources services, labor relations and recruiting services, accounting, audit, tax, and other financial services | $1,572,927 | $1,527,422 |
| Foreign Vendors | Manufactured goods, third party services | $15,468,516 | $11,021,637 |
| Other | Marketing, equipment maintenance, non-capitalized office supplies and equipment, domestic purchased goods, and other miscellaneous services | $3,959,656 | $3,738,986 |
| **Total** | | $33,809,092 | $25,193,856 |

## III.    Cash Management Motion.[7]

43.     **Relief Requested**.  The Debtors seek entry of the Order authorizing them, in their sole discretion, to: (a) continue to operate the existing Cash Management System; (b) honor

---

[7]     *See Motion of EveryWare Global, Inc., et al. for Entry of an Order (A) Authorizing the Debtors to (I) Continue to Operate the Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Maintain Existing Business Forms, and (IV) Continue to Perform Intercompany Transactions, and (B) Granting Related Relief*, filed concurrently herewith.

certain prepetition obligations related thereto; (c) continue to invest funds in accordance with the Debtors' current investment practices; and (d) maintain existing business forms.

44.     **The Cash Management System**.  The Cash Management System is similar to the centralized cash management systems used by other large, diversified companies to manage the cash of multiple operating units in a cost-effective, efficient manner.  The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, controls, and reporting.

45.     **Cash Collections and Disbursements**.  The Cash Management System consists of fourteen bank accounts (collectively, the "Bank Accounts").[8]  The Bank Accounts are maintained respectively by Debtors Anchor Hocking, LLC ("Anchor") and Oneida Ltd. ("Oneida"), the Debtors' primary subsidiaries.  Anchor maintains a lockbox account, a master operating account, a fee account, a payroll account, an accounts payable account, and a medical account.  Oneida maintains a lockbox account, a master operating account, a consumer web account, an accounts payable account, a flex payments account, a workers' compensation account, and a medical account.  Oneida also maintains a deferred trust compensation account that is generally dormant and maintains a de minimis balance.

46.     The Debtors and certain non-Debtor affiliates maintain business relationships with each other resulting in intercompany loans, receivables, and payables in the ordinary course of business.  Such Intercompany Transactions are frequently conducted, (a) among the Debtors, and (b) between the Debtors and certain non-Debtor affiliates, including foreign affiliates, pursuant to prepetition shared services and intercompany trade arrangements, among others.

---

[8]     In the ordinary course of business, the Debtors may close existing accounts or open new accounts.

Most of the Intercompany Transactions result in book value adjustments in respect of such transfers rather than an actual transfer of funds. The Debtors engage in Intercompany Transactions wherein funds are transferred among the Debtors and their non-Debtor affiliates, including foreign affiliates.[9] Specifically, the Debtors transfer approximately $100,000.00 in cash each month to their wholly-owned, Chinese subsidiary, Oneida (Guangzhou) Foodservice Co., Ltd, to fund payroll and accounts payable. The Debtors also transfer cash to their wholly-owned, Mexican subsidiary, Ceramica de Juarez, S.A. de C.V., on an as-needed basis in the Debtors' sole discretion. The Debtors' Intercompany Transactions, including transfers to foreign affiliates, are integral to the Debtors' enterprise and consistent with the Debtors' historical, ordinary-course business practices.

47.    **The Bank Accounts**. The Bank Accounts are described in the following table:

| Category | Description |
| --- | --- |
| Anchor Lockbox-1581 | Anchor maintains a lockbox account which acts as the depository account for customer receipts from the Debtors' U.S. operations. The Anchor lockbox account is a zero balance account; excess cash is transferred from the Anchor lockbox account to the ABL revolver via a daily cash sweep. |
| Anchor Master Operating—5041 | The Anchor master operating account is one of the Debtors' two master operating accounts. The Anchor master operating account is funded from the ABL revolver via manual wires regularly on an as-needed basis. Funds in the Anchor master operating account are used to pay employees and vendors in the Debtors' U.S. and Canada operations and to defray various expenses of the Debtors' businesses. |
| Anchor Fee Account—1602 | Anchor maintains the Anchor fee account to process certain bank fees owed to PNC on account of the Anchor lockbox account. The Anchor fee account is funded from the Anchor master operating account on an as-needed basis. |

---

[9]    In the ordinary course of business, the Debtors fund all of their Canadian operations regularly on an as-needed basis. Except as otherwise permitted pursuant to any debtor-in-possession financing facility, the Debtors do not intend to, and will not during these chapter 11 cases, transfer funds to their non-Debtor Canadian affiliate without further order from the Court and notice to the U.S. Trustee and any official committee appointed in these chapter 11 cases.

