## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERYWARE GLOBAL, INC., *et al.*,[1] | ) | Case No. 15-10743 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## MOTION OF EVERYWARE GLOBAL, INC., *ET AL.* FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING POSTPETITION FINANCING, (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) AUTHORIZING THE USE OF CASH COLLATERAL, (D) GRANTING ADEQUATE PROTECTION, (E) MODIFYING THE AUTOMATIC STAY, (F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF

The above-captioned debtors (collectively, the "Debtors") file this motion (this "Motion")[2] for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim DIP Order") and a final order (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders"), (a) authorizing the Debtors to obtain postpetition secured financing pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and in accordance with Rules 2002, 4001, 6004 and 9014, of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b) and 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Anchor Hocking, LLC (6923); Buffalo China, Inc. (9731); Delco International, Ltd. (7553); EveryWare, LLC (2699); EveryWare Global, Inc. (4553); Kenwood Silver Company, Inc. (2286); Oneida Food Service, Inc. (7321); Oneida International Inc. (4774); Oneida Ltd. (5700); Oneida Silversmiths Inc. (6454); Sakura, Inc. (9359); THC Systems, Inc. (9103); Universal Tabletop, Inc. (4265).  The location of the Debtors' service address is:  519 North Pierce Avenue, Lancaster, Ohio 43130.

[2] Unless otherwise noted herein, all capitalized terms used in this Motion shall have the meanings ascribed to such terms herein, regardless of whether the definitions of such terms appear later in this Motion than the first use of such term.  Capitalized terms used in this Motion but not otherwise defined herein shall have the meanings ascribed to them in the Interim DIP Order, the DIP Term Loan Agreement, and the DIP ABL Credit Agreement, as applicable.

Rules"), in the form of (i) the DIP Term Facility set forth in the DIP Term Loan Agreement, attached hereto as **Exhibit 1** to **Exhibit A** and (ii) the DIP ABL Credit Facility set forth in the DIP ABL Credit Agreement, attached hereto as **Exhibit 2** to **Exhibit A**; (b) granting liens and providing super-priority claims with respect to such postpetition financing; (c) authorizing the Debtors to use Cash Collateral; (d) approving the form of adequate protection to be provided by the Debtors to the Prepetition Term Lenders, Prepetition Term Agent, ABL Lenders and ABL Agent, as applicable; (e) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the Interim DIP Order; (f) scheduling a final hearing (the "Final Hearing") to consider entry of the Final DIP Order; and (g) granting related relief.  In support of this Motion, the Debtors have filed contemporaneously herewith the *Declaration of Richard Morgner in Support of the Motion of EveryWare Global, Inc., et al. for Entry of Interim and Final Orders (A) Authorizing Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Granting Adequate Protection, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* (the "Morgner Declaration").  In further support of this Motion, the Debtors respectfully state as follows.[3]

### Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C.

---

[3]     The facts and circumstances supporting this Motion are set forth in the Morgner Declaration and the *Declaration of Joel Mostrom in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

§ 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rules 2002-1(b) and 4001-2.

## **Preliminary Statement**

4.      The Debtors require immediate access to liquidity to ensure that they are able to continue operating their businesses during these chapter 11 cases and thereby preserve the value of their estates for the benefit of all parties in interest.  Absent additional liquidity, the Debtors are projected to run out of cash by the end of the week.  To that end, prior to filing these prepackaged chapter 11 cases, the Debtors secured $100 million in postpetition debtor-in-possession financing (the "DIP Financing") to ensure that ongoing business operations—and overall enterprise value—can be preserved and continue without disruption.  The DIP Financing proposed herein consists of (i) a $40 million new money term loan (the "DIP Term Facility"), provided by certain lenders party to the Prepetition Term Loan Agreement and (ii) continued access to up to $60 million of revolving loans and letters of credit (the "DIP ABL Credit Facility," and together with the DIP Term Facility, the "DIP Facilities"), provided by lenders party to the Prepetition ABL Credit Agreement.  Among other things, the proceeds from the DIP Facilities, together with anticipated cash flow from operations, will be used to honor employee wages and benefits, procure goods and services integral to the Debtors' ongoing business operations, fund certain operational expenses, and allow the Debtors to maintain favorable

relationships with their vendors, suppliers, employees, and customers, and satisfy working capital needs in the ordinary course.

5.     As discussed below and in the Morgner Declaration, the Debtors believe that the DIP Facilities represent the best source of appropriately-sized financing available to the Debtors under the circumstances.   The DIP Facilities are an essential component of the broader restructuring transaction contemplated by the Debtors' prepackaged chapter 11 plan of reorganization (the "Plan"), which has the support of 68.1% of the holders of the Debtors' Class 5 Term Loan Facility Claims (as defined in the Plan), the only class of claimants entitled to vote on the Plan.   In conjunction with the prepackaged chapter 11 process, the Debtors have successfully negotiated the DIP Facilities, which generally provide:

- •     a $40 million DIP Term Facility secured by consensual, first priority priming liens on all the Debtors' assets encumbered by a first priority lien under the Prepetition Term Loan Facility as of the Petition Date, as well as additional liens described herein;

- •     up to $60 million DIP ABL Credit Facility secured by consensual, first priority priming liens on all the Debtors' assets encumbered by a first priority lien under the Prepetition ABL Facility as of the Petition Date, as well as additional liens described herein;

- •     borrowings and disbursements to be made pursuant to the terms of an agreed 13-week budget, a copy of which is attached as **Exhibit 3** to the Interim DIP Order (as the same may be modified in accordance with the DIP Credit Agreements, the "Budget"); and

- •     a scheduled maturity date of the DIP Term Facility of the earlier of 75 days after the Petition Date or consummation of the Plan, and a scheduled maturity date of the DIP ABL Credit Facility of the earlier of July 31, 2015 or consummation of the Plan, each with additional, customary termination events.

6.     Absent interim approval of the DIP Facilities, there is a significant risk that the Debtors would be forced to cease operations or otherwise stop paying their obligations as they become due, thereby threatening the Debtors' value as a going concern to the detriment of the Debtors' estates and their creditors.   In addition, and as discussed more fully below and in the

Morgner Declaration, substantially all the Debtors' assets are encumbered by liens arising under their prepetition credit facilities, and the Debtors believe the Prepetition Term Lenders are materially undersecured.  As a result, the Debtors do not believe third-party debtor-in-possession financing would be reasonably available, and have determined that their proposed DIP Facilities provide the best path forward under the circumstances to address their immediate liquidity needs, fund these chapter 11 cases, and provide a clear path toward the confirmation and consummation of the Plan.

**Terms and Conditions of the DIP Term Facility and DIP ABL Credit Facility**

**I.      Highlighted Provisions under Bankruptcy Rule 4001 and Local Rule 4001-2.**

7.      The following chart contains a summary of the essential terms of the proposed DIP Facilities, together with references to the applicable sections of the relevant source documents, in accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Rule 4001-2.[4]

| Bankruptcy Code/Local Rule | Credit Facility | Summary of Material Terms |
|---|---|---|
| Borrower Bankr. R. 4001(c)(1)(B) | DIP Term Facility | Oneida Ltd. and Anchor Hocking, LLC (together, the "Borrowers"). *See* DIP Term Agt. pmbl.; Interim DIP Order, pmbl. |
| | DIP ABL Facility | Borrowers. *See* DIP ABL Agt. pmbl.; Interim DIP Order, pmbl. |
| Guarantors Bankr. R. 4001(c)(1)(B) | DIP Term Facility | Universal Tabletop, Inc., Buffalo China, Inc., Delco International, Ltd., Kenwood Silver Company, Inc., Oneida Food Service, Inc., Oneida International Inc., Oneida Silversmiths Inc., Sakura, Inc., and THC Systems, Inc. (collectively, the "Guarantors"). *See* DIP Term Agt. § 1.01. |
| | DIP ABL Facility | Guarantors.  *See* DIP ABL Agt. pmbl. |

---

[4]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined shall have the meanings ascribed to them in the DIP Loan Documents or the Interim DIP Order, as applicable.

5

| Bankruptcy Code/Local Rule | Credit Facility | Summary of Material Terms |
|---|---|---|
| DIP Lenders Bankr. R. 4001(c)(1)(B) | DIP Term Facility | Any lender from time to time a party to the DIP Term Loan Agreement (collectively, the "DIP Term Lenders"). <br><br> *See* DIP Term Agt. pmbl., § 1.01. |
| | DIP ABL Facility | Any lender from time to time a party to the DIP ABL Credit Agreement (collectively, the "ABL Lenders," and together with the DIP Term Lenders, the "DIP Lenders"). <br><br> *See* DIP ABL Agt. pmbl. |
| Administrative Agent Bankr. R. 4001(c)(1)(B) | DIP Term Facility | Wilmington Trust, N.A. (in such capacity, the "DIP Term Agent"). <br><br> *See* DIP Term Agt., pmbl. |
| | DIP ABL Facility | Wells Fargo Bank, N.A. (in such capacity, the "ABL Agent," and together with the DIP Term Agent, the "DIP Agents"). <br><br> *See* DIP ABL Agt. pmbl. |
| Commitment Bankr. R. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | DIP Term Facility | Loans to be advanced to the Borrowers in an aggregate principal amount of $40 million, all of which shall be available on an interim basis (subject to the terms of the DIP Term Loan Agreement). <br><br> *See* DIP Term Agt. § 2.01; Interim DIP Order ¶ 2. |
| | DIP ABL Facility | Revolving loans and letter of credit obligations in an aggregate principal amount not to exceed $60 million, all of which shall be available on an interim basis (subject to the terms of the DIP ABL Credit Agreement). <br><br> *See* DIP ABL Agt. § 1.2(c); Interim DIP Order ¶ 2. |
| Interest Rates Bankr. R. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | DIP Term Facility | Eurodollar Rate Loans shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period plus 9.00%. Base Rate Loans shall bear interest on the the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus 8.00%. <br><br> Default Interest Rate: Applicable rate plus 2.00% per annum. <br><br> *See* DIP Term Agt. §§ 2.06, 1.01 definitions of "Base Rate," "Eurodollar Rate," and "Interest Period." |
| | DIP ABL Facility | Base Rate Revolving Loans shall bear interest at a fluctuating rate per annum equal to the Base Rate plus 2.00%. LIBO Rate Revolving Loans shall bear interest at a rate per annum equal to the LIBO Rate plus 3.00%. <br><br> Default Interest Rate: Applicable rate plus 2.00% per annum. <br><br> *See* DIP ABL Agt. § 1.2(b). |