| Category | Description |
|---|---|
| Anchor Payroll—1314 | Anchor maintains the Anchor payroll account to fund payments to the Debtors' U.S. employees. Cash is deposited into the Anchor payroll account from the Anchor master operating account regularly as-needed to cover cashed checks and ACH transfers. On a daily basis, the Anchor master operating account conducts a cash sweep of the Anchor payroll account, which maintains a zero balance. |
| Anchor Accounts Payable —1329 | The Anchor accounts payable account is a controlled disbursement account used to pay vendors, service providers, certain employees, and other trade parties on an as needed basis. The Anchor accounts payable account receives funds from the Anchor master operating account on an as-needed basis. The Anchor accounts payable account is a zero balance account. |
| Anchor Medical—1529 | Anchor maintains the Anchor medical account to process transactions related to certain employee health benefits. Pursuant to certain of the Debtors' employee health benefit policies, the medical account maintains a $400,000.00 minimum balance at all times. In addition, the Anchor medical account receives funds from the Anchor master operating account on an as-needed basis, often weekly, to fund health benefit-related claims. |
| Oneida Lockbox—1145 | Oneida maintains a lockbox account which acts as the depository account for customer receipts from the Debtors' U.S. operations. The Oneida lockbox account is a zero balance account; excess cash is transferred from the Oneida lockbox account to the ABL revolver via an automatic cash sweep on a daily basis. |
| Oneida Master Operating—1186 | This account is one of the Debtors' two master operating accounts. The Oneida master operating account is funded from the ABL revolver via manual wires regularly on an as-needed basis. Funds in the Oneida master operating account are used to pay employees in the Debtors' U.S. operations and defray various expenses of the Debtors' business. |
| Oneida Consumer Web—1129 | Oneida maintains the Oneida consumer web account to process credit credit payments from internet-based sales. Oneida transfers funds from the Oneida consumer web account to the ABL revolver daily via an automatic cash sweep. Oneida also pays certain bank and processing fees from the Oneida consumer web account. |
| Oneida Accounts Payable—8297 | Oneida maintains the Oneida accounts payable account to fund payments to the Debtors' U.S. employees. Cash is deposited into the Oneida accounts payable account from the Oneida master operating account on an as-needed basis, typically weekly, to fund checks and wire transfers. The Oneida accounts payable account maintains a zero balance. |
| Oneida Flex Payments—8303 | Oneida maintains the Oneida flex payments account to fund payments related to the Debtors' flexible savings account program. The Oneida master operating account transfers funds to the Oneida flex payments account on an as-needed basis. |

| Category | Description |
|---|---|
| Oneida Workers' Compensation Account—8318 | Oneida maintains the Oneida workers' compensation account to fund payments related to the Debtors' workers' compensation policies. The Oneida master operating account transfers funds to the Oneida workers' compensation account on an as needed basis. |
| Oneida Medical—8322 | Oneida maintains the Oneida medical account to process payments related to certain employee health benefits. The Oneida master operating account transfers funds to the Oneida medical account on an as-needed basis. |
| Oneida Deferred Compensation Trust-0574 | The Oneida deferred compensation trust account is generally dormant and maintains a de minimis balance. |

48.     The Debtors pay approximately $33,000.00 per month on account of fees incurred in connection with the Bank Accounts (the "Bank Fees"). The Debtors pay the Bank Fees as they come due on a rolling basis over the course of each month. The Debtors estimate that they owe approximately $6,500.00 in Bank Fees as of the Petition Date, the entirety of which will become due and payable within 21 days of the Petition Date.

**V.      Prime Clerk LLC Retention Application Pursuant to Section 156(c).**[10]

49.     **Relief Requested**. The Debtors seek entry of an Order approving the Services Agreement between the Debtors and Prime Clerk LLC ("Prime Clerk") and the Debtors' retention and employment of Prime Clerk as claims and noticing agent for the Debtors in lieu of the Clerk of the United States Bankruptcy Court for the District of Delaware and for related relief, effective *nunc pro tunc* to the Petition Date.

50.     **Services to be Provided**. The retention application pertains only to the work to be performed by Prime Clerk under the Clerk's delegation of duties permitted by 28 U.S.C. § 156(c), Local Rule 2002-1(f), and the Claims Agent Protocol, and any work to be performed

---

[10]     *See Application of EveryWare Global, Inc., et al. for (A) Appointment of Prime Clerk LLC as Claims and Noticing Agent, and (B) Granting Related Relief*, filed concurrently herewith.

by Prime Clerk outside of this scope is not covered by the application or by any order granting

approval thereof.  Specifically, Prime Clerk will perform, to the extent the Debtors request, the

following services in its role as claims and noticing agent, as well as all quality control relating

thereto:

a.      prepare and serve required notices and documents in the  cases in accordance with the Bankruptcy Rules in the form and manner directed by the Debtors and/or the Court, including, if applicable (i) notice of the commencement of the cases, (ii) notices of transfers of claims, (iii) notices of objections to claims and objections to transfers of claims, (iv) notices of any hearings on a disclosure statement and confirmation of the Plan, including under Bankruptcy Rule 3017(d), (v) notice of the effective date of any plan, and (vi) all other notices, orders, pleadings, publications, and other documents as the Debtors and/or the Court may deem necessary or appropriate for an orderly administration of these chapter 11 cases;

b.      maintain (i) a list of all potential creditors, equity holders, and other parties in interest, and (ii) a "core" mailing list consisting of all parties described in Bankruptcy Rule 2002 and those parties that have filed a notice of appearance under Bankruptcy Rule 9010;

c.      maintain a post office box or address for the purpose of receiving claims and returned mail, and process all mail received;

d.      prepare and file or cause to be filed with the Clerk an affidavit or certificate of service for all notices, motions, orders, other pleadings, or documents served within seven business days of service that includes (i) either a copy of the notice served or the docket number(s) and title(s) of the pleading(s) served, (ii) a list of persons to whom it was mailed (in alphabetical order) with their addresses, (iii) the manner of service, and (iv) the date served;

e.      process all proofs of claim received, including those received by the Clerk's Office, and check said processing for accuracy, and maintain the original proofs of claim in a secure area;

f.      maintain the official claims register for each Debtor (the "Claims Register") on behalf of the Clerk and upon the Clerk's request, provide the Clerk with certified, duplicate unofficial Claims Registers; and specify in the Claims Registers the following information for each claim docketed: (i) the claim number assigned, (ii) the date received, (iii) the name and address of the claimant and agent, if applicable, who filed the claim, (iv) the amount asserted, (v) the asserted classification(s) of the claim