| Bankruptcy Code/Local Rule | Credit Facility | Summary of Material Terms |
|---|---|---|
| Term<br>Bankr. R.<br>4001(b)(l)(B)(iii),<br>4001(c)(1)(B);<br>Local R. 4001-2(a)(ii) | | The earliest of (i) thirty-five (35) days after the entry of the Interim DIP Order, (ii) delivery of the Default Notice, plus the Default Notice Period, (iii) the Maturity Date (defined in the DIP Term Loan Agreement), and (iv) the Termination Date (as defined in the DIP ABL Credit Agreement).<br><br>*See* DIP Term Agt. § 1.01; DIP ABL Agt. § 1.1(n); Interim DIP Order ¶ 27. |
| Use of DIP Facility and Cash Collateral<br>Bankr. R.<br>4001(b)(l)(B)(ii);<br>Local R. 4001-2(a)(ii) | DIP Term Facility | Proceeds of the DIP Term Facility will be used in accordance with the terms of the Budget, including without limitation. (i) to pay all amounts due to Lenders and the Administrative Agent and all professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Administrative Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby and (ii) to provide working capital, and for other general corporate purposes of the Loan Parties and their respective Subsidiaries, and to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court.<br><br>*See* DIP Term Agt. § 5.19; Interim DIP Order ¶¶ 3, 10-11. |
| | DIP ABL Facility | All Revolving Loans and Letters of Credit shall be used by Debtors and their Subsidiaries for general operating and working capital purposes in the ordinary course of business of the Debtors and their Subsidiaries in accordance with the Budget pursuant to Section 5.3 of the DIP ABL Credit Agreement; for the avoidance of doubt, no proceeds of the Revolving Loans or any Letters of Credit shall be used to fund or ensure that adequate funds are set aside for or available to fund the Carve Out obligations.<br><br>*See* DIP ABL Agt. § 5.2; Interim DIP Order ¶¶ 3, 10-11. |
| Entities with Interests in Cash Collateral<br>Bankr. R.<br>4001(b)(l)(B)(i) | | The Prepetition Term Lenders and the ABL Lenders (together, the "Prepetition Lenders").<br><br>*See* Interim DIP Order ¶ G. |
| Fees<br>Bankr. R.<br>4001(c)(1)(B)<br>Local R. 4001-2(a)(ii) | DIP Term Facility | Borrowers shall pay certain separately agreed upon fees to the DIP Term Agent; a backstop fee of 1.00%, payable in common stock upon Exit Conversion; an original issue discount of 2.00% of the principal amount of the Term Borrowing; and an Exit Conversion fee payable in the form of common stock, in an amount equal to 10% of the pro forma common stock (after giving effect to certain exclusions).<br><br>*See* DIP Term Agt. § 2.07. |
| | DIP ABL Facility | Borrowers shall pay to the ABL Agent a debtor-in-possession financing fee of $90,000. |

DOCS_DE:199269.1 24689/001

| Bankruptcy Code/Local Rule | Credit Facility | Summary of Material Terms |
|---|---|---|
| | | *See* DIP ABL Agt. § 6. |
| Conditions of Borrowing Bankr. R. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | DIP Term Facility | The DIP Term Loan Agreement contains certain customary conditions precedent to extensions of credit, including, among other things:  (1) with respect to the initial credit extension (a) commencement of chapter 11 cases, (b) entry of the Cash Management Orders, (c) receipt of certain evidence of liens or mortgages, financing statements, and financial information, (d) receipt of the Initial Budget in form and substance satisfactory to the Required Lenders, (e) receipt of the fees and expenses due and payable under the Loan Documents; and (2) with respect to any withdrawal (a) if more than 30 days after the date of entry of the Interim DIP Order, the Final DIP Order shall have been entered, (b) receipt of the fees and expenses due and payable under the Loan Documents, (c) timely delivery of a Notice of Withdrawal, and (d) compliance in all respects with the Budget.

*See* DIP Term Agt. Art. IV. |
| | DIP ABL Facility | The DIP ABL Credit Agreement contains certain customary conditions precedent to extensions of credit, including, among other things:  (a) commencement of chapter 11 cases, (b) entry of the Interim DIP Order or other orders ratifying the Debtors' cash management system, (c) execution of the DIP ABL Credit Agreement and certain other documents, (d) receipt of the initial Budget in form and substance satisfactory to the Agent, along with other financial documents, (e) receipt of the Committed Loan Notice, (f) Borrowers and Guarantors shall have established a cash management system reasonably satisfactory to Agent, (g) no Default or Event of Default shall have occurred or be existing.

*See* DIP ABL Agt. §§ 9.1-9.22. |
| Budget Bankr. R. 4001 (c)(1)(B); Local R. 4001-2(a)(ii) | | The use of Cash Collateral and proceeds from the DIP Term Facility and DIP ABL Credit Facility are subject to a customary budget, attached to the Interim DIP Order as <u>Exhibit 3</u>.

*See* DIP Term Agt. § 6.01(e); DIP ABL Agt. § 5.3; Interim DIP Order ¶ 11, <u>Exhibit 3</u>. |
| Reporting Information Bankr. R. 4001(c)(l)(B) Local R. 4001-2(a)(ii) | DIP Term Facility | Standard reporting requirements that largely conform to the Debtors' prepetition reporting obligations, including a variance report setting forth (i) actual cash receipts, expenditures, and disbursements for the immediately preceding calendar week, on a line-item basis and the aggregate liquidity as of the end of such calendar week and (ii) the variance in dollar amounts of the actual expenditures and disbursements (including debt service, professional fees and capital expenditures) for each weekly period from those reflected for the corresponding period in the then-effective Approved Budget.

*See* DIP Term Agt. § 6.01; Interim DIP Order ¶ 20(a)(iv). |

8

| Bankruptcy Code/Local Rule | Credit Facility | Summary of Material Terms |
|---|---|---|
| | DIP ABL Facility | Standard reporting requirements that largely conform to the Debtors' prepetition reporting obligations, as well as (i) a budget compliance report that sets forth for the immediately preceding week and on a cumulative, weekly roll-forward basis through the end of such week the actual results for the following items: (a) net cash flow, (b) excess availability, and (c) loan balance, noting therein variances from values set forth for such periods in the Budget and (ii) copies of all financial reports, schedules and other materials and information at any time furnished by or on behalf of any Loan Party to the Bankruptcy Court, or the U.S. Trustee or to any creditors' committee. <br><br> *See* DIP Term Agt. § 5.3(b); Interim DIP Order ¶ 20(a)(iv). |
| Variance Covenant <br> Bankr. R. 4001(c)(l)(B) <br> Local R. 4001-2(a)(ii) | | So long as the Maturity Date has not occurred, the Debtors shall be authorized to use proceeds of the DIP Extensions of Credit and Cash Collateral in accordance with the Budget subject to variances permitted under the DIP Loan Documents. <br><br> *See* Interim DIP Order ¶ 12; DIP Term Agreement § 7.11; DIP ABL Agreement § 5.3(c). |
| Chapter 11 Milestones <br> Bankr. R. 4001(c)(1)(B) <br> Local R. 4001-2(a)(ii) | DIP Term Facility | The Borrower shall achieve each of the following milestones: <br><br> (i) the order scheduling a hearing to approve the disclosure statement and confirm the Plan (the "<u>Confirmation Hearing</u>") shall be entered by the Court within 5 business days of the Petition Date; (ii) the Confirmation Hearing shall have been commenced by the Court within 45 days after the Petition Date; (iii) the order confirming the Plan shall be entered by the Court within 50 days of the Petition Date and such order is in form and substance satisfactory to the Administrative Agent in its sole discretion; and (iv) the effective date of the Plan shall have occurred within 75 days after the Petition Date. <br><br> *See* DIP Term Agt. § 8.01. |
| | DIP ABL Facility | N/A |
| Liens and Priorities <br> Bankr. R. 4001(c)(l)(B)(i) <br> Local R. 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | DIP Term Facility | Subject to the Carve Out, all DIP Term Obligations shall be (i) secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a first priority lien and security interest in all of the unencumbered assets of the Debtors other than Excluded Assets (as defined in the DIP Term Loan Agreement) (now or hereafter acquired and all proceeds thereof), provided further that such liens shall rank equally in priority and share on a 50%/50% basis with the DIP ABL Liens on any unencumbered assets of the Debtors granted pursuant to the Interim DIP Order (but excluding, for the avoidance of doubt, the Segregated Operating Account); (ii) secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a first priority lien on the Segregated Operating Account, the funds maintained in such account, and all proceeds thereof; (iii) secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by a junior lien on all Priority ABL Collateral, and (iv) secured, pursuant to section 364(d) of the Bankruptcy Code, a first priority, senior priming lien on and security interest in the Priority Term Collateral; *provided* further that, upon entry of the Final DIP Order, the DIP Term Liens shall attach to |