(*e.g.*, secured, unsecured, priority, etc.), (vi) the applicable Debtor, and (vii) any disposition of the claim;

g.    implement necessary security measures to ensure the completeness and integrity of the Claims Registers and the safekeeping of the original claims;

h.    record all transfers of claims and provide any notices of such transfers as required by Bankruptcy Rule 3001(e);

i.    relocate, by messenger or overnight delivery, all of the court-filed proofs of claim to the offices of Prime Clerk, not less than weekly;

j.    upon completion of the docketing process for all claims received to date for each case, turn over to the Clerk copies of the Claims Registers for the Clerk's review (upon the Clerk's request);

k.    monitor the Court's docket for all notices of appearance, address changes, and claims-related pleadings and orders filed, and make necessary notations on and/or changes to the Claims Registers;

l.    assist in the dissemination of information to the public and respond to requests for administrative information regarding the cases, as directed by the Debtors and/or the Court, including through the use of a case website and/or call center;

m.    30 days prior to the close of these cases, to the extent practicable, request that the Debtors submit to the Court a proposed Order dismissing Prime Clerk and terminating Prime Clerk's services upon completion of its duties and responsibilities and upon the closing of these cases;

n.    within seven days' notice to Prime Clerk of entry of an order closing the chapter 11 cases, provide to the Court the final version of the Claims Registers as of the date immediately before the close of the cases; and

o.    at the close of these cases, box and transport all original documents, in proper format, as provided by the Clerk's office, to (i) the Federal Archives Record Administration, located at Central Plains Region, 200 Space Center Drive, Lee's Summit, MO 64064, or (ii) any other location requested by the Clerk's office.

51.    The Claims Registers shall be open to the public for examination without charge during regular business hours and on a case-specific website maintained by Prime Clerk.  Prime Clerk shall not employ any past or present employee of the Debtors for work that involves the Debtors' bankruptcy cases.  Prime Clerk will follow the notice and claim procedures that

conform to the guidelines promulgated by the Clerk's Office, section 331 of the Judicial Code, or as it otherwise may be directed by the Court.

## VI.    Joint Administration Motion.[11]

52.    **Relief Requested**.    The Debtors seek entry of the Order directing joint administration of the Debtors' chapter 11 cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for all of these chapter 11 cases under the case of EveryWare Global, Inc.

53.    **The Debtors' Corporate Structure**.  The Debtors are "affiliates" pursuant to section 101(2) of the Bankruptcy Code and each Debtor's chapter 11 case is pending in the Court.  Thus, the conditions set forth in Bankruptcy Rule 1015(b) for joint administration of these cases are satisfied.  Various Debtors play a role in other Debtors' capital structures, *e.g.*, as guarantors.  Numerous parties have interests in the cases of multiple Debtors.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity. Joint administration of these chapter 11 cases will reduce parties' fees and costs by avoiding duplicative filings and objections and make the most efficient use of the Court's valuable resources.  Joint administration also will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  No party in interest will be prejudiced by the joint administration of these chapter 11 cases.

---

[11]    *See Motion of EveryWare Global, Inc., et al. for Entry of an Order (A) Directing Joint Administration of Related Chapter 11 Cases, and (B) Granting Related Relief*, filed concurrently herewith.

## VII.    Equity Trading Motion.[12]

54.    **Relief Requested**.  The Debtors seek entry of Orders:   (a) approving the Procedures, without prejudice to the Debtors' right to waive the Procedures, or any term thereof, with respect to any purchase, sale, or other transfer of, or declaration of worthlessness with respect to, the Equity Securities; (b) directing that any purchase, sale, or other transfer of, or declaration of worthlessness with respect to, the Equity Securities in violation of the Procedures is null and void *ab initio*; and (c) scheduling a final hearing on this motion.

55.    **The NOLs**.  As of December 31, 2014, the Debtors had NOLs in the amount of approximately $129.6 million.  The Debtors anticipate that utilization of the NOLs in future tax years could generate up to approximately $51.8 million in cash savings from reduced taxes assuming an effective combined state and federal tax rate of 40% for the post-emergence company.[13]  The value of the NOLs will inure to the benefit of all of the Debtors' stakeholders.

56.    As of the Petition Date, one entity Beneficially Owns more than 50% of the Equity Securities, and three other entities Beneficially Own more than 4.5% of the Equity Securities.

## VIII.   Disclosure Statement Scheduling Motion.[14]

57.    **Relief Requested**.  The Debtors seek entry of the Order: (a) scheduling the Confirmation Hearing, (b) establishing the Objection Deadline and approving related procedures,

---

[12]    *See Motion of EveryWare Global, Inc., et al. for Entry of Interim and Final Orders (A) Approving Notification and Hearing Procedures for Certain Transfers of or Claims of Worthlessness with Respect to, Certain Equity Related Securities, and (B) Granting Related Relief*, filed concurrently herewith.

[13]    For the avoidance of doubt, this figure does not take into account any reduction in NOLs that may take place due to the cancellation of any debt obligation of the Debtors.

[14]    *See Motion of EveryWare Global, Inc., et al. for Entry of an Order (A) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (B) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (C) Approving the Solicitation Procedures, (D) Approving the Confirmation Hearing Notice, and (E) Directing that a Meeting of Creditors Not Be Convened*, filed concurrently herewith.

(c) approving the Solicitation Procedures, (d) approving the form and manner of distributing the Notice, and (e) directing that the U.S. Trustee not convene the Creditors' Meeting if the Plan is confirmed within 75 days of the Petition Date, and for certain related relief.

58.     In connection with the foregoing, the Debtors seek that the Order approve the following schedule of proposed dates:

| Event | Date[15] |
|---|---|
| Voting Record Date[16] | March 31, 2015 |
| Start of Solicitation | April 3, 2015 |
| Petition Date | April 7, 2015 |
| Notice Date | April 9, 2015 |
| Voting Deadline[17] | April 17, 2015 |
| Objection Deadline | May 8, 2015 |
| Reply Deadline | May 13, 2015 |
| Confirmation Hearing | May 15, 2015 |

59.     **The Solicitation Procedures**.  The Debtors commenced solicitation of holders of claims regarding the Plan prior to the Petition Date in accordance with the following Solicitation Procedures and the Bankruptcy Code.  On April 3, 2015, the Debtors caused their solicitation agent, Prime Clerk LLC (the "Solicitation Agent"),[18] to distribute packages containing the Disclosure Statement, the Plan, and ballots (the "Solicitation Packages") to holders of claims entitled to vote to accept or reject the Plan as of the Voting Record Date.  Holders of claims to whom the Solicitation Packages were transmitted were directed in the Disclosure Statement and

---

[15]    Certain of the proposed dates are subject to the Court's availability.