| Bankruptcy Code/Local Rule | Credit Facility | Summary of Material Terms |
|---|---|---|
| | | Avoidance Actions. |
| | | *See* DIP Term Agt. § 10.05; Interim DIP Order ¶ 14(a). |
| | DIP ABL Facility | All DIP ABL Obligations shall be (i) secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a first priority lien and security interest in all unencumbered assets of the Debtors other than Excluded Assets (as defined in the DIP ABL Credit Agreement) (now or hereafter acquired and all proceeds thereof) (but excluding, for the avoidance of doubt, the Segregated Operating Account), provided further that such liens shall rank equally in priority and share on a 50%/50% basis with the DIP Term Liens on any unencumbered assets of the Debtors granted pursuant to the Interim DIP Order; (ii) secured, pursuant to section 364(c)(3) and (d) of the Bankruptcy Code, by a junior lien on all Priority Term Collateral, and (iii) secured, pursuant to section 364(d) of the Bankruptcy Code, a first priority, senior priming lien on and security interest in the Priority ABL Collateral; *provided* further that, upon entry of the Final DIP Order, the DIP ABL Liens shall attach to Avoidance Actions. <br><br> *See* DIP ABL Agt. § 9.17; Interim DIP Order ¶ 14(b). |
| Events of Default<br>Bankr. R.<br>4001(c)(l)(B);<br>Local R. 4001-2(a)(ii) | | Except as otherwise provided in the Interim DIP Order or to the extent the DIP Term Lenders may otherwise agree in writing, any violation of any of the terms of the Interim DIP Order or any occurrence of an "Event of Default" under and as defined in the DIP Term Loan Agreement and the DIP ABL Credit Agreement shall constitute an event of default (each, an "Event of Default"). Interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Term Loan Agreement. <br><br> *See* Interim DIP Order ¶ 28. |
| Carve Out<br>Bankr. R.<br>4001(c)(1)(B)<br>Local R. 4001-2(a)(i)(f) | | Upon the DIP Term Agent's issuance of a Carve Out Trigger Notice (as defined below), all liens, claims and other security interests held by the DIP Term Lenders, including the DIP Term Lenders' DIP Superpriority Claims, the DIP Term Liens, the Term Adequate Protection Obligations, and the Prepetition Term Liens, shall be subject to the payment of the Carve Out. Notwithstanding anything to the contrary contained in this paragraph or otherwise, none of the liens, claims and other security interests held by the ABL Agent or any ABL Lender in any Priority ABL Collateral shall be subject to the payment of the Carve Out (or any portion thereof), and under no circumstances shall proceeds of the ABL Priority Collateral and/or the ABL Agent's and ABL Lenders' superpriority claims be available for purposes of satisfying the Carve Out obligations as described herein. For purposes of the Interim DIP Order, "Carve Out" means the sum of: <br><br> (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); |

| Bankruptcy Code/Local Rule | Credit Facility | Summary of Material Terms |
|---|---|---|
| | | (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); |
| | | (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") at any time before or on the first business day following delivery by the DIP Term Agent of a Carve Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and |
| | | (iv) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $750,000 incurred after the first business day following delivery by the DIP Term Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post Carve Out Trigger Notice Cap"). |
| | | For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Term Agent to the Debtors, their lead restructuring counsel, the DIP ABL Agent and their lead restructuring counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Term Agreement) and acceleration of the DIP Term Obligations under the DIP Term Facility, stating that the Post Carve-Out Trigger Notice Cap has been invoked. |
| | | *See* Interim DIP Order ¶ 5. |
| 506(c) Waiver Bankr. R. 4001(c)(l)(B)(x) Local R. 4001-2(a)(i)(C) | | Upon entry of the Final DIP Order, the Debtors (on behalf of themselves and their estates) shall irrevocably waive, and shall be prohibited from asserting, any surcharge claim under section 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the Prepetition Term Agent, the Prepetition Term Lenders, the ABL Agent or the ABL Lenders upon, the DIP Collateral.  In no event shall the DIP Term Agent, the ABL Agent, the DIP Term Lenders, the ABL Lenders, the Prepetition Term Agent, or the Prepetition Term Lenders be subject to the equitable doctrine of marshaling or any similar doctrine with respect to the DIP Collateral. |
| | | *See* Interim DIP Order ¶¶ N, 14, 22. |
| Section 552(b) Bankr. R. 4001(c)(l)(B) Local R. 4001-2(a)(i)(h) | | Subject to and effective upon entry of the Final DIP Order and, in light of, as applicable, the subordination of the Prepetition Term Liens and the Prepetition ABL Liens to the DIP Liens and the Carve Out (in the case of the DIP Term Liens and the Term Adequate Protection Liens), and the granting of the DIP Liens, the Prepetition |

11

| Bankruptcy Code/Local Rule | Credit Facility | Summary of Material Terms |
|---|---|---|
| | | Term Agent, the Prepetition Term Lenders, the ABL Agent, the ABL Lenders shall be entitled to all benefits of Bankruptcy Code section 552(b), and the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to the Prepetition Term Agent, the Prepetition Term Lenders, the ABL Agent, the ABL Lenders with respect to the proceeds, product, offspring, or profits of any of the DIP Collateral, including the Prepetition Collateral.<br><br>*See* Interim DIP Order ¶¶ N, 42. |
| Stipulations to Prepetition Liens and Claims<br>Bankr. R. 4001(c)(1)(B)(iii)<br>Local R. 4001-2(a)(i)(B) | | The Debtors stipulate and acknowledge (i) the amount and validity of the Prepetition Term Loan Obligations and Prepetition ABL Obligations, (ii) the validity, priority, perfection, and enforceability of the Prepetition Term Liens and Prepetition ABL Liens, and (iii) that the Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against any of the Prepetition Term Agent, the Prepetition Term Lenders, the ABL Agent or the ABL Lenders with respect to the Prepetition Financing Documents, the Prepetition Obligations, the Prepetition Liens, or otherwise.<br><br>*See* Interim DIP Order ¶ F. |
| Adequate Protection<br>Bankr. R. 4001(b)(l)(B)(iv),<br>4001(c)(1)(B)(ii) | | The Prepetition Term Agent, for the benefit of itself, and the Prepetition Term Lenders shall receive the following as Term Adequate Protection Obligations for the extent of any diminution in the value of the prepetition security interests whether or not such diminution in value results from (i) the sale, use, or lease of the collateral securing the Prepetition Term Obligations (including, without limitation, Cash Collateral), (ii) the granting of priming liens to secure the DIP Facilities, or (iii) the imposition of the automatic stay:<br><br>(i) the Term Adequate Protection Liens; *provided* that the Term Adequate Protection Liens shall only encumber the Avoidance Actions upon entry of the Final Order;<br><br>(ii) subject to payment of the Carve Out, a superpriority administrative expense claim junior only to the claims granted to the DIP Term Agent and the ABL Agent by the Interim DIP Order; *provided* that the Prepetition Term Agent and the Prepetition Term Lenders shall not receive or retain any payments, property or other amounts in respect of such superpriority claims unless and until the obligations under the DIP Term Facility and the DIP ABL Credit Facility have indefeasibly been paid in cash in full;<br><br>(iii) payment of all reasonable and documented prepetition and postpetition fees and expenses incurred by the Prepetition Term Agent (for its benefit and the benefit of the Prepetition Term Lenders thereunder) and the ABL Agent (for its benefit and the benefit of the ABL Lenders) during and in connection with the Chapter 11 Cases |

12

| Bankruptcy Code/Local Rule | Credit Facility | Summary of Material Terms |
|---|---|---|
| | | and required to be paid by the Debtors under the Prepetition Term Loan Financing Documents and the Prepetition ABL Financing Documents, as applicable, including, but not limited to, agency fees, and the Term Loan and ABL Facility Professional Fees and Expenses; and |
| | | (iv) the continued accrual of interest (including interest on interest) at the default rate applicable on the Petition Date under the Prepetition Term Facility on all obligations, including accrued but unpaid interest, under the Prepetition Term Facility owing by the Debtors thereunder and other fees owing by the Debtors, *provided* such interest shall not be payable in cash. |
| | | The ABL Agent, for the benefit of itself, and the ABL Lenders shall receive the following as ABL Adequate Protection Obligations for the extent of any diminution in the value of any Cash Collateral or other collateral whether or not arising as a result of (i) the sale, use, or lease of the collateral securing the Prepetition ABL Obligations (including, without limitation, Cash Collateral), (ii) the granting of priming liens to secure the DIP Facilities, or (iii) the imposition of the automatic stay: |
| | | (i) pursuant to sections 361 and 363 of the Bankruptcy Code, valid and binding, enforceable and perfected replacement liens upon and security interests in the Prepetition ABL Collateral; *provided, that* any portion of such liens and security interests in the Priority Term Collateral shall be junior in priority and subordinate in all respects to the DIP Term Liens, the Prepetition Term Liens and the Term Adequate Protection Liens on the Term Priority Collateral; and |
| | | (ii) the ABL Adequate Protection Superpriority Claim; *provided, further*, the ABL Adequate Protection Superpriority Claim shall have priority over all administrative claims and unsecured claims against the Debtors and their estates now existing or hereafter arising of any kind or nature whatsoever subject only to the DIP Term Superpriority Claim, which shall rank equally in priority and share on a 50%/50% basis with respect to all amounts payable in respect of such super priority administrative expense claims, *provided* that the ABL Replacement Lien shall only encumber the Avoidance Actions upon entry of the Final DIP Order. |
| | | *See* Interim DIP Order ¶ M, 20. |
| Waiver/Modification of the Automatic Stay Bankr. R. 4001(c)(1)(B)(iv) | | The automatic stay provisions of section 362 of the Bankruptcy Code shall be automatically vacated and modified to the extent necessary to permit the DIP Term Agent, the DIP Term Lenders, the ABL Agent, or the ABL Lenders, as applicable, to exercise, upon not less than five business days' prior written notice by email (which notice may be set forth in a Default Notice) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, if any, following the occurrence and continuance of an Event of Default (as defined in the applicable DIP Loan Documents), all rights and remedies provided in this Interim Order and the DIP Loan Documents, as applicable, subject to the terms and conditions |

| Bankruptcy Code/Local Rule | Credit Facility | Summary of Material Terms |
|---|---|---|
| | | of the Intercreditor Agreement.  The Debtors or any party in interest may seek a determination from the Court that no Event of Default has occurred and is continuing, and request appropriate relief from the Court in the event it should so determine that no Event of Default has occurred and is continuing.<br><br>*See* Interim DIP Order ¶ 29. |
| Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens<br>Bankr. R. 4001(c)(1)(B)(vii) | | The DIP Liens granted pursuant to the Interim DIP Order shall constitute valid, enforceable, nonavoidable and duly perfected first priority security interests and liens, and the DIP Term Agent, the DIP Term Lenders, the ABL Agent and the ABL Lenders shall <u>not</u> be required to file or serve financing statements, notices of lien, mortgage deeds, deeds of trust or similar instruments which otherwise may be required under federal, state or local law in any jurisdiction, or take any action, including taking possession or control, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the DIP Liens or deliver possessory DIP Collateral shall in no way affect the validity, enforceability, perfection or priority of such liens.  The DIP Term Agent, the DIP Term Lenders, the ABL Agent and the ABL Lenders are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Term Agent, the DIP Term Lenders, the ABL Agent or the ABL Lenders shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments or otherwise take any action to validate, perfect, or confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, nonavoidable and not subject to challenge, dispute or subordination, at the time and as of the date of entry of the Interim DIP Order.<br><br>*See* Interim DIP Order ¶ 16. |
| Release<br>Bankr. R. 4001(c)(1)(B)(viii) | | The Debtors stipulate and agree that they forever and irrevocably release, discharge and acquit the Prepetition Term Agent, the DIP Term Agent, the ABL Agent, and all former, current and future Consenting Term Lenders (as defined in the Prepackaged Plan), DIP Term Lenders, and ABL Lenders, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "<u>Releasees</u>") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the DIP Facilities, the DIP Loan Documents, the Prepetition Facilities, the Prepetition Financing Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, |