[16]    The "Voting Record Date" is the date as of which a holder of record of a claim entitled to vote on the Plan must have held such claim or interest to cast a vote to accept or reject the Plan.

[17]    The "Voting Deadline" is the date and time by which a holder of a claim entitled to vote to accept or reject the Plan must have submitted its ballot casting its vote, as more fully described herein.

[18]    The Debtors have also applied for authority to retain Prime Clerk LLC as their claims and noticing agent.  *See Application of EveryWare Global, Inc., et al. for (A) Appointment of Prime Clerk LLC as Claims and Noticing Agent, and (B) Granting Related Relief*, filed contemporaneously herewith.

ballots to follow the instructions contained in the ballots (and described in the Disclosure Statement) to complete and submit their respective ballots to cast a vote to accept or reject the Plan.  Each holder was explicitly informed in the Disclosure Statement and applicable ballot that such holder needed to submit its ballot such that it is actually received by the Solicitation Agent on or before the Voting Deadline to be counted.  Certain holders of claims and interests were not provided a Solicitation Package because such holders are: (a) unimpaired under, and conclusively presumed to accept, the Plan under section 1126(f) of the Bankruptcy Code; or (b) impaired, entitled to receive no distribution on account of such claims or interests under the Plan, and therefore deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.   The Debtors expect to complete a final tabulation of the ballots on or about April 24, 2015.  The Debtors' procedures and standard assumptions for tabulating ballots include:

| | |
|---|---|
| **Votes Not Counted** | – any ballot that is illegible or contains insufficient information to permit the identification of the holder of the claim or the interest |
| | – any ballot that is not actually received by the Solicitation Agent by the Voting Deadline |
| | – any unsigned ballot |
| | – any ballot that partially rejects and partially accepts the Plan |
| | – any ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan |
| | – any ballot superseded by a later, timely submitted valid ballot |
| | – any improperly submitted ballot |
| **No Vote Splitting** | – holders are required to vote all of their claims within a particular class either to accept or reject the Plan and are not permitted to split any votes |
| **Establishing Claim Amounts** | – claim amounts held by a holder, as applicable, were pre-populated in the ballots.  The Debtors determined these amounts as of the Voting Record Date based on the books and records of the applicable administrative agent |

## IX.    Schedules Waiver and Consolidated List of Creditors Motion.[19]

60.    **Relief Requested**.    The Debtors seek entry of the Order (a) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor, (b) extending the time for the Debtors to file schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements") through and including June 6, 2015 (the "Deadline"), and (c) waiving the requirement that the Debtors file the Schedules and Statements upon confirmation of the Plan if confirmation occurs on or before the Deadline.

61.    **The Debtors' List of Creditors**.    The Debtors have thousands of creditors.    The ordinary operation of the Debtors' businesses requires the Debtors to maintain voluminous books, records, and complex accounting systems.    Maintaining a single consolidated list of creditors will therefore benefit the Debtors and their estates by allowing the Debtors to more efficiently provide required notices to parties in interest and reduce the potential for duplicate mailings.    Accordingly, substantial time would be required for the Debtors to complete the Schedules and Statements.

## XI.    Taxes Motion.[20]

62.    **Relief Requested**.    The Debtors seek entry of the Order authorizing the Debtors to pay certain accrued and outstanding prepetition taxes, fines, and refunds.

63.    **The Taxes**.    The Debtors incur and remit use, property, gross receipts, business, and various other taxes, and pay certain regulatory fees, fines, and refunds (each a "Tax" and

---

[19]    *See Motion of EveryWare Global, Inc., et al. for Entry of an Order (A) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor and (B) Extending the Time, and, Upon Plan Confirmation, Waiving the Requirement, to File Schedules and Statements of Financial Affairs, and (C) Granting Related Relief,* filed concurrently herewith.

[20]    *See Motion of EveryWare Global, Inc., et al. for Entry of an Order (A) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees, and (B) Granting Related Relief,* filed concurrently herewith.

collectively, the "Taxes").    The Debtors remit the Taxes to applicable taxing authorities (each an

"Authority" and collectively, the "Authorities"), a list of which is attached to the motion, in the

ordinary course of business and in accordance with all applicable laws and regulations.  As of the

Petition Date, the Debtors believe that they have timely filed all applicable returns for the Taxes.

64.    The following table contains descriptions of the Taxes, as well as the Debtors'

estimate of the amounts of the Taxes accrued as of the Petition Date and, of those amounts, the

amounts that will become payable in the ordinary course within 21 days of the Petition Date:

| Category | Description | Approximate Amount Accrued as of the Petition Date | Approximate Amount Due and Owing with 21 Days of the Petition Date |
|---|---|---|---|
| Income Taxes | Taxes imposed on the Debtors' income and required to conduct business in the ordinary course. | $10,000 | $10,000 |
| Franchise Taxes | Taxes required to conduct business in the ordinary course. | $10,521 | $8,521 |
| Sales and Use Taxes | Taxes imposed on the sale and use of certain goods and services. | $108,339 | $88,339 |
| Unemployment Taxes | Taxes related to employer funded unemployment programs. | $29,607 | $29,607 |
| Customs Taxes and Fees | Taxes and Fees imposed on goods when transported across international borders. | $505,000 | $505,000 |
| Environmental and Safety Fees | Fees related to compliance with environmental and safety laws and regulations. | $1,863,747 | $140,000 |
| Other Taxes and Fees | Other taxes and fees imposed by federal, state, and local Authorities against the Debtors . | $25,000 | $0 |
| **Total** | | **$2,552,214** | **$781,467** |

**XII.    Utilities Motion.**[21]

65.    **Relief Requested**.  The Debtors seek entry of Orders:  (a) prohibiting utility providers from altering, refusing, or discontinuing services, (b) deeming the utility providers adequately assured of future performance, and (c) establishing procedures, if needed, for resolving requests for additional adequate assurance and authorizing the Debtors to provide adequate assurance of future payment to the utility providers.