14

| Bankruptcy Code/Local Rule | Credit Facility | Summary of Material Terms |
|---|---|---|
| | | (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Term Agent, the Prepetition Term Lenders, the DIP Term Agent, the DIP Term Lenders, the ABL Agent, and the ABL Lenders. The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Obligations and the DIP Obligations which the Debtors now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to the Bankruptcy Court entering the Interim DIP Order. <br><br> *See* Interim DIP Order ¶ F(vii). |
| Indemnification <br> Bankr. R. <br> 4001(c)(1)(B)(ix) | | The Prepetition Term Agent, the Prepetition Term Lenders, the ABL Agent, the ABL Lenders, the DIP Term Agent, the DIP Term Lenders, and all successors thereof, have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting or obtaining requisite approvals of, as applicable, the Support Agreement, the DIP Facilities, and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facilities or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing. Accordingly, the Prepetition Term Agent, the Prepetition Term Lenders, the DIP Term Agent, the DIP Term Lenders, the ABL Agent and the ABL Lenders, and all successors thereof, shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto, provided that no such parties will be indemnified for any cost, expense or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct. No exception or defense in contract, law or equity exists as to any obligation set forth, as the case may be, in this paragraph F(vi), in the Prepetition Financing Documents or in the DIP Loan Documents, to indemnify and/or hold harmless the Prepetition Term Agent, the Prepetition Term Lenders, the the DIP Term Agent, the DIP Term Lenders, the ABL Agent or the ABL Lenders, or any successors thereof, as the case may be. <br><br> *See* Interim DIP Order ¶ F(vi). |
| Liens on Avoidance Actions <br> Bankr. R. <br> 4001(c)(1)(B)(xi); <br> Local R. <br> 4001-2(a)(i)(D) | | Subject to the entry of the Final DIP Order, the DIP Liens shall attach to and encumber claims and causes of action under Chapter 5 of the Bankruptcy Code and similar laws, and any proceeds thereof and property received thereby whether by judgment, settlement or otherwise. <br><br> *See* Interim DIP Order ¶ 14. |
| Challenge Period | | The stipulations and admissions contained in the Interim Order shall |

| Bankruptcy Code/Local Rule | Credit Facility | Summary of Material Terms |
|---|---|---|
| Bankr. R. 4001(c)(l)(B) Local R. 4001-2(a)(i)(B) | | be binding on the Debtors' estates and all parties in interest, including, without limitation, any Committee, unless (a) any Committee, or another party in interest (other than any of the Debtors) with standing and requisite authority, has timely commenced a contested matter or adversary proceeding (a "Challenge") challenging the amount, validity or enforceability of the Prepetition Term Obligations, the Prepetition ABL Obligations, or the perfection or priority of the Prepetition Term Liens or the Prepetition ABL Liens, or otherwise asserting any objections, claims or causes of action on behalf of the Debtors' estates against the Prepetition Term Lenders or ABL Lenders relating to the Prepetition Term Obligations, the Prepetition ABL Obligations, the Prepetition Term Liens or the Prepetition ABL Liens no later than on or before either (i) if no Committee has been appointed, the earlier of (A) seventy-five (75) days from the date of entry of this Interim Order and (B) the date on which objections to confirmation of the Debtors' Chapter 11 plan or plans of reorganization for one or more of the Debtors are due, or (ii) if a Committee has been appointed, the earlier of (A) sixty (60) days after such Committee is appointed and (B) the date on which objections to confirmation of Every Ware's Chapter 11 plan or plans of reorganization for one or more of the Debtors are due, and (b) to the extent the Court rules in favor of the plaintiff in any such timely and properly filed Challenge.<br><br>*See* Interim DIP Order ¶ 32. |
| No Priming or Pari Passu Liens Bankr. R. 4001(c)(1)(B); Local R. 4001-2(a)(ii) | | Except for the Carve Out, the Carve Out Reserves or as otherwise expressly set forth in the DIP Loan Documents or the Interim DIP Order, it shall constitute an Event of Default under the DIP Term Facility and the DIP ABL Credit Facility if any of the Debtors incurs or requests authority to incur a claim or grants a lien (or a claim or lien is allowed) having a priority superior to or *pari passu* with those granted pursuant to the Interim DIP Order to the Prepetition Term Agent on its behalf and on behalf of the Prepetition Term Lenders or the ABL Agent on behalf of the ABL Lenders at any time during which any portion of the DIP Facilities, the DIP Obligations, the Prepetition ABL Credit Facility, the Prepetition Term Loan Facility, the Prepetition Term Loan Obligations or the Adequate Protection Obligations remains outstanding.<br><br>*See* Interim DIP Order ¶ 23. |

## Relief Requested

8.     The Debtors seek entry of the Interim DIP Order and, pending the Final Hearing, the Final DIP Order, in each case:

  a.     authorizing the Debtors to enter into the DIP Term Facility, which shall include loans to be advanced and made available to the Borrowers in the aggregate principal amount of $40 million, all of which will be available upon entry of the Interim DIP Order and satisfaction of other conditions to

DOCS_DE:199269.1 24689/001

borrowing, pursuant to the terms and conditions of the DIP Term Loan Agreement, a copy of which is attached hereto as **Exhibit 1** to **Exhibit A**;

b.    authorizing the Debtors to enter into the DIP ABL Facility, which shall consist of revolving loans and letters of credit to be advanced and made available to the Borrowers in the maximum aggregate principal amount of $60 million, all of which will be available upon entry of the Interim DIP Order and satisfaction of other conditions to borrowing, pursuant to the terms and conditions of the DIP ABL Credit Agreement, a copy of which is attached hereto as **Exhibit 2** to **Exhibit A**;

c.    ordering that, subject to the Carve Out in all respects, all obligations of the Borrowers under the DIP Term Facility shall be:

(i)    secured, pursuant to section 364(d) of the Bankruptcy Code, by a first priority, priming lien on and security interests in all of the assets of the Debtors encumbered by a first priority lien under the Prepetition Term Loan Facility not otherwise described in clauses (a) through (c) above (the "Priority Term Collateral"), *provided further* that such lien shall be senior to the Prepetition Term Liens, the DIP ABL Liens and the Prepetition ABL Liens on the Priority Term Collateral;

(ii)    secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by a junior lien on all assets of the Debtors encumbered by a first priority lien under the Prepetition ABL Facility (now or hereafter acquired) (the "Priority ABL Collateral"), *provided further* that such lien on the Priority ABL Collateral shall be junior to the DIP ABL Liens (defined below) and the Prepetition ABL Liens on the Priority ABL Collateral and senior to any other lien on the Priority ABL Collateral (including, without limitation, the Prepetition Terms Liens); and

(iii)    secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a first priority lien on the Segregated Operating Account, the funds maintained in such account, and all proceeds thereof;

(iv)    secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a first priority, lien on and security interest in all unencumbered assets of the Debtors other than Excluded Assets (as defined in the DIP Term Loan Agreement) (now or hereafter acquired and all proceeds therof); provided further that such liens shall rank equally in priority and share on a 50%/50% basis with the DIP ABL Liens on any unencumbered assets of the Debtors granted pursuant to the Interim DIP Order (but excluding, for the avoidance of doubt, the Segregated Operating Account); (the liens granted in

17

subparagraphs (i)-(iv), the "DIP Term Liens," and any collateral subject to the DIP Term Liens, the "DIP Term Collateral");

d.    ordering that, all obligations of the Borrowers under the DIP ABL Facility shall be:

(i)    secured, pursuant to section 364(d) of the Bankruptcy Code, by a first priority lien on and security interest in the Priority ABL Collateral, which lien shall be senior in priority to the DIP Term Liens and the Prepetition Term Liens on the Priority ABL Collateral; and

(ii)    secured, pursuant to section 364(c)(3) and (d) of the Bankruptcy Code, by a junior priming lien on the Priority Term Collateral, which lien shall be junior in priority and subordinate to the DIP Term Liens and Prepetition Term Liens on the Term Priority Collateral but senior in priority to the Prepetition ABL Liens on the Term Priority Collateral; and

(iii)    secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a first priority lien on and security interest in all unencumbered assets of the Debtors other than Excluded Assets (as defined in the DIP ABL Credit Agreement) (now or hereafter acquired and all proceeds thereof) (but excluding, for the avoidance of doubt, the Segregated Operating Account); provided further that such liens shall rank equally in priority and share on a 50%/50% basis with the DIP Term Liens on any unencumbered assets of the Debtors granted pursuant to this Interim Order; (the liens granted in subparagraphs (i)-(iii), the "DIP ABL Liens," and together with the DIP Term Liens, the "DIP Liens");

e.    authorizing the Debtors to use any and all "cash collateral" as defined in section 363 of the Bankruptcy Code, in which the Prepetition Lenders or Prepetition Agents on behalf of the DIP Agents has a lien or security interest ("Cash Collateral");

f.    ordering that, the Prepetition Term Agent, for the benefit of itself, and the Prepetition Term Lenders shall receive the following as adequate protection (the "Term Adequate Protection Obligations") for the extent of any diminution in the value of the prepetition security interests whether or not such diminution in value results from (i) the sale, use, or lease of the collateral securing the Prepetition Term Obligations (including, without limitation, Cash Collateral), (ii) the granting of priming liens to secure the DIP Facilities, or (iii) the imposition of the automatic stay:

(i)    an effective and perfected security interest in and lien on all assets of the Debtors (together, the "Term Adequate Protection Liens"),

18

subject and subordinate only to (x) the Carve-Out, (y) the DIP Term Liens securing the DIP Term Facility and (z) with respect to the Priority ABL Collateral, the DIP ABL Liens securing the DIP ABL Credit Facility and Prepetition ABL Liens securing the Prepetition ABL Facility; *provided* that the Term Adequate Protection Liens shall only encumber the Avoidance Actions upon entry of the Final Order;

(ii)    subject to payment of the Carve Out, a superpriority administrative expense claim junior only to the claims granted to the DIP Term Agent and the ABL Agent by the Interim DIP Order; *provided* that the Prepetition Term Agent and the Prepetition Term Lenders shall not receive or retain any payments, property or other amounts in respect of such superpriority claims unless and until the obligations under the DIP Term Facility and the DIP ABL Credit Facility have indefeasibly been paid in cash in full;

(iii)    payment of all reasonable and documented prepetition and postpetition fees and expenses incurred by the Prepetition Term Agent (for its benefit and the benefit of the Prepetition Term Lenders thereunder) and the ABL Agent (for its benefit and the benefit of the ABL Lenders) during and in connection with the Chapter 11 Cases and required to be paid by the Debtors under the Prepetition Term Loan Financing Documents and the Prepetition ABL Financing Documents, as applicable, including, but not limited to, agency fees, the reasonable professional fees and disbursements of: (i) counsel to the existing Prepetition Term Agent and counsel to the anticipated successor Prepetition Term Agent, (ii) counsel to the Prepetition Term Lender Ad Hoc Committee, (iii) each local counsel of the Prepetition Term Agent, the ABL Agent, and Prepetition Term Lender Ad Hoc Committee, (iv) the financial advisor to the Prepetition Term Lender Ad Hoc Committee, (v) counsel to the ABL Lenders, and (vi) the financial advisor to the ABL Lenders;

(iv)    financial and other reporting provided by the Debtors in compliance with the Prepetition Term Loan Financing Documents, including with respect to any cure period provided for therein, and any reports provided to the ABL Agent or the ABL Lenders; and

(v)    the continued accrual of interest (including interest on interest) at the default rate applicable on the Petition Date under the Prepetition Term Facility on all obligations, including accrued but unpaid interest, under the Prepetition Term Facility owing by the Debtors thereunder and other fees owing by the Debtors, *provided* such interest shall not be payable in cash;

19

g.      ordering that the ABL Agent, for the benefit of itself, and the ABL Lenders shall receive the following as adequate protection (the "ABL Adequate Protection Obligations") for the extent of any diminution in the value of any Cash Collateral or other collateral whether or not arising as a result of (i) the sale, use, or lease of the collateral securing the Prepetition ABL Obligations (including, without limitation, Cash Collateral), (ii) the granting of priming liens to secure the DIP Facilities, or (iii) the imposition of the automatic stay:

(i)      pursuant to sections 361 and 363 of the Bankruptcy Code, valid and binding, enforceable and perfected replacement liens upon and security interests in the Prepetition ABL Collateral; *provided, that* any portion of such liens and security interests in the Priority Term Collateral shall be junior in priority and subordinate in all respects to the DIP Term Liens, the Prepetition Term Liens and the Term Adequate Protection Liens on the Term Priority Collateral; and

(ii)     as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Chapter 11 cases and any Successor Cases (the "ABL Adequate Protection Superpriority Claim"); *provided, further*, the ABL Adequate Protection Superpriority Claim shall have priority over all administrative claims and unsecured claims against the Debtors and their estates now existing or hereafter arising of any kind or nature whatsoever subject only to the DIP Term Superpriority Claim, which shall rank equally in priority and share on a 50%/50% basis with respect to all amounts payable in respect of such super priority administrative expense claims, *provided* that the ABL Replacement Lien shall only encumber the Avoidance Actions upon entry of the Final Order;

h.      modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim DIP Order or the Final DIP Order, as applicable;

i.      scheduling the Final Hearing to consider entry of the Final DIP Order and approving the form of notice with respect to the Final Hearing; and

j.      granting related relief.

### Introduction[5]

---

[5]     For more information regarding the Debtors' history, operations, and financial performance, see the First Day Declaration. On April 7, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have filed a motion seeking joint administration of their chapter 11 cases under Bankruptcy Rule 1015(b). The Debtors are operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a

9.     The Debtors commenced these chapter 11 cases to implement a consensual, prepackaged chapter 11 plan of reorganization—i.e., the Plan.[6]  The restructuring transactions contemplated by the Plan will significantly deleverage the Debtors' balance sheet, reducing the Debtors' funded debt obligations by approximately 72.4% by converting the entire $248.7 million term loan facility (the "Term Loan Facility") into 96.0% of the reorganized Debtors' new equity (the "New Common Stock").  All other creditors, including holders of general unsecured claims, are "riding through" these chapter 11 cases.  The Plan has support from the Debtors' primary stakeholders, including term loan lenders holding more than 65.0% of the loans outstanding under the Term Loan Facility (the "Consenting Term Lenders"), and equity holders holding more than 84.0% of EveryWare common stock and 100% of EveryWare preferred stock (the "Consenting Equity Holders") pursuant to a restructuring support agreement (the "Support Agreement").  As of the Petition Date, holders of more than 68.1% in amount of Class 5 Term Loan Facility Claims—the only class entitled to vote on the Plan—already have voted to accept the Plan.[7]

## Background

10.     The Debtors are leading global marketers of tabletop, food preparation, and storage products for the consumer, foodservice, and specialty markets.  The Debtors' primary operating subsidiaries, Oneida Ltd. and Anchor Hocking, LLC, were founded in 1848 and 1873,

---

trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

[6]     For additional information, please refer to the *Debtors' Joint Prepackaged Chapter 11 Plan* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") and the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan*, filed contemporaneously herewith.

[7]     *See Preliminary Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Joint Prepackaged Chapter 11 Plan*, filed contemporaneously herewith.  The Debtors commenced solicitation of the Plan on April 3, 2015.  Solicitation will remain open until April 17, 2015.

DOCS_DE:199269.1 24689/001

respectively.  In 2011, investment funds affiliated with Monomoy Capital Partners completed their acquisition of these companies and, in March 2012, integrated them under the EveryWare brand.  The Debtors completed a subsequent merger transaction in May 2013, resulting in their existing capital structure today.  As of September 30, 2014, the Debtors reported total assets of approximately $237.8 million and total liabilities of approximately $380.4 million.  As of the Petition Date, the Debtors' funded debt obligations include a $250.0 million term loan facility— i.e., the Term Loan Facility—and $60.0 million asset-based revolving facility (the "ABL Facility"), with outstanding principal balances of approximately $248.7 million and $43.6 million,[8] respectively.  For the year ended December 31, 2014, the Debtors preliminarily reported $354.0 million of total revenue.

11.    Since the early part of 2014, the Debtors have explored and implemented a series of out-of-court financial and operational restructuring initiatives to stabilize the business and create long-term value.  A number of these initiatives succeeded, including the satisfaction of certain performance targets under a revised business plan in the second-half of 2014.  The Debtors' 2015 business plan projected compliance with the financial covenants under the term loan credit agreement (the "Term Loan Agreement").  Nevertheless, in early March 2015, the Debtors were informed that they may receive a "going concern" qualification from their independent auditors in connection with the filing of their annual report.  If uncured within 30 days, the going concern qualification could have ripened into an event of default under the Term Loan Agreement and a cross-default under the ABL Loan Agreement.  If such event a default occurred, liquidity issues arising from the resultant, foreseeable contraction of trade terms from the Debtors' vendor and supplier base could have jeopardized the Debtors' ongoing

---

[8]    In addition, approximately $10.2 million of standby letters of credit have been issued under the ABL Facility.

operations.  Accordingly, the Debtors engaged their primary equity holders, a steering committee of term loan lenders, and the ABL Agent regarding various restructuring alternatives—both out-of-court and in-court—to strengthen the Debtors' balance sheet, provide short-term liquidity support, and create a sustainable capital structure to position the Debtors for the future.  On March 31, 2015, after extensive, hard fought negotiations, the Debtors, the Consenting Term Lenders, and the Consenting Equity Holders entered into the Support Agreement, whereby the parties thereto have agreed to support the restructuring transactions described herein.

12.     As noted above, these restructuring transactions will significantly deleverage the Debtors' balance sheet, reducing the Debtors' funded debt obligations by approximately 72.4% by converting the entire $248.7 million Term Loan Facility into 96.0% of the New Common Stock.  The Plan provides that the other 4.0% of New Common Stock will be allocated to all existing equity holders in exchange for the Consenting Equity Holders' support of the proposed restructuring.  Importantly, holders of allowed general unsecured claims will be paid in full in cash under the Plan.  The Debtors have also received commitments for a $40.0 million new money DIP term facility and continued access to their $60.0 million ABL Facility to ensure the smooth continuation of operations during the in-court proceedings.  The Debtors and the parties to the Support Agreement believe that the Plan and the transactions contemplated thereunder will right-size the Debtors' balance sheet, improve liquidity, and strengthen go-forward operations, positioning the Debtors for long-term success.