66.    **The Utility Providers**.  As part of the Debtors' business operations, the Debtors incur utility expenses for Utility Services such as electricity, gas, water, telephone, internet, waste disposal, and other similar services in the ordinary course of business from approximately 41 Utility Providers.  On average, the Debtors spend approximately $2.0 million each month for the Utility Services, calculated as a historical average over a six-month period prior to the Petition Date.[22]  As of the Petition Date, the Debtors estimate that approximately $1.76 million in utility costs have accrued and remain outstanding.  The Debtors do not believe they owe any past due amounts to the Utility Providers.

67.    **The Proposed Adequate Assurance**.  The Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner.  The Debtors expect that cash generated from operations, together with cash available to the Debtors through their debtor in possession financing facility, will be sufficient to pay obligations related to the Utility Services in accordance with prepetition practice.   Nevertheless, to provide additional assurance of

---

[21]    *See Motion of EveryWare Global, Inc., et al. for Entry of Interim and Final Orders (A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (B) Deeming Utility Providers Adequately Assured of Future Performance, (C) Establishing Procedures for Determining Adequate Assurance of Payment, and (D) Granting Related Relief* (the "Utilities Motion"), filed concurrently herewith.

[22]    The Debtors have calculated the historical average using the last six months of normal operations.  The Debtors believe this time period is more representative of the cost for Utility Services than the last 12-months because of the extended shutdowns of the Lancaster and Monaca facility operations in 2014.

payment to the Utility Providers, the Debtors propose to deposit $1,002,786.0 (the "Adequate Assurance Deposit") into a newly created, segregated, interest-bearing account (the "Adequate Assurance Account") within 20 days of the Petition Date for the benefit of the Utility Providers, pending further order of the Court.  The amount of the Adequate Assurance Deposit equals approximately 50 percent of the Debtors' average monthly cost of the Utility Services during a six-month period prior to the Petition Date.

68.     The Debtors submit that the creation and maintenance of the Adequate Assurance Account, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers in satisfaction of section 366 of the Bankruptcy Code. These protections ensure that each of the Utility Providers will have adequate assurance of payment throughout these chapter 11 cases, and the Debtors submit that no other or further assurance is necessary.  If a Utility Provider believes that adequate assurance is required beyond the protections described in the Utilities Motion, however, the Debtors submit that such provider must request assurance pursuant to the Adequate Assurance Procedures.

## X.    **Customer Programs Motion.**[23]

69.     **Relief Requested**.  The Debtors seek entry of the Order authorizing the Debtors to maintain and administer their existing customer-related programs (collectively, the "Customer Programs") and honor certain prepetition obligations related thereto in the ordinary course of business and in a manner consistent with past practice.

---

[23]    *See Motion of EveryWare Global, Inc., et al. for Entry of an Order (A) Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Customer Programs in the Ordinary Course of Business, and (B) Granting Related Relief*, filed concurrently herewith.

70.    **Customer Programs**.  The Debtors are a leading global marketer of tabletop and food preparation products, and manufacture a variety of glassware products at its two domestic factories.  The Debtors offer a wide range of consumer, food service, and specialty products, including beverageware, flatware, dinnerware, serveware, and bakeware, as well as candle containers and custom glass products.  The Debtors sell these products to over 3,700 customers, including, amongst others, mass market and specialty retailers, department stores, supermarkets, restaurant suppliers, hotels, cruise lines, and business-to-business partners.  More than 250 of the Debtors' customers participate in the various Customer Programs, outlined in more detail in the chart below.

| Category | Description | Approximate Amount Accrued as of March 1, 2015[24] | Approximate Amount Due Within 21 Days[25] |
|---|---|---|---|
| Rebates and Volume Discounts | In the ordinary course of business, the Debtors offer certain customers annual or quarterly rebates on product sales (the "Rebates"). In addition to the Rebates, the Debtors also offer certain customers a percentage discount off of the list price for products if the customer's order exceeds a certain volume (the "Volume Discounts").<br><br>In 2014, the Debtors issued Rebates and Volume Discounts to customers totaling approximately $12.71 million. | $1.62 million | $1.62 million |
| Advertising and Promotional | In the ordinary course of business, the Debtors offer certain customers allowances and discounts for advertising and marketing | $413,000.0 | $413,000.0 |

---

[24]    The adjustments to accrued reserves are completed at the beginning of each month for the month prior, and have not yet been completed for March.

[25]    This number represents an accrued reserve against cash receivables.  Customers generally deduct amounts associated with the Customer Programs from outstanding invoices. Therefore, very few of the Customer Programs involve actual cash disbursements by the Debtors.  Instead, the Debtors typically adjust their books and records to account for obligations in respect of the Customer Programs.

| Category | Description | Approximate Amount Accrued as of March 1, 2015[24] | Approximate Amount Due Within 21 Days[25] |
|---|---|---|---|
| Activities | the Debtors' products, or running promotions for the Debtors products. | | |
| | In 2014, the Debtors issued allowances or discounts to customers on account of Advertising and Promotional Activities totaling approximately $2.57 million. | | |
| Bill-Back Allowances | In the ordinary course of business, the Debtors offer certain customers in the food service segment of their business a bill-back allowance (collectively, the "Bill-Back Allowances").  Generally, the Bill-Back Allowances are available to customers who are restaurant suppliers and food service industry distributors (the "Distributors"). The Bill-Back Allowances allow Distributors to take advantage of favorable pricing terms that the Debtors may have negotiated with the Distributors' customers. | $1.61 million | $1.61 million |
| | In 2014, the Debtors issued Bill-Back Allowances to customers totaling approximately $9.51 million. | | |
| Breakage Claims | The Debtors' products are of such a nature that some percentage of products may be damaged while in transit and arrive broken when the customer receives the products. When a customer receives broken products they can submit a breakage claim (a "Breakage Claim") to the Debtors for the broken goods. | $2.2 million | $2.2 million |
| | In 2014, the Debtors paid Breakage Claims totaling approximately $4.65 million. | | |
| **Total** | | $5.84 million | $5.84 million |