## The Debtors' Prepetition Capital Structure

13.     As of the Petition Date, the Debtors' funded debt consists of the $250.0 million term loan facility, the Prepetition Term Loan Facility and the $60.0 million asset-based revolving credit facility, the Prepetition ABL Facility.  As of the Petition Date, the obligations outstanding under these facilities are estimated at the following amounts:

23

|                                | $ millions    |
|--------------------------------|---------------|
| Prepetition Term Loan Facility | $248.7        |
| Prepetition ABL Facility       | $43.6         |
|                                | **Total $292.3** |

## I.    The Prepetition Term Loan Facility.

14.    Debtors Anchor Hocking, LLC and Oneida Ltd. are party to that certain Term Loan Agreement, dated May 21, 2013 (as amended, restated, modified, or supplemented from time to time prior to the Petition Date), as borrowers and Universal Tabletop, Inc. and all wholly-owned domestic subsidiaries of Anchor Hocking, LLC and Oneida Ltd., as guarantors, pursuant to which the lender parties thereto agreed to provide a senior secured term loan facility in an aggregate principal amount of up to $250.0 million.  As of the Petition Date, the aggregate outstanding principal amount under the Prepetition Term Loan Facility was approximately $248.7 million, excluding accrued and unpaid interest.  The Prepetition Term Loan Facility matures May 21, 2020.  The Prepetition Term Loan Agreement requires quarterly amortization payments of principal and interest in the amount of 0.25% of the amount of the Prepetition Term Loan Facility outstanding on the Term Loan closing date until maturity.  As of December 31, 2014, interest was paid at the Debtors' option as follows:

     i.     in the case of base rate loans, a base rate equal to the greatest of (a) the prime rate in effect on such day, (b) the federal funds effective rate in effect on such day plus 0.50% and (c) the Eurodollar rate for a one-month interest period plus 1.00% (provided that the base rate will be deemed to be not less than 2.25%), plus a margin of 7.25%; or

     ii.     in the case of Eurodollar loans, a Eurodollar rate equal to (a) LIBOR divided by (b) one minus an applicable reserve requirement (subject to a LIBOR floor of 1.25% per annum), plus a margin of 8.25%.

DOCS_DE:199269.1 24689/001

The Prepetition Term Loan Agreement requires mandatory prepayments upon the occurrence of certain events, including additional debt issuances, common and preferred stock issuances, certain asset sales, and excess cash flow generation.

15.     Anchor Hocking, LLC's and Oneida Ltd.'s obligations under the Prepetition Term Loan Agreement are guaranteed on a joint and several basis, by Universal Tabletop, Inc., Buffalo China, Inc. Delco International, Ltd., Kenwood Silver Company, Inc., Oneida Food Service, Inc., Oneida International Inc., Oneida Silversmiths Inc., Sakura, Inc., and THC Systems, Inc. Additionally, obligations under the Prepetition Term Loan Facility are secured on first-priority basis by liens on substantially all of the assets of Universal Tabletop, Inc. and its domestic subsidiaries, other than with respect to the assets securing the Prepetition ABL Facility on a first-priority basis, which secure the Prepetition Term Loan Facility on a second-priority basis. The Prepetition Term Loan Facility is subject to that certain intercreditor agreement, dated May 21, 2013, by and among, the Prepetition Term Agent, the ABL Agent, and certain other parties.

## II.     The Prepetition ABL Facility.

16.     Debtors Anchor Hocking, LLC and Oneida Ltd. are party to that certain ABL Credit Agreement, dated May 21, 2013 (as amended, restated, modified, or supplemented from time to time prior to the Petition Date), as borrowers, Universal Tabletop, Inc. and all wholly-owned domestic subsidiaries of Anchor Hocking, LLC and Oneida Ltd., as guarantors, pursuant to which the lender parties thereto have agreed to provide an asset-based revolving credit facility in an aggregate principal amount of up to $60.0 million, subject to a borrowing base limitation and compliance with a fixed charge coverage ratio financial covenant. As of the Petition Date, the aggregate outstanding borrowings under the Prepetition ABL Facility were approximately $43.6 million, excluding accrued and unpaid interest and obligations in respect of certain letters

25

of credit.[9]  Availability under the Prepetition ABL Facility is subject to an asset-based borrowing formula based on eligible accounts receivable and inventory.  The Prepetition ABL Facility matures on May 21, 2018.  As of December 31, 2014, borrowings under the Prepetition ABL Facility bore interest at variable rates (with an average of 3.3%), determined by either (a) LIBOR plus a margin as described below, or (b) for any day, a rate per annum equal to the greater of (i) the Prime Rate in effect on such day, (ii) the Federal Funds Effective Rate in effect on such day plus 0.50%, and (iii) LIBOR plus 1.00%, in each case plus a margin as described below. The applicable margin was calculated as follows:

| Tier | Quarterly Average Availability | Applicable LIBOR Margin | Applicable Base Rate Margin |
|------|-------------------------------|:-----------------------:|:---------------------------:|
| 1 | Greater than 30% of the maximum revolver amount | 2.00% | 1.00% |
| 2 | Greater than 15% of the maximum revolver amount but less than 30% of the maximum revolver amount | 2.25% | 1.25% |
| 3 | Less than 15% of the maximum revolver amount | 2.50% | 1.50% |

17.    Anchor Hocking, LLC's and Oneida Ltd.'s obligations under the Prepetition ABL Loan Agreement are guaranteed, subject to certain customary exceptions and limitations, on a joint and several basis, by Universal Tabletop, Inc., Buffalo China, Inc. Delco International, Ltd., Kenwood Silver Company, Inc., Oneida Food Service, Inc., Oneida International Inc., Oneida Silversmiths Inc., Sakura, Inc., and THC Systems, Inc.  Additionally, obligations under the Prepetition ABL Facility are secured on first-priority basis by liens on substantially all of the assets of Universal Tabletop, Inc. and its domestic subsidiaries, other than with respect to the assets securing the Prepetition Term Loan Facility on a first-priority basis, which secure the

---

[9]    Approximately $10.2 million of standby letters of credit have been issued under the Prepetition ABL Facility.

Prepetition ABL Facility on a second-priority basis.  The Prepetition ABL Facility is subject to that certain intercreditor agreement, dated May 21, 2013, by and among, the Prepetition Term Agent, the ABL Agent, and certain other parties.

## III.    The Intercreditor Agreement.

18.    The Debtors, the Prepetition Term Agent, and ABL Agent are parties to that certain ABL Intercreditor Agreement, dated as of May 21, 2013 (as amended, restated, modified, or supplemented from time to time prior to the Petition Date, the "<u>Intercreditor Agreement</u>"). The Intercreditor Agreement governs certain of the respective rights and interests of the Prepetition Term Lenders and ABL Lenders relating to, among other things, their rights with respect to the Prepetition Obligations and the Prepetition Collateral and the relative priorities of the Prepetition Liens in respect of the Prepetition Collateral.  The Intercreditor Agreement has been modified by the proposed Interim DIP Order to account for the Debtor's anticipated incurrence of the DIP Obligations and to govern the relative rights and remedies of the Prepetition Term Lenders, the Prepetition Term Agent, the ABL Lenders, the ABL Agent, the DIP Term Lenders, the DIP Term Agent, the ABL Lenders and the ABL Agent.

<u>The Debtors Have an Immediate Need for Cash</u>

19.    As noted above, the Debtors propose to use the DIP Term Loans, DIP ABL Loans, and Cash Collateral to satisfy employee wages, employee benefits, certain other limited operational expenses as set forth in the Budget, and to fund administration of these chapter 11 estates.  Without access to the DIP Term Loans, the DIP ABL Loans, and Cash Collateral to satisfy these obligations, the Debtors will have insufficient funds to pay wages for their employees, preserve and maximize the value of their estates, and administer these chapter 11 cases.  Thus, the Debtors' access to the DIP Term Loans, the DIP ABL Loans, and Cash Collateral will facilitate their efforts to maximize value for their stakeholders through the

proposed restructuring transaction.  Absent approval of the Interim DIP Order, the Debtors will not have access to the DIP Term Loans, the DIP ABL Loans, or the Cash Collateral necessary to fund administration of these chapter 11 estates, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders and other parties in interest.

**Alternative Sources of Financing Are Not Readily Available**

20.    The Debtors do not believe that alternative sources of financing are readily available.  Additionally, the Debtors do not believe it would be prudent, or even possible, to administer these chapter 11 estates on a "cash collateral" basis.  As noted above, without access to the DIP Facilities, the Debtors have extremely limited cash on hand, and do not expect to be able to generate sufficient levels of operating cash flow in the ordinary course of business to cover their working capital needs and the projected costs of these chapter 11 cases.  In addition, substantially all of the Debtors' assets are encumbered by liens arising under the Prepetition Term Loan Agreement and Prepetition ABL Credit Agreement.  As a result, the Debtors do not believe third-party debtor-in-possession financing would be reasonably available given the realities imposed by the Debtors' existing capital structure.

21.    Indeed, the Debtors, after consulting their advisors, believe that because any potential sources of financing (outside of the Debtors' Prepetition Lenders) would undoubtedly insist on priming the Prepetition Lenders, such outside financing was not a feasible option. Without the consent of the Prepetition Lenders, any attempts at non-consensual priming of the Prepetition Lenders' liens would likely involve a costly, extended, and contested hearing.  The Debtors do not believe that they would be able to demonstrate adequate protection for the non-consensual priming of the Prepetition Lenders' liens  Moreover, any such outside financing would expose the Debtors to the execution risk associated with a new lender transaction,

including material timing and due diligence constraints, necessarily involving the payment of additional professional fees.

22.     In contrast, the proposed DIP Facilities offered by the Prepetition Term Lenders and ABL Lenders (i.e., the DIP Lenders) will allow the Debtors to avoid the need to engage in a costly and time-consuming priming fight at the outset of these chapter 11 cases.  Accordingly, the Debtors believe that the DIP Facilities provides, on balance, a more attractive postpetition financing proposal than alternative postpetition financing obtained from a third-party.  Further, the DIP Facilities are the product of extensive good faith, arms'-length negotiations with the DIP Lenders and are an essential component of the broader restructuring transaction contemplated by the Restructuring Support Agreement and the Plan, which were themselves heavily negotiated prior to the Petition Date.  Moreover, the DIP Facilities represent the only viable financing available that would not require the Debtors to seek to prime the Prepetition Lenders' liens on a nonconsensual basis.