## XIII.    Wages and Benefits Motion. [26]

71.    **Relief Requested**.  The Debtors seek entry of the Order authorizing them, in their sole discretion, to (a) pay prepetition wages, salaries, reimbursable employee expenses, and other compensation, (b) pay and honor obligations relating to employee medical, insurance, and other benefits programs, and (c) continue employee and retiree benefit programs in the ordinary course of business on a postpetition basis and in a manner consistent with prepetition practices, all as more fully described in the motion.

72.    **The Employees**.  The Debtors currently employ approximately 1,557 Employees, nearly all of whom are full-time employees.  Approximately 1,325, or 85%, of their Employees are paid on an hourly basis, and the remaining approximately 232, or 15%, are paid on a salaried basis.  A substantial number of the Debtors' employees, approximately 1,200, are represented by unions that are party to three collective bargaining agreements with United Steelworkers (collectively, the "CBAs").  In addition to their Employees, the Debtors supplement their workforce by utilizing Independent Contractors (as defined herein), as well as Temporary Employees (as defined herein), procured through an employment agency during various periods throughout the year.

73.    The Employees perform a variety of critical functions, including operating the Debtors' manufacturing and distribution facilities, as well as providing sales and marketing, finance and accounting, information technology, human resources, management, and other related support services.  The Employees' valuable skill sets, institutional knowledge, customer

---

[26]    *See Motion of EveryWare Global, Inc., et al. for Entry of Interim and Final Orders Authorizing the Debtors to (A) Pay Prepetition Wages, Other Compensation, and Reimbursable Employee Expense, (B) Pay and Honor Employee Medical and Other Benefits, and (C) Continue Employee and Retiree Benefit Programs, and (D) Granting Related Relief*, filed concurrently herewith.

relationships, and understanding of the Debtors' operations make them essential to the success of these chapter 11 cases.

74.    **The Obligations**.  The Debtors compensate the Employees for services rendered to the Debtors, in addition to reimbursing certain of the Employees' business expenses, and paying for their health and related benefits.  The following table describes these obligations, the Debtors' estimate of the amounts outstanding as of the Petition Date and, of those amounts, the amounts that are due in the ordinary course of business within 21 days of the Petition Date:

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days |
|---|---|---|---|
| Compensation | In the ordinary course of business, the Debtors pay Employees wages, salaries, commissions, incentive bonuses, reimbursable expenses, and certain other forms of compensation. | $3.7 million | $3.7 million |
| | The Debtors' Employees are paid on either a salaried or hourly basis.  Salaried Employees are paid bi-weekly on Fridays, on a current basis, and hourly Employees are paid bi-weekly on Fridays, two weeks in arrears.  On average, the Debtors gross weekly payroll is approximately $1.6 million. | | |
| Sales Commissions | The Debtors pay commissions to certain Employees in the sales and marketing department (the "Sales Representatives").[27]  The Sales Commissions are paid monthly in arrears and processed in the Debtors' normal payroll. | $80,000 | $80,000 |
| Payroll Processor | The Debtors use the services of Automatic Data Processing, Inc. (the "Payroll Processor") to administer payroll checks to Employees and process direct deposit transfers.  The Debtors pay approximately 40% of their Employees by check and the remainder by direct deposit.  The Debtors pay approximately $29,000 per month to the Payroll Processor for the payroll-related services it provides | $29,300.0 | $29,300 |

---

[27]    Approximately 25% of the Sales Representatives are paid commissions in addition to their salary.  The other 75% of the Sales Representatives participate in the Sales Incentive Plan.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days |
|---|---|---|---|
| | to the Debtors and related administrative costs. | | |
| Sales Incentive Plan | Approximately 66 non-insider Employees are eligible to participate in the Sales Incentive Plan. The Sales Incentive Plan has two components, a performance component and a discretionary component.  The performance component, which accounts for 70% of an Employee's potential payout, is based on achieving target increases in gross margin (net sales less the cost of goods sold), which targets are individualized for each participant.  The discretionary component, which accounts for 30% of an Employee's potential payout, is recommended by an Employee's manager and approved by the Debtors' Chief Executive Officer. | $661,000 | N/A |
| | Based on the Debtors' current projections, they estimate that approximately $661,000 will become due and payable after the Petition Date on account of the Sales Incentive Plan. | | |
| Management Incentive Plan | Approximately 28 Employees are eligible to participate in the Management Incentive Plan.[28]  The Management Incentive Plan has two components, a performance component and a discretionary component.  The performance component, which accounts for 70% of an Employee's potential payout, is based on achieving certain EBITDA targets.  The discretionary component, which accounts for 30% of an Employee's potential payout, is recommended by an Employee's manager and approved by the Debtors' Chief Executive Officer. | $400,000 | N/A |
| | Based on the Debtors' current projections, they estimate that approximately $400,000.0 will become due and payable to non-insider Employees after the Petition Date on account of the Management Incentive Plan.[29] | | |

---

[28]   Certain of these Employees are insiders of the Debtor.  The Debtors are not seeking authority to make payments under the Management Incentive Plan to any insiders.  To the extent the Debtors propose to make bonus or incentive payments to any insiders, the Debtors will seek separate approval from this Court prior to making any such payments.