**Provisions to be Highlighted Pursuant to Local Rule 4001-2**

23.     In accordance with Local Rule 4001-2, the following provisions of the DIP Facilities are highlighted below.  As discussed in detail herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these chapter 11 cases and should be approved.

   a.     **Local Rule 4001-2(a)(i)(A) — *Cross-Collateralization Protection*.**  The DIP Orders do not provide for cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors.

   b.     **Local Rule 4001-2(a)(i)(B) — *Challenge Period*.**  The Interim DIP Order affords the Committee (if any) or any other party in interest an opportunity to assert claims against the Prepetition Lenders in connection with any matter related to the Prepetition Term Obligations, the Prepetition ABL Obligations, the Prepetition Term Liens, or the Prepetition ABL Liens by no later than (a) with respect to the Committee, if appointed, sixty (60)

days from the date of formation of the Committee, and (b) with respect to all other parties-in-interest, the earlier of seventy-five (75) days from the entry of the Interim DIP Order and the date on which objection to confirmation of the Plan are due. *See* Interim DIP Order ¶ 32.

c.    **Local Rule 4001-2(a)(i)(C) — *506(c) Waiver***.  Subject to the entry of the Final DIP Order, the DIP Collateral shall not be subject to surcharge pursuant to section 506(c) of the Bankruptcy Code. *See* Interim DIP Order ¶¶ 14, 22.

d.    **Local Rule 4001-2(a)(i)(D) — *Liens on Avoidance Actions***.  DIP Liens will not be granted on Avoidance Actions or the proceeds thereof; *provided* that upon entry of the Final DIP Order, the proceeds of Avoidance Actions will constitute a portion of the DIP Collateral. *See* Interim DIP Order ¶ 14(a)-(b).

e.    **Local Rule 4001-2(a)(i)(E) — *Repayment Features***.  The DIP Facilities do not provide that (and the Debtors do not intend that) proceeds of the DIP Facilities will be used immediately to pay all outstanding obligations under the Prepetition Term Loan Agreement or the Prepetition ABL Credit Agreement.  Nonetheless, the DIP ABL Credit Facility includes a "creeping roll-up" feature: upon the closing of the DIP ABL Credit Facility, all collections and payments made in respect of the DIP ABL Collateral shall be applied first to pay down the Prepetition ABL Obligations, and second to pay obligations arising under the DIP ABL Credit Facility. *See* DIP ABL Credit Agt. § 7.3.  The roll-up feature of the DIP ABL Credit Facility is reasonable under the circumstances, given the structure of the facility and the ABL Lenders willingness to continue extending credit to the Debtors on a postpetition basis.  Moreover, the DIP ABL Credit Facility, and the support of the ABL Lenders, is an essential component of the broader restructuring transaction contemplated by the Support Agreement and the Plan, which were themselves heavily negotiated at arms' length in good faith prior to the Petition Date.  Accordingly, the Debtors submit the roll-up is reasonable, appropriate, and a sound exercise of their business judgment under the circumstances.

f.    **Local Rule 4001-2(a)(i)(F) — *Disparate Carve Out Treatment***.  There is disparate treatment between the Debtors' professionals and those of a Committee, if any, with respect to the professional fee Carve Out.  There is no provision for payment of a Committee's professionals under the professional fee Carve Out.  The Debtors respectfully submit this treatment is appropriate under the facts of these chapter 11 cases.  The Debtors intend to consummate their Plan as quickly as reasonably possible.  Further, the Plan contemplates payment in full of general unsecured creditors and the Debtors, therefore, do not anticipate any Committee will be formed.  To the extent a Committee is formed, the Debtors do not intend that these chapter 11 cases will have an extended

duration and that professional fees incurred by any Committee professionals will, therefore, be adequately provided for by the terms of the Budget.  *See* Interim DIP Order ¶ 5.

g.    **Local Rule 4001-2(a)(i)(G) — *Nonconsensual Priming***.  The Prepetition Term Lenders and ABL Lenders have consented to the "self-priming" of the Prepetition Term Liens and Prepetition ABL Liens, respectively.  *See* Interim DIP Order ¶ 20.

h.    **Local Rule 4001-2(a)(i)(H) — *Section 552(b)(1)***.  The proposed waiver of "equities of the case" claims under section 552(b) of the Bankruptcy Code will only be effective after entry of the Final DIP Order. *See* Interim DIP Order ¶ 42.

## Basis for Relief

**I.    The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Loan Documents.**

**A.    Entering into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.**

24.    The Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facilities, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See*, *e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that

31

permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

25.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

26.    Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re Ion Media Networks. Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.* This is particularly true in a bankruptcy setting

> where cooperation and establishing alliances with creditor groups
> can be a vital part of building support for a restructuring that
> ultimately may lead to a confirmable reorganization plan. That
> which helps foster consensus may be preferable to a notionally
> better transaction that carries the risk of promoting unwanted
> conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

27.    The Debtors' determination to move forward with the DIP Facilities is an exercise of their sound business judgment following an arms'-length process and careful evaluation of alternatives.  Specifically, and in the face of extremely limited cash on hand, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support their operational and restructuring activities.  Further, while the Debtors' vendors historically have allowed the Debtors to purchase goods on credit, the Debtors' ability to continue this practice is dependent upon their having access to sufficient liquidity to assure business counterparties that the Debtors are not a credit risk.  Accordingly, the Debtors negotiated the DIP Term Loan Agreement, DIP ABL Credit Agreement, and other DIP Loan Documents with the DIP Lenders in good faith, at arms' length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available.

**B.    The Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.**

28.    The Debtors propose to obtain financing under the DIP Facilities by providing security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the

33

Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

29.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.     the credit transaction is necessary to preserve the assets of the estate; and

c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Ames Dep't Stores*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

30.     As described above, prior to negotiating the DIP Facilities, the Debtors, together with their advisors, considered other sources of postpetition financing to determine whether the Debtors could obtain debtor in possession financing on better terms.  Based on current capital market conditions, after consultation with their advisors, the Debtors determined that postpetition financing on an unsecured basis would be unobtainable.  Without postpetition financing, the Debtors will not be able to preserve and maximize the value of their estates.  Absent sufficient financing to operate the businesses during these chapter 11 cases and consummate the proposed restructuring transaction, the value of the Debtors' estates would be significantly impaired to the determent of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facilities, as set forth in the DIP Loan Documents, are fair, reasonable, and adequate, all as more fully set forth below.

31.     In the event that a debtor is unable to obtain unsecured credit, section 364(c)(1) of the Bankruptcy Code provides that the debtor may obtain credit that is secured by an administrative expense claim having priority "over any or all administrative expenses of the kind

specified in section 503(b) or 507(b) of [the Bankruptcy Code]." As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving the Superpriority Claims in favor of the DIP Lenders is reasonable and appropriate. Further, section 364(c)(2) of the Bankruptcy Code provides that the debtor may obtain credit that is secured by lien on property of the estate that is not otherwise subject to a lien. The DIP Liens sought herein are senior only with respect to the Debtors' unencumbered property. As the Debtors are unable to obtain the critical financing they need to administer their chapter 11 cases from any other source, they respectfully represent that granting DIP Liens to the DIP Lenders is warranted under the circumstances.

C.    **The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens.**

32.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lienholders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1). Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facilities if they are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Lenders have consented or (b) the Prepetition Lenders' interests in collateral are adequately protected.

33.     Here, the Debtors seek authority to enter into the DIP Facilities, which will provide the DIP Lenders priming liens on the collateral currently secured by the existing liens of the Prepetition Lenders.   Importantly, the Prepetition Lenders have consented to the DIP Facilities and the priming liens granted thereunder.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

### D.     No Comparable Alternative to the DIP Facilities Is Reasonably Available.

34.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

35.     As noted above, the Debtors do not believe that alternative sources of financing are reasonably available.  Substantially all the Debtors' assets are encumbered by liens arising under their prepetition lending facilities, and the Debtors believe the Prepetition Term Lenders

36

are materially undersecured.  Moreover, as discussed above, third-party debtor-in-possession was not a feasible financing option given the realities imposed by the Debtors' existing capital structure.  Thus, the Debtors have determined that the DIP Facilities provide the best path forward under the circumstances to both fund these chapter 11 cases and provide a clear path toward the confirmation and consummation of the Plan.  Therefore, in addition to evidence to be introduced at the hearing on the Interim DIP Order if necessary, the Debtors submit that the requirements of sections 364 of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors is satisfied.

### E.  The Repayment Feature of the DIP ABL Credit Facility Is Appropriate.

36.  Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc*., 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

37.  The repayment function of the Prepetition ABL Facility is a sound exercise of the Debtors' business judgment.  The Prepetition ABL Facility is structured as revolving loans, such that the Debtors' cash receipts are swept on a daily basis to pay down outstanding loans, and the Debtors are able to re-borrow loans, pursuant to the borrowing base limitations.  Continuing this prepetition practice, the DIP ABL Credit Facility contemplates applying proceeds from cash

37

collected by the Debtors in the ordinary course of their operations, or cash generated from the DIP ABL Collateral, to pay down the Prepetition ABL Facility, and then issuing new borrowings under the DIP ABL Credit Facility. This structure allows the Prepetition ABL Facility to be "rolled-up" into the DIP ABL Credit Facility during the course of these chapter 11 cases. The ABL Lenders have agreed to continue extending credit under the ABL facility, even though they could not be compelled to do so on a postpetition basis, and, therefore, it is reasonable to allow the DIP ABL Facility to continue to function in the same manner as the Prepetition ABL Facility—paying down past loans with cash proceeds, and issuing new loans.