[29]   The Debtors will determine the extent to which the Employees participating in the Management Incentive Plan achieved their performance targets, and the amount of any discretionary payout, during the month of April.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days |
|---|---|---|---|
| Temporary Employees | From time to time, the Debtors utilize the services of various Temporary Employees to fill gaps in staffing needs.[30]  These Temporary Employees are procured through a number of Staffing Agencies.  The Debtors typically pay for the Temporary Employees' services directly to the Staffing Agencies through their accounts payable system.  The Staffing Agencies, in turn, pay the Temporary Employees.<br><br>On average, the Debtors pay approximately $130,000 per month on account of fees paid to the Staffing Providers for compensation owed to Temporary Employees. | $140,200 | $140,200 |
| Independent Contractors | The Debtors engage approximately 55 Independent Contractors to conduct important sales services for the Debtors.<br><br>On average, the Debtors pay approximately $318,600 per month on account of amounts owed to the Independent Contractors (collectively, the "Independent Contractor Fees"), through their accounts payable system. | $422,000 | $342,000 |
| Reimbursable Expenses | The Debtors routinely Reimburse Expenses incurred by Employees for business development initiatives, air travel, meals, and other business related expenses incurred in the scope of their employment on behalf of the Debtors.   The majority of Reimbursable Expenses are paid directly by the Employees.[31]<br><br>The Debtors pay approximately $120,000 per month on account of Reimbursable Expenses. | $100,000 | $100,000 |
| Paid Vacation | The Debtors provide Vacation Time to their Employees as a paid time-off benefit.  The amount of Vacation Time and rate at which Vacation Time | $1.8 million | N/A |

---

[30]  Under the CBAs the Debtors are also permitted to hire "pre-union" Employees for a short trial period before they are hired as full-time, union Employees.  The number of temporary "pre-union" Employees varies throughout the year, but the Debtors estimate they currently employ approximately 30 such Employees.  These Employees are paid through the Debtors normal payroll process described above.

[31]  The Debtors also utilize a corporate credit card issued by Wells Fargo to pay for airline tickets (the "Corporate Credit Card").  The Debtors pay the Corporate Credit Card balances directly through their accounts payable system.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days |
|---|---|---|---|
| | accrues varies amongst union and non-union Employees. Union Employees accrue all of their Vacation Time on January 1 of each year, with the amount of Vacation Time determined based on hours worked during the previous calendar year. If a union Employee does not use all of his or her Vacation Time in a year they are entitled to a cash payment at the end of the year for all accrued, unused Vacation Time. Non-union Employees accrue one-twelfth of their Vacation Time at the end of each month worked, with the amount of Vacation Time determined by an Employee's length of employment and level of seniority. Non-union Employees may not carry over any accrued Vacation Time to the next year, and are not entitled to a cash payment for any accrued, unused Vacation Time unless they terminate their employment. | | |
| Holidays | The Debtors recognize either 10 or 12 holidays, including personal holidays, as a paid time-off benefit for their union Employees, and 11 holidays, including personal holidays, for their non-union Employees (each, a "Holiday" and, collectively, the "Holidays"). Generally, eligible Employees are not required to work on designated Holidays and are paid for Holiday time at either their hourly or salaried rate. Employees are not entitled to cash payments for Holidays. Thus, the Debtors do not believe that there are any obligations owing as of the Petition Date on account of Holidays. | None | None |
| Leave Time | Employees may also take certain other unpaid leaves of absence for personal reasons. Leave Time includes family medical leave, sick leave, jury duty, personal leave, military leave, bereavement, jury duty, and long-term unpaid leave. Employees are not entitled to cash payments for unused Leave Time. Thus, the Debtors do not believe that there are any obligations owing as of the Petition Date on account of Leave Time. | None | None |
| Health Benefit Plans | The Debtors offer full-time Employees the opportunity to participate in a number of health benefit plans, including medical, dental, and vision plans (collectively, the "Health Benefit Plans"). The medical, dental, and vision plans are provided | $1.45 million | $1.45 million |

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days |
|---|---|---|---|
| | through Cigna Health and Life Insurance Company. | | |
| | Because the Debtors Health Benefit Plans are self-insured, claims under the Health Benefit Plans are funded on a "pay as you go" basis and average approximately $1.34 million per month. | | |
| Flexible Spending Accounts | The Debtors offer full-time Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible out-of-pocket health care and dependent care expenses (the "Flexible Spending Accounts"). | None | None |
| | At the beginning of each year, participating Employees contribute amounts up to the $2,500 limit on the health care Flexible Spending Account and the $5,000 limit on the dependent care Flexible Spending Account. Currently, approximately 97 Employees maintain Flexible Spending Accounts, and the Debtors withhold approximately $152,000 annually on account of Employee contributions to the Flexible Spending Accounts. | | |
| | The Debtors pay a *de minimis* fee to ADP to administer the Flexible Spending Accounts, which amount is included as part of the Payroll Processor Fees. The Debtors seek authority to pay any prepetition amounts owed to ADP for administration of the Flexible Spending Accounts, and to continue offering the Flexible Spending Accounts to its Employees in the ordinary course of business and consistent with past practice. | | |
| Life Insurance | The Debtors provide certain qualified employees with term life insurance, accidental death and dismemberment insurance, and long-term disability insurance through a policy with Life Insurance Company of North America ("LINA"), a division of Cigna. The Debtors provide approximately 1,232 Employees with the term life insurance benefit (the "Life Insurance"). The Debtors also provide approximately 1,276 Employees with accidental death and dismemberment insurance (the "AD&D Insurance"). And, the Debtors provide approximately 471 full-time Employees with long-term disability benefits (the "Long-Term Disability Benefits"), in the event an Employee is disabled for | $39,765 | $39,765 |