38.    Moreover, the ABL Lenders are substantially oversecured. Where, as here, a prepetition secured creditor is oversecured, repaying such creditor that stands to receive payment in full with postpetition loans will not harm the Debtors' estates and other creditors. In contrast, absent the DIP ABL Credit Facility, the Debtors' ability to continue operating as a going concern will be jeopardized to the detriment of all parties in interest. The DIP ABL Credit Facility's proposed repayment feature merely affects the timing, not the amount, of the ABL Lenders' recovery. And the only holders of undersecured funded debt — the Prepetition Term Lenders — support the relief requested as DIP Lenders. Given these circumstances, repayment of the Prepetition ABL Facility is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

39.    Repayment of prepetition debt (often referred to as "roll-ups") is a common feature in debtor-in-possession financing arrangements. Courts in this jurisdiction have approved similar DIP features on the first day of the case. *See, e.g.*, *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included roll-up of approximately $144 million prepetition debt pursuant to interim

38

order); *In re Furniture Brands Int'l, Inc.*, No. 13-12329 (CSS) (Bankr. D. Del. Sept. 11, 2013) (authorizing approximately $140 million DIP that included roll-up of approximately $91 million prepetition debt pursuant to interim order); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011) (authorizing approximately $140 million DIP that included roll-up of approximately $48 million prepetition debt pursuant to interim order); *In re Source Interlink Cos. Inc.*, No. 09-11424 (KG) (Bankr. D. Del. Apr. 29, 2009) (authorizing approximately $139 million DIP that included roll-up of approximately $110 million prepetition debt pursuant to interim order); *In re Dayton Superior Corp.*, No. 09-11351 (BLS) (Bankr. D. Del. Apr. 21, 2009) (authorizing approximately $165 million DIP that included roll-up of approximately $110 million prepetition debt pursuant to interim order).[10]

## II.    The Debtors Should Be Authorized to Use the Cash Collateral.

40.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, the Prepetition Lenders consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order.

41.    Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re*

---

[10]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of these orders are available on request of the Debtors' proposed counsel.

*Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

42.     As described more fully above and in the Interim DIP Order, the Debtors propose to provide the Prepetition Term Lenders with the Term Adequate Protection, which provides two primary forms of adequate protection to protect against the postpetition diminution in value of the Prepetition Term Lenders' security interests, whether resulting from the use, sale, or lease of the Cash Collateral by the Debtors, the priming liens, or the imposition of the automatic stay:

  a. <u>Adequate Protection Claim</u>: a superpriority administrative expense claim, junior only to the claims granted to the DIP Agents by the Interim DIP Order, and subject and subordinate to the payment of the Carve Out and the obligations under the DIP Term Facility and the DIP ABL Credit Facility; and

  b. <u>Adequate Protection Liens</u>: an effective and perfected security interest in and lien on all of the Debtors' assets subject and subordinate to (i) the Carve Out, (ii) the DIP Term Liens securing the DIP Term Facility, and (iii) with respect to the Priority ABL Collateral, the DIP ABL Liens securing the DIP ABL Credit Facility and the Prepetition ABL Liens securing the Prepetition ABL Facility, p*rovided that* the Term Adequate Protection Liens shall only encumber the Avoidance Actions upon entry of the Final Order.

43.     The Term Adequate Protection also includes financial reporting, the payment of certain fees and expenses to the Prepetition Term Agent, and the continued accrual of interest under the Prepetition Term Facility.  Accordingly, the proposed Term Adequate Protection provisions are sufficient to protect the Prepetition Term Lenders from any diminution in value to

the Cash Collateral.  In light of the foregoing, the Debtors submit, and the Prepetition Term Lenders agree, that the proposed Term Adequate Protection to be provided for the benefit of the Prepetition Term Lenders is appropriate.

44.    Additionally, as described more fully above and in the Interim DIP Order, the Debtors propose to provide the ABL Lenders with the ABL Adequate Protection, which provides two primary forms of adequate protection to protect against the postpetition diminution in value of the Prepetition ABL Lenders' security interests, whether resulting from the use, sale, or lease of the Cash Collateral by the Debtors, the priming liens, or the imposition of the automatic stay:

c.    <u>Adequate Protection Claim</u>: an allowed superpriority administrative expense claim, *provided* that such claim shall have priority over all administrative claims and unsecured claims against the Debtors and their estates now existing or hereafter arising of any kind or nature whatsoever subject only to the superpriority administrative expense claim held by the Prepetition Term Lenders, which shall rank equally in priority and share on a 50%/50% basis with respect to all amounts payable in respect of such super priority administrative expense claims; and

d.    <u>Adequate Protection Liens</u>: a valid and binding, enforceable and perfected replacement liens upon and security interests in the Prepetition ABL Collateral; provided, that any portion of such liens and security interests in the Priority Term Collateral shall be junior in priority and subordinate in all respects to the DIP Term Liens, the Prepetition Term Liens and the Term Adequate Protection Liens on the Term Priority Collateral.

45.    The ABL Adequate Protection also includes financial reporting, and the payment of certain fees and expenses to the ABL Agent.  Accordingly, the proposed ABL Adequate Protection provisions are sufficient to protect the ABL Lenders from any diminution in value to the Cash Collateral.  In light of the foregoing, the Debtors submit, and the ABL Lenders agree, that the proposed ABL Adequate Protection to be provided for the benefit of the ABL Lenders is appropriate.

46.    Thus, the Debtors' provision of the Term Adequate Protection and ABL Adequate Protection is not only necessary to protect against any diminution in value, but is fair and

appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order, for the benefit of all parties in interest and their estates.

### III. The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders under the DIP Loan Documents.

47. Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agents and the DIP Lenders. In particular, as noted above, the Debtors have agreed to pay:

    a. an original issue discount of 2% of the principal amount of the Term Borrowing under the DIP Term Loan Agreement;

    b. an exit conversion fee payable in the form of common stock, in an amount equal to 10% of the pro forma common stock (after giving effect to certain exclusions), under the DIP Term Loan Agreement; and

    c. a debtor-in-possession financing fee of $90,000 under the DIP ABL Credit Agreement.

48. The fees associated with obtaining the DIP Facilities are usual and customary and well within the range of reasonableness. Indeed, courts routinely authorize debtors to pay fees similar to those the Debtors propose to pay, where the associated financing is, in the debtor's business judgment, beneficial to the debtor's estate.[11] *See, e.g.*, *In re Sea Launch Co., L.L.C.*, No. 09-12153 (BLS) (Bankr. D. Del. May 12, 2010) (approving 3.75 percent DIP break-up fee); *In re Aleris Int'l. Inc.*, No. 09-10478 (BLS) (Bankr. D. Del. Mar. 18, 2009) (approving 3.5 percent exit fee and 3.5 percent front-end net adjustment against each lender's initial commitment); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Jan. 30, 2008) (approving 2.5 percent fee related to refinancing and extending a postpetition financing facility); *see also In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011)

---

[11] Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

(approving 3 percent letter of credit fee); *In re InSight Health Servs. Holdings Corp.*, No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.5 percent DIP closing fee); *In re Neff Corp.*, No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1 percent DIP and exit facility fee); *In re Movie Gallery, Inc.*, No. 07-33849 (DOT) (Bankr. E.D. Va. Oct. 16, 2007) (approving 0.5 percent commitment fee and 3.5 percent letter of credit fee); *In re Reader's Digest Ass'n*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009) (approving 3.1 percent exit fee); *In re Lear Corp.*, No. 09-14326 (ALG) (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5.0 percent upfront fee and 1.0 percent exit/conversion fee); *In re Gen. Growth Props., Inc.*, No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75 percent exit fee); *In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. Feb. 9, 2009) (approving 3 percent upfront facility fee). Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Loan Documents in connection with entering into those agreements.

## IV. The DIP Lenders Should Be Deemed Good-Faith Lenders under Section 364(e).

49.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

50.    As explained herein, in the Morgner Declaration, and in the First Day Declaration, the DIP Loan Documents are the result of the Debtors' reasonable and informed

determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of extended arms' length, good-faith negotiations between the Debtors and the DIP Lenders.    The terms and conditions of the DIP Loan Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code.    Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein.    Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

### V.    The Automatic Stay Should Be Modified on a Limited Basis.

51.    The proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Debtors to grant the liens and security interests contemplated by the DIP Loan Documents and proposed Interim DIP Order The proposed Interim DIP Order further provides that, following the occurrence of an Event of Default (as defined in the DIP Loan Documents), the automatic stay shall be vacated and modified, following a notice period of least five business days, to the extent necessary to permit the DIP Agents and DIP Lenders to exercise all rights and remedies in accordance with the DIP Loan Documents, or applicable law.

52.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.    *See, e.g.*, *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re*

44

*Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights*

*Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

**VI.     Failure to Obtain the Immediate Interim Access to the DIP Facilities and Cash Collateral Would Cause Immediate and Irreparable Harm.**

53.      Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to

obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to

section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service

of such motion.   Upon request, however, the Court is empowered to conduct a preliminary

expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral

to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

54.      The Debtors request that the Court hold and conduct a hearing to consider entry of

the Interim DIP Order authorizing the Debtors from and after entry of the Interim DIP Order

until the Final Hearing to use the Cash Collateral and to withdrawal and borrow funds under the

DIP Facilities.  The Debtors require access to these funds prior to the Final Hearing and entry of

the Final DIP Order to be able to continue to operate and pay their administrative expenses.  This

relief will enable the Debtors to operate their business in a manner that will permit them to

preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice

to their estates and all parties in interest, pending the Final Hearing.

### Request for Final Hearing

55.      Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that

the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date

prior to the Final Hearing for parties to file objections to this Motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

56.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

57.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' revolving facility; (d)  the administrative agent under the Debtors' term loan facility; (e) the parties to the Support Agreement; (f) the United States Environmental Protection Agency; (g) the United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; (i) the office of the attorneys general for the states in which the Debtors operate; (j) the Securities and Exchange Commission; and (k)  any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

58.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

46

WHEREFORE, the Debtors respectfully request that the Court enter the Interim DIP

Order, granting the relief requested herein and such other relief as the Court deems appropriate

under the circumstances.

Wilmington, Delaware
Dated:  April 7, 2015

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*

Laura Davis Jones (DE Bar No. 2436)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              crobinson@pszjlaw.com
              pkeane@pszjlaw.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Ross M. Kwasteniet (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              ross.kwasteniet@kirkland.com

*Proposed Counsel for the*
*Debtors and Debtors in Possession*