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days |
|---|---|---|---|
| | more than 180 consecutive days. The Long-Term Disability Benefits pays 60% of the Employee's base pay, up to a maximum of $5,000 or $12,000 per month, depending on the Employees' level of employment. The Debtors pay 100% of the costs for the Long-Term Disability Benefits.<br><br>The coverage provided by these policies costs the Debtors approximately $39,765 per month. | | |
| Supplemental and Voluntary Insurance | In addition to the Life Insurance provided by the Debtors, Employees have the option to purchase supplemental term life insurance or whole life insurance (collectively, the "Supplemental Life Insurance") through Unum Group ("Unum"). Premiums for the Supplemental Life Insurance are paid entirely by the participating Employee. The Debtors estimate that approximately 420 Employees have elected to purchase Supplemental Life Insurance Coverage. As of the Petition Date, the Debtors do not believe there are any prepetition amounts owed to Unum on account of the Supplemental Life Insurance.<br><br>Full-time Employees also have the option to purchase voluntary critical illness and voluntary accident insurance through Unum for themselves and their spouse and dependents (collectively, the "Voluntary Insurance"). Approximately 321 Employees have elected to purchase Voluntary Insurance for critical illness coverage and approximately 611 Employees have elected to purchase Voluntary Insurance for accident coverage. Premiums for the Voluntary Insurance are paid entirely by the participating Employees. As of the Petition Date, the Debtors do not believe there are any prepetition amounts owed to Unum on account of the Voluntary Insurance. | None | None |
| Workers' Compensation | The Debtors provide workers' compensation insurance for their Employees at the statutorily-mandated level for each state in the United States in which they operate (collectively, the "Workers' Compensation Program").[32] The | $4,760 | $4,760 |

---

[32]   The Debtors' workers' compensation insurance policies and the premiums associated therewith are addressed in the *Motion of Everyware Global, Inc., et al., for Entry of an Order (A) Authorizing the Debtors to (I) Continue*

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days |
|---|---|---|---|
| | Debtors utilize three third-party administrators to administer the Workers' Compensation Program. The Debtors pay approximately $4,760 per month to two of the third-party administrators, and an annual fee of $30,000 to the other third-party administrator. | | |
| 401(k) | The Debtors maintain a retirement savings plan meeting the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan") for the benefit of their Employees.  Union Employees are eligible to participate in the 401(k) Plan after 90 days of employment, and non-union, salaried Employees are eligible to participate in the 401(k) Plan on their date of hire.   Approximately 1,415 Employees currently participate in the 401(k) Plan, with approximately 500 of these Employees actively making contributions.   The Debtors estimate that they withhold approximately $72,000 each week from Employees' paychecks on account of employee 401(k) contributions. | $13,600 | $13,600 |
| Qualified Defined Benefit Pension Plans | The Debtors maintain two funded qualified, defined benefit pension plans that provide benefits to eligible former salaried and union Employees of Debtor Buffalo China, Inc. (the "Pension Plans").   The Debtors' Pension Plans are currently frozen, however, certain former Employees receive payments under the Pension Plans. The Debtors pay approximately $40,000 to administer the Pension Plans (the "Pension Plan Administration Fees").  As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the Pension Plan Administration Fees. | None | None |
| Supplemental Executive Retirement Plan | The SERP has been frozen with regard to new participants since at least 2005, but the Debtors continue to make benefit payments under the SERP to certain retired employees.<br><br>There are currently five remaining participants under the SERP, who receive monthly benefit payments. The average monthly cost of the SERP payments is | $14,700 | $14,700 |

*Insurance Coverage Entered Into Prepetition, (II) Enter Into New Insurance Policies, (III) Honor Their Prepetition Insurance Premium Financing Agreement, and (IV) Renew Their Premium Financing Agreement in the Ordinary Course of Business, and (B) Granting Related Relief*, filed contemporaneously herewith.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days |
|---|---|---|---|
| | approximately $14,700.  As of the Petition Date, the Debtors estimate they owe approximately $14,700 on account of SERP benefits (the "Unpaid SERP Benefits"), all of which will become due and owing within the Interim Period. | | |
| Restoration Plans | The Restoration Plans have been frozen with regard to new participants since at least 2005, but the Debtors continue to make benefit payments under the plans to certain retired employees. | $49,600 | $49,600 |
| | There are currently eight remaining participants under the Restoration Plan, who receive monthly benefit payments.  The average monthly cost of the Restoration Plan payments is approximately $49,600. As of the Petition Date, the Debtors estimate they owe approximately $49,600 on account of Restoration Plan benefits (the "Unpaid Restoration Plan Benefits"), all of which will become due and owing within the Interim Period. | | |
| Retiree Medical Benefits | The Debtors sponsor retiree medical benefits (the "Retiree Medical Benefits") for approximately 600 retired Employees, (collectively, the "Retirees"), and in some cases, such Retirees' spouse.  Generally, the Retirees meeting the plan eligibility requirements are entitled to a maximum lifetime benefit of $5,000 to cover health care expenses.  The Retiree Medical Benefits continue until the $5,000 maximum is depleted, and surviving spouses may continue to utilize the remaining benefit until the $5,000 maximum is exhausted. In 2014, the Debtors paid approximately $25,000 on account Retiree Medical Benefits.    Additionally,    the    Debtors    pay approximately   $6,500   annually   to   Cigna   to administer the Retiree Medical Benefits (the "Retiree Medical Benefits Administration Fees"). | None | None |
| Severance | Certain  Employees  are  entitled  to  severance payments pursuant to their employment agreements (the  "Severance  Payments").      The  amount  of severance varies from agreement to agreement, but is generally reflective of the Employee's position.  For example, senior management-level Employees may be entitled to six months of Severance Payments. | $280,000 | $52,600 |

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days |
|---|---|---|---|
| | The Severance Payments are not due and payable until termination.  As of the Petition Date, two former Employees are receiving Severance Payments. | | |

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 7, 2015

Respectfully submitted,

Joel Mostrom
Interim Chief Financial Officer
EveryWare Global, Inc.
519 North Pierce Avenue
Lancaster, Ohio 43130