**<u>EXHIBIT A</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X

In re:

EVERYWARE GLOBAL, INC., *et al.*,[1]

                  Debtors.

-------------------------------------------------------- X

: 

:   Chapter 11

:

:   Case No. 15-10743 (____)

:

:   (Joint Administration Requested)

:

**Re: Docket Nos. _____**

## INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS AND DEBTORS IN POSSESSION TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

Upon the motion (the "<u>Motion</u>")[2] of EveryWare Global, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (each, a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") for entry of an interim order (this "<u>Interim Order</u>") and a final order (the "<u>Final Order</u>") under sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), and 507 of title 11 of the United States Code, 11 U.S.C. §§101-1532 (as amended, the "<u>Bankruptcy Code</u>"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "<u>Bankruptcy Rules</u>"), and Rule 4001-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), *inter alia* (a) authorizing Anchor Hocking LLC ("<u>Anchor</u>") and Oneida Ltd. ("<u>Oneida</u>"; together with Anchor,

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Anchor Hocking, LLC (6923); Buffalo China, Inc. (9731); Delco International, Ltd. (7553); EveryWare, LLC (2699); EveryWare Global, Inc. (4553); Kenwood Silver Company, Inc. (2286); Oneida Food Service, Inc. (7321); Oneida International Inc. (4774); Oneida Ltd. (5700); Oneida Silversmiths Inc. (6454); Sakura, Inc. (9359); THC Systems, Inc. (9103); Universal Tabletop, Inc. (4265).  The location of the Debtors' service address is:  519 North Pierce Avenue, Lancaster, Ohio 43130.

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Term Loan Agreement (as defined below) or the DIP ABL Credit Agreement (as defined below), as applicable.

the "Borrowers") to obtain, and each of the other Debtors to guarantee, postpetition financing in

the form of (i) a term loan facility as set forth in that certain Debtor-in-Possession Term Loan

Agreement attached hereto as Exhibit 1 (as amended, supplemented or otherwise modified from

time to time, the "DIP Term Loan Agreement"), by and among the Borrowers, Universal

Tabletop, Inc., Wilmington Trust, National Association, as administrative agent (in such capacity

and its capacity as the collateral agent for the DIP Term Facility (as defined below), the "DIP

Term Agent"), and the lenders party thereto (the "DIP Term Lenders"), of up to $40 million (the

"DIP Term Facility"), of which $40 million shall be available on an interim basis, under the

terms of this Interim Order and the other DIP Term Loan Documents (as defined below), and (ii)

a revolving credit and letter of credit facility as set forth in that certain Ratification and

Amendment Agreement attached hereto as Exhibit 2 (as amended, supplemented or otherwise

modified from time to time, the "DIP ABL Credit Agreement"), by and between the Borrowers,

the Guarantors, Wells Fargo Bank, National Association, as administrative agent and collateral

agent (in such capacities, the "ABL Agent"; together with the DIP Term Agent, the "DIP

Agents" and each, a "DIP Agent"), and the lenders party thereto (the "ABL Lenders"; together

with the DIP Term Lenders, the "DIP Lenders"), of up to $60,000,000 million (the "DIP ABL

Credit Facility"; together with the DIP Term Facility, the "DIP Facilities"), under the terms of

this Interim Order and the other DIP ABL Credit Documents (as defined below), (b) authorizing

the use of Cash Collateral (as defined below) by the Debtors effective as of the Petition Date,

(c) allowing superpriority administrative expense status of the DIP Term Obligations (as defined

below) and the DIP ABL Obligations (as defined below) in the Debtors' chapter 11 cases (the

"Chapter 11 Cases") and authorizing the Debtors to grant to the DIP Term Agent on its behalf

and on behalf of the DIP Term Lenders and the ABL Agent on behalf of the ABL Lenders

automatically perfected security interests in and liens on the Collateral (as defined below) to the extent set forth herein, (d) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the Final Order, (e) granting adequate protection to the Prepetition Term Agent (as defined below), the Prepetition Term Lenders (as defined below), the ABL Agent (as defined below), and the ABL Lenders (as defined below), (f) scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, and (g) granting related relief; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and the Court having found that the Debtors' notice of the Motion and the opportunity for a hearing on the Motion was appropriate and no other notice need be provided; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court on [_____], 2015 (the "Interim Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion, the *Declaration of Joel Mostrom in Support of First Day Motions*, dated as of April 7, 2015 (the "First Day Declaration"), the Declaration of Richard Morgner in support of the Motion, dated as of April 7, 2015 (the ""Morgner Declaration"), and at the Interim Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND CONCLUDED THAT:

A.    Disposition.  The Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of the Interim Order that have not been withdrawn, waived or settled are hereby denied and overruled.

B.    Commencement of Cases.  On April 7, 2015 (the "Petition Date"), each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are in possession of their properties and are continuing to operate their businesses as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  No official committee of unsecured creditors (a "Committee") has been appointed in the Chapter 11 Cases.

C.    Jurisdiction and Venue.  This Court has jurisdiction over the Chapter 11 Cases, the Motion and the parties and property affected hereby, pursuant to 28 U.S.C. §§ 157(b) and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue of the Chapter 11 Cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and Local Rule 4001-2.

D.    Adequate Notice.  On the Petition Date, the Debtors filed the Motion with this Court pursuant to Bankruptcy Rules 2002, 4001 and 9014, and provided notice of the Motion and the Interim Hearing by electronic mail, facsimile, hand delivery or overnight delivery to the following parties and/or their respective counsel as indicated below:  (a) the Office of the U.S. Trustee; (b) counsel to the Prepetition Term Agent; (c) counsel to the ABL Agent; (d) counsel to the ad hoc committee of Prepetition Term Lenders (the "Prepetition Term Lender Ad Hoc Committee"); (e) creditors holding the thirty (30) largest unsecured claims as set forth in the consolidated list filed with the Debtors' voluntary petitions; and (f) all parties requesting service

4

in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").[3]  Given the nature of the relief sought in the Motion, this Court concludes that the foregoing notice was sufficient and adequate under the circumstances and complies with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any other applicable law, and no further notice relating to this proceeding and the hearing on this Motion is necessary or required.

      E.    The Prepetition Obligations.

      (ii)    *Prepetition Term Loan Agreement*.  Prior to the Petition Date, pursuant to the terms and conditions set forth in that certain (a) Term Loan Agreement, dated May 21, 2013 (as amended, modified, supplemented or restated from time to time, the Prepetition Term Loan Agreement"), by and among the Borrowers, Universal Tabletop, Inc., the lenders party thereto (the "Prepetition Term Lenders"), and Deutsche Bank AG New York Branch, in its capacity as administrative agent (in such capacity and its capacity as collateral agent with respect to the Prepetition Term Loan Facility, and together with any of its successors, the "Prepetition Term Agent"); and (b) all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Prepetition Term Agent and/or the Prepetition Term Lenders, including, without limitation, the Intercreditor Agreement (as defined below), all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the Prepetition Term Loan Agreement, as all of the same have been or may be supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date or in connection with any

---

[3] NTD:  Other notice paries:  U.S. Attorney for Delaware, IRS, parties with recorded liens on Debtors' assets as of the Petition Date; financial institutions where EveryWare maintains deposit/securities accoutns, landlords, IP licensors.

resignation or appointment of the role of the Prepetition Term Agent, collectively, the "Prepetition Term Loan Financing Documents"), the Prepetition Term Lenders agreed to make term loans to the Borrowers and to otherwise extend credit to the Debtors, in an aggregate principal amount of up to $250.0 million (the "Prepetition Term Loan Facility").  All obligations of the Debtors arising under the Prepetition Term Loan Agreement or any other Prepetition Term Loan Financing Document, including under the Prepetition Term Loan Facility, and all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees (including fees of the Prepetition Term Agent), costs, charges, indemnification obligations, expenses (including any and all reasonable attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition Term Loan Financing Documents), or other amounts, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable, in respect of any of the Debtors' obligations under the Prepetition Term Loan Financing Documents, including all "Obligations" as defined in the Prepetition Term Loan Agreement, shall hereinafter be referred to collectively as the "Prepetition Term Loan Obligations."

(iii)    *Prepetition ABL Agreement*.  Prior to the Petition Date, pursuant to the terms and conditions set forth in that certain (a) Second Amended and Restated Loan and Security Agreement, dated May 21, 2013 (as amended, modified, supplemented or restated from time to time, the Prepetition ABL Agreement"), by and among the Borrowers, Universal Tabletop, Inc. and each Subsidiary (as defined therein) of Universal Tabletop, Inc. party thereto as guarantors, the ABL Lenders from time to time party thereto and the ABL Agent; and (b) all

other agreements, documents and instruments executed and/or delivered with, to or in favor of the ABL Agent and/or the ABL Lenders, including, without limitation, the Intercreditor Agreement, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the Prepetition ABL Agreement, as all of the same have been supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Prepetition ABL Financing Documents"; together with the Prepetition Term Loan Financing Documents, the "Prepetition Financing Documents"), the ABL Lenders agreed to make revolving loans to, and issue letters of credit for the account of, the Borrowers and to otherwise extend credit to the Debtors, in an aggregate principal amount not to exceed $60.0 million (the "Prepetition ABL Facility"; together with the Prepetition Term Loan Facility, the "Prepetition Facilities").   All obligations of the Debtors arising under the Prepetition ABL Agreement or any other Prepetition ABL Financing Document, including under the Prepetition ABL Facility, and all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all reasonable attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition ABL Financing Documents), of any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Prepetition ABL Financing Documents shall hereinafter be referred to collectively as the "Prepetition ABL Obligations" (together with the Prepetition Term Loan Obligations, the "Prepetition Obligations").   The

Prepetition ABL Obligations and the DIP ABL Obligations (as hereinafter defined) are sometimes collectively referred to herein as the "ABL Obligations."

(iv)    *Guarantors*.  The Prepetition Term Loan Obligations and the Prepetition ABL Obligations are guaranteed by Universal Tabletop, Inc. and each wholly-owned domestic subsidiary of the Borrowers under the terms of the applicable Prepetition Term Loan Financing Documents and the Prepetition ABL Financing Documents, respectively (collectively, the "Guarantors").

(v)    *Prepetition Term Liens*.  Pursuant to certain Prepetition Term Loan Financing Documents, each Debtor granted to the Prepetition Term Agent for its benefit and the benefit of the Prepetition Term Lenders, to secure the Prepetition Term Loan Obligations, a security interest in and continuing lien on (the "Prepetition Term Liens") all of the "Collateral" (as defined in the Prepetition Term Loan Agreement), subject to certain exclusions as set forth in the Prepetition Term Loan Financing Documents (collectively, the "Prepetition Term Loan Collateral").

(vi)    *Prepetition ABL Liens*.  Pursuant to certain Prepetition ABL Financing Documents, each Debtor granted to the ABL Agent for the benefit of the ABL Lenders, to secure the Prepetition ABL Obligations a security interest in and continuing lien on (the "Prepetition ABL Liens"; together with the Prepetition Term Liens, the "Prepetition Liens") all of the "Collateral" as defined in the Prepetition ABL Credit Agreement, subject to certain exclusions as set forth in the Prepetition ABL Credit Agreement (collectively, the "Prepetition ABL Collateral"; together with the Prepetition Term Loan Collateral, the "Prepetition Collateral").

(vii)    *Prepetition Intercreditor Agreement*.  The Debtors, the ABL Agent and the Prepetition Term Agent are parties to that certain ABL Intercreditor Agreement dated as of

May 21, 2013 (as amended, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), which governs (x) the relative rights against the Debtors of the Prepetition Term Lenders and the ABL Lenders in respect of the respective Prepetition Obligations and the Prepetition Collateral and (y) the relative priorities of the Prepetition Liens in respect of the Prepetition Collateral.  The Intercreditor Agreement remains in full force and effect in accordance with the terms thereof, subject to and as modified by the terms and provisions of this Interim Order.

(viii)    *No Other Liens*.  As of the Petition Date, other than as expressly permitted under the Prepetition Term Loan Financing Documents and the Prepetition ABL Financing Documents (including any "Permitted Liens" as such term is defined in the applicable Prepetition Term Loan Financing Documents and Prepetition ABL Financing Documents, respectively), there were no liens on or security interests in the Prepetition Collateral other than the Prepetition Liens.

(ix)    *Restructuring Support Agreement*.  After good faith, arm's length negotiations, the Debtors, certain holders of existing preferred stock and existing common stock issued by EveryWare Global, Inc., and certain Prepetition Term Lenders (owning more than one-half in dollar amount of the Prepetition Term Loan Obligations) entered into that certain Restructuring Support Agreement, dated as of March 31, 2015 (as may be amended, supplemented, restated, or modified from time to time in accordance with the terms thereof, the "RSA"), in which the parties thereto agreed, *inter alia*, to engage in various transactions to restructure the Debtors' obligations under the Prepetition Term Loan Financing Documents and its capital structure pursuant to the Debtors' prepackaged plan of reorganization attached as an exhibit to the RSA (the "Prepackaged Plan").  In connection with the RSA, certain of the

Prepetition Term Lenders have agreed to provide the Debtors additional funding as contemplated by, and subject to the terms and conditions of, the DIP Term Facility to preserve the Debtors' business operations and to consummate the transactions contemplated by the RSA.

F.    <u>Debtors' Stipulations</u>.  Subject to the rights of any Committee or other parties-in-interest as and to the extent set forth in paragraph 32 below, the Debtors acknowledge, admit, represent, stipulate and agree that:

(i)    *Prepetition Term Loan Obligations*.  As of the Petition Date, the Prepetition Term Loan Obligations for which the Debtors were truly and justly indebted to the Prepetition Term Agent and Prepetition Term Lenders, without defense, counterclaim, recoupment or offset of any kind, aggregated not less than approximately $248,550,836.24, plus accrued but unpaid interest and other unpaid fees, charges, costs and expenses as required under the terms of the Prepetition Term Loan Financing Documents.

(ii)    *Prepetition Term Liens Not Subject to Avoidance*.  The Prepetition Term Liens (a) constitute valid, binding, enforceable, nonavoidable, and properly perfected liens on the Prepetition Collateral, (b) prior to entry of this Interim Order, were senior in priority over any and all liens except for "Permitted Liens" as defined in, and to the extent expressly permitted under, the Prepetition Term Loan Agreement, and except to the extent the Prepetition Term Liens were subordinated to the Prepetition ABL Liens in respect of certain Prepetition Collateral, as expressly set forth in this Interim Order, the DIP Loan Documents, and the Intercreditor Agreement, and (c) are not subject to avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any other applicable law or regulation (except insofar as such liens are subordinated to the DIP Term Liens, the Adequate Protection Liens (as defined

10

below) in respect of the ABL Lenders and the Prepetition Term Lenders, and the Carve-Out (each term as defined below) in accordance with the provisions of this Interim Order, the other DIP Loan Documents and the Intercreditor Agreement).

(iii)    *Prepetition ABL Obligations*.    As of the Petition Date, the Prepetition ABL Obligations for which the Debtors were truly and justly indebted to the ABL Lenders, without defense, counterclaim, recoupment or offset of any kind, aggregated not less than approximately $43,355,608.00, plus accrued but unpaid interest and other unpaid fees, charges, costs and expenses as required under the terms of the Prepetition ABL Financing Documents.

(iv)    *Prepetition ABL Liens Not Subject to Avoidance*.    The Prepetition ABL Liens (a) constitute valid, binding, enforceable, nonavoidable, and properly perfected liens on the Prepetition Collateral, (b) prior to the entry of this Interim Order, were senior in priority over any and all liens except for "Permitted Liens" as defined in and to the extent expressly permitted under the Prepetition ABL Credit Agreement and except to the extent the Prepetition ABL Liens are subordinated to the Prepetition Term Liens in respect of certain Prepetition Collateral, as expressly set forth in this Interim Order, the DIP Loan Documents, and the Intercreditor Agreement, (c) prior to the entry of this Interim Order, were senior in priority (except for (i) the Prepetition Term Liens and (ii) "Permitted Liens" as defined in and to the extent expressly permitted under the Prepetition ABL Credit Agreement) over any and all other liens on the Term Priority Collateral, (d) are not subject to avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any other applicable law or regulation (except insofar as such liens are subordinated to the DIP Term Liens (as defined below), the Adequate Protection Liens in respect of the ABL Lenders and the Prepetition Term

11

Lenders in accordance with the provisions of this Interim Order, the other DIP Loan Documents and the Intercreditor Agreement), and (e) are fully secured as of the Petition Date, as the value of such liens in the Prepetition Collateral exceeds the amount of the Prepetition ABL Obligations.

(v)    *No Claims*.  The Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against any of the Prepetition Term Agent, the Prepetition Term Lenders, the ABL Agent or the ABL Lenders with respect to the Prepetition Financing Documents, the Prepetition Obligations, the Prepetition Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive, of the Bankruptcy Code.

(vi)    *Indemnity*.  The Prepetition Term Agent, the Prepetition Term Lenders, the ABL Agent, the ABL Lenders, the DIP Term Agent, the DIP Term Lenders, and all successors thereof, have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting or obtaining requisite approvals of, as applicable, the RSA, the DIP Facilities, and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facilities or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing.  Accordingly, the Prepetition Term Agent, the Prepetition Term Lenders, the DIP Term Agent, the DIP Term Lenders, the ABL Agent and the ABL Lenders, and all successors thereof, shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto, provided that no such parties will be indemnified for any cost, expense or liability to the extent

12

determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct.  No exception or defense in contract, law or equity exists as to any obligation set forth, as the case may be, in this paragraph F(vi), in the Prepetition Financing Documents or in the DIP Loan Documents, to indemnify and/or hold harmless the Prepetition Term Agent, the Prepetition Term Lenders, the DIP Term Agent, the DIP Term Lenders, the ABL Agent or the ABL Lenders, or any successors thereof, as the case may be.

(vii)    *Release.*  The Debtors hereby stipulate and agree that they forever and irrevocably release, discharge and acquit the Prepetition Term Agent, the DIP Term Agent, the ABL Agent, and all former, current and future Consenting Term Lenders (as defined in the Prepackaged Plan), DIP Term Lenders, and ABL Lenders, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the DIP Facilities, the DIP Loan Documents, the Prepetition Facilities, the Prepetition Financing Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Term Agent, the Prepetition Term Lenders, the DIP Term Agent, the DIP Term Lenders, the ABL Agent, and

13

the ABL Lenders.  The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Obligations and the DIP Obligations which the Debtors now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to the Bankruptcy Court entering this Interim Order.

G.     <u>Cash Collateral</u>.  For purposes of this Interim Order the term "<u>Cash Collateral</u>" shall mean and include any and all "cash collateral" as defined in section 363 of the Bankruptcy Code, in which the Prepetition Term Agent on its behalf and on behalf of the Prepetition Term Lenders or the ABL Agent on behalf of the ABL Lenders has a lien or security interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order or any Final Order, or otherwise; provided, that, for all purposes under this Interim Order, all references to the Debtors' use of the ABL Agent's and the ABL Lenders' Cash Collateral shall be limited to mean the Debtors' use of proceeds of the loans extended to the Debtors under the DIP ABL Credit Facility.

H.     <u>Use of DIP Facilities and Cash Collateral</u>.  The Debtors have an immediate and critical need to use the DIP Facilities and Cash Collateral to preserve and operate their businesses and effectuate a reorganization of their businesses, which will be used in accordance with the terms of this Interim Order.  Without the use of the DIP Facilities and Cash Collateral, the Debtors will not have sufficient liquidity to be able to continue to operate their businesses. The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary in order to obtain such consent or non-objection of certain parties, and to adequately protect the parties' interests in the

Prepetition Collateral.  Absent authorization to immediately use the DIP Facilities and Cash Collateral, the Debtors' estates and their creditors would suffer immediate and irreparable harm.

I.      Other Financing Unavailable.  As discussed in the First Day Declaration and the Morgner Declaration, the Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(l) of the Bankruptcy Code or (b) under section 364(c)(l) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered  assets of their estates under section 364(c)(2) of the Bankruptcy Code or (y) a junior lien on encumbered assets of their estates under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(l) of the Bankruptcy Code from sources other than the DIP Term Lenders and the ABL Lenders on terms more favorable than the terms of the DIP Facilities.  The only source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Facilities.  The Debtors require both additional financing under the DIP Facilities and the continued use of Cash Collateral under the terms of this Interim Order in order to satisfy its postpetition liquidity needs.

J.      Best Financing Presently Available.  The DIP Term Lenders, the ABL Agent, and the ABL Lenders have indicated a willingness to provide the Debtors with financing solely on the terms and conditions set forth in this Interim Order (and, subject to entry by the Court, the Final Order) and the applicable DIP Loan Documents.  After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Term Lenders and the ABL Lenders pursuant to the terms of this Interim Order (and, subject to entry by the Court, the Final Order) and the DIP Loan Documents, represents the best financing presently available.  The DIP Term Lenders and ABL Lenders are good faith financiers.  The DIP Term Lenders', the DIP Term Agent's, the ABL Lenders', and

15

the ABL Agents' claims, superpriority claims, security interests, liens and other protections granted pursuant to this Interim Order (and, subject to entry by the Court, the Final Order) and the applicable DIP Loan Documents will not be affected by any subsequent reversal, modification, vacatur or amendment of this Interim Order, the Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

K.      <u>Good Cause for Immediate Entry</u>.  Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2.  In particular, the authorization granted herein for the Debtors to enter into the DIP Facilities, to continue using Cash Collateral and to obtain interim financing, including on a priming lien basis as set forth herein, is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  Entry of this Interim Order is in the best interest of the Debtors, their estates and creditors. The terms of the DIP Facilities (including the Debtors' continued use of Cash Collateral, as qualified in "I" above) are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

L.      <u>Arm's Length Negotiation</u>.  The Debtors, the DIP Term Agent, the DIP Term Lenders, the ABL Agent, the ABL Lenders, the Prepetition Term Agent, and the Prepetition Term Lenders have negotiated the terms and conditions of the DIP Facilities (including the Debtors' continued use of Cash Collateral) and this Interim Order in good faith and at arm's length, and any credit extended and loans made to the Debtors pursuant to this Interim Order shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

M.      Adequate Protection for the Prepetition Term Lenders, Prepetition Term Agent, ABL Lenders and ABL Agent.  The Prepetition Term Lenders, the Prepetition Term Agent, the ABL Lenders and the ABL Agent have negotiated and acted in good faith regarding the DIP Facilities and the Debtors' use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses, in accordance with the terms hereof.  The Prepetition Term Lenders, the Prepetition Term Agent, the ABL Lenders and the ABL Agent have agreed to permit the Debtors to use the Prepetition Collateral, including the Cash Collateral, in accordance with the terms hereof.  The Prepetition Term Lenders, the Prepetition Term Agent, the ABL Lenders, and the ABL Agent are entitled to the adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to §§ 361, 363 and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including the Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the consent thereto of the Prepetition Term Lenders, the Prepetition Term Agent, the ABL Lenders and the ABL Agent; provided, that nothing in this Interim Order or the other DIP Loan Documents shall (x) be construed as a consent by a n y o f  the Prepetition Term Lenders, the Prepetition Term Agent, the ABL Lenders or the ABL Agent that it would be adequately protected in the event debtor in possession financing is provided by a third party (i.e., other than the DIP T e r m Lenders and the ABL Lenders as contemplated herein) or a consent to the terms of any other such financing or any lien encumbering the P r e p e t i t i o n Collateral (whether senior or junior) or to the use of Cash Collateral except as expressly provided in this Interim Order, including as set forth in

paragraph G above, or (y) prejudice, limit or otherwise impair the rights of the Prepetition Term Agent (for its benefit or the benefit of the Prepetition Term Lenders) or the ABL Agent (for the benefit of the ABL Lenders) to seek new, different or additional adequate protection in the event circumstances change after the date hereof.

N.    Sections 506(c) and 552(b).   In light of the Prepetition Term Agent and the Prepetition Term Lenders' agreement to subordinate their liens and claims to the Carve-Out and the DIP Liens and the use of Cash Collateral, as qualified in paragraph G above, and the DIP Lenders permitting the use of the DIP Facility and Cash Collateral for payments made in accordance the terms of this Interim Order (a) the Prepetition Term Lenders, the Prepetition Term Agent, the ABL Lenders and the ABL Agent are entitled to a waiver of the provisions of Bankruptcy Code section 506(c), and (b) the Prepetition Term Lenders, the Prepetition Term Agent, the ABL Lenders and the ABL Agent are entitled to a waiver of any "equities of the case" claims under Bankruptcy Code section 552(b).

O.    Order of the Court.   Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND, DETERMINED, ORDERED, ADJUDGED AND DECREED THAT:**

1.    Motion Granted.   The Motion is granted on an interim basis, subject to the terms set forth herein.   Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled on their merits.   This Interim Order shall be valid, binding on all parties in interest, and fully effective immediately upon entry notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, and 9014.

2.      <u>Authority to Enter Into DIP Facilities</u>.  The Debtors are hereby authorized to incur and perform the obligations arising from and after the date of this Interim Order under the DIP Facilities, on the terms set forth in this Interim Order, including entry into, execution and delivery of (a) the DIP Term Loan Agreement attached hereto as Exhibit 1 and such additional documents, instruments and agreements as may be reasonably required by the DIP Term Agent and the DIP Term Lenders to implement the terms or effectuate the purposes of and transactions contemplated by this Interim Order, the Final Order (when entered by the Court) and the DIP Term Loan Agreement (collectively, this Interim Order, the Final Order, the DIP Term Loan Agreement and such additional documents, instruments and agreements, including any fee letters, the "<u>DIP Term Loan Documents</u>") and (b) the DIP ABL Credit Agreement attached hereto as Exhibit 2 and such additional documents, instruments and agreements as may be reasonably required by the ABL Agent to implement the terms or effectuate the purposes of and transactions contemplated by this Interim Order, the Final Order (when entered by the Court) and the DIP ABL Credit Agreement (collectively, this Interim Order, the Final Order, the DIP ABL Credit Agreement and such additional documents, instruments and agreements, including any fee letters, the "<u>DIP ABL Credit Documents</u>"; together with the DIP Term Loan Documents, the "<u>DIP Loan Documents</u>"). The Debtors are hereby authorized to execute and deliver the DIP Loan Documents and borrow money and obtain letters of credit, as applicable, under the DIP Term Facility, on an interim basis, up to an aggregate principal amount not to exceed $40.0 million and the DIP ABL Credit Facility, and the Guarantors are hereby authorized to guaranty such borrowings and the Borrower's obligations under the DIP Facilities and the DIP Loan Documents, all in accordance with the terms of this Interim Order and the other DIP Loan Documents.

19

3.    <u>Use of Cash Collateral and DIP Extensions of Credit</u>.  Subject to Paragraph G of this Interim Order, the Debtors are hereby authorized to use Cash Collateral and the proceeds of any borrowings under the DIP Facilities in accordance with the Budget (including any Permitted Variances (as defined herein)) and the other terms and conditions set forth in this Interim Order and the DIP Loan Documents.

4.    <u>Validity of DIP Loan Documents</u>.  The DIP Loan Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms thereof.  No obligation, payment, transfer or grant of security under the DIP Loan Documents as approved under this Interim Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

5.    <u>Carve Out</u>.

(a)    Upon the DIP Term Agent's issuance of a Carve Out Trigger Notice (as defined below), all liens, claims and other security interests held by the DIP Term Lenders, including the DIP Term Lenders' DIP Superpriority Claims, the DIP Term Liens, the Term Adequate Protection Obligations, and the Prepetition Term Liens, shall be subject to the payment of the Carve Out.  Notwithstanding anything to the contrary contained in this paragraph or otherwise, none of the liens, claims and other security interests held by the ABL Agent or any ABL Lender in any Priority ABL Collateral (as defined below) shall be subject to the payment of the Carve Out (or any portion thereof), and under no circumstances shall proceeds of the ABL Priority Collateral and/or the ABL Agent's and ABL Lenders' superpriority claims be available for purposes of satisfying the Carve Out obligations as described in this paragraph.  For purposes of this Order, "<u>Carve Out</u>" means the sum of: (i) all fees required to be paid to the Clerk of the

20

Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") at any time before or on the first business day following delivery by the DIP Term Agent of a Carve Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $750,000 incurred after the first business day following delivery by the DIP Term Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Term Agent to the Debtors, their lead restructuring counsel, the ABL Agent and their lead restructuring counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Term Agreement) and acceleration of the DIP Term Obligations under the DIP Term Facility, stating that the Post Carve-Out Trigger Notice Cap has been invoked. Notwithstanding the foregoing, so long as a Carve Out Trigger Notice has not been issued, the Debtors shall be permitted to pay fees to estate professionals and reimburse expenses incurred by estate professionals to the extent set forth in the Budget and that are allowed by the Court and

21

payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court and in form and substance reasonably acceptable to the Debtors and the Prepetition Term Lenders and the ABL Lenders, as the same may be due and payable, and the same shall not reduce the Post Carve Out Trigger Notice Cap.  In any event, the DIP Term Lenders, the ABL Lenders, and the Prepetition Term Lenders reserve the right to review and object to any fee statement, interim application or monthly application issued or filed by Debtor Professionals.

      (b)      On the day on which a Carve Out Trigger Notice is given by the DIP Term Agent to the Debtors, with a copy to its lead restructuring counsel, the U.S. Trustee, and the ABL Agent and its lead restructuring counsel, (the "Termination Declaration Date"), (i) if amounts available in the Segregated Operating Account are insufficient to pay the Allowed Professional Fees then due and payable and then only to the extent of such unpaid amounts in respect of the Allowed Professional Fees, the Debtors may deliver a Notice of Withdrawal (as defined in the DIP Term Loan Agreement) to the DIP Term Agent (upon which Notice of Withdrawal the DIP Term Agent shall be entitled to rely upon, and shall be fully protected in relying upon), specifying the then unpaid amounts of the Allowed Professional Fees to be Withdrawn, and on the first business day after receipt of such Notice of Withdrawal, the DIP Term Agent shall disburse funds from the DIP Term Loan Funding Account in an amount equal to the amount specified in such Notice of Withdrawal and (ii) the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in the Segregated Operating Account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger

Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, if

amounts available in the Segregated Operating Account are insufficient to fund the amount of the

Post Carve Out Trigger Notice Cap and then only to the extent of such shortfall, the Debtors may

deliver a Notice of Withdrawal to the DIP Term Agent (upon which Notice of Withdrawal the

DIP Term Agent shall be entitled to rely upon, and shall be fully protected in relying upon),

specifying the amount of the Post Carve Out Trigger Notice Cap to be Withdrawn, and on the

first business day after receipt of such Notice of Withdrawal, the DIP Term Agent shall disburse

funds from the DIP Term Loan Funding Account in an amount equal to the amount specified in

such Notice of Withdrawal.  The Debtors shall deposit and hold such amounts in the Segregated

Operating Account in trust to pay such Allowed Professional Fees benefiting from the Post-

Carve Out Trigger Notice Cap (the "Post Carve Out Trigger Notice Reserve" and, together with

the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other

claims.  The DIP Term Agent shall fund the Carve Out Reserves from the DIP Term Loan

Funding Account in accordance with this paragraph 5(b), notwithstanding anything in this

Interim Order or the DIP Term Loan Agreement to the contrary, including with respect to the

existence of a Default or Event of Default, the failure of the Debtors to satisfy any or all of the

conditions precedent for Withdrawals under the DIP Term Loan Agreement, any termination of

the DIP Term Loan Agreement following an Event of Default, or the occurrence of the Maturity

Date.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used by the Debtors first

to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth

above (the "Pre-Carve Out Amounts"), and then to pay the Post-Carve Out Trigger Notice Cap,

until each is paid in full.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used

by the Borrowers first to pay the obligations set forth in clause (iv) of the definition of Carve Out

set forth above (the "Post-Carve Out Amounts").  Notwithstanding anything to the contrary in this Agreement or the Bankruptcy Court Orders, following delivery of a Carve Out Trigger Notice, the DIP Term Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded in accordance with this paragraph 5(b).  The Loan Parties hereby grant, and the DIP Term Agent, on its behalf and on behalf of the DIP Term Lenders, shall have, a first priority security interest in any residual interest in the Carve Out Reserves held in the Segregated Operating Account.  Further, notwithstanding anything to the contrary in this Interim Order, except in respect of the ABL Agent and the ABL Lenders, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Term Loans or increase or reduce the Term Commitment (as defined in the DIP Term Loan Agreement), (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, (iii) in no way shall the Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors, and (iv) the DIP Term Agent shall have no obligation to fund any amount in excess of the amounts then held in the DIP Term Loan Funding Account.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in any other order of the Bankruptcy Court, or in the Prepetition Term Loan Documents, or in the DIP Loan Documents, except for the ABL Priority Collateral, the Carve Out shall be senior to all liens and claims securing the DIP Term Facility and the Term Adequate Protection Obligations, and any and all other forms of adequate protection, liens, or claims securing the DIP Term Loan or the Prepetition Term Loan Obligations under the Prepetition Term Loan Financing Documents.

24

(c)     Any payment or reimbursement made prior to the occurrence of the Carve Out

Trigger Notice in respect of any Allowed Professional Fees shall not reduce the Carve Out.

6.     <u>DIP Extensions of Credit</u>.  All loans made to or for the benefit of any of the

Debtors on or after the Petition Date in accordance with the DIP Term Loan Documents

(collectively, the "<u>DIP Term Extensions of Credit</u>"), all interest thereon and all fees, costs,

expenses, indemnification obligations and other liabilities, owing by the Debtors to the DIP

Term Lenders or the DIP Term Agent in accordance with and relating to this Interim Order and

the other DIP Term Loan Documents, including all "Obligations" as defined in the DIP Term

Loan Agreement, shall hereinafter be referred to as the "<u>DIP Term Obligations</u>."  All loans and

letters of credit made to or for the benefit of any of the Debtors on or after the Petition Date in

accordance with the DIP ABL Credit Documents (collectively, the "<u>DIP ABL Extensions of

Credit</u>"; together with the "DIP Term Extensions of Credit, the "<u>DIP Extensions of Credit</u>"), all

interest thereon and all fees, costs, expenses, indemnification obligations and other liabilities,

owing by the Debtors to the ABL Lenders or the ABL Agent in accordance with and relating to

this Interim Order and the other DIP ABL Credit Documents shall hereinafter be referred to as

the "<u>DIP ABL Obligations</u>", and together with the DIP Term Obligations, the "<u>DIP Obligations</u>".

The DIP Extensions of Credit:  (a) shall be evidenced by the books and records of the DIP Term

Agent, the DIP Term Lenders, the ABL Agent or the ABL Lenders, as applicable; (b) shall bear

interest payable and incur fees at the rates set forth in the applicable provisions of the DIP Term

Loan Agreement and DIP ABL Credit Agreement; (c) shall be secured in the manner specified

below; (d) shall be payable in accordance with the DIP Loan Documents; and (e) shall otherwise

be governed by the terms set forth in this Interim Order and the other DIP Loan Documents.

7.     <u>Application of Collections in respect of ABL Priority Collateral</u>.  All collections and payments made in respect of the ABL Priority Collateral, subject to the terms of the Intercreditor Agreement and the Interim Order and the Final Order, shall be deemed applied first as and when received by the ABL Agent and/or ABL Lenders to the repayment in full of the Prepetition ABL Obligations under the Prepetition ABL Facility, second to the payment in full of the DIP ABL Obligations under the DIP ABL Credit Facility, third to the payment of the DIP Term Obligations under the DIP Term Facility, and fourth to the payment of the Prepetition Term Obligations under the Prepetition Term Facility.

8.     <u>DIP Term Loan Funding Account; Segregated Operating Account</u>. Notwithstanding anything to the contrary contained herein or any DIP Loan document, every provision set forth in this paragraph 8 is subject in all respect to the Carve Out and the Carve Out Reserves.  The proceeds of the DIP Term Loans drawn under the DIP Term Facility shall be funded into a trust account established by and in the name of the DIP Term Agent for the purpose of holding such proceeds (the "<u>DIP Term Loan Funding Account</u>").  The Borrowers may request a disbursement of funds from the DIP Term Loan Funding Account, and the DIP Term Agent may honor such request, subject to the terms described herein and in the DIP Term Loan Documents, including without limitation that each such disbursement shall be in accordance with the Budget; provided, however, with respect to any disbursement of funds from the DIP Term Loan Funding Account, the DIP Term Agent shall be entitled to all protections set forth in the DIP Term Loan Documents, including, without limitation, that the DIP Term Agent may rely upon, and shall be fully protected in relying upon, any notice, certificate, or request from the Borrowers delivered in connection with such disbursement.  The DIP Term Loan Funding Account and the funds held therein shall not constitute property of the estate.  The DIP

26

Term Agent shall have the right to deduct from and pay interest, fees and expenses of the DIP Term Obligations from the proceeds in the DIP Term Loan Funding Account (including the fees and expenses of the DIP Term Agent).   Disbursements from the DIP Term Loan Funding Account shall be deposited by the Debtors in a segregated deposit account established by the Debtors for the purpose of receipt of the proceeds of the DIP Term Facility (the "Segregated Operating Account").  Upon the "Maturity Date" (as defined in the DIP Term Loan Agreement) all proceeds remaining in the DIP Term Loan Funding Account shall be applied by the DIP Term Agent to repay the DIP Term Obligations in accordance with the DIP Term Loan Agreement. Notwithstanding anything to the contrary herein or in the Prepetition Loan Documents (including, without limitation, the Intercreditor Agreement), (i) the ABL Agent and ABL Lenders shall not have any right to sweep any of the funds in the Segregated Operating Account and shall not have any liens on, security interests in, claims to or rights with respect to the Segregated Operating Account or the funds maintained therein, and (ii) the DIP Term Facility or any of the funds maintained in the DIP Term Loan Funding Account or the Segregated Operating Account shall not be used to repay any of the DIP ABL Obligations, the Prepetition ABL Obligations or Prepetition Term Obligations.

9.      Rights and Benefits Under Intercreditor Agreement.  Except to the extent (if any) that such terms and conditions are inconsistent with the express terms of this Interim Order, the terms and conditions of the Intercreditor Agreement (including with respect to the relative rights of the Prepetition Term Lenders and the ABL Lenders) shall not be mitigated or modified as a result of entry of this Interim Order, entry into the DIP Loan Documents, or the incurrence of the DIP Obligations.   The Prepetition Term Lenders and ABL Lenders have consented or are

deemed to have consented to the terms of the DIP Facilities under the Intercreditor Agreement and the modifications to the Intercreditor Agreement as set forth in this Interim Order.

10.    <u>Other Use of DIP Extensions of Credit and Cash Collateral</u>.  Subject to the terms and conditions set forth in this Interim Order and the other DIP Loan Documents, the Debtors may use the DIP Extensions of Credit and the Cash Collateral, in accordance with the Budget.

11.    <u>Budget</u>.

(a)    The budget annexed hereto as <u>Exhibit 3</u> (and as it may be updated periodically in accordance with the DIP Loan Documents, but only with the consent of (i) each of the ABL Lenders and (ii) the "Required Lenders" as defined in the DIP Term Loan Agreement, the "<u>Budget</u>") hereby is approved.  Proceeds of the DIP Extensions of Credit and Cash Collateral under this Interim Order shall be used by the Debtors only in accordance with the Budget and this Interim Order, subject to any Permitted Variance.  Subject to the Carve-Out (but only in the case of the DIP Term Lenders), the DIP Term Lenders' and the ABL Lenders' consent to the Budget shall not be construed as consent to the use of DIP Extensions of Credit or Cash Collateral (i) beyond the "Maturity Date" (as defined in the DIP Term Loan Documents) with respect to the DIP Term Extensions of Credit and (ii) beyond the "Termination Date" (as defined in the DIP ABL Documents) with respect to the DIP ABL Extensions of Credit, regardless of whether the aggregate funds shown on the Budget have been expended.  The Debtors shall provide a copy of any revised or updated budget to the U.S. Trustee and counsel to the Committee, if any.

12.    <u>Permitted Variance</u>.  So long as the Maturity Date has not occurred, the Debtors shall be authorized to use proceeds of the DIP Extensions of Credit and Cash Collateral in

accordance with the Budget subject to variances permitted under the DIP Loan Documents (each a "Permitted Variance").

13.  <u>Continuation of Prepetition Liens</u>.  Until the Debtors have indefeasibly paid in full all Prepetition Term Obligations or such Prepetition Term Obligations receive the treatment set forth in the Prepackaged Plan on a final and nonappealable basis, all liens and security interests of the Prepetition Term Agent and the Prepetition Term Lenders (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein.  Until the Debtors have indefeasibly paid in full all Prepetition ABL Obligations, all liens and security interests of the ABL Agent and the ABL Lenders securing the Prepetition ABL Obligations (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein.

14.  <u>DIP Liens and Collateral</u>.

(a)  Subject to Paragraph 14(c), and as more fully set forth in the DIP Term Loan Financing Documents, as security for the full and timely payment of the DIP Term Obligations, the DIP Term Agent on its behalf and on behalf of the DIP Term Lenders is hereby granted:

  i.  pursuant to Bankruptcy Code Section 364(c)(2), a first priority lien on and security interest in all unencumbered assets of the Debtors other than Excluded Assets (as defined in the DIP Term Loan Agreement) (now or hereafter acquired and all proceeds thereof); provided further that such liens shall rank equally in priority and share on a 50%/50% basis with the DIP ABL Liens on any unencumbered assets of the Debtors granted pursuant to this Interim Order (but excluding, for the avoidance of doubt, the Segregated Operating Account);

ii. pursuant to Bankruptcy Code Section 364(c)(2), a first priority lien on the Segregated Operating Account, the funds maintained in such account, and all proceeds thereof;

iii. pursuant to Bankruptcy Code Section 364(c)(3), a junior lien on and security interest in all assets of the Debtors encumbered by a first priority lien under the Prepetition ABL Facility  (now or hereafter acquired and all proceeds thereof) (the "Priority ABL Collateral"); provided further that such lien on the Priority ABL Collateral shall be junior in priority and subordinate to the DIP ABL Liens (defined below) and the Prepetition ABL Liens on the Priority ABL Collateral, and senior in priority to any other lien on the Priority ABL Collateral (including, without limitation, the Prepetition Terms Liens) securing any other indebtedness of the Debtors; and

iv. pursuant to Bankruptcy Code Section 364(d), a first priority priming lien on and security interest in all assets of the Debtors encumbered by a first priority lien under the Prepetition Term Facility not otherwise described in clauses (a) through (c) above (the "Priority Term Collateral") (now or hereafter acquired and all proceeds thereof); provided further that such lien on the Priority Term Collateral shall be senior in priority to the Prepetition Term Liens, the DIP ABL Liens and the Prepetition ABL Liens on the Priority Term Collateral;

provided further that, upon entry of the Final Order, the DIP Term Liens (as defined below) shall attach to and encumber claims and causes of action under Chapter 5 of the Bankruptcy Code and similar laws, and any proceeds thereof and property received thereby whether by judgment, settlement or otherwise (collectively, the "Avoidance Actions").  The liens and

security interests identified in this paragraph are referred to herein as the "<u>DIP Term Liens</u>" and the collateral to which such DIP Term Liens attach, the "<u>DIP Term Collateral</u>."

(b) Subject to Paragraph 14(c), and as more fully set forth in the DIP ABL Financing Documents, as security for the full and timely payment of the DIP ABL Obligations, the ABL Agent on behalf of the ABL Lenders is hereby granted:

    i.      pursuant to Bankruptcy Code Section 364(c)(2), a first priority lien on and security interest in all unencumbered assets of the Debtors other than Excluded Assets (as defined in the DIP ABL Credit Agreement) (now or hereafter acquired and all proceeds thereof) (but excluding, for the avoidance of doubt, the Segregated Operating Account); provided further that such liens shall rank equally in priority and share on a 50%/50% basis with the DIP Term Liens on any unencumbered assets of the Debtors granted pursuant to this Interim Order;

    ii.      pursuant to Bankruptcy Code Section 364(d), a first priority lien on and security interest in the Priority ABL Collateral, which lien shall be senior in priority to the DIP Term Liens and the Prepetition Term Liens on the Priority ABL Collateral; and

    iii.      pursuant to Bankruptcy Code Section 364(c)(3) and (d), a junior priming lien on the Priority Term Collateral, which lien shall be junior in priority and subordinate to the DIP Term Liens and Prepetition Term Liens on the Term Priority Collateral but senior in priority to the Prepetition ABL Liens on the Term Priority Collateral;

<u>provided</u> further that, upon entry of the Final Order, the DIP ABL Liens (as defined below) shall attach to and encumber Avoidance Actions and the proceeds thereof.  The liens and

security interests identified in this paragraph are referred to herein as the "<u>DIP ABL Liens</u>" (together with the DIP Term Liens, the "<u>DIP Liens</u>") and the collateral to which such DIP Term Liens attach, the "<u>DIP ABL Collateral</u>" (together with the DIP Term Collateral, the "<u>DIP Collateral</u>").

(c)    The DIP Term Liens shall be subject and subordinate to the Carve Out. Except as otherwise set forth herein and in the Intercreditor Agreement or by any court order heretofore or hereafter entered in the Chapter 11 Cases, the DIP Liens shall not, without the consent of the applicable DIP Agent, be made subject to, or *pari passu* with, any other lien or security interest, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (such cases or proceedings, "<u>Successor Cases</u>"), and/or upon the dismissal of any of the Chapter 11 Cases; provided further that the DIP Liens described in Paragraphs 14(a) or 14(b) shall remain subject to any "Permitted Liens" as that term is defined in each of the Prepetition Term Loan Agreement and the Prepetition ABL Credit Agreement.  The DIP Liens and the Adequate Protection Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code or, upon entry of the Final Order, section 506(c) of the Bankruptcy Code.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as permitted by this Interim Order, the Final Order, the DIP Loan Documents, the Intercreditor Agreement or as otherwise authorized by the Court.

15.    <u>Automatic Effectiveness of Liens</u>.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby vacated and modified to permit the Debtors to

grant the liens and security interests to the Prepetition Term Agent, the Prepetition Term

Lenders, the DIP Term Agent, the DIP Term Lenders, the ABL Agent and the ABL Lenders

contemplated by this Interim Order and the other DIP Loan Documents.

16.    <u>Automatic Perfection of DIP Liens</u>.  The DIP Liens granted pursuant to this

Interim Order shall constitute valid, enforceable, nonavoidable and duly perfected first priority

security interests and liens, and the DIP Term Agent, the DIP Term Lenders, the ABL Agent and

the ABL Lenders shall not be required to file or serve financing statements, notices of lien,

mortgage deeds, deeds of trust or similar instruments which otherwise may be required under

federal, state or local law in any jurisdiction, or take any action, including taking possession or

control, to validate and perfect such security interests and liens; and the failure by the Debtors to

execute any documentation relating to the DIP Liens or deliver possessory DIP Collateral shall in

no way affect the validity, enforceability, perfection or priority of such liens.  The DIP Term

Agent, the DIP Term Lenders, the ABL Agent and the ABL Lenders are hereby authorized, but

not required, to file or record financing statements, trademark filings, copyright filings,

mortgages, deeds of trust, notices of lien or similar instruments in any jurisdiction or take any

other action in order to validate and perfect the liens and security interests granted to them

hereunder.  Whether or not the DIP Term Agent, the DIP Term Lenders, the ABL Agent or the

ABL Lenders shall, in their sole discretion, choose to file such financing statements, trademark

filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments or

otherwise take any action to validate, perfect, or confirm perfection of the liens and security

interests granted to them hereunder, such liens and security interests shall be deemed valid,

perfected, allowed, enforceable, nonavoidable and not subject to challenge, dispute or

subordination, at the time and as of the date of entry of this Interim Order.  Upon the request of

the DIP Term Agent or the ABL Agent, as applicable, the Debtors, without any further consent

of any party, are authorized to take, execute and deliver such instruments (in each case without

representation or warranty of any kind except as set forth in the DIP Loan Documents) to enable

the DIP Term Agent, DIP Term Lenders, the ABL Agent or the ABL Lenders, as the case may

be, to further validate, perfect, preserve and enforce the DIP Liens consistent with the terms of

this Interim Order.  A certified copy of this Interim Order may be filed with or recorded in filing

or recording offices in addition to or in lieu of such financing statements, mortgages, deeds of

trust, notices of lien or similar instruments, and all filing offices are hereby authorized to accept

such certified copy of this Interim Order for filing and recording.

17.    <u>Other Automatic Perfection Matters</u>.  To the extent that the Prepetition Term

Agent or the ABL Agent is the secured party under any account control agreements, listed as loss

payee or additional insured under any of the Debtors' insurance policies or is the secured party

under any Prepetition Financing Document, the applicable DIP Agent, on its behalf and on

behalf of the applicable DIP Lenders, is also deemed to be the secured party under such account

control agreements, loss payee or additional insured under the Debtors' insurance policies and

the secured party under each such Prepetition Financing Document, and shall have all rights and

powers in each case attendant to that position (including, without limitation, rights of

enforcement), and shall act in that capacity and distribute any proceeds recovered or received in

accordance with the terms of this Interim Order and/or the Final Order, as applicable, and the

other DIP Loan Documents.  The Prepetition Term Agent or the ABL Agent, as applicable, shall

serve as agent for the DIP Term Agent or the ABL Agent, as applicable, for purposes of

perfecting the DIP Term Agent's or ABL Agent's security interests in and liens on all DIP

Collateral that is of a type such that perfection of a security interest therein may be accomplished

only by possession or control by a secured party; provided that nothing herein shall be deemed to grant the ABL Agent or the ABL Lenders any liens on, security interests in, or rights with respect to the Segregated Operating Account and the funds contained therein.

18.    <u>Automatic Perfection of Adequate Protection Liens</u>.  The Adequate Protection Liens granted pursuant to this Interim Order shall constitute valid, enforceable, nonavoidable and duly perfected security interests and liens, and the Prepetition Term Agent, the Prepetition Term Lenders, the ABL Agent and ABL Lenders (collectively, the "<u>Adequate Protection Parties</u>") shall not be required to file or serve financing statements, mortgage deeds, deeds of trust, notices of lien or similar instruments which otherwise may be required under federal, state or local law in any jurisdiction, or take any action, including taking possession or control, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the Adequate Protection Liens or deliver possessory collateral shall in no way affect the validity, enforceability, perfection or priority of such liens.  The Adequate Protection Parties are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the Adequate Protection Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments or otherwise take any action to validate, perfect or confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, nonavoidable and not subject to challenge, dispute or subordination, at the time and as of the date of entry of this Interim Order.  Upon the request of the Prepetition Term

Lenders or the ABL Lenders, the Debtors, without any further consent of any party, are authorized to take, execute and deliver such instruments (in each case without representation or warranty of any kind except as set forth in the DIP Loan Documents) to enable the applicable Adequate Protection Party to further validate, perfect, preserve and enforce the Adequate Protection Liens.  A certified copy of this Interim Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, deeds of trust, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

19.     DIP Superpriority Claims.  In addition to the liens and security interests granted to the DIP Term Agent on its behalf and on behalf of the DIP Term Lenders and the ABL Agent on behalf of the ABL Lenders pursuant to this Interim Order, subject and subordinate to the Carve-Out (but only in the case of the DIP Term Agent and DIP Term Lenders) and in accordance with sections 364(c)(1), 503 and 507 of the Bankruptcy Code, all of the DIP Term Obligations and the DIP ABL Obligations (including, without limitation, all DIP Extensions of Credit) shall constitute allowed superpriority administrative expense claims (the "DIP Superpriority Claims") with priority over any and all administrative expenses of the Debtors, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code; provided, that (i) the DIP Superpriority Claims in respect of the DIP Term Facility and the DIP Superpriority Claims in respect of the DIP ABL Credit Facility shall rank equally in priority and share on a 50%/50% basis with respect to all amounts payable in respect of such superpriority administrative expense claims and

(ii) upon the entry of the Final Order, the DIP Superpriority Claims shall attach to the Avoidance Actions.

20.    <u>Adequate Protection</u>.

(a)    The Prepetition Term Agent for the benefit of itself and the Prepetition Term Lenders (collectively, the "<u>Term Adequate Protection Parties</u>"), shall be granted the following protection, pursuant to Sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise, of its Prepetition Term Liens for the consent of the Prepetition Term Agent and the Prepetition Term Lenders to the priming effectuated by the DIP Facilities, consent to the use of its collateral (including Cash Collateral), consent to the transaction contemplated by the DIP Facilities, and for the diminution in the value of the pre-petition security interests of such party, whether or not such diminution in value results from the sale, lease or use by the Debtors of the collateral securing the Prepetition Term Obligations (including, without limitation, Cash Collateral), the priming of the Prepetition Term Liens or the stay of enforcement of any pre-petition security interest arising from section 362 of the Bankruptcy Code, or otherwise (each, a "<u>Term Diminution Claim</u>").  As security for and solely to the extent of any Diminution Claim, the Term Adequate Protection Parties are granted the following adequate protection (collectively, the "<u>Term Adequate Protection Obligations</u>"):

i.    <u>Term Adequate Protection Lien</u>.  The Prepetition Term Agent, on behalf of itself and the Prepetition Term Lenders shall be granted for their benefit, effective and perfected as of the date of entry of this Interim Order and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest in and lien on all assets of the Debtors (together, the "<u>Term Adequate Protection Liens</u>"), subject and subordinate

only to (x) the Carve-Out, (y) the DIP Term Liens securing the DIP Term Facility and (z) with respect to the Priority ABL Collateral, the DIP ABL Liens securing the DIP ABL Credit Facility and Prepetition ABL Liens securing the Prepetition ABL Facility; provided that the Term Adequate Protection Liens shall only encumber the Avoidance Actions upon entry of the Final Order.

ii. <u>Term Adequate Protection Super-Priority Claim</u>.  The Prepetition Term Agent, on behalf of itself and the Prepetition Term Lenders, shall be granted, subject to the payment of the Carve-Out, a superpriority administrative expense claim junior only to the claims granted to the DIP Term Agent and the ABL Agent by this Interim Order; provided that the Prepetition Term Agent and the Prepetition Term Lenders shall not receive or retain any payments, property or other amounts in respect of such superpriority claims unless and until the obligations under the DIP Term Facility and the DIP ABL Credit Facility have indefeasibly been paid in cash in full.

iii. <u>Fees and Expenses</u>.  Without further application to the Court, the Debtors are authorized and directed to pay, on an ongoing basis, from time to time after the Petition Date, and without duplication, pursuant to the procedures set forth in this paragraph 20(a)(iii), all reasonable and documented prepetition and postpetition fees and expenses incurred by the Prepetition Term Agent (for its benefit and the benefit of the Prepetition Term Lenders thereunder) and the ABL Agent (for its benefit and the benefit of the ABL Lenders) during and in connection with the Chapter 11 Cases and required to be paid by the Debtors under the Prepetition Term Loan Financing Documents and the Prepetition ABL Financing Documents, as applicable, including, but not limited to, agency fees, the reasonable professional fees and disbursements of

(i) White & Case LLP (as counsel to Deutsche Bank AG New York Branch, the existing Prepetition Term Agent) and Ropes & Gray LLP (as counsel to Wilmington Trust, National Association, as the anticipated successor Prepetition Term Agent), in connection with the Prepetition Term Agent in its role as agent and its administration of the Prepetition Term Loan Financing Documents, (ii) Milbank, Tweed, Hadley & McCloy LLP, as counsel to the Prepetition Term Lender Ad Hoc Committee, of all professional fees and expenses, (iii) each local counsel for the Prepetition Term Agent, the ABL Agent and Prepetition Term Lender Ad Hoc Committee, (iv) Houlihan Lokey, in connection with its role as financial advisor to the Prepetition Term Lender Ad Hoc Committee and (v) Otterbourg, P.C. as counsel to the ABL Lenders and (vi) RAS Management, the ABL Agent's financial advisor (such professional fees, collectively, the "<u>Term Loan and ABL Facility Professional Fees and Expenses</u>").  The Debtors shall pay the Term Loan and ABL Facility Professional Fees and Expenses within ten business days (if no written objection is received with such ten business days' period) after such professional has delivered an invoice to the Debtors describing such fees and expenses in summary form, with a copy of such invoices delivered simultaneously to the DIP Lenders, the U.S. Trustee, and counsel to a Committee, if any; <u>provided</u> <u>however</u>, that any such invoice may be redacted as necessary to protect privileged, confidential, or proprietary information.  Parties in interest may deliver written objections to payment of Term Loan and ABL Facility Professional Fees and Expenses within ten business days following receipt of an invoice for such fees and expenses.  None of the Term Loan and ABL Facility Professional Fees and Expenses shall be subject to Court approval or required to be

maintained in accordance with the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; provided, however, if an objection to a professional's invoice is timely received, the Debtors shall only be required to pay the undisputed amount of the invoice and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.

iv.  Financial Reporting.  The Debtors shall continue to provide the Prepetition Term Agent, the ABL Agent, Houlihan Lokey and RAS Management with financial and other reporting in compliance with the Prepetition Term Loan Financing Documents and the Prepetition, including with respect to any cure period provided for therein, and any reports provided to the ABL Agent or the ABL Lenders.

v.  Interest.  All obligations, including accrued but unpaid interest, under the Prepetition Term Facility owing by the Debtors thereunder and other fees owing by the Debtors thereunder shall continue to accrue interest (including interest on interest) at the default rate applicable on the Petition Date under the Prepetition Term Facility, but shall not be payable in cash.

(b)  The ABL  Agent for the benefit of itself and the ABL Lenders (collectively, the "ABL Adequate Protection Parties"), shall be granted the following protection, pursuant to Sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise, of its Prepetition ABL Liens for the consent of such ABL Lenders to the priming effectuated by the DIP Facilities, consent to the use of its collateral (including Cash Collateral), consent to the transaction contemplated by the DIP Facilities, and for the diminution in the value of the pre-petition security interests of such party, whether or not such diminution in value results from the

sale, lease or use by the Debtors of the collateral securing the Prepetition ABL Obligations (including, without limitation, Cash Collateral), the priming of the Prepetition ABL Liens or the stay of enforcement of any pre-petition security interest arising from section 362 of the Bankruptcy Code, or otherwise (each, an "ABL Diminution Claim").  As security for and solely to the extent of any ABL Diminution Claim, the ABL Adequate Protection Parties are granted the following adequate protection (collectively, the "ABL Adequate Protection Obligations"):

    i.   Pursuant to Sections 361 and 363 of the Bankruptcy Code, valid and binding, enforceable and perfected replacement liens upon and security interests in the Prepetition ABL Collateral; provided, that any portion of such liens and security interests in the Priority Term Collateral shall be junior in priority and subordinate in all respects to the DIP Term Liens, the Prepetition Term Liens and the Term Adequate Protection Liens on the Term Priority Collateral (the "ABL Adequate Protection Liens"; together with the Term Adequate Protection Liens, the "Adequate Protection Liens"); and

    ii.   as and to the extend provided by Section 507(b) of the Bankruptcy Code an allowed Superpriority administrative expense claim in each of the Chapter 11 cases and any Successor Cases (the "ABL Adequate Protection Superpriority Claim"); provided, further, the ABL Adequate Protection Superpriority Claim shall have priority overall all administrative claims and unsecured claims against the Debtors and their estates now existing or hereafter arising of any kind or nature whatsoever subject only to the DIP Term Superpriority Claim, which shall rank equally in priority and share on a 50%/50% basis with respect to all amounts payable in respect of such super priority administrative expense claims;

provided, however, that any lien on property and /or proceeds recovered as a result of Avoidance

Actions shall be subject to entry of a Final Financing Order granting such relief ( the

ABL Replacement Lien). The ABL Replacement Lien shall be senior to all other security

interest in ,liens on, or claims against the Prepetition ABL Collateral.

21.    <u>Investigation Budget</u>.  The Debtors shall not assert or prosecute, and no portion of

the DIP Facilities, the DIP Collateral (including the Prepetition Collateral and the Cash

Collateral), or the Carve Out, and no disbursements set forth in the Budget, shall be used for the

payment of professional fees, disbursements, costs or expenses incurred by any party in interest

in connection with (a) asserting or prosecuting any claims or causes of action arising under or

related to the DIP Loan Documents, the Prepetition Term Loan Financing Documents or the

Prepetition ABL Financing Documents, or the liens or security interests securing the obligations

under any of the foregoing or to pursue a Challenge (as defined in paragraph 32) against the

Prepetition Term Lenders, the Prepetition Term Agent, the ABL Lenders or the ABL Agent, or

(b) asserting any Challenge or raising any defenses to the Prepetition Obligations, the DIP

Obligations, or the liens of the Prepetition Term Lenders or ABL Lenders; <u>provided</u>, however,

that not more than $25,000 in the aggregate of proceeds of any Cash Collateral or any proceeds

of the DIP Facilities or the DIP Collateral may be used to pay any allowed fees of the Committee

or professionals retained by the Committee and incurred in connection with investigating the

matters covered by the stipulations contained in paragraph F of this Interim Order (the

"<u>Investigation Budget</u>").

22.    <u>506(c) Waiver</u>.  The Debtors (on behalf of themselves and their estates) shall

irrevocably waive, and shall be prohibited from asserting, any surcharge claim under section

506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection

with the preservation, protection or enhancement of, or realization by the Prepetition Term

Agent, the Prepetition Term Lenders, the ABL Agent or the ABL Lenders upon, the DIP

Collateral.  In no event shall the DIP Term Agent, the ABL Agent, the DIP Term Lenders, the

ABL Lenders, the Prepetition Term Agent, or the Prepetition Term Lenders be subject to the

equitable doctrine of marshaling or any similar doctrine with respect to the DIP Collateral.

23.    Restrictions on Granting Postpetition Liens; Collateral Rights; Limitations in

Respect of Subsequent Court Orders and Subordination of Liens.   Except for the Carve-Out, the

Carve Out Reserves or as otherwise expressly set forth in the DIP Loan Documents or this

Interim Order, it shall constitute an Event of Default under the DIP Term Facility and the DIP

ABL Credit Facility if any of the Debtors incurs or requests authority to incur a claim or grants a

lien (or a claim or lien is allowed) having a priority superior to or *pari passu* with those granted

pursuant to this Interim Order to the Prepetition Term Agent on its behalf and on behalf of the

Prepetition Term Lenders or the ABL Agent on behalf of the ABL Lenders at any time during

which any portion of the DIP Facilities, the DIP Obligations, the Prepetition ABL Credit

Facility, the Prepetition Term Loan Facility, the Prepetition Term Loan Obligations or the

Adequate Protection Obligations remains outstanding.  Without limiting the provisions and

protections of this paragraph 23, if at any time prior to the indefeasible repayment and

satisfaction in full in cash of all DIP Obligations and all Prepetition Term Obligations and all

Prepetition ABL Obligations, and the termination of the applicable DIP Lenders' obligations to

make DIP Extensions of Credit, including subsequent to the confirmation of any plan of

reorganization, with respect to the Debtors or their estates, any trustee, any examiner with

enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur

debt in violation of this Interim Order or the DIP Loan Documents, then all of the cash proceeds

derived from such credit or debt and all Cash Collateral shall be immediately be turned over to the DIP Term Agent or the ABL Agent, as the case may be and as provided in the Intercreditor Agreement, for application in accordance with this Interim Order, the DIP Loan Documents, the Intercreditor Agreement and the Prepetition Term Documents and the Prepetition ABL Documents, as applicable, and under applicable law.

24.     Binding Nature of Order.  The provisions of this Interim Order shall be binding upon the Debtors and their respective successors and assigns (including, without limitation, any trustee or other fiduciary hereafter elected or appointed for or on behalf of any Debtor's estate or with respect to its property).

25.     Survival of Order.  Solely with respect to the DIP Term Agent, the DIP Term Lenders, the ABL Agent, the ABL Lenders, the Prepetition Term Agent, and the Prepetition Term Lenders, the provisions of this Interim Order and any actions taken pursuant thereto (a) shall survive the entry of any order:  (i) confirming any plan of reorganization in any of the Chapter 11 Cases; (ii) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; or (iii) dismissing any of the Chapter 11 Cases; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Interim Order shall maintain their priority as provided by this Interim Order until all of the DIP Obligations are indefeasibly paid in full and discharged in accordance with the DIP Loan Documents.  The DIP Obligations shall not be discharged by the entry of any order confirming any plan of reorganization in any of the Chapter 11 Cases that does not provide for payment in full of the DIP Obligations or such other treatment of the DIP Obligations as may be agreed to by the DIP Term Agent, the DIP Term Lenders, the ABL Agent or the ABL Lenders, as applicable, in their sole discretion.

44

26.     <u>Protection under Section 364(e) of the Bankruptcy Code</u>.  If any or all of the

provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such

reversal, modification, vacation or stay shall not affect (i) the validity of any DIP Obligations or

Adequate Protection Obligations owing to the DIP Term Agent, the DIP Term Lenders, the ABL

Agent, the ABL Lenders, the Prepetition Term Agent, or the Prepetition Term Lenders, as

applicable, incurred prior to the actual receipt by such entities of written notice of the effective

date of such reversal, modification, vacation or stay, or (ii) the validity or enforceability of any

claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Loan

Documents with respect to any DIP Obligations or Adequate Protection Obligations owing to the

DIP Term Agent, the DIP Term Lenders, the ABL Agent, the ABL Lenders, the Prepetition

Term Agent, or the Prepetition Term Lenders, as applicable.  Notwithstanding any such reversal,

modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations or

Adequate Protection Obligations owing to the Adequate Protection Parties by the Debtors prior

to the actual receipt by the Adequate Protection Parties of written notice of the effective date of

such reversal, modification, vacation or stay, shall be governed in all respects by the provisions

of this Interim Order, and the Adequate Protection Parties shall be entitled to all of the rights,

remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this

Interim Order and the other DIP Loan Documents with respect to all uses of Cash Collateral and

the incurrence of DIP Obligations and Adequate Protection Obligations owing to the Adequate

Protection Parties.

27.     <u>Termination of DIP Facilities and Use of Cash Collateral</u>.  The Debtors' right to

use the DIP Term Facility and Cash Collateral shall terminate immediately upon the earliest of

(i) thirty-five (35) days after the entry of this Interim Order (unless the Final Order, in a form

acceptable to the Debtors and the "Required Lenders" (as defined in the DIP Term Loan Agreement), has been entered as of such date by the Court) and with respect to any provisions that affect the rights and duties of the DIP Term Agent, the DIP Term Agent, (ii) delivery of written notice (the "Default Notice") via electronic mail and facsimile by either the DIP Term Agent or the ABL Agent to counsel to the Debtors and their lead restructuring counsel, counsel to the DIP Lenders, the U.S. Trustee, counsel to the Committee (if any), and any other official committee appointed in the Chapter 11 Cases, of the occurrence of an Event of Default (as defined below), plus the longer of five business days or any applicable cure period set forth in the applicable DIP Loan Documents (such period of time, the "Default Notice Period"), (iii) the Maturity Date (as defined in the DIP Term Loan Agreement), and (iv) the Termination Date (as defined in the DIP ABL Credit Agreement) (the date of such termination pursuant to clause (i), (ii) or (iv) above, the "Termination Date").

28.    Events of Default.  Except as otherwise provided in this Interim Order or to the extent the DIP Term Lenders may otherwise agree in writing, any violation of any of the terms of this Interim Order or any occurrence of an "Event of Default" under and as defined in Section [•] of the DIP Term Loan Agreement and Section [•] of the DIP ABL Credit Agreement shall constitute an event of default (each, an "Event of Default").  Interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Term Loan Agreement.

29.    Remedies.  The automatic stay provisions of section 362 of the Bankruptcy Code shall be automatically vacated and modified to the extent necessary to permit the DIP Term Agent, the DIP Term Lenders, the ABL Agent, or the ABL Lenders, as applicable, to exercise, upon not less than five business days' prior written notice by email (which notice may be set

forth in a Default Notice) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, if any, following the occurrence and continuance of an Event of Default (as defined in the applicable DIP Loan Documents), all rights and remedies provided in this Interim Order and the DIP Loan Documents, as applicable, subject to the terms and conditions of the Intercreditor Agreement.  The Debtors or any party in interest may seek a determination from this Court that no Event of Default has occurred and is continuing, and request appropriate relief from this Court in the event it should so determine that no Event of Default has occurred and is continuing.

30.    <u>Limitations on Borrowings</u>.    Except as expressly permitted herein, it shall constitute an Event of Default if any of the Debtors seeks authorization for the Debtors or their estates to borrow money from any person other than the DIP Term Lenders as contemplated herein to the extent that the repayment of such borrowings is to be secured pursuant to section 364(d)(1) of the Bankruptcy Code by a security interest, lien or mortgage that is senior to or *pari passu* with any of the security interests, liens or mortgages held by the DIP Term Agent on its behalf and on behalf of the DIP Term Lenders  or the Prepetition Term Agent on its behalf and on behalf of the Prepetition Term Lenders, including the Term Adequate Protection Liens, the Prepetition Term Liens, and the DIP Term Liens, unless in connection with such borrowings the DIP Term Obligations and any Prepetition Term Obligations are indefeasibly paid in full in cash as a condition to the closing of such borrowings.

31.    <u>Modifications of DIP Loan Documents and Budgets</u>.  The Debtors are hereby authorized, without further order of this Court, to enter into agreements with the DIP Term Agent, the DIP Term Lenders, the ABL Agent, or the ABL Lenders, as applicable, providing for any non-material modifications to the Budget or the DIP Loan Documents, or of any other

modifications to the DIP Loan Documents necessary to conform the terms of the DIP Loan Documents to this Interim Order; provided, however, that the Debtors shall not enter into any material modification or amendment to the Budget or the DIP Loan Documents that is adverse to the Debtors' estates absent further order of this Court.

32.    _Stipulations Regarding Prepetition Term Obligations, the Prepetition Term Liens, the Prepetition ABL Obligations and the Prepetition ABL Liens Binding on Parties in Interest_.    The stipulations and admissions contained in this Interim Order, including, without limitation, in recital paragraph F of this Interim Order, shall be binding on the Debtors' estates and all parties in interest, including, without limitation, any Committee, unless (a) any Committee, or another party in interest (other than any of the Debtors) with standing and requisite authority, has timely commenced a contested matter or adversary proceeding (subject to the limitations set forth in paragraph 21 hereof, including, for the avoidance of doubt, the Investigation Budget) (a "Challenge") challenging the amount, validity or enforceability of the Prepetition Term Obligations, the Prepetition ABL Obligations, or the perfection or priority of the Prepetition Term Liens or the Prepetition ABL Liens, or otherwise asserting any objections, claims or causes of action on behalf of the Debtors' estates against the Prepetition Term Lenders or ABL Lenders relating to the Prepetition Term Obligations, the Prepetition ABL Obligations, the Prepetition Term Liens or the Prepetition ABL Liens no later than on or before either (i) if no Committee has been appointed, the earlier of (A) seventy-five (75) days from the date of entry of this Interim Order and (B) the date on which objections to confirmation of the Debtors' Chapter 11 plan or plans of reorganization for one or more of the Debtors are due, or (ii) if a Committee has been appointed, the earlier of (A) sixty (60) days after such Committee is appointed and (B) the date on which objections to confirmation of Every Ware's Chapter 11 plan or plans of

reorganization for one or more of the Debtors are due, and (b) to the extent the Court rules in favor of the plaintiff in any such timely and properly filed Challenge.  If no such Challenge is timely commenced as of such date then, without further order of the Court, to the extent not theretofore indefeasibly repaid, satisfied, or discharged, as applicable, (x) the claims, liens and security interests of the Prepetition Term Agent, the Prepetition Term Lenders, the ABL Agent and the ABL Lenders shall, without further order of the Court, be deemed to be finally allowed for all purposes in the Chapter 11 Cases and any subsequent Chapter 7 cases and shall not be subject to challenge or objection by any party in interest as to validity, priority, amount or otherwise, and (y) without further order of the Court, the Debtors and their estates shall be deemed to have released any and all claims or causes of action against the Consenting Term Lenders and the ABL Lenders with respect to the Prepetition Term Loan Financing Documents, the Prepetition ABL Financing Documents, or any related transactions.  Notwithstanding anything to the contrary herein, if no Challenge is timely commenced, the stipulations contained in paragraph F of this Interim Order shall be binding on the Debtors' estates, any Committee and all parties in interest.  If a Challenge is timely commenced, the stipulations contained in paragraph F of this Interim Order shall be binding on the Debtors' estates and all parties in interest except to the extent such stipulations are specifically challenged in such Challenge, as and when originally filed (ignoring any relation back principles); provided, that if and to the extent a Challenge is withdrawn, denied or overruled, the stipulations specifically challenged in such Challenge also shall be binding on the Debtors' estates and all parties in interest to the extent set forth herein.

33.     <u>Waiver of Requirement to File Proofs of Claim</u>.

(a)     The DIP Term Agent, the DIP Term Lenders, the ABL Agent and the ABL Lenders shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to maintain their respective claims for payment of the DIP Obligations under the applicable DIP Loan Documents.  The statements of claim in respect of the DIP Obligations set forth in this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim in respect of such obligations and such secured status.

(b)     The Prepetition Term Agent, the Prepetition Term Lenders, the ABL Agent and the ABL Lenders shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to maintain their respective claims for payment of the Prepetition Term Obligations and the Prepetition ABL Obligations, respectively, under the respective Financing Documents.  The statements of claim in respect of the Prepetition Term Obligations and the Prepetition ABL Obligations, respectively, set forth in this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim in respect of such obligations and such secured status.

34.     <u>Final Hearing</u>.  The Final Hearing is scheduled for _____ __, 2015, at __:00_.m. (prevailing Eastern Time) before this Court.  Any objections by creditors or other parties in interest to any provisions of this Interim Order shall be deemed waived unless timely filed and served in accordance with this paragraph 34.  The Debtors shall promptly serve notice of entry of this Interim Order and the Final Hearing on the appropriate parties in interest in accordance with the Bankruptcy Rules and the Local Rules.  Without limiting the foregoing, the

Debtors shall promptly serve a notice of entry of this Interim Order and the Final Hearing, together with a copy of this Interim Order, by first class mail, postage prepaid, facsimile, electronic mail or overnight mail upon the Notice Parties.  The notice of the entry of this Interim Order and the Final Hearing shall state that objections to the entry of a Final Order shall be filed with the United States Bankruptcy Court for the District of Delaware by no later than 5:00 p.m. (prevailing Eastern Time) on _____ __, 2015.

35.     <u>DIP Term Agent, ABL Agent, Prepetition Term Agent Authorization</u>.  For the avoidance of doubt and notwithstanding any provision of the Prepetition Term Loan Financing Documents, the Prepetition ABL Financing Documents, or the DIP Loan Documents, each of the DIP Term Agent, the ABL Agent, and the Prepetition Term Agent is hereby authorized to make any and all account transfers requested by the Debtors in accordance with the Budget, and is further authorized to take any other action reasonably necessary to implement the terms of this Interim Order.

36.     <u>No Modification of Interim Order</u>.  The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Interim Order without the prior written consent of the DIP Term Lenders, the ABL Lenders, the Prepetition Term Lenders and the ABL Lenders (and with respect to amendments or modifications which affect the rights and duties of the DIP Term Agent, the ABL Agent, or the Prepetition Term Agent hereunder, the DIP Term Agent, the ABL Agent, or the Prepetition Term Agent, as applicable), and no such consent shall be implied by any action, inaction or acquiescence of the DIP Term Lenders, the ABL Lenders, or the Prepetition Term Lenders (and, if applicable, the DIP Term Agent, the ABL Agent, or the Prepetition Term Agent).

37.     <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly (a) the DIP Term Agent's, the DIP Term Lenders', the ABL Agent's, the ABL Lenders', the Prepetition Term Agent's, and the Prepetition Term Lenders' right to seek any other or supplemental relief in respect of the Debtors, including the right to seek additional adequate protection, as applicable, subject to the terms of the Intercreditor Agreement, (b) any of the rights of the DIP Term Agent, the DIP Term Lenders, the ABL Agent, the ABL Lenders, the Prepetition Term Agent, or the Prepetition Term Lenders under the Bankruptcy Code or applicable nonbankruptcy law (including, and subject to the terms of, the Intercreditor Agreement).  Nothing contained herein shall be deemed a finding by the Court or an acknowledgement by any of the Prepetition Term Agent, the Prepetition Term Lenders, the ABL Agent or the ABL Lenders that the adequate protection granted herein does in fact adequately protect the Prepetition Term Agent, the Prepetition Term Lenders, the ABL Agent or the ABL Lenders against any diminution in value of the Prepetition Collateral.

38.     <u>Priority of Terms</u>.  To the extent of any conflict between or among the Motion, the DIP Loan Documents, the Intercreditor Agreement and this Interim Order, the terms and provisions of this Interim Order shall govern.

39.     <u>Entry of Interim Order; Effect</u>.  This Interim Order shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof, notwithstanding the possible application of Fed. R. Bankr. P. 6004(h), 7062, 9014, or otherwise, and the Clerk of this Court is hereby directed to enter this Interim Order on this Court's docket in the Chapter 11 Cases.

40.    <u>Limitation of Liability</u>.  In determining to make any DIP Extensions of Credit,

permitting the use of Cash Collateral, or in exercising any rights or remedies as and when

permitted pursuant to this Interim Order (or any Final Order), the DIP Loan Documents,

Prepetition Term Loan Financing Documents, or the Prepetition ABL Financing Documents, as

applicable, none of the DIP Term Agent, the DIP Term Lenders, the ABL Agent, the ABL

Lenders, the Prepetition Term Agent, or the Prepetition Term Lenders, or any successor of any of

the foregoing, shall be deemed to be in control of the operations of the Debtors or any affiliate

(as defined in section 101(2) of the Bankruptcy Code) of the Debtors, or to be acting as a

"responsible person" or "owner or operator" with respect to the operation or management of the

Debtors or any affiliate of the Debtors (as such terms, or any similar terms, are used in the

United States Comprehensive Environmental Response, Compensation and Liability Act, 29

U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).  Furthermore, nothing

in this Interim Order, the DIP Loan Documents, the Prepetition Term Loan Financing

Documents, or the Prepetition ABL Financing Documents shall in any way be construed or

interpreted to impose or allow the imposition upon the DIP Term Agent, the DIP Term Lenders,

the ABL Agent, the ABL Lenders, the Prepetition Term Agent, the Prepetition Term Lenders,

the Prepetition ABL Agent, or the ABL Lenders, or any successor of any of the foregoing, of any

liability for any claims arising from the prepetition or postpetition activities of the Debtors or any

affiliate of the Debtors.

41.    <u>Credit Bidding</u>.

(a)    Subject to and effective upon entry of the Final Order, and subject to the

terms of the Intercreditor Agreement, the DIP Term Agent, acting at the direction of the

"Required Lenders" (as defined in the DIP Term Loan Agreement), shall have the unqualified

right to credit bid up to the full amount of the DIP Term Obligations in any sale of the Priority

Term Collateral (or any part thereof), without the need for further Court order authorizing the

same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code,

by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise; and

(b)    Subject to and effective upon entry of the Final Order, and subject to the

terms of the Intercreditor Agreement, the ABL Agent, acting at the direction of the ABL

Lenders, shall have the unqualified right to credit bid up to the full amount of the DIP ABL

Obligations in any sale of the Priority ABL Collateral (or any part thereof), without the need for

further Court order authorizing the same, and whether such sale is effectuated through section

363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy

Code, or otherwise.

42.    <u>Equities of the Case</u>.  Subject to and effective upon entry of the Final Order and,

in light of, as applicable, the subordination of the Prepetition Term Liens and the Prepetition

ABL Liens to the DIP Liens and the Carve-Out (in the case of the DIP Term Liens and the Term

Adequate Protection Liens), and the granting of the DIP Liens, the Prepetition Term Agent, the

Prepetition Term Lenders, the ABL Agent, the ABL Lenders shall be entitled to all benefits of

Bankruptcy Code section 552(b), and the "equities of the case" exception under Bankruptcy

Code section 552(b) shall not apply to the Prepetition Term Agent, the Prepetition Term Lenders,

the ABL Agent, the ABL Lenders with respect to the proceeds, product, offspring, or profits of

any of the DIP Collateral, including the Prepetition Collateral.

43.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim

Order does not create any rights for the benefit of any party, creditor, equity holder or other

entity other than the DIP Term Agent, the DIP Term Lenders, the ABL Agent, the ABL Lenders,

54

the Prepetition Term Agent, the Prepetition Term Lenders, and the Debtors, and their respective successors and assigns.

44.     <u>Intercreditor Issues</u>.  Except as expressly set forth in Paragraph 41 or otherwise herein, nothing in this Interim Order shall be construed to convey on any individual DIP Term Lender, ABL Lender, or Prepetition Term Lender any consent, voting or other rights beyond those (if any) set forth in the DIP Loan Documents, the Prepetition Term Loan Financing Documents, the Prepetition ABL Financing Documents, and the Intercreditor Agreement as applicable.

45.     <u>DIP Fees and Expenses</u>.  The Debtors are authorized and directed to pay all fees and expenses of the DIP Term Agent, the DIP Term Lenders, the ABL Agent and the ABL Lenders in connection with the DIP Facilities, as applicable, as provided in the applicable DIP Loan Documents, whether or not the transactions contemplated hereby are consummated, whether or not incurred prepetition or postpetition, including, without limitation, agency fees, the professional fees and expenses of Ropes & Gray LLP (as counsel to the DIP Term Agent), Milbank, Tweed, Hadley & McCloy LLP (as counsel to the DIP Term Lenders), Houlihan Lokey (as financial advisor to the DIP Term Lenders), Otterbourg, P.C. (as counsel to the ABL Lenders), RAS Management (as the ABL Agent's financial advisor), and each local counsel to the DIP Term Agent, DIP Term Lenders, and the ABL Agent, in each case promptly upon receipt of summary form invoices which may be redacted for privileged information.

46.     <u>Resignation of Prepetition Term Agent; Successor Prepetition Term Agent</u>. Deutsche Bank AG New York Branch (i) is authorized to resign as Prepetition Term Agent in accordance with the terms of the Prepetition Term Loan Agreement, transfer collateral to any successor administrative agent under the Prepetition Term Loan Agreement (and serve as sub-

collateral agent of and bailee for such successor administrative agent), and take or refrain from taking any other action to effectuate such resignation permitted under the Prepetition Term Loan Financing Documents, and (ii) is entitled to all of the rights, benefits and protections under the Prepetition Term Loan Financing Documents, all of which are reaffirmed and ratified pursuant to this Interim Order.  Wilmington Trust, National Association ("WT") (i) is authorized to accept the appointment as Prepetition Term Agent in accordance with the terms of the Prepetition Term Loan Agreement, accept transfers of collateral from the resigning administrative agent under the Prepetition Term Loan Agreement, and take or refrain from taking any other action to effectuate such appointment permitted under the Prepetition Term Loan Financing Documents, and (ii) upon such appointment, shall be entitled to all of the rights, benefits and protections under this Interim Order and under the Prepetition Term Loan Financing Documents, all of which are reaffirmed and ratified pursuant to this Interim Order.  The Debtors are authorized to (i) enter into such agreements and amendments to the Prepetition Term Loan Documents and take any other action as may be reasonably required by WT in connection with such resignation and appointment, (ii) pay all prepetition and postpetition fees and expenses as set forth in such agreements and amendments, (iii) and provide Deutsche Bank AG New York Branch and WT, solely in their respective capacity as Prepetition Term Agent, with any requested notice or documents required under the Prepetition Term Loan Financing Documents.  Notwithstanding anything to the contrary herein, this paragraph shall become effective on a final basis.

47.    Enforceability.    This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.  Any findings

of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact.

48.    <u>Retention of Jurisdiction</u>.    Notwithstanding any provision in the DIP Loan Documents, the Prepetition Term Loan Financing Documents or the Prepetition ABL Financing Documents, this Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation and enforcement of this Interim Order, the DIP Facilities, or the DIP Loan Documents.

49.    <u>Disposition of Collateral</u>.    Subject to the terms of the Intercreditor Agreement, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of the ABL Agent, the ABL Lenders, the DIP Term Agent, the DIP Term Lenders, the Prepetition Term Agent, and the Prepetition Term Lenders (and no such consent shall be implied, from any other action, inaction or acquiescence by the ABL Agent, the ABL Lenders, the DIP Term Agent, the DIP Term Lenders, the Prepetition Term Agent, or the Prepetition Term Lenders or an order of this Court, except for sales, transfers, leases or uses of Debtors' inventory in the ordinary course of their businesses). Until such time as the ABL Obligations, the DIP Term Obligations and the Prepetition Term Obligations have been paid full in accordance with the terms of the applicable DIP Loan Documents and the Prepetition Term Loan Financing Documents, the Debtors shall remit to the ABL Agent, the ABL Lenders, and the DIP Term Agent, as applicable, or cause to be remitted to the ABL Agent, the ABL Lenders and the DIP Term Agent, all proceeds of Collateral for application against the ABL Obligations, the DIP Term Obligations and the Prepetition Term Obligations in accordance with the terms of the applicable DIP Loan Documents, the Prepetition Term Loan Financing Documents, the Intercreditor Agreement and this Interim Order.

50.    <u>Inventory</u>. The Debtors shall not, without the consent of the ABL Agent or the ABL Lenders (a) enter into any agreement to return any inventory to any of their creditors for application against any pre-petition indebtedness under any applicable provision of Section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its prepetition indebtedness based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise.

51.    <u>Plan Treatment</u>.  The security interests and liens granted to or for the benefit of the ABL Agent, the ABL Lenders, the DIP Term Agent, the DIP Term Lenders, the Prepetition Term Agent and the Prepetition Term Lenders hereunder and the rights of the ABL Agent, the ABL Lenders, the DIP Term Agent, the DIP Term Lenders, the Prepetition Term Agent and the Prepetition Term Lenders pursuant to this Interim Order and the DIP Loan Documents are cumulative and shall not be altered, modified, extended, impaired, or affected by any plan of reorganization or liquidation of Debtors.

Dated: _____, 2015          _____
         Wilmington, Delaware                   United States Bankruptcy Judge

**EXHIBIT 1**

**DIP Term Loan Agreement**

**DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT**

**DATED AS OF**

**APRIL [__], 2015**

**AMONG**

**ANCHOR HOCKING, LLC,**
**AS BORROWER AGENT**,

**ONEIDA LTD.,**
**AS BORROWER**,

**UNIVERSAL TABLETOP, INC.,**
**AS HOLDINGS**,

**VARIOUS LENDERS FROM TIME TO TIME PARTY HERETO**,

**AND**

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**
**AS ADMINISTRATIVE AGENT**,

_____

**SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-**
**POSSESSION FACILITY**
_____

# TABLE OF CONTENTS

Page

### ARTICLE 1.
### DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Defined Terms ....................................................................................... 7
Section 1.02    Other Interpretive Provisions .............................................................. 37
Section 1.03    Accounting Terms ................................................................................. 38
Section 1.04    Rounding ............................................................................................... 39
Section 1.05    Times of Day; Calculation of Dates .................................................... 39
Section 1.06    Currency Equivalents Generally; Change of Currency ....................... 39

### ARTICLE 2.
### THE TERM COMMITMENTS AND CREDIT EXTENSION

Section 2.01    Commitments to Lend; Term Loan ....................................................... 39
Section 2.02    Term Borrowings .................................................................................. 40
Section 2.03    Prepayments ......................................................................................... 41
Section 2.04    Conversion of Loans to Exit Facility; Implementation ....................... 44
Section 2.05    Repayment of Term Loan ..................................................................... 46
Section 2.06    Interest ................................................................................................... 46
Section 2.07    Fees ....................................................................................................... 46
Section 2.08    Computation of Interest and Fees ........................................................ 47
Section 2.09    Evidence of Debt .................................................................................. 47
Section 2.10    Payments Generally; Administrative Agent's Clawback .................... 48
Section 2.11    Sharing of Payments by Lenders .......................................................... 49
Section 2.12    Borrower Agent ..................................................................................... 49
Section 2.13    Joint and Several Nature and Extent of Each Borrower's Liability ..... 50
Section 2.14    No Discharge; Survival of Claims ....................................................... 51

### ARTICLE 3.
### TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01    Taxes ..................................................................................................... 51
Section 3.02    Illegality ............................................................................................... 55
Section 3.03    Inability to Determine Rates ................................................................ 55
Section 3.04    Increased Costs; Reserves on Eurodollar Rate Loans ........................ 56
Section 3.05    Compensation for Losses ..................................................................... 57
Section 3.06    Mitigation Obligations; Replacement of Lenders ............................... 58
Section 3.07    Survival ................................................................................................. 58

### ARTICLE 4.
### CONDITIONS PRECEDENT

Section 4.01    Conditions to Closing Date .................................................................. 58

-i-

Section 4.02    Conditions to Withdrawals ..................................................... 60
Section 4.03    Conditions to the Credit Extension and to each Withdrawal Date ...................... 60

ARTICLE 5.
REPRESENTATIONS AND WARRANTIES

Section 5.01    Existence, Qualification and Power ........................................... 62
Section 5.02    Authorization; No Contravention ............................................. 62
Section 5.03    Governmental Authorization; Other Consents ............................... 62
Section 5.04    Binding Effect .................................................................. 62
Section 5.05    Financial Statements; No Material Adverse Effect ......................... 63
Section 5.06    Litigation ....................................................................... 63
Section 5.07    No Default ...................................................................... 63
Section 5.08    Ownership of Property; Liens ................................................ 63
Section 5.09    Environmental .................................................................. 64
Section 5.10    Insurance ....................................................................... 65
Section 5.11    Taxes ............................................................................ 65
Section 5.12    ERISA Compliance ............................................................ 65
Section 5.13    Subsidiaries; Equity Interests .............................................. 66
Section 5.14    Margin Regulations; Investment Company Act ........................... 66
Section 5.15    Disclosure ...................................................................... 67
Section 5.16    Compliance with Laws ....................................................... 67
Section 5.17    [Reserved] ...................................................................... 67
Section 5.18    Intellectual Property; Licenses, Etc ........................................ 67
Section 5.19    Purpose of Loans .............................................................. 67
Section 5.20    Collateral Documents ......................................................... 68
Section 5.21    [Reserved] ...................................................................... 68
Section 5.22    Sanctioned Persons ........................................................... 68
Section 5.23    Foreign Corrupt Practices Act ............................................... 69
Section 5.24    Patriot Act ..................................................................... 69
Section 5.25    Budget and Financial Plan ................................................... 69
Section 5.26    Prepetition Obligations ...................................................... 69

ARTICLE 6.
AFFIRMATIVE COVENANTS

Section 6.01    Financial Statements; Budget ............................................... 69
Section 6.02    Certificates; Other Information ............................................. 71
Section 6.03    Notices .......................................................................... 73
Section 6.04    Preservation of Existence, Etc .............................................. 73
Section 6.05    Maintenance of Properties ................................................... 73
Section 6.06    Maintenance of Insurance .................................................... 73
Section 6.07    Compliance with Laws ....................................................... 74
Section 6.08    Books and Records ........................................................... 74
Section 6.09    Inspection Rights ............................................................. 74
Section 6.10    Use of Proceeds ............................................................... 75
Section 6.11    Covenant to Guarantee Obligations and Give Security ................. 75

Section 6.12    Compliance with Environmental Laws...............................................................77
Section 6.13    Preparation of Environmental Reports.............................................................77
Section 6.14    Further Assurances............................................................................................78
Section 6.15    Advisors..............................................................................................................78

ARTICLE 7.
NEGATIVE COVENANTS

Section 7.01    Liens....................................................................................................................78
Section 7.02    Investments.........................................................................................................80
Section 7.03    Indebtedness........................................................................................................81
Section 7.04    Fundamental Changes.......................................................................................82
Section 7.05    Dispositions.........................................................................................................82
Section 7.06    Restricted Payments..........................................................................................83
Section 7.07    Change in Nature of Business; Permitted Activities of Holdings.................84
Section 7.08    Transactions with Affiliates..............................................................................85
Section 7.09    Burdensome Agreements...................................................................................85
Section 7.10    Right of Subrogation.........................................................................................86
Section 7.11    Budget Covenant................................................................................................86
Section 7.12    Amendments or Waivers of Organization Documents....................................87
Section 7.13    Fiscal Year...........................................................................................................87
Section 7.14    Prepayments of Indebtedness............................................................................87
Section 7.15    Sale-Leaseback Transactions...........................................................................87
Section 7.16    Chapter 11 Modifications..................................................................................87
Section 7.17    Segregated Operating Account. .......................................................................87

ARTICLE 8.
EVENTS OF DEFAULT AND REMEDIES

Section 8.01    Events of Default...............................................................................................88
Section 8.02    Remedies Upon Event of Default......................................................................92
Section 8.03    Application of Funds...........................................................................................92

ARTICLE 9.
ADMINISTRATIVE AGENT

Section 9.01    Appointment and Authority...............................................................................93
Section 9.02    Rights as a Lender..............................................................................................93
Section 9.03    Exculpatory Provisions......................................................................................94
Section 9.04    Reliance...............................................................................................................95
Section 9.05    Delegation of Duties...........................................................................................95
Section 9.06    Resignation of Administrative Agent................................................................95
Section 9.07    Non-Reliance on Administrative Agent and Other Lenders............................96
Section 9.08    No Other Duties, Etc..........................................................................................96
Section 9.09    Administrative Agent May File Proofs of Claim..............................................97
Section 9.10    Collateral and Guaranty Matters.....................................................................97
Section 9.11    Indemnification of Administrative Agent..........................................................98

Section 9.12    Certain Rights of the Administrative Agent ...................................... 99
Section 9.13    [Reserved .............................................................................................. 99
Section 9.14    Delivery of Information ....................................................................... 99
Section 9.15    Withholding .......................................................................................... 99

ARTICLE 10.

SECURITY AND PRIORITY

Section 10.01   Prepetition Obligations ...................................................................... 100
Section 10.02   Acknowledgment of Security Interests ............................................... 100
Section 10.03   Binding Effect of Documents ............................................................. 100
Section 10.04   Collateral; Grant of Lien and Security Interest ................................... 101
Section 10.05   Priority and Liens Applicable to Loan Parties. ................................... 101
Section 10.06   Grants, Rights and Remedies .............................................................. 104
Section 10.07   No Filings Required ............................................................................ 104
Section 10.08   Survival ............................................................................................... 104

ARTICLE 11.
GUARANTEE

Section 11.01   Guarantee. ........................................................................................... 105
Section 11.02   Rights of Reimbursement, Contribution and Subrogation .................. 106
Section 11.03   Amendments, etc. with respect to the Obligations. ............................ 108
Section 11.04   Guarantee Absolute and Unconditional .............................................. 109
Section 11.05   Reinstatement ...................................................................................... 109
Section 11.06   Payments ............................................................................................. 110

ARTICLE 12.
MISCELLANEOUS

Section 12.01   Amendments, Etc .................................................................................. 110
Section 12.02   Notices; Effectiveness; Electronic Communication .......................... 112
Section 12.03   No Waiver; Cumulative Remedies; Enforcement ............................... 114
Section 12.04   Expenses; Indemnity; Damage Waiver ............................................... 114
Section 12.05   Payments Set Aside ............................................................................. 117
Section 12.06   Successors and Assigns ....................................................................... 117
Section 12.07   Treatment of Certain Information; Confidentiality .............................. 120
Section 12.08   Right of Setoff ..................................................................................... 122
Section 12.09   Interest Rate Limitation ...................................................................... 122
Section 12.10   Counterparts; Integration; Effectiveness ............................................ 122
Section 12.11   Survival of Representations and Warranties ....................................... 122
Section 12.12   Severability .......................................................................................... 123
Section 12.13   Replacement of Lenders ..................................................................... 123
Section 12.14   Governing Law; Jurisdiction; Etc ....................................................... 124
Section 12.15   Waiver of Jury Trial ............................................................................ 125
Section 12.16   No Advisory or Fiduciary Responsibility ........................................... 125

Section 12.17  Electronic Execution of Assignments and Certain Other Documents ................ 126
Section 12.18  USA PATRIOT Act ....................................................................................... 126
Section 12.19  Judgment Currency ....................................................................................... 126
Section 12.20  [ABL Intercreditor Agreement ...................................................................... 127

#4829-5338-7298v12

**SCHEDULES**

| | |
|---|---|
| 1.01(a)-1 | Immaterial Subsidiaries |
| 1.01(a)-2 | Real Property Subject to Mortgages |
| 2.01 | Commitments |
| 5.06 | Litigation |
| 5.08(a) | Liens |
| 5.08(b) | Owned Real Property |
| 5.09 | Environmental Matters |
| 5.13 | Subsidiaries; Other Equity Investments |
| 6.17 | Post-Closing Actions |
| 7.03 | Existing Indebtedness |
| 7.08 | Transactions with Affiliates |
| 12.02 | Administrative Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

| | *Form of* |
|---|---|
| A | Committed Loan Notice |
| B | Notice of Withdrawal |
| C | Prepayment Notice |
| D | Budget |
| E | Assignment and Assumption |
| F | [Reserved] |
| G-1 | U.S. Tax Compliance Certificate |
| G-2 | U.S. Tax Compliance Certificate |
| G-3 | U.S. Tax Compliance Certificate |
| G-4 | U.S. Tax Compliance Certificate |
| H | Closing Certificate |
| I | Exit Term Sheet |
| J | Interim Bankruptcy Court Order |

## DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT

This DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT ("**Agreement**") is entered into as of April [__], 2015, among ANCHOR HOCKING, LLC, a Delaware limited liability company, as debtor and debtor-in-possession ("**Anchor**"), ONEIDA LTD., a Delaware corporation, as debtor and debtor-in-possession ("**Oneida**" and together with Anchor, each individually a "**Borrower**" and collectively, "**Borrowers**"), UNIVERSAL TABLETOP, INC., a Delaware corporation, as debtor and debtor-in-possession ("**Holdings**") and certain of its subsidiaries party hereto, each as debtor and debtor-in-possession (together with Holdings, the "**Guarantors**"), each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**") and WILMINGTON TRUST, NATIONAL ASSOCIATION, as Administrative Agent.

**WHEREAS**, EveryWare Global, Inc. ("**Parent**") and the Loan Parties have commenced voluntary cases (the "**Chapter 11 Cases**") under Chapter 11 of the Bankruptcy Code (as hereinafter defined) in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), and the Borrowers continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrowers have asked the Lenders to make post-petition loans and advances to the Borrowers comprising a term loan facility in an aggregate principal amount not to exceed $40,000,000.  The Lenders have severally, and not jointly, agreed to extend such credit to the Borrowers subject to the terms and conditions hereinafter set forth; and

**WHEREAS**, to provide security for the repayment of the Term Loan (as hereinafter defined), and the payment of the other Obligations (as hereinafter defined) of the Loan Parties hereunder and under the Loan Documents (as hereinafter defined), the Loan Parties will provide and grant to the Administrative Agent, for its benefit and the benefit of the Lenders, certain security interests, liens, and other rights and protections pursuant to the terms hereof, and, in the case of the Loan Parties, security interests and liens pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and super-priority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code, and other rights and protections, as more fully described herein.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

ARTICLE 1.
DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    *Defined Terms*.  As used in this Agreement, the following terms shall have the meanings set forth below:

"**ABL Agent**" means the "Administrative Agent" under (and as defined in) the ABL Credit Agreement.

"**ABL Collateral**" has the meaning specified in Section 10.05(a)(iv).

"**ABL Collateral Documents**" means the security agreements, the mortgages and each of the other agreements, instruments or documents that create or purport to create a Lien in favor of the ABL Agent for the benefit of the ABL Lenders.

"**ABL Credit Agreement**" means that certain Second Amended and Restated Loan and Security Agreement, dated as of May 21, 2013, as amended, modified or otherwise supplemented from time to time including by that certain Ratification and Amendment Agreement, dated on or about April [___], 2015 (and as further amended, modified or otherwise supplemented from time to time), among the ABL Loan Parties, the ABL Lenders, the ABL Agent and the other parties thereto from time to time.

["**ABL Facility Indebtedness**" means the "Obligations" as such term is defined in the ABL Credit Agreement.]

"**ABL Intercreditor Agreement**" means the ABL Intercreditor Agreement, dated as of May 21, 2013, as amended by the Bankruptcy Court Orders (and as further amended and supplemented from time to time), among the Loan Parties, the Prepetition Term Agent and the ABL Agent.

"**ABL Lenders**" means the "Lenders" under (and as defined in) the ABL Credit Agreement.

"**ABL Loan Documents**" means the ABL Credit Agreement, the ABL Collateral Documents and each of the other agreements, instruments or documents related thereto.

"**ABL Loan Parties**" means the "Loan Parties" under (and as defined in) the ABL Credit Agreement.

"**Act**" has the meaning specified in Section 12.18.

"**Adequate Protection Orders**" has the meaning specified in Section 4.01.

"**Administrative Agent**" means Wilmington Trust, National Association in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 12.02, or such other address or account as the Administrative Agent may from time to time notify Borrower Agent and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form approved by the Administrative Agent.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Notwithstanding anything herein to the contrary, neither the Administrative Agent nor any Lender shall be deemed an Affiliate of any Loan Party by virtue of its execution of this Agreement.

"**Agent Parties**" has the meaning specified in Section 12.02(c).

"**Aggregate Term Commitments**" means the Term Commitments of all the Lenders.

"**Agreement**" means this Debtor-in-Possession Term Loan Agreement.

"**Agreement Currency**" has the meaning specified in Section 12.19.

"**Allowed Professional Fees**" has the meaning specified in Section 10.05(d).

"**Alternative Currency**" means lawful currency (other than Dollars) that is readily available and freely transferable and convertible into Dollars.

"**Anchor**" has the meaning specified in the introductory paragraph hereto.

"**Anchor Canada**" means Anchor Hocking Canada, Inc., a Canadian corporation.

"**Annual Financial Statements**" means the audited consolidated balance sheets of Holdings and its Subsidiaries for the Fiscal Year ended 2013.

"**Applicable Percentage**" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the aggregate principal amount of all Term Commitments and, as applicable and without duplication, the Term Loan then outstanding represented by the principal amount of such Lender's Term Commitments and, as applicable and without duplication, the Term Loan outstanding at such time. The initial Applicable Percentage of each Lender in respect of the Term Facility is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"**Applicable Reserve Requirement**" means, at any time, for any Eurodollar Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including any basic marginal, special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurodollar liabilities" (as such term is defined in Regulation D of the FRB) under regulations issued from time to time by the FRB or other applicable banking regulator. A Eurodollar Rate Loan shall be deemed to constitute Eurodollar liabilities and as such shall be deemed subject to reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender. The rate of interest on Eurodollar Rate Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Approved Plan of Reorganization**" means a plan of reorganization and disclosure statement filed by the Loan Parties with the Bankruptcy Court that are acceptable in form and substance to the Administrative Agent and the Required Lenders.

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 12.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit E-1 or any other form approved by the Administrative Agent.

"**Attributable Indebtedness**" means, on any date, (a) in respect of any Capital Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a Capital Lease.

"**Avoidance Actions**" means all causes of action arising under Sections 542, 544, 545, 547, 548, 550, 551, 553(b) or 724(a) of the Bankruptcy Code and any proceeds therefrom.

"**Backstop Lenders**" means each Lender party to the Backstop Commitment Letter.

"**Backstop Commitment Letter**" means the letter agreement dated as of March 31, 2015, between the Borrowers, Holdings and the Backstop Lenders.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" has the meaning specified therefor in the recitals hereto.

"**Bankruptcy Court Order**" means the Interim Bankruptcy Court Order and the Final Bankruptcy Court Order.

"**Base Rate**" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1.00% and (c) the Eurodollar Rate that would be payable on such day for a Eurodollar Rate Loan with a one-month Interest Period plus 1.00%; *provided* that the Base Rate will be deemed not to be less than 2.00%.  Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"**Base Rate Loan**" means a Term Loan that bears interest at the Base Rate.

"**Borrower**" has the meaning specified in the introductory paragraph hereto.

"**Borrower Agent**" has the meaning specified in Section 2.12.

"**Borrower Materials**" has the meaning specified in Section 6.02.

"**Borrower Notice**" means a notification to the Borrower Agent that improvement(s) to an improved real property is located in a special flood hazard area.

"**Budget**" means the 14-week budget of the Loan Parties broken down by week, including the anticipated receipts and disbursements for such period, a summary of which is attached as Exhibit D.

"**Budget Testing Period**" has the meaning specified in Section 7.11(a).

"**Budget Testing Date**" has the meaning specified in Section 7.11(a).

"**Business Day**" means (a) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close, and (b) with respect to all notices, determinations, fundings and payments in connection with the Eurodollar Rate or any Eurodollar Rate Loans, the term "Business Day" means any day which is a Business Day described in clause (a) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Capital Expenditures**" means, with respect to any Person for any period, any expenditure in respect of the purchase or other acquisition or maintenance of any fixed or capital asset, in each case, that are capitalized in accordance with GAAP (without giving effect to FASB ASC 840).

"**Capital Lease**" means, with respect to any Person, any lease that is required by GAAP (but without giving effect to FASB ASC 840) to be capitalized on a balance sheet of such Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Carve Out**" has the meaning specified in Section 10.05(d).

"**Carve Out Reserves**" has the meaning specified in Section 10.05(e).

"**Carve Out Trigger Notice**" has the meaning specified in Section 10.05(d).

"**Cash Equivalents**" means any of the following types of Investments:

(a)    Dollars, Pounds Sterling, Euros or any other currency to the extent utilized in connection with the conduct of the business of Holdings or any of its Subsidiaries;

(b)    securities issued or directly and fully guaranteed or insured by the United States, any province of Canada, any member state of the European Union, or any agency or instrumentality thereof having maturities of not more than 24 months from the date of acquisition

thereof (*provided* that the full faith and credit of such country or such member state is pledged in support thereof);

(c)      time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) any bank or trust company, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (d) of this definition and (iii) has net assets of not less than $5,000,000,000 and has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 365 days from the date of acquisition thereof;

(d)      commercial paper issued by any Person organized under the laws of any state of the United States and maturing no more than 365 days from the time of the acquisition thereof, and having, at the time of acquisition thereof, a rating of A-2 (or the then equivalent grade) or better from S&P or P-2 (or the then equivalent grade) or better from Moody's;

(e)      Investments, classified in accordance with GAAP as current assets of Holdings or any of its Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (b), (c) and (d) of this definition;

(f)      repurchase obligations for underlying securities of the types described in clauses (b) and (c) entered into with any Person referenced in clause (c) above;

(g)      securities with maturities of one year or less from the date of acquisition backed by standby letters of credit issued by any Person referenced in clause (c);

(h)      bills of exchange issued in the United States, Canada, a member state of the European Union or Japan eligible for rediscount at the relevant central bank and accepted by a bank (or any dematerialized equivalent);

(i)      interests in any investment company, money market or enhanced high yield fund which invests at least 90% of its assets in instruments of the type specified in clauses (a) through (h) above;

(j)      securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government having an investment grade rating from either S&P or Moody's (or the equivalent thereof); and

(k)      instruments and investments equivalent to those referred to in clauses (a) through (j) above denominated in euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used in any jurisdiction outside the United States in connection with any business conducted in such jurisdiction.

"**Cash Management Orders**" has the meaning specified in Section 4.01(c).

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, and any rules or regulations promulgated thereunder.

"**CFC**" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Change of Control**" means the occurrence of any of the following:

(a)     (1) any "person" or "group" (within the meaning of the Securities and Exchange Act of 1934, as amended), other than Monomoy Capital Partners, L.P. and its Affiliates, the Prepetition Term Lenders and the Lenders, is or becomes the "beneficial owner" (within the meaning of Rule 13(d)-3 and 13(d)-5 of the Securities and Exchange Act of 1934, as amended, directly or indirectly, of more than 35% of the Equity Interests of Holdings entitled to vote for members of the board of directors or equivalent governing body of Holdings on a fully-diluted basis (and taking into account all such Equity Interests that such person or group has the right to acquire pursuant to any option right) or (2) Holdings shall cease to own, directly or indirectly, 100% of the Equity Interests in each Borrower on a fully-diluted basis;

(b)     during each period of twelve consecutive months, individuals who, at the beginning of such period, constituted the board of directors (or similar governing body) of Holdings (together with any directors whose election by the board of directors of Holdings or whose nomination for election by the members of Holdings was approved by a vote of at least a majority of the directors (or members of a similar governing body) then still in office who either were directors at the beginning of such period or whose elections or nomination for election was previously so approved) cease for any reason other than death or disability or termination of employment to constitute a majority of the directors (or members of a similar governing body) then in office; or

(c)     a "Change of Control," "Change in Control" or similar event shall occur under the ABL Credit Agreement, any other Indebtedness (other than under the Prepetition Term Loan Agreement) of Holdings or any of its Subsidiaries with an aggregate principal amount in excess of the Threshold Amount (to the extent that the occurrence of such event permits the holders of Indebtedness thereunder to accelerate the maturity thereof or to resell such other Indebtedness to

Holdings or any of its Subsidiaries, or requires Holdings or any of its Subsidiaries to repay, or offer to repurchase, such Indebtedness).

"**Chapter 11 Cases**" has the meaning specified therefor in the recitals hereto.

"**Closing Date**" means the first date all the conditions in Section 4.01 have been satisfied or waived.

"**Code**" means the Internal Revenue Code of 1986, as amended (unless otherwise provided herein).

"**Collateral**" means all of the "Collateral" referred to in the Collateral Documents and the "DIP Term Collateral" referred to in the Bankruptcy Court Orders.

"**Collateral Documents**" means, collectively, this Agreement, each of the mortgages, collateral assignments, supplements to all of the foregoing, security agreements, pledge agreements, control agreements or other similar agreements delivered to the Administrative Agent in connection with this Agreement, and each of the other agreements, instruments or documents (including, without limitation, patent, trademark or copyright filings) that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Committed Loan Notice**" means a notice of the Term Borrowing, which shall be substantially in the form of Exhibit A.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Confirmation Order**" means an order of the Bankruptcy Court, in form and substance acceptable to the Administrative Agent and the Required Lenders, confirming the Approved Plan of Reorganization.

"**Consolidated EBITDA**" means, at any date of determination, an amount equal to Consolidated Net Income of Holdings and its Subsidiaries on a consolidated basis for the most recently completed Measurement Period, plus the following, without duplication, and except with respect to clauses (o) and (q) below, to the extent deducted in calculating such Consolidated Net Income:  (a) depreciation expense, (b) amortization expense, (c) the annual provision attributed to a management long-term incentive plan, and other FASB ASC 718 compensation expense, if applicable, (d) other non-cash deductions, losses or expenses that do not represent an accrual or reserve for potential cash items in any future period, (e) provision for LIFO and deferred variance adjustments for inventory valuations, (f) consolidated Federal, state and local income tax expenses, (g) Consolidated Interest Charges, (h) extraordinary losses, (i) any non-cash non-recurring charge or non-cash restructuring charges (to include, but not be limited to, write-downs to goodwill and other intangible assets as covered by FASB ASC 350, 360 and 840, barter credits, inventory and accounts receivable (including trade receivables and duty drawback receivables)) and also including, without duplication, any other non-cash restructuring costs as allowed under GAAP (including, but not limited to FASB ASC 420 Accounting for Costs Associated with Exit or Disposal Activities), (j) cash restructuring charges, fees and expenses;

*provided* that the aggregate amount of all items added back pursuant to this clause (j) shall not exceed 15% of Consolidated EBITDA for such period calculated on a pro forma basis after giving effect to all adjustments thereto, (k) professional fees and expenses incurred and costs under employee retention programs, (1) foreign currency translation gains or losses as shown on the consolidated statement of income of Holdings and its Subsidiaries, (m) [reserved], (n) any fees, indemnities and expenses paid to the members of the board of directors (or similar governing body, including members of committees or subcommittees thereof) of Holdings and any of direct and indirect parent entities thereof for periods beginning on or after the Closing Date, (o) business interruption insurance proceeds, (p) any fees, costs or expenses incurred in connection with Permitted Acquisitions or potential Permitted Acquisitions (whether consummated or not), and (q) the amount of "run rate" cost savings, operating expense reductions and cost synergies projected by Holdings in good faith to result from actions taken or committed to be taken no later than twelve (12) months after the end of such period (calculated on a pro forma basis as though such cost savings, operating expense reductions and cost synergies had been realized on the first day of such period for which Consolidated EBITDA is being determined and as if such cost savings, operating expense reductions and cost synergies were realized during the entirety of such period), net of the amount of actual benefits realized during such period from such actions; *provided* that such cost savings and synergies are reasonably identifiable and factually supportable (it is understood and agreed that "run-rate" means the full recurring benefit for a period that is associated with any action taken or committed to be taken, net of the amount of actual benefits realized during such period from such actions); *provided* that the aggregate amount of cost savings, operating expense reductions and cost synergies added back pursuant to this clause (q), and clause (C) in the paragraph directly below, for any period shall not exceed 7.0% of Consolidated EBITDA for such period calculated on a pro forma basis after giving effect to all adjustments thereto, and <u>minus</u>, without duplication, (i) non-cash gains included in Consolidated Net Income for such Measurement Period, (ii) any cash payments made in such Measurement Period in respect of non-cash charges taken in any prior Measurement Period, (iii) to the extent not deducted in the calculation of net income, actual fees, costs and expenses associated with the proceeds of business interruption insurance to the extent such amounts are the basis of such recovery and (iv) extraordinary gains.

"**Consolidated Interest Charges**" means, for any Measurement Period, consolidated interest expense (net of interest income) for such period whether paid or accrued and whether or not capitalized(including, without limitation, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments under Capital Leases, imputed interest with respect to Attributable Indebtedness, and commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings, amortization of debt issuance costs and of original issue discount, net payments, if any, pursuant to interest Swap Contracts in respect of Indebtedness), in each case, of or by Holdings and its Subsidiaries on a consolidated basis for the most recently completed Measurement Period.

"**Consolidated Net Income**" means, at any date of determination, the net income (or net loss) of Holdings and its Subsidiaries on a consolidated basis for the most recently completed Measurement Period taken as a single accounting period, after giving effect to deduction of or provision for all operating expenses, all taxes and reserves (including, without limitation, reserves for deferred taxes) and all other proper deductions, all determined in conformity with

GAAP; *provided* that Consolidated Net Income shall exclude, without duplication, (a) the net income (or net loss) for such Measurement Period of any Person accrued prior to the date it becomes a Subsidiary of, or is merged into or consolidated with, Holdings or a Subsidiary of Holdings; (b) any net gains or losses on the sale or other disposition, not in the ordinary course of business, of investments and other capital assets, *provided* that there shall also be excluded any related charges for taxes thereon; (c) any net gain arising from the collection of the proceeds of any insurance policy; (d) any cancellation of debt income; and (e) any other extraordinary item, as determined according to GAAP.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Corporate Expenses**" means those expenses properly included in the line item "Corporate Expenses" on the financial statements of Holdings and its Subsidiaries in accordance with GAAP and as allocated by Holdings and its Subsidiaries consistent with past practice.

"**Credit Date**" means the date of the Credit Extension.

"**Credit Extension**" means the Term Borrowing.

"**Debtor Professionals**" has the meaning specified in Section 10.05(d).

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of notice, the passage of the applicable grace periods, or both, would be an Event of Default.

"**Default Rate**" means an interest rate (before as well as after judgment) equal to the applicable interest rate plus 2.00% per annum.

"**Deposit Account**" has the meaning specified in the Prepetition Term Loan Collateral Agreement.

"**DIP Superpriority Claim**" has the meaning specified in Section 10.05(a).

"**DIP Term Loan Funding Account**" means the trust account established by the Administrative Agent in which the proceeds of the Term Loan shall be deposited and held as provided herein.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than (i) solely for Qualified Equity Interests and cash in lieu of fractional shares or (ii) solely at the discretion of the issuer), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale or similar event shall be subject to the prior repayment in full of the Term Loan and all other Obligations that are accrued and payable), (b) is redeemable at the option of the holder thereof (other than (i) solely for Qualified Equity Interests and cash in lieu of fractional shares or (ii) as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale or similar event shall be subject to the prior repayment in full of the Term Loan and all other Obligations that are accrued and payable), in whole or in part, (c) provides for the scheduled payments of dividends in cash or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the Latest Maturity Date at the time of issuance of such Equity Interests; *provided* that if such Equity Interests are issued pursuant to a plan for the benefit of employees of Holdings (or any direct or indirect parent thereof) or any of its Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by Holdings or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Dollar Equivalent**" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any Alternative Currency, the equivalent amount thereof in Dollars as determined by the Administrative Agent at such time on the basis of the Spot Rate for the purchase of Dollars with such Alternative Currency.

"**Domestic Subsidiary**" means, with respect to any Person, each Subsidiary of such Person that is organized under the laws of the United States, any state thereof or the District of Columbia.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Sections 12.06(b)(iii), (v) and (vi) (subject to such consents, if any, as may be required under Section 12.06(b)(iii)).

"**Environmental Claim**" means any notice, claim, demand, action, suit, lien, litigation, toxic tort, proceeding, demand, request for information, complaint, citation, summons, investigation, notice of non-compliance or violation, cause of action, consent order, consent decree, investigation, or other proceeding by or from any Governmental Authority or any other Person, relating in any way to any non-compliance with, or liability arising under, Environmental Law.

"**Environmental Laws**" means any and all Laws relating to human health and safety, pollution, the protection of the environment or the release of any materials into the environment, including those related to Hazardous Materials and water emissions and discharges.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) under common control with any Loan Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization under Section 4241 of ERISA; (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA; or (e) the institution by the PBGC of proceedings to terminate a Pension Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (g) the determination that any Pension Plan is considered an at-risk plan or a Multiemployer Plan is in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate.

"**Eurodollar liabilities**" has the meaning specified in Section 3.04(e).

"**Eurodollar Rate**" means for any Interest Rate Determination Date with respect to an Interest Period for a Eurodollar Rate Loan, the rate per annum obtained by dividing (and rounding upward, if necessary, to the next whole multiple of 1/100 of 1.00%) (i) (x) the rate per annum equal to the rate determined by the Administrative Agent to be the offered rate which appears on the page of the Reuters Screen which displays an average British Bankers Association Interest Settlement Rate or the successor thereto if the British Bankers Association is no longer making such rate available (such page currently being LIBOR01 page) for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (y) in the event the rate referenced in the preceding clause (x) does not appear on such page or service or if such page or service shall cease to be available, the rate per annum equal to the rate determined by the Administrative Agent to be the offered rate on such other page or other service which displays an average British Bankers Association Interest Settlement Rate for deposits or the successor thereto if the British Bankers Association is no longer making such rate available (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (z) in the event the rates referenced in the preceding clauses (x) and (y) are not available, the rate per annum equal to the offered quotation rate to first class banks in the London interbank market by the Administrative Agent for deposits (for delivery on the first day of the relevant period) in Dollars of amounts in Same Day Funds comparable to the principal amount of the applicable Term Loan of the Lenders for which the Eurodollar Rate is then being determined with maturities comparable to such period as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, by (ii) an amount equal to (x) one minus (y) the Applicable Reserve Requirement.  Notwithstanding the foregoing, with respect to the Term Loan, if the rate described in the preceding sentence would be less than 1.00% per annum, then the "Eurodollar Rate" will be deemed to be 1.00% per annum.

"**Eurodollar Rate Loan**" means a Term Loan that bears interest at a rate based on the definition of "Eurodollar Rate."

"**Event of Default**" has the meaning specified in Section 8.01.

"**Evidence of Flood Insurance**" means a copy of any of the following: the flood insurance policy, each Borrower's application for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been issued, or such other evidence of flood insurance satisfactory to the Required Lenders.

"**Excluded Accounts**" means with respect to each Loan Party, (i) Deposit Accounts used solely for payroll, employee benefits, tax and other trust purposes and (ii) other Deposit Accounts; *provided* that the aggregate amount of cash held by the Loan Parties in such accounts shall not at any time exceed $1,000,000 in the aggregate.

"**Excluded Assets**" means (i) any permit, lease or license held by a Loan Parties that either validly prohibits the creation of a security interest therein or to the extent that any requirement of Law applicable thereto prohibits the creation of a security interest therein and (ii)

any shares of Foreign Subsidiary Voting Stock in excess of 65% of the outstanding Foreign Subsidiary Voting Stock of any given Foreign Subsidiary or FSHCO, in each case, other than any proceeds thereof.

"**Excluded Subsidiary**" means (a) any Subsidiary that is not a wholly owned Subsidiary of a Borrower or a Guarantor, (b) any Foreign Subsidiary, (c) any Immaterial Subsidiary, (d) any Subsidiary that is prohibited by applicable Law or Contractual Obligations existing on the Closing Date (or, in the case of any newly acquired Subsidiary, in existence at the time of acquisition but not entered into in contemplation thereof) from guaranteeing the Obligations or if guaranteeing the Obligations would require governmental (including regulatory) consent, approval, license or authorization (unless such consent, approval, license or authorization has been obtained), (e) any FSHCO, (f) any Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary or of a FSHCO, (g) any other Subsidiary with respect to which, as reasonably determined by Borrowers, the burden or cost or other consequences (including any material adverse tax consequences) of providing a Guarantee outweighs the benefits to be obtained by the Lenders therefrom, (h) any not-for-profit Subsidiaries, (i) any special purpose securitization vehicle (or similar entity) and (j) any captive insurance subsidiaries.  Notwithstanding the foregoing, in no event shall any Subsidiary that is an obligor under any Indebtedness incurred pursuant to Section 7.03(a)(ii) be an Excluded Subsidiary.

"**Excluded Swap Obligation**" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest pursuant to the Collateral Documents to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the Guarantee of such Guarantor or the grant of such security interest would otherwise have become effective with respect to such related Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.

"**Excluded Taxes**" means, with respect to the Administrative Agent or any Lender, (a) Taxes imposed on or measured by overall net income (however denominated), franchise Taxes (in lieu of net income Taxes), and branch profits Taxes in each case, (i) imposed by the jurisdiction (or any political subdivision thereof) under the Laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, or (ii) that are Other Connection Taxes; (b) any backup withholding tax that is required by the Code to be withheld from amounts payable to a Lender that has failed to comply with clause (A) of Section 3.01(e)(ii); (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by Borrower Agent under Section 12.13), any United States federal withholding Tax that (i) is required to be imposed on amounts payable to such Foreign Lender pursuant to the Laws in force at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office) or (ii) is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with clause (B) of Section 3.01(e)(ii), except that in the case of a Foreign Lender that designates a new Lending Office or becomes a party to this Agreement pursuant to an assignment, withholding Taxes shall

not be Excluded Taxes to the extent that such Taxes were not Excluded Taxes with respect to such Foreign Lender or its assignor, as the case may be, immediately before such designation of a new Lending Office or assignment; and (d) in respect of any Lender, any U.S. federal withholding Taxes imposed under FATCA attributable to such Lender's failure to comply with Section 3.01(e)(iii) in a manner indicating that no withholding under FATCA is applicable to payments hereunder to such Lender.

"**Exit Conversion**" has the meaning specified in Section 2.04(a).

"**Exit Credit Agreement**" has the meaning specified in Section 2.04(b).

"**Exit Term Sheet**" means the Term Sheet attached hereto as Exhibit I.

"**Extraordinary Receipt**" means any cash received by or paid to any Person as a result of (i) proceeds of insurance (other than proceeds of business interruption insurance) and (ii) condemnation awards (and payments in lieu thereof); *provided*, *however*, that for purposes of clauses (i) and (ii) hereof, an Extraordinary Receipt shall not include cash receipts from proceeds of insurance or condemnation awards (or payments in lieu thereof) to the extent that such proceeds or awards are received by any Person in respect of any third-party claim against, or liability of, such Person and applied to pay (or to reimburse such Person for its prior payment of) such claim or liability and the costs and expenses of such Person with respect thereto.

"**FASB ASC**" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code and any applicable intergovernmental agreement with respect thereto and applicable official implementing guidance thereunder.

"**Federal Funds Effective Rate**" means, for any day, the rate per annum (expressed as a decimal rounded upwards, if necessary, to the next higher 1/100 of 1.00%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"**Fee Letter**" means the letter agreement dated as of April [__], 2015, between the Borrowers and the Administrative Agent.

"**Final Bankruptcy Court Order**" means the final order of the Bankruptcy Court with respect to the Loan Parties, in form and substance satisfactory to the Administrative Agent and

the Required Lenders in their sole discretion, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent, the Administrative Agent).

"**Final Bankruptcy Court Order Entry Date**" means the date on which the Final Bankruptcy Court Order shall have been entered on the docket of the Bankruptcy Court.

"**Fiscal Quarter**" means each of the four quarterly periods which constitute a Fiscal Year.

"**Fiscal Year**" means the fiscal year for financial reporting purposes of Holdings and its Subsidiaries, on a consolidated basis, ending on December 31 of each calendar year.

"**Flood Determination Form**" means a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination form.

"**Flood Documents**" means, collectively, the (A) Flood Determination Form, (B) (if applicable) a Borrower Notice and notification to Borrower Agent that flood insurance coverage under the NFIP is not available because the community does not participate in the NFIP, (C) documentation evidencing Borrower Agent's receipt of Borrower Notice (e.g., countersigned Borrower Notice, return receipt of certified U.S. Mail, or overnight delivery), and (D) if Borrower Notice is required to be given and flood insurance is available in the community in which the property is located, Evidence of Flood Insurance.

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968, (ii) the Flood Disaster Protection Act of 1973 and (iii) the National Flood Insurance Reform Act of 1994, each as now or hereafter in effect or any successor statute thereof and related legislation (including the regulations of the Board of Governors of the Federal Reserve System).

"**Foreign Government Scheme or Arrangement**" has the meaning specified in Section 5.12(d).

"**Foreign Lender**" means a Lender that is not a U.S. Person.

"**Foreign Plan**" has the meaning specified in Section 5.12(d).

"**Foreign Subsidiary**" means, with respect to any Person, any Subsidiary of such Person that is not a Domestic Subsidiary.

"**Foreign Subsidiary Voting Stock**" means the voting Equity Interests of any Foreign Subsidiary or FSHCO.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**FSHCO**" means any Domestic Subsidiary that holds no material assets other than equity (and debt, if any) of one or more CFCs or other FSHCOs.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States that are applicable to the circumstances as of the date of determination (but without giving effect to FASB ASC 840).

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including the National Association of Insurance Commissioners and any supranational bodies such as the European Union or the European Central Bank).

"**Guarantee**" means, as to any Person, any (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets or Permitted Acquisitions permitted under this Agreement (other than such obligations with respect to Indebtedness).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "**Guarantee**" as a verb has a corresponding meaning.

"**Guarantors**" has the meaning specified in the introductory paragraph hereto.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes, contaminants, pollutants or hazardous or toxic substances, wastes or materials or any other substances or materials regulated under or defined in any Environmental Law, including petroleum, its derivatives or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas and infectious or medical wastes.

"**Holdings**" has the meaning specified in the introductory paragraph hereto.

"**Immaterial Subsidiary**" means, at any time, in respect of all Subsidiaries of Holdings not otherwise an Excluded Subsidiary (other than Borrowers) for which (a) (i) the assets of each such Subsidiary constitute less than 2.5% of the total assets of Holdings and its Subsidiaries on a consolidated basis and (ii) the Consolidated EBITDA of each such Subsidiary accounts for less than 2.5% of the Consolidated EBITDA of the Holdings and its Subsidiaries for the most recently ended Measurement Period for which financial statements have been delivered pursuant to Section 6.01(a) or (b), and (b) (i) the assets of all such Subsidiaries constitute 5.0% or less than the total assets of the Holdings and its Subsidiaries on a consolidated basis, and (ii) the Consolidated EBITDA of all relevant Subsidiaries accounts for less than 5.0% of the Consolidated EBITDA of Holdings and its Subsidiaries for the most recently ended Measurement Period for which financial statements have been delivered pursuant to Section 6.01(a) or (b), and in each case such Subsidiary has been designated as an Immaterial Subsidiary by Borrowers on Schedule 1.01(a)-1 or, if after the Closing Date, in a written notice delivered to the Administrative Agent.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)      all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)      the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)      net obligations of such Person under any Swap Contract;

(d)      all obligations, other than intercompany items, of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts payable and accrued expenses arising in the ordinary course of business and (ii) earnouts, holdbacks and other deferred payment of consideration in acquisitions and other Investments except to the extent not paid after becoming due);

(e)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements (other than customary reservations or retentions of title

under agreements with suppliers entered into in the ordinary course of business)), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     Capital Leases and Synthetic Lease Obligations;

(g)     all obligations of such Person in respect of Disqualified Equity Interests; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall (A) include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person (B) in the case of Holdings and its Subsidiaries, exclude all intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extension of terms) and made in the ordinary course of business and (C) exclude (i) accruals for payroll and other liabilities accrued in the ordinary course of business and (ii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of any Capital Lease or Synthetic Lease Obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.

"**Indemnified Liabilities**" has the meaning specified in Section 12.04(b).

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Indemnitee**" has the meaning specified in Section 12.04(b).

"**Information**" has the meaning specified in Section 12.07.

"**Intercompany Subordination Agreement**" means the agreement, dated as of May 21, 2013 (as amended and supplemented from time to time), among the Loan Parties, the other Subsidiaries of Holdings party thereto from time to time, the Prepetition Term Agent and the ABL Agent.

"**Interest Payment Date**" means the last day of each Interest Period applicable to the Term Loan and the Maturity Date; *provided*, *however*, that upon the conversion of the Eurodollar Rate Loan of a Lender to a Base Rate Loan pursuant to Section 3.02 or Section 3.03, as to any Base Rate Loan, the last Business Day of each month and the Maturity Date of the Term Loan.

"**Interest Period**" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed and ending on the date one month thereafter; *provided* that:

(a)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)    no Interest Period shall extend beyond the Maturity Date.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"**Interim Bankruptcy Court Order**" means the order of the Bankruptcy Court with respect to the Loan Parties, in the form of Exhibit J hereto, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent, the Administrative Agent).

"**Interim Bankruptcy Court Order Entry Date**" means the date on which the Interim Bankruptcy Court Order shall have been entered on the docket of the Bankruptcy Court.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person (including pursuant to a merger, consolidation, amalgamation or similar transaction), (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person (excluding, in the case of the Loan Parties, intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extension of terms)), or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested (measured at the time made), without adjustment for subsequent increases or decreases in the value of such Investment, less all Returns received in respect thereof.

"**IP Rights**" has the meaning specified in Section 5.18.

"**IRS**" means the United States Internal Revenue Service.

"**Joint Disclosure Statement and Plan Confirmation Hearing**" means the joint hearing to consider the adequacy of the disclosure statement related to the Plan of Reorganization, approval of the Borrowers' prepetition solicitation of the Prepetition Term Lenders, and confirmation of the Plan of Reorganization.

"**Judgment Currency**" has the meaning specified in Section 12.19.

"**Latest Maturity Date**" means, at any date of determination, the latest Maturity Date applicable to the Term Loan.

"**Laws**" means, collectively, all applicable international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directives, licenses, authorizations and permits of any Governmental Authority.

"**Lender**" means any Lender that holds a Term Commitment and/or Term Loan, as applicable, at such time.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify Borrower Agent and the Administrative Agent in writing.

"**Lien**" means any mortgage, pledge, hypothecation, collateral assignment, security deposit arrangement, encumbrance, lien (statutory or otherwise), charge, or other security interest or preferential arrangement, in each case, in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right-of-way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing).  For the avoidance of doubt, the filing of a UCC financing statement that is a protective lease filing in respect of an operating lease does not constitute a Lien solely on account of being filed in a public office.

"**Loan Documents**" means the Restructuring Support Agreement, this Agreement, the ABL Intercreditor Agreement and the Collateral Documents, the Fee Letter, the Interim Bankruptcy Court Order, the Final Bankruptcy Court Order, the Confirmation Order and any other agreement, instrument, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Obligation.

"**Loan Parties**" means, collectively, each Borrower and each Guarantor.

"**Material Adverse Effect**" means a material adverse effect upon (a) the operations, business, properties or financial condition of the Loan Parties and their Subsidiaries, taken as a whole (other than by virtue of the commencement of the Chapter 11 Cases and the events and conditions related and/or leading up to and effects thereof); (b) the rights and remedies of the Administrative Agent or any Lender under the Loan Documents, taken as a whole; or (c) the ability of the Loan Parties, taken as a whole, to perform their payment obligations under the Loan Documents.

"**Maturity Date**" means the date which is the earliest of (i) the date which is 75 days following the Petition Date, (ii) the earlier of the maturity date or the acceleration of the loans under the ABL Credit Agreement, (iii) the earlier of the effective date and the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code), in each case, of the Approved Plan of Reorganization that has been confirmed by the Confirmation Order, (iv) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a Chapter 7 case, (v) such

earlier date on which the Term Loan and other Obligations for the payment of money shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents and (vi) the date that is 30 days after the Interim Bankruptcy Court Order Entry Date if the Final Bankruptcy Court Order Entry Date shall not have occurred; *provided*, *however*, that, in each case, if such date is not a Business Day, the Maturity Date shall be the immediately succeeding Business Day.

"**Maximum Rate**" has the meaning specified in Section 12.09.

"**Measurement Period**" means, at any date of determination, the most recently completed four Fiscal Quarters of Holdings or, if fewer than four consecutive Fiscal Quarters of Holdings have been completed since the Closing Date, the Fiscal Quarters of Holdings that have been completed since the Closing Date.

"**MNPI**" has the meaning specified in Section 6.02.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto

"**Mortgaged Property**" means the owned real property located in the United States having a value in excess of $1,000,000 that is subject to a deed of trust, trust deed, deed to secure debt or mortgage as listed on Schedule 1.01(a)-2.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years has made or been obligated to make contributions.

"**Net Cash Proceeds**" means (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries or any Extraordinary Receipt received by or paid to or for the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash actually received in connection with such transaction (including any cash actually received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) less (ii) the sum of (A) the principal amount of any Indebtedness that secured is by the applicable asset and that is required to be repaid in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the out-of-pocket expenses incurred (or reasonably expected to be incurred) by such Loan Party or such Subsidiary in connection with such transaction, (C) taxes or Permitted Tax Distributions reasonably paid or estimated to be actually payable or, without duplication, permitted to be paid, in connection with the relevant transaction, including any taxes payable as a result of any gain recognized in connection therewith (the "**cash proceeds**"); *provided* that, if the amount of any estimated taxes pursuant to subclause (C) exceeds the amount of taxes actually required to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall be a reduction of the Taxes previously taken into account under subclause (C) for purposes of redetermining Net Cash Proceeds, (D) appropriate amounts that must be set aside as a reserve in accordance with GAAP or pursuant to any contract or agreement against any indemnities or liabilities (contingent or otherwise) associated with such Disposition or Extraordinary Receipt, (E) in the case of any Disposition or Extraordinary Receipt by a non-wholly owned Subsidiary, the pro rata portion of

the Net Cash Proceeds thereof (calculated without regard to this clause (E)) attributable to minority interests and not available for distribution to or for the account of Holdings or a wholly-owned Subsidiary as a result thereof, and (F) any funded escrow established pursuant to the documents evidencing any such sale or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or disposition (provided that to the extent that any amounts are released from such escrow to Holdings or any Subsidiary thereof, such amounts net of any related expenses shall constitute Net Cash Proceeds); *provided*, *further*, that if (x) a Responsible Officer of Borrower Agent shall deliver a certificate to the Administrative Agent prior to the date on which a prepayment of the cash proceeds is required to be made with respect to any Disposition or Extraordinary Receipt hereunder setting forth that Holdings intend to reinvest such cash proceeds in assets useful in the business of Holdings and its Subsidiaries within 365-days of receipt of such cash proceeds (*provided* that if, prior to the expiration of such 365-day period, Holdings or a Subsidiary shall have entered into a binding agreement providing for such investment on or prior to the date that is 180 days after the expiration of such 365-day period, such 365-day period shall be extended to the date provided for such investment in such binding agreement or such longer period as the Required Lenders may agree in their reasonable discretion) and (y) at the time of delivery of such certificate and at the time of the proposed reinvestment of such cash proceeds no Event of Default shall have occurred and be continuing, such cash proceeds shall not constitute Net Cash Proceeds except to the extent not so reinvested by the end of such 365-day period (or such additional periods, if applicable, provided for in the proviso to clause (x) above) and (b) with respect to any incurrence or issuance of Indebtedness by any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the cash proceeds received in connection with such transaction over (ii) the out-of-pocket expenses incurred (or reasonably expect to be incurred) by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, attorneys' fees, investment banking fees, accountants' fees, consulting fees, underwriting discounts and commissions, placement fees and other fees and expenses (including legal fees and expenses) actually incurred in connection therewith).

"**NFIP**" means National Flood Insurance Program.

"**Notice of Withdrawal**" has the meaning specified in Section 2.02(d).

"**Obligations**" means all advances to, and debts, liabilities and obligations of, any Loan Party arising under any Loan Document, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"**OFAC**" has the meaning specified in Section 5.22.

"**Oneida**" has the meaning specified in the introductory paragraph hereto.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents

with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Connection Taxes**" means, with respect to the Administrative Agent or any Lender, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising solely from one or more of the following:  such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Term Loan or any Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing, mortgage or mortgage recording Taxes, any other excise or property Taxes, or similar Taxes arising from any payment made hereunder or under any other Loan Document or from the execution, delivery, performance, or enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any other Loan Document.

"**Outstanding Amount**" means the aggregate outstanding principal amount of the Term Loan after giving effect to any borrowings and prepayments or repayments of the Term Loan occurring on such date.

"**Parent**" has the meaning specified in the first recital.

"**Participant**" has the meaning specified in Section 12.06(d).

"**Participant Register**" has the meaning specified in Section 12.06(d).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Act**" means the Pension Protection Act of 2006.

"**Pension Funding Rules**" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"**Pension Plan**" means any employee pension benefit plan (other than any Multiemployer Plan) that is maintained or is contributed to by any Loan Party or any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"**Permitted Acquisition**" means any investment by any Subsidiary of Holdings in the form of acquisitions of all or substantially all of the business or a line of business or a separate operation (whether by merger, consolidation, amalgamation or similar transaction or the acquisition of capital stock, assets or any combination of the foregoing) of any other Person if:

(a)     the board of directors of the acquired company shall have approved the acquisition prior to closing (except in the case of an acquisition of a Subsidiary of an entity, or of assets of an entity); and

(b)     such Permitted Acquisition is made in accordance with the Budget.

"**Permitted Disbursement Variation**" means, the percentage set forth below opposite such Budget Testing Date:

| Budget Testing Date | Permitted Disbursement Variation |
|---|---|
| April 15, 2015 | 125.0% |
| April 22, 2015 | 122.7% |
| April 29, 2015 | 120.2% |
| May 6, 2015 | 119.0% |
| May 13, 2015 | 116.4% |
| May 20, 2015 and thereafter | 115.0% |

"**Permitted Liens**" means those Liens permitted pursuant to Section 7.01.

"**Permitted Receipts Variation**"  means, the percentage set forth below opposite such Budget Testing Date:

| Budget Testing Date | Permitted Receipts Variation |
|---|---|
| April 15, 2015 | 70.0% |
| April 22, 2015 | 72.8% |
| April 29, 2015 | 74.9% |
| May 6, 2015 | 76.5% |
| May 13, 2015 | 78.8% |
| May 20, 2015 and thereafter | 80.0% |

"**Permitted Tax Distribution**" means, for any taxable period for which Holdings and/or any of its Subsidiaries are members of a consolidated, combined or similar income tax group for U.S. federal and/or applicable state or local income Tax purposes (a "**Tax Group**") of which a direct or indirect parent of Holdings is the common parent, or for which Holdings is for U.S. federal and/or applicable state or local income Tax purposes a disregarded entity deemed to be owned by a corporate parent (a "**Corporate Parent**"), payments by Holdings to any direct or indirect parent of Holdings, to pay the portion of any consolidated, combined or similar U.S. federal, state or local income Taxes (as applicable) of such Tax Group, or the portion of the U.S. federal, state or local income Taxes of such Corporate Parent, as applicable, for such taxable period that are attributable to the income of Holdings and/or its applicable Subsidiaries; *provided* that the amount of such dividends or other distributions for any taxable period shall not exceed the amount of such Taxes that Holdings and/or its applicable Subsidiaries would have

been responsible to pay had Holdings and/or such Subsidiaries, as applicable, been a stand-alone corporate taxpayer (or a stand-alone corporate Tax Group).

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" means April [7], 2015.

"**Plan**" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of any Loan Party or any such Plan to which any Loan Party is required to contribute on behalf of any of its employees or under which any Loan Party has any liability or with respect to any Pension Plan or Multiemployer Plan any ERISA Affiliate has any liability.

"**Platform**" has the meaning specified in Section 6.02.

"**Pledged Equity**" means the "Pledged Equity Interests" (as defined in the Prepetition Term Loan Collateral Agreement) required to be delivered by the Loan Parties pursuant to Section 5 of the Prepetition Term Loan Collateral Agreement.

"**Pledged Notes**" means the "Pledged Notes" (as defined in the Prepetition Term Loan Collateral Agreement) required to be delivered by the Loan Parties pursuant to Section 5 of the Prepetition Term Loan Collateral Agreement.

"**Post-Carve Out Amounts**" has the meaning specified in Section 10.05(e).

"**Post-Carve Out Trigger Notice Cap**" has the meaning specified in Section 10.05(d).

"**Post Carve Out Trigger Notice Reserve**" has the meaning specified in Section 10.05(e).

"**Pre-Carve Out Amounts**" has the meaning specified in Section 10.05(e).

"**Pre-Carve Out Trigger Notice Reserve**" has the meaning specified in Section 10.05(e).

"**Prepayment Notice**" has the meaning specified in Section 2.03(c)(i).

"**Prepetition Indebtedness Holders**" means, collectively, the Prepetition Term Agent, the Prepetition Term Lenders, the ABL Agent and the ABL Lenders.

"**Prepetition Loan Documents**" means the Prepetition Term Loan Agreement, the ABL Credit Agreement, the ABL Intercreditor Agreement, the Intercompany Subordination Agreement and the Prepetition Term Loan Collateral and any other agreement, instrument, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Prepetition Obligation.

"**Prepetition Obligations**" means all indebtedness, obligations and liabilities of the Loan Parties to the Prepetition Indebtedness Holders incurred prior to the Petition Date arising from or related to the Prepetition Term Loan Agreement, the ABL Credit Agreement and the other agreements, instruments and other documents related thereto including fees, premiums, expenses, indemnities and reimbursement obligations due thereunder and interest thereon accruing both before and after the Petition Date, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"**Prepetition Term Agent**" means (i) Deutsche Bank AG New York Branch in its capacity as administrative agent under any of the Prepetition Term Loan Documents, (ii) on and after the effective date of the anticipated successor agent agreement, Wilmington Trust, National Association in its capacity as successor to the administrative agent under the Prepetition Term Loan Documents, or (iii) any other successor administrative agent.

"**Prepetition Term Loan Collateral**" means all collateral purported to be granted to the Prepetition Term Agent pursuant to the Prepetition Term Loan Documents.

"**Prepetition Term Loan Collateral Agreement**" means the guarantee and collateral agreement, dated as of May 21, 2013 (as amended and supplemented from time to time) by and among the Loan Parties and Agent.

"**Prepetition Term Loan Collateral Documents**" means, collectively, the Prepetition Term Loan Collateral Agreement, each of the mortgages, collateral assignments, supplements to all of the foregoing, security agreements, pledge agreements, control agreements or other similar agreements delivered to the Prepetition Term Agent in connection with the Prepetition Term Loan Agreement, and each of the other agreements, instruments or documents (including, without limitation, patent, trademark or copyright filings) that creates or purports to create a Lien in favor of the Prepetition Term Agent for the benefit of the Secured Parties.

"**Prepetition Term Lenders**" means the lenders party to the Prepetition Term Loan Agreement, from time to time, under and as defined in the Prepetition Term Loan Agreement.

"**Prepetition Term Loan Agreement**" means that certain Loan Agreement, dated as of May 21, 2013, by and among the Borrowers, the Guarantors party thereto, the Prepetition Term Agent and the Prepetition Term Lenders, as amended, restated, supplemented or otherwise modified from time to time.

"**Prepetition Term Loan Documents**" means the Prepetition Term Loan Agreement, the Prepetition Term Loan Collateral Documents and each of the other agreements, instruments or documents related thereto.

"**Prime Rate**" means the rate of interest quoted in *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks), as in effect from time to time.  In the event such rate is not available at such time for any reason, "**Prime Rate**" shall mean a rate of interest per annum publicly announced from time to time by any banking institution selected by Administrative Agent as its prime rate.  The Prime Rate is a reference rate and does not

necessarily represent the lowest or best rate actually charged to any customer.  The Administrative Agent or any Lender may make commercial loans or other loans at rates of interest at, above, or below the Prime Rate.

"**Priming Liens**" has the meaning specified in section 10.05(a)(v).

"**Proceeding**" has the meaning specified in Section 12.04(b).

"**Public Lender**" has the meaning specified in Section 6.02.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Quarterly Financial Statements**" means the unaudited consolidated balance sheets of Holdings and its Subsidiaries and the consolidated statements of operations, Stockholders' Equity and cash flows for each such Fiscal Quarter subsequent to the most recent respective Annual Financial Statement of Holdings and its Subsidiaries ended at least 45 days prior to the Closing Date.

"**Register**" has the meaning specified in Section 12.06(c).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"**Reorganization Plan**" means the plan of reorganization filed on the first day of the Chapter 11 Cases, as such plan may be amended with the prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent).

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"**Required Lenders**" means, as of any date of determination, Lenders holding more than 50% of the sum of the total Outstanding Amount of the Term Loan.

"**Responsible Officer**" means the chief executive officer, president, chief financial officer, treasurer, assistant treasurer or controller of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Payment**" means (a) any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person or any of its Subsidiaries, (b) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance,

acquisition, cancellation or termination of any Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent or any thereof).

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of March 31, 2015 (as amended and supplemented from time to time), between the Loan Parties and the other parties party thereto.

"**Return**" means, with respect to any Investment, any dividend, distribution, interest, fee, premium, return of capital, repayment of principal, income, profit (from a disposition or otherwise) and any other amount received or realized in respect thereof.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Same Day Funds**" means immediately available funds.

"**Secured Parties**" means, collectively, the Administrative Agent, the Lenders, each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.05 and the other Persons the Obligations owing to which are secured by the Collateral under the terms of the Collateral Documents.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Segregated Operating Account**" means the deposit account established by the Borrowers for the purpose of receipt of the Withdrawals.

"**Spot Rate**" for a currency means the rate determined by the Administrative Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date as of which the foreign exchange computation is made; *provided* that the Administrative Agent may obtain such spot rate from another financial institution designated by the Administrative Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

"**Stockholders' Equity**" means, as of any date of determination, consolidated stockholders' equity of Holdings and its Subsidiaries as of the date determined in accordance with GAAP.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing),whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other similar master agreement relating to a transaction described in clause (a) (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Synthetic Lease Obligation**" means the monetary obligation of a Person under an agreement for the use or possession of property (including sale and leaseback transactions) creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as indebtedness of such Person (without regard to accounting treatment).

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Borrowing**" means the borrowing consisting of the a $40,000,000 Term Loan under the Term Facility.

"**Term Commitment**" means as to each Lender, its obligation to make a Term Loan to Borrowers hereunder, expressed as an amount representing the maximum principal amount of the Term Loan to be made by such Lender under this Agreement, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to

an Assignment and Assumption.  The amount of each Lender's Term Commitment is set forth on Schedule 2.01 under the caption "Commitment" or, otherwise, in the Assignment and Assumption pursuant to which such Lender shall have assumed its Term Commitment, as the case may be.  The aggregate amount of the Term Commitments on the Credit Date is $40,000,000.

"**Term Facility**" means, at any time, the aggregate principal amount of the Term Loan of all Lenders outstanding at such time.

"**Term Loan**" means the term loan made by the Lenders to the Borrower pursuant to Section 2.01.

"**Termination Declaration Date**" has the meaning specified in Section 10.05(e).

"**Threshold Amount**" means $5,000,000.

"**Type**" means, with respect to a Term Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided* that if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"**United States**" and "**U.S.**" mean the United States of America.

"**U.S. Person**" means any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**" means a certificate substantially in the form of [Exhibits G-1 through G-4].

"**Withdrawal**" means a disbursement of funds from the DIP Term Loan Funding Account.  "**Withdraw**" and "**Withdrawn**" shall have correlative meanings thereto.

"**Withdrawal Date**" means that date of a Withdrawal.

Section 1.02    *Other Interpretive Provisions*.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context

requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including."

(c)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03     *Accounting Terms*.

(a)     *Generally*.  Subject to Sections 1.03(b) and (c), all accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with GAAP applied on a consistent basis, as in effect from time to time, except as otherwise specifically prescribed herein;

(b)     *Changes in GAAP*.  Subject to Section 1.03 (c), if at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Required Lenders or Borrowers shall so request, the Required Lenders and Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); *provided* that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) Holdings shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

(c)      Notwithstanding any actual or proposed change in GAAP after the date hereof or anything herein to the contrary, any lease that is treated as an operating lease for purposes of GAAP as of the date hereof shall not be treated as Indebtedness, Attributable Indebtedness or as a Capital Lease and shall continue to be treated as an operating lease (and any future lease, if it were in effect on the date hereof, that would be treated as an operating lease for purposes of GAAP as of the date hereof shall be treated as an operating lease), in each case for purposes of this Agreement.

Section 1.04    *Rounding*.  Any financial ratios required to be maintained or complied with by Borrowers pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05    *Times of Day; Calculation of Dates*.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).  In any calculation of dates for required performance or deliveries (other than payments), if the date calculated is not a Business Day, then the date for such performance or delivery shall be the next succeeding Business Day.

Section 1.06    *Currency Equivalents Generally; Change of Currency*.  For purposes of this Agreement and the other Loan Documents (other than Articles 2, 9 and 12 hereof), where the permissibility of a transaction or determinations of required actions or circumstances depend upon compliance with, or are determined by reference to, amounts stated in Dollars, such amounts shall be deemed to refer to Dollars or Dollar Equivalents and any requisite currency translation shall be based on the Spot Rate in effect on the Business Day immediately preceding the date of such transaction or determination.  Notwithstanding the foregoing, for purposes of determining compliance with Sections 7.01, 7.02 and 7.03 with respect to any amount of Liens, Investment or Indebtedness in currencies other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Lien is created, Indebtedness is incurred or Investment is made.  Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify with Borrower Agent's consent (not to be unreasonably withheld) to appropriately reflect a change in currency of any country and any relevant market conventions or practices relating to such change in currency.

ARTICLE 2.
THE TERM COMMITMENTS AND CREDIT EXTENSION

Section 2.01    *Commitments to Lend; Term Loan*.  Subject to the terms and conditions set forth herein, each Lender severally agrees to make a single loan to the Borrowers on the Credit Date in an aggregate amount not to exceed such Lender's Term Commitment.  Amounts borrowed under this Section 2.01 and repaid or prepaid, in whole or in part, may not be reborrowed.  The Term Loan shall be denominated in Dollars and shall be Eurodollar Rate Loans, as further provided herein, and except as set forth in Sections 3.02 and 3.03, may not be converted to Base Rate Loans. The Term Commitment shall automatically terminate upon the

making of the Term Loan. Proceeds of the Term Loan shall be deposited in the DIP Term Loan Funding Account and used solely as permitted herein.

Section 2.02   *Term Borrowings*.

(a)   The Term Borrowing shall be made upon Borrower Agent's irrevocable notice to the Administrative Agent, which may be given by "pdf" or similar electronic format, in the form of the Committed Loan Notice attached hereto as Exhibit A.  The Committed Loan Notice must be received by the Administrative Agent not later than 12:00 p.m., New York City time, one Business Day prior to the requested date of the Term Borrowing.

(b)   Following receipt of a Committed Loan Notice by the Administrative Agent and subject to the satisfaction of the conditions set forth in Sections 4.01 and 4.03, each Lender shall make the amount of its Applicable Percentage under the Term Facility of the Term Borrowing (net of original issue discount pursuant to Section 2.07(c)) available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 12:00 p.m., New York City time, on the Business Day specified in the applicable Committed Loan Notice, which shall be no later than two Business Days after the Interim Bankruptcy Court Order Entry Date.

(c)   Unless the Required Lenders determine that any applicable condition specified in Article 4 has not been satisfied, the amount so received by the Administrative Agent shall on the date of the Term Borrowing be applied by the Administrative Agent to pay all fees and expenses then due and payable under Section 2.07(a) and Section 12.04 and the amount net of such applied amount shall be deposited by the Administrative Agent in the DIP Term Loan Funding Account.

(d)   Subject to Article 4 and the other terms and conditions set forth herein, the Borrower Agent may request disbursements from the DIP Term Loan Funding Account by delivering to the Administrative Agent a written notice substantially in the form of Exhibit B hereto (a "**Notice of Withdrawal**"), not later than 12:00p.m., New York City time, one Business Day before the proposed date of the applicable Withdrawal.  Promptly upon the receipt of a Notice of Withdrawal and the satisfaction of the conditions set forth in Sections 4.02 and 4.03, the Administrative Agent shall disburse funds from the DIP Term Loan Funding Account in an aggregate principal amount equal to the amount specified in such Notice of Withdrawal to the Segregated Operating Account. All proceeds of the Term Loan shall be held in the DIP Term Loan Funding Account at all times until such proceeds are disbursed in accordance with this Section 2.02(d) for purposes permitted under Section 6.10 or applied in accordance with Section 2.05 or Section 8.03 or Section 10.05(d) and (e).  The Borrowers and the other Loan Parties shall have no property interest of any kind in the DIP Term Loan Funding Account and the funds held therein.

(e)   The Administrative Agent shall promptly notify Borrower Agent and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate.  At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify Borrower Agent and the Lenders of any change in the Prime

Rate used in determining the Base Rate promptly following the public announcement of such change.

(f)     The Administrative Agent may honor instructions received from the Borrower Agent in the form of a Notice of Withdrawal unless and until directed otherwise in writing by the Required Lenders.  On and after the date of receipt by the Administrative Agent of a written direction from the Required Lenders instructing the Administrative Agent that it may no longer honor instructions from the Borrower Agent with respect to the DIP Term Loan Funding Account, the Borrower Agent and the other Loan Parties shall have no right to request Withdrawals from the DIP Term Loan Funding Account and the Administrative Agent shall not honor such requests (in each case, other than to pay any amounts due and payable in accordance with Section 10.05(e)); *provided*, *however*, that the Administrative Agent shall not be liable for (i) any disbursements made pursuant to instructions from the Borrower Agent or (ii) irrevocable electronic funds transfers or wire transfers that are subject to cut-off times, in each case, that were processed prior to receipt of such written direction from the Required Lenders.

(g)     Each submission by the Borrower Agent to the Administrative Agent of a Notice of Withdrawal shall be deemed to constitute a representation and warranty by the Borrower Agent, on behalf of the Borrowers, that the conditions set forth in Section 4.02 and Section 4.03 have been satisfied as of the date of the Withdrawal.  With respect to any disbursement, withdrawal, transfer, or application of funds from the DIP Term Loan Funding Account hereunder, the Administrative Agent shall be entitled to conclusively rely upon, and shall be fully protected in relying upon, (i) any Notice of Withdrawal submitted by the Borrower Agent and (ii) any instructions from the Required Lenders.  Notwithstanding anything herein to the contrary, the Administrative Agent shall have no obligation to fund any amount in excess of the amounts then held in the DIP Term Loan Funding Account.

Section 2.03     *Prepayments*.

(a)     *Optional*.  Borrowers may, upon written notice by Borrower Agent to the Administrative Agent pursuant to Section 2.03(c) below, at any time or from time to time voluntarily prepay the Term Loan in whole, but not in part, subject to Section 2.03(d), but otherwise without premium or penalty. The voluntary prepayment of the Term Loan pursuant to this Section 2.03(a) shall be accompanied by all accrued interest on the outstanding principal amount of the Term Loan, together with any additional amounts owed hereunder.  The notice shall specify the date and amount of such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  The Administrative Agent will promptly notify each Lender of its receipt of the notice, and of the amount of such Lender's Applicable Percentage or other applicable share provided for under this Agreement of the prepayment.

(b)     *Mandatory*.

(i)     Subject to clause (vi) below and except with respect to ABL Priority Collateral (as defined in the ABL Intercreditor Agreement), if Holdings or any of its Subsidiaries Disposes of any property (other than any Disposition of any property permitted by Section 7.05 which results in the realization by such Person of Net Cash

Proceeds in excess of an aggregate amount of $2,500,000 per Fiscal Year, Borrowers shall prepay, subject to Section 2.03(d), an aggregate principal amount of Term Loan equal to 100% of such Net Cash Proceeds in excess of $2,500,000 no later than five Business Days following receipt thereof by such Person (such prepayments to be applied as set forth in clause (v) below).

(ii)     On the date of receipt by Holdings or any of its Subsidiaries of cash proceeds from a capital contribution to, or the issuance of any Capital Stock of, Holdings or any of its Subsidiaries (other than issuances of Capital Stock by a Subsidiary to Holdings and capital contributions by Holdings to a Subsidiary), the Borrowers shall prepay, subject to Section 2.03(d), an aggregate principal amount of the Term Loan equal to 100% of such Net Cash Proceeds received therefrom no later than five Business Days following receipt thereof by such Person (such prepayments to be applied as set forth in clause (v) below).

(iii)     Upon the incurrence or issuance by Holdings or any of its Subsidiaries of any Indebtedness after the Closing Date not permitted to be incurred or issued pursuant to Section 7.03, Borrowers shall prepay, subject to Section 2.03(d), an aggregate principal amount of Term Loan equal to 100% of all Net Cash Proceeds received therefrom no later than five Business Days following receipt thereof by such Person (such prepayments to be applied as set forth in clause (v) below).

(iv)     Upon any Extraordinary Receipt (other than those Extraordinary Receipts arising from any ABL Priority Collateral (as defined in the ABL Intercreditor Agreement)) received by or paid to or for the account of Holdings or any of its Subsidiaries and not otherwise included in clause (i), (ii) or (iii) of this Section 2.03(b), Borrowers shall prepay, subject to Section 2.03(d), an aggregate principal amount of Term Loan equal to 100% of all Net Cash Proceeds received therefrom in excess of the greater of $2,500,000 per Fiscal Year no later than five Business Days following receipt thereof by such Person (such prepayments to be applied as set forth in clause (v) below).

(v)     Any prepayment of the Term Loan pursuant to this Section 2.03(b) shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05.

(vi)     Notwithstanding any other provisions of this Section 2.03,

(1)     to the extent that any of or all the Net Cash Proceeds of any Disposition by or Extraordinary Receipt of, a Foreign Subsidiary prohibited or delayed by applicable local law from being repatriated to the United States, the portion of such Net Cash Proceeds so affected will not be required to be applied to repay the Term Loan at the times provided in this Section 2.03 but may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable local law, will not permit repatriation to the United States (Holdings hereby agreeing to use commercially reasonably efforts to otherwise cause the applicable Foreign Subsidiary to promptly take all commercially reasonable actions required by the applicable local law to permit such repatriation), and once

such repatriation of any of such affected Net Cash Proceeds that, in each case, would otherwise be required to be used to prepay the Term Loan pursuant to Section 2.03(b)(i) or (iv), is permitted under the applicable local law, even if such cash is not actually repatriated at such time, an amount equal to such repatriated (or permitted to be repatriated) Net Cash Proceeds will be promptly (and in any event not later than five Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Term Loan pursuant to this Section 2.03;

(2)     to the extent that Borrowers have determined in good faith that repatriation of any of or all the Net Cash Proceeds of any Disposition or Extraordinary Receipt by any Foreign Subsidiary would have material adverse tax cost consequence (as determined by Borrowers) with respect to such Net Cash Proceeds, such Net Cash Proceeds so affected may be retained by the applicable Foreign Subsidiary; *provided* that, in the case of this clause, on or before the date on which any such Net Cash Proceeds so retained would otherwise have been required to be applied to reinvestments or prepayments pursuant to Section 2.03(b), Borrowers may apply an amount equal to such Net Cash Proceeds to such reinvestments or prepayments, as applicable, as if such Net Cash Proceeds had been received by Borrowers rather than such Foreign Subsidiary, less the amount of additional taxes that would have been payable or reserved against if such Net Cash Proceeds had been repatriated (or, if less, the Net Cash Proceeds that would be calculated if received by such Foreign Subsidiary); and.

(3)     to the extent that any of or all the Net Cash Proceeds of any Disposition by or Extraordinary Receipt of a Subsidiary is prohibited or delayed by restrictions in such Subsidiary's Organization Documents, the portion of such Net Cash Proceeds so affected will not be required to be applied to repay the Term Loan at the times provided in this Section 2.03 but may be retained by the applicable Subsidiary so long, but only so long, as the applicable Organization Documents will not permit such repayment (Holdings hereby agreeing to cause the applicable Subsidiary to promptly take all actions reasonably required by such Organization Document to permit such repayment), and once such repayment of any of such affected Net Cash Proceeds that, in each case, would otherwise be required to be used to make an offer of prepayment pursuant to Section 2.03(b)(i) or (iv), is permitted under the applicable Organization Document such repayment will be immediately effected; and even if such cash is not actually repatriated at such time, an amount equal to such Net Cash Proceeds will be promptly (and in any event not later than five Business Days after such repayment becomes possible) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Term Loan pursuant to this Section 2.03.  For the avoidance of doubt, nothing within this Section 2.03(b)(vi) shall require any Loan Party to cause any amounts to be repatriated to the United States (whether or not such amounts are used in or excluded from the determination of the amount of any mandatory prepayments hereunder).

(c)    *Notices of Prepayments*.

(i)    *Generally*.  Other than as specified in Section 2.03(c)(ii) below, Borrower Agent shall provide written notice substantially in the form of Exhibit C hereto (each, a "**Prepayment Notice**") to the Administrative Agent not later than 12:00 p.m., New York City time, (i) three Business Days prior to any date of prepayment of Eurodollar Rate Loans and (ii) one Business Day prior to any date of prepayment of Base Rate Loans.  Each Prepayment Notice shall specify (x) the date and amount of such prepayment and (y) the Type of the Term Loan to be prepaid.  The Administrative Agent will promptly notify the Lenders of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage in respect of the relevant Term Facility).  If such notice is given by Borrower Agent, Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein, unless such notice specified that prepayment is contingent upon consummation of another transaction, and the Borrowers shall have provided written notice to the Administrative Agent that such transaction was not consummated.

(ii)    *Notice of Mandatory Prepayment Events*.  Borrowers shall use commercially reasonable efforts to give to the Administrative Agent and the Lenders, at least one Business Day's prior written or telecopy notice of each and every prepayment required under Section 2.03(b)(i) through (iv), including the amount of Net Cash Proceeds expected to be received therefrom and the expected schedule for receiving such proceeds.

(d)    *Prepayment penalty*.  Upon making any prepayment pursuant Section 2.03(a), the Borrowers agree to pay to the Administrative Agent for account of each Lender a prepayment penalty equal to 4.00% of the aggregate principal amount of the Term Loan so prepaid; *provided* that if the Borrowers elect to exercise the Exit Conversion, no prepayment penalty shall be due.  Prepayment penalties paid shall not be refundable under any circumstances.

Section 2.04    <u>Conversion of Loans to Exit Facility; Implementation</u>.

(a)    Upon the consummation of an Approved Plan of Reorganization, the Borrowers, subject to the satisfaction, or waiver, of the conditions set forth in the Exit Term Sheet and otherwise in accordance with the terms and conditions set forth in the Exit Credit Agreement (as defined below), may exercise an option to continue or convert the Term Loan into an exit term facility financing (the "**Exit Conversion**").

(b)    If the Borrowers elect to exercise the Exit Conversion, subject to, the satisfaction, or waiver by the Required Lenders in accordance with the Exit Term Sheet and the Exit Credit Agreement (as defined below) of the following conditions:

(i)    each Lender, severally and not jointly, hereby agrees to continue the Term Loan hereunder outstanding on the date of consummation of an Approved Plan of Reorganization as loans under, and subject entirely and exclusively to the terms and

provisions of, the definitive documentation to be agreed (including a credit agreement governing the continuation and conversion of the Term Loan, the "**Exit Credit Agreement**") and related documentation to the extent that such documentation is consistent with the Exit Term Sheet and contains the terms set forth in the Exit Term Sheet and is otherwise in form and substance satisfactory to the Required Lenders; and

(ii)    subject to Section 2.04(a), the Administrative Agent, the Lenders and the Loan Parties agree that, upon the effectiveness of the Exit Credit Agreement:

(A)    the Borrowers, in their capacity as reorganized Borrowers, and each Guarantor, in its capacity as a reorganized Guarantor, shall assume all the Obligations hereunder with respect to the Term Loan and all other obligations in respect thereof in the manner set forth in the Exit Credit Agreement and related loan documents;

(B)    the Term Loan hereunder shall be continued or converted, as the case may be, as loans under the Exit Credit Agreement;

(C)    each Lender hereunder shall be a lender under the Exit Credit Agreement;

(D)    except as otherwise agreed between the Required Lenders and the Borrowers, the Administrative Agent hereunder shall be the administrative agent and collateral agent under the Exit Credit Agreement (provided that the Exit Credit Agreement and related documentation is in form and substance satisfactory to the Administrative Agent); and

(E)    this Agreement shall terminate and be superseded and replaced by the Exit Credit Agreement.

(c)    If the Borrowers elect not to exercise the Exit Conversion:

(i)    the Borrowers shall prepay the Term Loan in full in accordance with Section 2.03(a) and subject to Section 2.03(d); and

(ii)    the Borrowers agree that the Lenders shall have a right of first refusal with respect to the financing of any new term loan facility.  The Borrowers may solicit proposals for financing from third-parties.  The Borrowers shall provide the Lenders with such information as the Lenders may reasonable request to determine whether or not to provide such new term loan facility.  If, after five Business Days of delivery of such information (including delivery of any follow-up information requests), the Lenders do not commit to provide such new term loan facility on terms which are, in the reasonable judgment of the Borrowers, on terms which are at least equivalent to those proposed by the aforementioned third-party or parties, the Borrowers may utilize third-party financing in respect of a new debt facility.  If, within such five-Business Day period, the Lenders make a binding commitment to provide such new term loan facility on such terms, the Borrowers may not utilize third-party financing in respect of such new debt facility.

Section 2.05    *Repayment of Term Loan*.  Upon the Maturity Date or earlier, if otherwise required by the terms hereof, (i) the Borrowers shall repay to the Administrative Agent for its account and the ratable account of the Lenders the aggregate outstanding principal amount of the Term Loan (less any amounts remaining in the DIP Term Loan Funding Account) and all accrued but unpaid interest thereon (together with any fees and expenses payable therewith, including without limitation, any such fees or expenses due under Section 2.07 and Section 12.04), and (ii) the Administrative Agent shall apply such funds (together with any funds remaining in the DIP Term Loan Funding Account (after the payment of fees and expenses, including without limitation any such fees or expenses due under Section 2.07 and Section 12.04)) to repay each Lender in the amount of such Lender's ratable portion of the remaining amount (based on such Lender's Applicable Percentage in respect of the relevant Term Facility); *provided, however* that, subject to terms and conditions set forth in Section 2.04(b), if the Borrower elects to exercise the Exit Conversion, all proceeds (after the payment of fees and expenses, including without limitation any such fees or expenses due under Section 2.07 and Section 12.04) in the DIP Term Loan Funding Account shall be remitted to the Borrowers as directed by the Borrowers in writing to the Administrative Agent on the date of the Exit Conversion subject to the terms and conditions of the Exit Credit Agreement.

Section 2.06    *Interest*.

(a)    Subject to the provisions of Section 2.06(b), the Term Loan shall bear interest on the outstanding principal amount for each Interest Period (with the first such Interest Period commencing on the Credit Date) at a rate per annum equal to the Eurodollar Rate for such Interest Period plus 9.00%; *provided* that upon the conversion of the Eurodollar Rate Loan of a Lender to a Base Rate Loan pursuant to Section 3.02 or Section 3.03, the Term Loan shall bear interest the outstanding principal amount of the Term Loan from the date of such conversion at a rate per annum equal to the Base Rate plus 8.00%.

(b)    *Default Rate*.

(i)    During the continuance of a Default under Section 8.01(a), Borrowers shall pay interest on such overdue amounts at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on the Term Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.07    *Fees*.

(a)    *Administrative Agent Fee.* Borrowers shall pay to the Administrative Agent fees and expenses in the amounts and at the times set forth in the Fee Letter.  Such fees

and expenses shall be fully earned and irrevocable when paid and shall not be refundable for any reason whatsoever.  The Administrative Agent shall be entitled to apply funds held in the DIP Term Loan Funding Account to the payment of such fees and expenses.

(b)     *Backstop Fee*.  The Borrowers shall pay to the Backstop Lenders fees in the amounts and at the times specified in the Backstop Commitment Letter.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever. The Administrative Agent shall apply funds held in the DIP Term Loan Funding Account to the payment of such fees and expenses.

(c)     *Original Issue Discount*.  The Borrowers and each Lender agrees that on the date of the Term Borrowing the Borrowers shall receive proceeds from the Term Loan based on a purchase price of 98.00% of the principal amount thereof.  For the avoidance of doubt, on the Closing Date, each Lender shall advance to the Administrative Agent for application as set forth in Section 2.02(c) an amount equal to 98.00% of its ratable share of the Term Loan requested by the Borrowers as of such date in exchange for the Borrowers' obligations to repay in full the face amount of the Term Loan plus interest accrued thereon in accordance with the terms hereof.

(d)     *Exit Facility Conversion Fees*.  If the Borrower elects to exercise the Exit Conversion, the Borrowers shall pay to the Lenders fees, payable in the form of common stock, in the amount equal to 10% of the pro forma common stock (after giving effect to equity granted to Prepetition Term Lenders, prepetition equity holders and the fees payable pursuant to Section 2.07(b) but excluding allocations of stock for the Management Incentive Plan (as such term is defined in the Reorganization Plan)), which shall be earned and payable on the effective date of the Approved Plan of Reorganization. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

Section 2.08    *Computation of Interest and Fees*.  All computations of interest for Base Rate Loans shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on the Term Loan for the day on which the Term Loan is made, and shall not accrue on the Term Loan, or any portion thereof, for the day on which the Term Loan or such portion is paid; *provided* that if the Term Loan is repaid on the same day on which it is made, subject to Section 2.10(a), then it shall bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest or demonstrable error.

Section 2.09    *Evidence of Debt*.  The Credit Extension made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest or demonstrable error of the amount of the Credit Extension made by the Lenders to Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of Borrowers hereunder to pay any amount owing with respect

to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest or demonstrable error.

Section 2.10    *Payments Generally; Administrative Agent's Clawback*.

(a)    *General*.  All payments to be made by Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than [2:00] p.m., New York City time, on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including all fees payable with respect thereto, in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after [2:00] p.m., New York City time, shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected on computing interest or fees, as the case may be.

(b)    *Failure to Satisfy Conditions Precedent*.  On the Closing Date, any Lender makes available to the Administrative Agent funds for the Term Loan to be made by such Lender as provided in this Article 2, and such funds are not made available to Borrowers by the Administrative Agent because the conditions to the Credit Extension set forth in Article 4 are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall promptly return such funds (in like funds as received from such Lender) to such Lender, without interest.

(c)    *Obligations of Lenders Several*.  The obligations of the Lenders hereunder to make the Term Loan and to make payments pursuant to Section 12.04(c) are several and not joint.  The failure of any Lender to make the Term Loan or to make any payment under Section 12.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Term Loan or to make its payment under Section 12.04(c).

(d)    *Funding Source*.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for the Term Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for the Term Loan in any particular place or manner.

(e)    *Insufficient Funds*.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, fees and expenses then due hereunder, such funds (including any funds remaining in the DIP Term Loan Funding Account) shall be applied (i) *first*, toward payment of fees and expenses then due to the Administrative Agent hereunder, in accordance with the amounts of fees and expenses then due

to the Administrative Agent, (ii) *second*, toward payment of interest and fees then due to any other parties hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (iii) *third*, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

Section 2.11    *Sharing of Payments by Lenders*.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations in respect of the Term Facility due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Term Facility due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the Term Facility due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) Obligations in respect of any of the Term Facility owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Term Facility owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payment on account of the Obligations in respect of the Term Facility owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time then the Lender receiving such greater proportion shall (A) notify the Administrative Agent of such fact, and (B) purchase (for cash at face value) participations in the Term Loan of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations in respect of the Term Facility then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be, *provided* that:

(i)    if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)    the provisions of this Section shall not be construed to apply to (x) any payment made by or on behalf of Borrowers pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Term Loan to any assignee or participant.

Section 2.12    *Borrower Agent*.  Each Borrower hereby designates Anchor  ("**Borrower Agent**") as its representative and agent for all purposes under the Loan Documents, including requests for the Term Loan, designation of interest rates, delivery or receipt of communications, preparation and delivery of financial reports, receipt and payment of Obligations, requests for waivers, amendments or other accommodations, actions under the Loan Documents (including in respect of compliance with covenants), and all other dealings with the Administrative Agent and the Lenders.  Borrower Agent hereby accepts such appointment.  The Administrative Agent shall

be entitled to rely upon, and shall be fully protected in relying upon, any notice or communication (including any Committed Loan Notice and any Notice of Withdrawal) delivered by Borrower Agent on behalf of any Borrower.  The Administrative Agent may give any notice or communication with a Borrower hereunder to Borrower Agent on behalf of such Borrower. The Administrative Agent shall have the right, in its discretion, to deal exclusively with Borrower Agent for any or all purposes under the Loan Documents.  Each Borrower agrees that any notice, election, communication, representation, agreement or undertaking made on its behalf by Borrower Agent shall be binding upon and enforceable against it.

Section 2.13   *Joint and Several Nature and Extent of Each Borrower's Liability*.

(a)      Notwithstanding anything in this Agreement or any other Loan Document to the contrary, each of the Borrowers hereby accepts joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Lenders under this Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.  Each of the Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 2.13), it being the intention of the parties hereto that all of the Obligations shall be the joint and several obligations of each of the Borrowers without preferences or distinction among them.  If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event, the other Borrowers will make such payment with respect to, or perform, such Obligation.  Subject to the terms and conditions hereof, the Obligations of each of the Borrowers under the provisions of this Section 2.13 constitute the absolute and unconditional, full recourse Obligations of each of the Borrowers, enforceable against each such Person to the full extent of its properties and assets, irrespective of the validity, binding effect or enforceability of this Agreement, the other Loan Documents or any other circumstances whatsoever.

(b)      The provisions of this Section 2.13 are made for the benefit of the Administrative Agent, the Lenders and their successors and assigns, and may be enforced by them from time to time against any or all of the Borrowers as occasion therefor may arise and without requirement on the part of the Administrative Agent, the Lenders or such successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Borrowers or to exhaust any remedies available to it or them against any of the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section 2.13 shall be in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.

(c)      Each of the Borrowers hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrowers with respect to any liability incurred by it hereunder or under any of the other Loan Documents, or any payments made by it to the Administrative Agent or the Lenders with respect to any of the Obligations or any

Collateral, until such time as all of the Obligations have been paid in full.  Any claim which any Borrower may have against any other Borrower with respect to any payments to the Administrative Agent or the Lenders hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full of the Obligations.

Section 2.14    *No Discharge; Survival of Claims*.  Until the Obligations are satisfied in full, and all the Commitments have been terminated, each of the Borrowers agree that (i) its Obligations hereunder shall not be discharged by the entry of an order confirming a Reorganization Plan (and each of the Borrowers, pursuant to section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the super-priority claim granted to the Administrative Agent and the Lenders pursuant to the Bankruptcy Court Orders and described in Section 10.[__] and the Liens granted to the Administrative Agent pursuant to the Bankruptcy Court Orders and described in Section 10.[_] shall not be affected in any manner by the entry of an order confirming any plan of reorganization.

ARTICLE 3.
TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01    *Taxes*.

(a)    *Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes*.

(i)    Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall to the extent permitted by applicable Laws be made free and clear of and without reduction or withholding for any Taxes.  If, however, applicable Laws require any applicable withholding agent to withhold or deduct any Tax, such Tax shall be withheld or deducted in accordance with such Laws upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii)    If any applicable withholding agent shall be required to withhold or deduct any Taxes, including both United States Federal backup withholding and withholding taxes, from any payment, then (A) the applicable withholding agent shall withhold or make such deductions based upon the information and documentation it has received pursuant to subsection (e) below, (B) the applicable withholding agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions of Indemnified Taxes (including deductions applicable to additional sums payable under this Section 3.01) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such withholding or deduction of Indemnified Taxes been made.

(b)      *Payment of Other Taxes by Borrowers*.  Without limiting the provisions of subsection (a) above, the Loan Parties shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Laws, or at the option of the Administrative Agent, timely reimburse it for the payment of Other Taxes.

(c)      *Tax Indemnifications*.  Without limiting or duplicating the provisions of subsection (a) or (b) above, the Loan Parties shall, and do hereby, jointly and severally indemnify the Administrative Agent and each Lender, and shall make payment in respect thereof within ten days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) payable or paid by the Administrative Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of any such payment or liability delivered to Borrower Agent by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest or demonstrable error.

(d)      *Evidence of Payments*.  As soon as practical after any payment of Taxes by any Loan Party  provided in this Section 3.01, Borrower Agent shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent, as the case may be.

(e)      *Status of Lenders*.

(i)      *Tax Documentation*.  Each Lender shall deliver to Borrower Agent and to the Administrative Agent, at the time or times prescribed by applicable Laws or when reasonably requested by Borrower Agent or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Laws or by the taxing authorities of any jurisdiction and such other reasonably requested information as will permit Borrower Agent or the Administrative Agent, as the case may be, to determine (A) whether or not payments made hereunder or under any other Loan Document are subject to Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such Lender by Borrowers pursuant to this Agreement or otherwise to establish such Lender's status for withholding tax purposes in the applicable jurisdiction.  Notwithstanding anything to the contrary in the preceding sentence, the delivery, completion and execution of documentation and other requested information described in this subsection (e)(i) (and not otherwise described in subsection (e)(ii)) shall not be required if in the Lender's reasonable judgment such delivery, completion or execution would subject the Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, on or prior to the date on which a Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower Agent or the Administrative Agent), but only to the extent it is legally eligible to do so,

(A)    any Lender that is a U.S. Person shall deliver to Borrower Agent and the Administrative Agent executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax; and

(B)    each Foreign Lender shall deliver to Borrower Agent and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party, (x) with respect to payments of interest under any Loan Document executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(2)    executed originals of Internal Revenue Service Form W-8ECI,

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-[] to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of any Loan Party within the meaning of section 881(c)(3)(B) of the Code, or (C) "a controlled foreign corporation" described in section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-[] or G-[], IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of

Exhibit G-[] on behalf of each such direct and indirect partner together with the executed originals of the applicable IRS Forms.

(iii)    If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower Agent and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrower Agent or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower Agent or the Administrative Agent as may be necessary for Borrower Agent and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (iii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iv)    Each Lender shall promptly (A) notify Borrower Agent and the Administrative Agent of any change in circumstances which would modify or render invalid, obsolete or inaccurate in any respect, or the expiration of, any form or certification provided pursuant to this  Section 3.01(e) and (B) update any such form or certification or notify Borrower Agent and Administrative Agent in writing of its legal inability to do so.

(f)    *Treatment of Certain Refunds*.  At no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, or have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of such Lender.  If the Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund of any Indemnified Taxes as to which it has been indemnified by Borrowers or with respect to which Borrowers have paid additional amounts pursuant to this Section 3.01, it shall pay to Borrower Agent an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to Taxes giving rise to such refund), net of all out-of-pocket expenses incurred by the Administrative Agent or such Lender, as the case may be, related to the receipt of such refund and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Loan Parties, upon the request of the Administrative Agent or such Lender, agree to repay the amount paid over to Borrower Agent (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  This subsection shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to a Loan Party or any other Person.  Notwithstanding anything to the contrary in this subsection, in no event will the Administrative Agent or such Lender be required to pay any amount to Borrower Agent pursuant to this subsection the payment of which would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the

Administrative Agent or such Lender would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid.

(g)     Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Obligations and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 3.02    *Illegality*.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund the Term Loan whose interest is determined by reference to the Eurodollar Rate, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars, then, on notice thereof by such Lender to Borrowers (with a copy to the Administrative Agent), (i) any obligation of such Lender to make Eurodollar Rate Loans in the affected currency or currencies shall be suspended and (ii) if such notice asserts the illegality of such Lender maintaining Base Rate Loans the interest rate on which is determined by reference to the Eurodollar Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate, in each case until such Lender notifies the Administrative Agent and Borrower Agent that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (x) Borrowers shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Rate Loans of such Lender to Base Rate Loans or (y) if such notice asserts the illegality of such Lender maintaining Base Rate Loans (the interest rate on which is determined by reference to the Eurodollar Rate component of the Base Rate), the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate, in each case, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurodollar Rate Loans.  Upon any such prepayment or conversion, Borrowers shall also pay accrued interest on the amount so prepaid or converted.

Section 3.03    *Inability to Determine Rates*.  If the Required Lenders determine that for any reason in connection with any request for a Eurodollar Rate Loan that (a) deposits are not being offered to banks in the London interbank Eurodollar market for the applicable amount and Interest Period of such Eurodollar Rate Loan, (b) adequate and reasonable means do not exist for determining the Eurodollar Rate for a proposed Eurodollar Rate Loan or (c) the Eurodollar Rate for  a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding the Term Loan, the  Required Lenders shall promptly notify the Administrative Agent and upon receipt of such notice from the Required Lenders, the Administrative Agent shall promptly so notify Borrower Agent and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended and (y) in the event of a determination described in the preceding sentence with respect to the Eurodollar Rate component of the Base Rate, the utilization of the Eurodollar Rate component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (upon

the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, Borrowers may revoke any pending request for a Term Borrowing of Eurodollar Rate Loans or, failing that, will be deemed to have converted such request into a request for a Term Borrowing of Base Rate Loans in the amount specified therein.

Section 3.04    *Increased Costs; Reserves on Eurodollar Rate Loans*.

(a)    *Increased Costs Generally*.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by Section 3.04(e));

(ii)    subject the Administrative Agent or any Lender to any Tax (except for Indemnified Taxes covered by Section 3.01 and the imposition of, or any change in the rate of, any Tax described in the definition of Excluded Tax) on its loans, loan principal, letters of credit, commitment, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to any Lender of making or maintaining the Term Loan (or of maintaining its obligation to make the Term Loan), or to reduce the amount of any sum received or receivable by the Administrative Agent or any Lender hereunder (whether of principal, interest or any other amount) then, upon request of the Administrative Agent or such Lender, Borrowers will pay to the Administrative Agent or such Lender, as the case may be, such additional amount or amounts as will compensate the Administrative Agent or such Lender, as the case may be, for such additional costs incurred or reduction suffered.

(b)    *Capital Requirements*.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Term Commitment of such Lender or the Term Loan made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    *Certificates for Reimbursement*.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to Borrower Agent

shall be conclusive absent manifest or demonstrable error.  Borrowers shall pay such Lender the amount shown as due on any such certificate within ten days after receipt thereof.

(d)        *Delay in Requests*.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, *provided* that Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than six months prior to the date that such Lender notifies Borrower Agent of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)        *Reserves on Eurodollar Rate Loans*.  Borrowers shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurodollar funds or deposits (currently known as "**Eurodollar liabilities**"), additional interest on the unpaid principal amount of each Eurodollar Rate Loan equal to the actual costs of such reserves allocated to the Term Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive and binding), which shall be due and payable on each date on which interest is payable on the Term Loan, *provided* Borrower Agent shall have received at least ten days prior notice (with a copy to the Administrative Agent) of such additional interest from such Lender.  If a Lender fails to give notice ten days prior to the relevant Interest Payment Date, such additional interest shall be due and payable ten days from receipt of such notice.

Section 3.05    *Compensation for Losses*.  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)        any conversion, payment or prepayment of the Term Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for the Term Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)        any failure by Borrowers to prepay, borrow or convert the Term Loan other than a Base Rate Loan on the date or in the amount notified by Borrower Agent (in the case of a borrowing, for a reason other than the failure of such Lender to make a Term Loan); or

(c)        any assignment of a Eurodollar Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by Borrowers pursuant to Section 12.13;

including any foreign exchange losses or loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain the Term Loan or from fees payable to terminate the deposits from which such funds were obtained or from the performance of any foreign exchange contract.  Borrowers shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by Borrowers to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurodollar Rate Loan made by it

at the Eurodollar Rate for the Term Loan by a matching deposit or other borrowing in the London or other offshore interbank market for Dollars for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Loan was in fact so funded.  A certificate (with reasonable supporting detail) of any Lender setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section 3.05 shall be delivered to the applicable Borrower and shall be conclusive absent manifest or demonstrable error.

Section 3.06   *Mitigation Obligations; Replacement of Lenders*.

(a)   *Designation of a Different Lending Office*.  If any Lender requests compensation under Section 3.04, or Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall (at the request of the Borrower Agent) use reasonable efforts to designate a different Lending Office for funding or booking its Term Loan hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)   *Replacement of Lenders*.  If any Lender requests compensation under Section 3.04, or if Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, Borrowers may replace such Lender in accordance with Section 12.13.

Section 3.07   *Survival*.  All of Borrowers' obligations under this Article 3 shall survive termination of the Aggregate Term Commitments, any assignment of rights by, or the replacement of, a Lender, repayment, satisfaction or discharge of all other Obligations hereunder, and resignation or replacement of the Administrative Agent.

ARTICLE 4.
CONDITIONS PRECEDENT

Section 4.01   *Conditions to Closing Date*.  This Agreement shall become effective as of the Business Day of and, subject to, the satisfaction, or waiver by the Required Lenders in accordance with this Agreement of the following conditions:

(a)   The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter shall be in form and substance satisfactory to the Required Lenders.

(b)   The Interim Bankruptcy Court Order shall have been entered by the Bankruptcy Court and the Administrative Agent shall have received a true and complete copy of such order, and such order shall and shall be in form and substance satisfactory to the Required

Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent) in their sole discretion, be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Administrative Agent and the Required Lenders.

(c)     All orders entered by the Bankruptcy Court pertaining to cash management ("**Cash Management Orders**") and adequate protection ("**Adequate Protection Orders**") and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith, shall be in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent) in their sole discretion.

(d)     No trustee, examiner or receiver shall have been appointed or designated with respect to Holdings or its Subsidiaries' business, properties or assets and no motion shall be pending seeking any such relief or seeking any other relief in the Bankruptcy Court to exercise control over any Collateral.

(e)     The Prepetition Term Agent, the Prepetition Term Lenders, the ABL Agent and the ABL Lenders shall have each received adequate protection in respect of the Liens securing their respective Prepetition Obligations pursuant to the Adequate Protection Orders.

(f)     The Administrative Agent shall have received UCC, tax and judgment lien searches and other appropriate evidence in form and substance satisfactory to the Required Lenders in their sole discretion evidencing the absence of any other liens or mortgages on the Collateral, except the liens securing the Prepetition Loan Documents, Liens permitted under the Prepetition Loan Documents and other existing liens acceptable to the Required Lenders in their sole discretion.

(g)     The Administrative Agent, for its benefit and the benefit of each Lender, shall have been granted a perfected lien on the Collateral by the Bankruptcy Court Orders on the terms and conditions set forth herein and in the other Loan Documents.

(h)     The Administrative Agent shall have received appropriate UCC-1 financing statements for filing under the UCC of each jurisdiction of organization of each Loan Party.

(i)     The ABL Loan Documents shall be in form and substance satisfactory to the Required Lenders in their sole discretion.

(j)     The Administrative Agent shall have received the Budget in form and substance satisfactory to the Required Lenders in their sole discretion.

(k)     The Required Lenders shall have received financial information reasonably requested by them.

(l)     The Borrowers shall have paid to the Administrative Agent and Lenders the fees and expenses then due and payable under the Loan Documents subject to and in accordance with the Bankruptcy Court Orders.

(m)      The Administrative Agent shall have received such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Required Lenders may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party and (B) such other documents and certificates (including Organization Documents and good standing certificates) as the Administrative Agent or the Required Lenders may reasonably request relating to the organization, existence and good standing of each Loan Party in its jurisdiction of organization, in each case, as certified by the Secretary or an Assistant Secretary of such Loan Party.

(n)      The Administrative Agent shall have received this Agreement and the other Loan Documents executed by each party hereto and thereto.

(o)      The Administrative Agent shall have received a Committed Loan Notice in accordance with Section 2.02.

Section 4.02    *Conditions to Withdrawals*.  The Borrower may make a Withdrawal on each Withdrawal Date subject to (other than in respect of Withdrawals for the payment of amounts due and payable in accordance with Section 10.05(e)) the satisfaction, or waiver by the Required Lenders in accordance with this Agreement of the following conditions:

(a)      With respect to any Withdrawal Date that is on or after the date which is 30 days following the date of the entry of the Interim Bankruptcy Court Order, the Final Bankruptcy Court Order shall have been signed and entered by the Bankruptcy Court, and (i) the Administrative Agent shall have received a true and complete copy of such order, (ii) such order shall be in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent) in their sole discretion and (iii) such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent the prior written consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent, the Administrative Agent).

(b)      The Borrowers shall have paid to the Administrative Agent and Lenders the fees and expenses then due and payable under the Loan Documents subject to and in accordance with the Bankruptcy Court Orders.

(c)      The Borrower shall have delivered to the Administrative Agent, an appropriate Notice of Withdrawal, duly executed and completed, not later than 12:00 p.m., New York City time, one Business Day prior to the proposed date of the Withdrawal specifying the amount to be Withdrawn in accordance with the Budget.

Section 4.03    *Conditions to the Credit Extension and to each Withdrawal Date*.  The obligation of each Lender to make the Credit Extension on the Credit Date, and the Borrower's right to make a Withdrawal on each Withdrawal Date, also are subject to (other than in respect of Withdrawals for the payment of amounts due and payable in accordance with Section 10.05(e))

the satisfaction, or waiver in accordance with this Agreement, of the following further conditions precedent:

(a)      The Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge.

(b)      The Loan Parties shall be in compliance with the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be.

(c)      The Loan Parties shall be in compliance with each Cash Management Order and each Adequate Protection Order.

(d)      The Administrative Agent and Lenders shall have received all periodic updates required under Section 6.01, each in form and substance satisfactory to the Required Lenders, and the Borrowers shall be in compliance with Section 7.11.

(e)      Except as disclosed to the Administrative Agent, since the Petition Date, no event, circumstance or change shall have occurred that has caused, be reasonably expected to cause, or evidences, either in any case or in the aggregate, to have a Material Adverse Effect.

(f)      The following statements shall be true and correct:  (i) the representations and warranties contained in Article 5 and in each other Loan Document are true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such Credit Date or Withdrawal Date, as applicable, as though made on and as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on such Credit Date or Withdrawal Date, as applicable, or would result from the making of such Credit Extension or Withdrawal on such date.

Without limiting the generality of the provisions of Section 9.03, for purposes of determining compliance with the conditions specified in this Article 4, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.  The Administrative Agent shall be entitled to conclusively rely upon, and shall be fully protected in relying upon, such Notice of Withdrawal.

ARTICLE 5.
REPRESENTATIONS AND WARRANTIES

Holdings and each Borrower jointly represent and warrant to the Administrative Agent and the Lenders on the Closing Date, the Credit Date and each Withdrawal Date that:

Section 5.01   *Existence, Qualification and Power*.  Each Loan Party and each Subsidiary thereof (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) subject to the entry and the terms of the Bankruptcy Court Orders in the case of the Loan Parties, has all requisite corporate or other organizational power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 5.02   *Authorization; No Contravention*.  Other than as a result of the Chapter 11 Cases, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is party, subject to the entry and the terms of the Bankruptcy Court Orders in the case of the Loan Parties, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien (other than Permitted Liens) under, or require any payment to be made under (i) any material contract to which such Person is a party or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law, except, with respect to clauses (b) and (c), for such violations, conflicts, breaches or contraventions that could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.03   *Governmental Authorization; Other Consents*.  Other than as a result of the Chapter 11 Cases, no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (with such priority as provided in the ABL Intercreditor Agreement) or (d) other than pursuant to applicable Law in connection with the exercise of remedies with respect to the Collateral, the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents.

Section 5.04   *Binding Effect*.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  Subject to the entry and the terms of the Bankruptcy Court Orders in the case of the Loan Parties, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except (a) as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and (b) that rights of acceleration and the

availability of equitable remedies may be limited by equitable principles of general applicability (regardless of whether enforcement is sought by proceedings in equity or at law).

Section 5.05    *Financial Statements; No Material Adverse Effect*.

(a)    (i) The Annual Financial Statements (A) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (B) fairly present in all material respects the financial condition of such Persons as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (ii) the Quarterly Financial Statements (A) were each prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (B) fairly present the financial condition of such Persons, as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (A) and (B) of this clause (ii), to the absence of footnotes and to normal year-end audit adjustments.

(b)    Since September 30, 2014, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

Section 5.06    *Litigation*.  Other than as a result of the Chapter 11 Cases as of the Closing Date, except as set forth in <u>Schedule 5.06</u>, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Loan Party, threatened in writing, before any Governmental Authority, against any Loan Party or any of their Subsidiaries or against any of their properties that either individually or in the aggregate would reasonably be expected to have a Material Adverse Effect.

Section 5.07    *No Default*.  Other than as a result of the Chapter 11 Cases, neither any Loan Party nor any Subsidiary thereof is in default under or with respect to any Contractual Obligation that would, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

Section 5.08    *Ownership of Property; Liens*.

(a)    Other than as a result of the Chapter 11 Cases, each of the Loan Parties has good title to, or valid leasehold interests in, or easements or other limited property interests in, all real property necessary in the ordinary conduct of its business, free and clear of all Liens except (a) as set forth on <u>Schedule 5.08(a)</u>, (b) minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes, (c) Liens permitted by Section 7.01 and (d) where the failure to have such title could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    <u>Schedule 5.08(b)</u> sets forth a complete and accurate list of all material real property owned by each Loan Party as of the Closing Date, showing as of the Closing Date the street address, county or other relevant jurisdiction, state and record owner thereof.

Section 5.09    *Environmental*.  Except as set forth in <u>Schedule 5.09</u>:

(a)    There are no existing Environmental Claims pending, or to the knowledge of any Responsible Officer of any Loan Party threatened, the effect of which alleges potential liability under or a violation of any Environmental Law relating to the Loan Parties', their Subsidiaries', or any of their respective businesses or properties, in each case, that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Each of the Loan Parties and its Subsidiaries is and has been in compliance with all Environmental Laws and has received and maintained in full force and effect all Environmental Permits required for its current operations, except where non-compliance could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    No Hazardous Materials are present, or have been released by any Person, whether related or unrelated to any Loan Party in, on, within, above, under, affecting or emanating from any real property currently or previously owned, leased or operated by any Loan Party or its Subsidiaries (i) in a quantity, location, manner or state requiring any cleanup, investigation or remedial action pursuant to any Environmental Laws, (ii) in violation or alleged violation of any Environmental Laws, or (iii) which has given or could give rise to any Environmental Claim against any Loan Party or its Subsidiaries, except as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(d)    No Environmental Claim is pending or, to the Loan Parties' knowledge, proposed, threatened or anticipated, with respect to or in connection with any of the Loan Parties or its Subsidiaries or any real properties now or previously owned, leased or operated by the Loan Parties or its Subsidiaries except as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e)    No properties now or previously owned, leased or operated by the Loan Parties or its Subsidiaries nor any property to which the Loan Parties or its Subsidiaries has, directly or indirectly, transported or arranged for the transportation of any Hazardous Material is listed or, to the Loan Parties' knowledge, proposed for listing on the National Priorities List promulgated pursuant to CERCLA, on CERCLIS (as defined in CERCLA) or on any similar federal, state or foreign list of sites requiring investigation or cleanup, nor to the knowledge of the Loan Parties, is any such property anticipated or threatened to be placed on any such list, except as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(f)    There are no liabilities under Environmental Law of any Loan Parties or its Subsidiaries of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, and there are no facts, conditions, situations or set of circumstances which could reasonably be expected to result in or be the basis for any Environmental Claim, except as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(g)    No Loan Party or its Subsidiaries has assumed or retained any Environmental Claim of any other Person, except as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.10    _Insurance_.  The properties of each Loan Party and its Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of such Loan Party, in such amounts (after giving effect to any self-insurance compatible with the following standards), with such deductibles and covering such risks as are prudent in the reasonable business judgment of Borrowers' officers.

Section 5.11    _Taxes_.  Each Loan Party and its Subsidiaries has filed all Federal, state and other material Tax returns and reports required to be filed, and have paid all Federal, state and other material Taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.  There is no proposed Tax assessment against any Loan Party or any Subsidiary of a Loan Party that would, if made, have a Material Adverse Effect.

Section 5.12    _ERISA Compliance_.

(a)    Except as would not reasonably be expected to result in a Material Adverse Effect, (i) each Plan is in compliance in all respects with the applicable provisions of ERISA, the Code and other Federal or state laws and (ii) each Pension Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service, and to the knowledge of any Loan Party, nothing has occurred that would reasonably be expected to prevent or cause the loss of such tax-qualified status.

(b)    There are no pending or, to the knowledge of any Loan Party, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that could reasonably be expected to result in a Material Adverse Effect.

(c)    Except as would not individually or in the aggregate reasonably be expected to result in a Material Adverse Effect, (i) no ERISA Event has occurred, and no Loan Party nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan or Multiemployer Plan; (ii) each Loan Party and, to the knowledge of any Loan Party, each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained; (iii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 60% or

higher and no Loan Party nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of the most recent valuation date; (iv) no Loan Party nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid; (v) no Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; and (vi) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan.

(d)     With respect to each scheme or arrangement mandated by a government other than the United States (a "**Foreign Government Scheme or Arrangement**") and with respect to each employee benefit plan maintained or contributed to by any Loan Party or any Subsidiary of any Loan Party that is not subject to United States law (a "**Foreign Plan**"), except as would not reasonably be expected to result in a Material Adverse Effect:

(i)     any employer and employee contributions required by law or by the terms of any Foreign Government Scheme or Arrangement or any Foreign Plan have been made, or, if applicable, accrued, in accordance with normal accounting practices;

(ii)     the fair market value of the assets of each funded Foreign Plan, the liability of each insurer for any Foreign Plan funded through insurance or the book reserve established for any Foreign Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations, as of the Closing Date, with respect to all current and former participants in such Foreign Plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles; and

(iii)     each Foreign Plan required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities.

Section 5.13     *Subsidiaries; Equity Interests*.  As of the Closing Date, Holdings has no Subsidiaries other than those specifically disclosed in Schedule 5.13, and all of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and nonassessable and are owned by a Loan Party in the amounts specified on Schedule 5.13 free and clear of all Liens other than the Liens permitted by the Loan Documents.

Section 5.14     *Margin Regulations; Investment Company Act*.

(a)     No Borrower is engaged or shall engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.

(b)     None of Holdings, any Borrower, nor any Subsidiary of Holdings is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 5.15    *Disclosure*.  No report, financial statement, certificate or other written information furnished (other than projections, pro formal financial information, budgets, other estimates and general market, industry and economic data) by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished), when taken as a whole, contains any material misstatement of material fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; *provided* that, with respect to projected financial information and pro forma financial information, each Loan Party represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation (it being understood and agreed that projections and pro forma financial information are not to be viewed as facts or guaranties of future performance, that actual results during the period or periods covered by such projections may differ from such forecasts and that such differences may be material and that the Loan Parties make no representation that such projected results will in fact be realized).

Section 5.16    *Compliance with Laws*.  Each Loan Party and each Subsidiary thereof is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties (including the Act), except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.17    *[Reserved]*.

Section 5.18    *Intellectual Property; Licenses, Etc*.  Each Loan Party and its Subsidiaries own, or possess the right to use, all of the trademarks, service marks, trade names, trade dress, logos, domain names, copyrights, patents, patent rights, trade secrets, know-how, franchises, licenses, computer software and other intellectual property rights (including all registrations and applications for registrations of the foregoing) (collectively, "**IP Rights**") that are necessary for the operation of their respective businesses, without conflict with the rights of any other Person, except where the failure to own or possess the right to use any such IP Rights, or such conflict with the rights of any other Person, would not reasonably be expected to have a Material Adverse Effect.  Each Loan Party and its Subsidiaries hold all right, title and interest in and to the IP Rights owned by each Loan Party and its Subsidiaries that are necessary for the operation of their respective businesses free and clear of any Lien (other than Liens permitted by Section 7.01).  No slogan or other advertising device, product, process, method, substance, part or other material or activity now employed, or now contemplated to be employed, by each Loan Party or any Subsidiary thereof infringes upon, misappropriates or otherwise violates any rights held by any other Person, except where such infringement, misappropriation or other violation would not reasonably be expected to have a Material Adverse Effect.

Section 5.19    *Purpose of Loans.*

(a)      *Loans*. The proceeds of the Term Loan will be used in accordance with the terms of the Budget, including, without limitation: (i) to pay all amounts due to Lenders and the Administrative Agent hereunder and all professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Administrative Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby and (ii) to provide working capital, and for other general corporate purposes of the Loan Parties and their respective Subsidiaries, and to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court.

(b)      *Limitations on use of Loans*. No portion of any proceeds of the Term Loan may be used (i) for any purpose that is prohibited under the Bankruptcy Code or the Interim Bankruptcy Court Order and the Final Bankruptcy Court Order; (ii) to finance in any way: (x) any adversary action, suit, arbitration, proceeding, application, motion, contested matter or other litigation of any type materially adverse to the interests of any or all of the Administrative Agent, the Lenders, the Prepetition Term Agent or the Prepetition Term Lenders or their respective rights and remedies under the Loan Documents, the Interim Bankruptcy Court Order, the Final Bankruptcy Court Order or the Prepetition Term Loan Documents or (y) any other action which with the giving of notice or passing of time would result in an Event of Default hereunder or under any of the Loan Documents; (iii) for the payment of fees, expenses, interest or principal under the Prepetition Loan Documents (other than permitted adequate protection payments, including payments in connection with the appointment of a successor Prepetition Term Agent); or (iv) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Administrative Agent acting at the direction of the Required Lenders, excluding administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court.

Section 5.20    *Collateral Documents*.  The provisions of the Interim Bankruptcy Court Order and Final Bankruptcy Court Order, as applicable, are effective to create in favor of the Administrative Agent for the benefit of the Secured Parties a legal, valid and enforceable security interest (subject, in the case of any Collateral, to Liens permitted by Section 7.01) on all right, title and interest of the respective Loan Parties in the Collateral described therein (with such priority as provided for in the ABL Intercreditor Agreement).  Except for filings contemplated hereby and by the Interim Bankruptcy Court Order and Final Bankruptcy Court Order, as applicable, no filing or other action will be necessary to perfect or protect such Liens to the extent required under this Agreement and to the extent perfection may be achieved by the filings and/or other actions required this Agreement.

Section 5.21    *[Reserved]*.

Section 5.22    *Sanctioned Persons*.  None of the Loan Parties or any of their Subsidiaries nor, to the knowledge of any Loan Party, any director, officer, agent, employee of any Loan Party or any of its Subsidiaries is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**"); and the Loan Parties will not directly or indirectly use the proceeds of the Term Loan or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.

Section 5.23    *Foreign Corrupt Practices Act*.  No part of the proceeds of the Term Loan will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

Section 5.24    *Patriot Act*.  To the extent applicable, each Loan Party and its Subsidiaries is in compliance, in all material respects, with (a) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) the Act.

Section 5.25    *Budget and Financial Plan*.  The Budget was prepared in good faith based on assumptions believed by the Loan Parties to be reasonable at the time made and upon information believed by the Loan Parties to have been accurate based upon the information available to the Loan Parties at the time the Budget was furnished.

Section 5.26    *Prepetition Obligations*.  Except for the Prepetition Obligations, the ABL Facility Indebtedness or as disclosed on Schedule 5.26, the Loan Parties do not have any other Indebtedness for borrowed money outstanding on the date hereof.

ARTICLE 6.
AFFIRMATIVE COVENANTS

From and after the Closing Date, so long as any Lender shall have any Term Commitment hereunder, any Term Loan or other Obligation (other than any contingent indemnification obligations not yet due and payable) hereunder shall remain unpaid or unsatisfied, Holdings and each Borrower shall, and shall cause each Subsidiary to:

Section 6.01    *Financial Statements; Budget*.  In the case of Holdings, deliver to the Administrative Agent for further distribution to each Lender, in form and detail satisfactory to the Required Lenders:

(a)    within 120 days after the end of each fiscal year of Holdings, a consolidated balance sheet of Holdings and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, changes in Stockholders' Equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of an independent certified public accountant of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and a "Management's Discussion and Analysis of Financial Condition and Results of Operations" with respect to such financial statements, certified by the chief executive officer, chief financial officer, treasurer or controller of Holdings as fairly presenting, in all material respects, the financial condition, results of operations, Stockholders' Equity and cash flows of Holdings and its Subsidiaries on a consolidated basis in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(b)    within 45 days after the end of each of the first three Fiscal Quarters of each fiscal year of Holdings, a consolidated balance sheet of Holdings and its Subsidiaries, as at the end of such Fiscal Quarter, the related consolidated statements of income or operations for such Fiscal Quarter and for the portion of Holdings' fiscal year then ended, and the related consolidated statements of changes in Stockholders' Equity and cash flows for the portion of Holdings' fiscal year then ended, in each case setting forth in comparative form, as applicable, the figures for the corresponding Fiscal Quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail, and a "Management's Discussion and Analysis of Financial Condition and Results of Operations" with respect to such financial statements, certified by the chief executive officer, chief financial officer, treasurer or controller of Holdings as fairly presenting, in all material respects, the financial condition, results of operations, Stockholders' Equity and cash flows of Holdings and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(c)    within 90 days after the end of each fiscal year of Holdings, an annual budget of Holdings and its Subsidiaries on a consolidated basis, on a quarterly basis for the then current fiscal year;

(d)    on each Budget Testing Date (prior to 11:59 P.M.), (x) a variance report certified by the chief financial officer of the Holdings, in form reasonably acceptable to the Required Lenders in their sole discretion, setting forth (i) the actual cash receipts, expenditures and disbursements for the immediately preceding calendar week (e.g. the calendar week beginning on Sunday, April 5, 2015 with respect to the report delivered on April 15, 2015) on a line-item basis and the aggregate liquidity as of the end of such calendar week and (ii) the variance in dollar amounts of the actual expenditures and disbursements (including debt service, professional fees and capital expenditures) for each weekly period from those reflected for the corresponding period in the Budget and (y) an analysis, certified by a Responsible Officer of the Holdings, demonstrating compliance with Section 7.11 for such week (if applicable).

As to any information contained in materials furnished pursuant to Section 6.02(c), Holdings shall not be required separately to furnish such information under clause (a) or (b) above, but the foregoing shall not be in derogation of the obligation of Holdings to furnish the information and materials described in clauses (a) or (b) above at the times specified therein.

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 6.01 (including any "Management's Discussion and Analysis of Financial Condition and Results of Operations") may be satisfied with respect to financial information of Holdings and its Subsidiaries by furnishing (A) the applicable financial statements of Holdings (or any direct or indirect parent of Holdings) or (B) Holdings' (or any direct or indirect parent thereof, as applicable) Form 10-K or 10-Q, as applicable, filed with the SEC; *provided* that, with respect to clauses (A) and (B), (i) to the extent such information relates to a parent of Holdings, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent), on the one hand, and the information relating to Holdings and its Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under Section 6.01(a), such materials are accompanied by a report and opinion of an independent

certified public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards.

Section 6.02   *Certificates; Other Information*.  In the case of Holdings, deliver to the Administrative Agent for further distribution to each Lender, in form and detail satisfactory to the Required Lenders:

(a)     promptly after any request by the Administrative Agent or any Lender, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of Holdings or any Borrower by independent accountants in connection with the accounts or books of Holdings or any of its Subsidiaries, or any audit of any of them;

(b)     promptly after the same are available, copies of all annual, regular, periodic and special reports and registration statements which Holdings or any Borrower may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, whether or not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(c)     promptly, and in any event within five Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Loan Party or any Subsidiary thereof,

(d)     promptly, such additional information regarding the business, financial or corporate affairs of Holdings or any of its Subsidiaries, or compliance with the terms of the Loan Documents, as the Administrative Agent or the Required Lenders may from time to time reasonably request; *provided* that none of Holdings, any Borrowers or any of the Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (iii) is subject to attorney-client or similar privilege or constitutes attorney work product;

(e)     promptly, all default notices and other material notices delivered or received under the ABL Loan Documents;

(f)     promptly, any amendments, restatements, supplements or other modifications to the ABL Loan Documents; and

(g)     promptly after the assertion or occurrence thereof, notice of any Environmental Claim against or of any noncompliance by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that could reasonably be expected to (i) have a Material Adverse Effect or (ii) cause any Mortgaged Property to be subject to any material restrictions on ownership, occupancy, use or transferability under any

Environmental Law to which the property would not have been subject but for such Environmental Claim.

Documents required to be delivered pursuant to Section 6.01(a) or (b) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (1) on which Holdings (or such direct or indirect parent of Holdings) posts such documents, or provides a link thereto on Holdings' (or such parent's) web site on the Internet at the web site address listed on Schedule 12.02, or the SEC's website on the Internet at www.sec.gov; or (2) on which such documents are posted on Holdings' behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third party website or whether sponsored by the Administrative Agent); *provided* that:  (i) Holdings shall deliver paper copies of such documents to the Administrative Agent for further distribution to any Lender that requests such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) Holdings shall notify the Administrative Agent (by facsimile or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

Holdings and Borrowers hereby acknowledge that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of Holdings or Borrowers hereunder (collectively, "**Borrower Materials**") by posting Borrower Materials on IntraLinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive material non-public information with respect to Holdings, Borrowers, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  Borrowers hereby agree that (w) all Borrower Materials that Borrowers elect to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," Holdings and Borrowers shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to Holdings, Borrowers or their respective securities for purposes of United States Federal and state securities laws ("**MNPI**") (*provided*, *however*, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 12.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information" (and the Administrative Agent agrees that only Borrower Material marked "PUBLIC" will be made available on such portion of the Platform) and (z) the Administrative Agent shall treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform that is not designated "Public Side Information."  Notwithstanding any of the foregoing, Holdings and Borrowers shall be under no obligation to mark any Borrower Materials "PUBLIC."

Section 6.03    _Notices_.  In the case of Holdings, promptly notify the Administrative Agent and each Lender:

(a)    of the occurrence of any Event of Default;

(b)    of the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, litigation, investigation, proceeding or suspension, whether at law or in equity, by or before any Governmental Authority against any Loan Party that could reasonably be expected to result in a Material Adverse Effect (other than the Chapter 11 Cases); and

(c)    of the occurrence or reasonably expected occurrence of any ERISA Event.

Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of Holdings (x) that such notice is being delivered pursuant to Section 6.03(a), (b) or (c) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the applicable Loan Party has taken and proposes to take with respect thereto.

Section 6.04    _Preservation of Existence, Etc_.

(a)    Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization except as otherwise permitted pursuant to the terms of this Agreement;

(b)    take all reasonable action to maintain all rights, privileges (including its good standing where applicable in the relevant jurisdiction), permits, licenses, approvals and franchises necessary or desirable in the normal conduct of its business, except, in the case of Section 6.04(a) (other than with respect to Borrowers) or this Section 6.04(b), to the extent (i) that failure to do so could not reasonably be expected to have a Material Adverse Effect or (ii) pursuant to any merger, consolidation or liquidation, dissolution or Disposition permitted by Article 7; and

(c)    pay, discharge or otherwise satisfy as the same shall become due and payable, all material Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (i) the same are being contested in good faith by appropriate proceedings and adequate reserves in accordance with GAAP are being maintained by such Loan Party or any of its Subsidiaries or (ii) the failure to pay or discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.05    _Maintenance of Properties_.  Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear, fire, casualty or condemnation excepted, in each case except where the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.06    _Maintenance of Insurance_.

(a)     Maintain with financially sound and reputable insurance companies that Borrowers believe (in the good faith judgment of their management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance) as are customarily carried under similar circumstances by such other Persons.

(b)     Notwithstanding anything herein to the contrary, with respect to each Mortgaged Property, if at any time the area in which the buildings and other improvements are located is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), then, to the extent required by applicable Flood Insurance Laws, Borrowers shall, or shall cause each Loan Party to, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount reasonably satisfactory to the Required Lenders and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) upon the reasonable request of the Administrative Agent (except after the occurrence and during the continuation of an Event of Default, not to exceed one time per Fiscal Year), deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent.

Section 6.07     *Compliance with and Laws*.  Comply in all material respects with (i) the requirements of all material Laws and all material orders, writs, injunctions and decrees applicable to it or to its business or property, except if such failure to comply therewith could not reasonably be expected to have a Material Adverse Effect and (ii) the Bankruptcy Court Orders.

Section 6.08     *Books and Records*.  Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP and which reflect all material financial transactions and matters involving the assets and business of the Loan Parties, as the case may be (it being understood and agreed that certain Foreign Subsidiaries may maintain individual books and records in conformity with general accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).

Section 6.09     *Inspection Rights*.  Permit representatives and independent contractors of the Administrative Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and to make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of Borrowers and at such reasonable times during normal business hours and as often as may be reasonably desired (but in no event more than one time per fiscal year of Holdings, upon reasonable advance notice to Borrowers; *provided* that only the Administrative Agent on behalf of the Lenders may exercise rights under this Section 6.09 and the Administrative Agent shall not exercise such rights more often than twice during any calendar year; *provided*, *however*, that during the continuation of an Event of Default, the Administrative Agent (or any of its respective representatives or independent contractors) on behalf of the Lenders may do any of the foregoing

at the expense of Borrowers at any time during normal business hours upon reasonable advance notice and without limitation as to frequency.  The Borrowers shall give the Administrative Agent the opportunity to participate in any discussions with Borrowers' independent public accountants.  Notwithstanding anything to the contrary in this Section 6.09, none of the Loan Parties or their Subsidiaries will be required to disclose, permit inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes nonfinancial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

Section 6.10    *Use of Proceeds*.  The Borrowers shall use the proceeds of the Term Loan solely for the purposes set forth in Section 5.19.  No portion of the proceeds of the Credit Extension shall be used in any manner that causes or might cause the Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act.

Section 6.11    *Covenant to Guarantee Obligations and Give Security*.

(a)    Upon the formation or acquisition by any Loan Party of any new direct or indirect Subsidiary (other than an Excluded Subsidiary) (*provided*, that prior to any such formation or acquisition, such Loan Party shall have received the written consent of the Required Lenders), or upon a Subsidiary of any Loan Party ceasing to be an Excluded Subsidiary, Holdings and Borrowers shall, at their expense:

(i)    Within 60 days, or with respect to mortgages on owned property, 120 days (in each case, as such time or times may be extended by the Required Lenders in their reasonable discretion) following, in each case, the creation or acquisition of such Subsidiary or following such Subsidiary ceasing to be an Excluded Subsidiary:

(A)    cause such Subsidiary to (a) become a Guarantor by executing and delivering to the Administrative Agent a joinder to the Collateral Documents, the ABL Intercreditor Agreement and such other documents as the Required Lenders shall reasonably deem appropriate for such purpose and (b) deliver to the Administrative Agent such other customary documentation reasonably requested by the Required Lenders including, without limitation, favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), all in form, content and scope reasonably satisfactory to the Required Lenders,

(B)    to duly execute and deliver to the Administrative Agent, deeds of trust, trust deeds, deeds to secure debt, mortgages, and other collateral and security agreements or supplements thereto, as specified by and in form and substance satisfactory to the Required Lenders (including delivery of all Pledged Equity Interests in and of such Subsidiary, and other instruments reasonably

requested by the Required Lenders), securing payment of all the Obligations of such Subsidiary or such parent, as the case may be, under the Loan Documents and constituting Liens on substantially all such real and personal properties, and

(C)    to take whatever action (including the recording of mortgages, the filing of UCC financing statements, the giving of notices and the endorsement of notices on title documents) may be required pursuant to the terms of the Collateral Documents to perfect the Liens granted thereunder on the Collateral purported to be subject thereto; *provided* that, the pledge of Equity Interests of (1) any Foreign Subsidiary and (2) any FSHCO, in each case, that is owned directly by such Subsidiary shall be limited to 65% of the issued and outstanding voting Equity Interests and 100% of the non-voting Equity Interests of such Foreign Subsidiary or FSHCO.

(b)    Upon the acquisition of any fee owned interest in any real property located in the United States of America with a fair market value greater than $1,000,000 by any Loan Party (*provided*, that prior to any such acquisition, such Loan Party shall have received the written consent of the Required Lenders), and if such property shall not already be subject to a perfected security interest (with such priority as provided in the ABL Intercreditor Agreement) in favor of the Administrative Agent for the benefit of the Secured Parties, then Holdings and Borrowers shall, at their expense:

(i)    within 120 days (as such time may be extended by the Required Lenders in their reasonable discretion) after such acquisition,

(A)    cause the applicable Loan Party, upon the written request of the Required Lenders in their sole discretion, to take commercially reasonable actions (including the recording of mortgages, the filing of UCC financing statements, the giving of notices and the endorsement of notices on title documents) required to perfect the Liens and security interests granted thereby on such property,

(B)    deliver to the Administrative Agent, upon the written request of the Required Lenders in their sole discretion, a signed copy of a favorable opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties acceptable to the Administrative Agent as to the matters contained in clauses (A) and (B) above and as to such other matters as the Required Lenders may reasonably request, and

(ii)    in connection with any Mortgaged Property, deliver, upon the reasonable request of the Required Lenders in their sole discretion, to the Administrative Agent with respect to such Mortgaged Property, title reports, surveys and engineering, soils and other reports, and environmental assessment reports and Flood Documents, each in form and substance reasonably satisfactory to the Required Lenders, in each case to the extent available and in the possession or reasonable control of the applicable Loan Party, *provided*, *however*, that there shall be no obligation to deliver to the Administrative

Agent any environmental assessment report whose disclosure to the Administrative Agent would require the consent of a Person other than any Loan Party.

(c)    At any time upon request of the Administrative Agent or the Required Lenders, promptly execute and deliver any and all further instruments and documents and take all such other action as the Administrative Agent or the Required Lenders may reasonably deem necessary in obtaining the full benefits of, or (as applicable) in perfecting and preserving the Liens of, such guaranties, deeds of trust, trust deeds, deeds to secure debt, mortgages, landlord access waivers, security agreement supplements, intellectual property security agreement supplements and other security and pledge agreements.

Section 6.12    *Compliance with Environmental Laws*.  (i) Comply and take all commercially reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply with all applicable Environmental Laws and Environmental Permits; (ii) obtain and renew all Environmental Permits necessary for its operations and properties; and (iii) in each case to the extent the Loan Parties are required by Environmental Laws, conduct any investigation, study, sampling and testing, and remedial or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with applicable Environmental Laws, except in each case above, as could not reasonably be expected to have a Material Adverse Effect; *provided*, *however*, that none of the Loan Parties nor any of their respective Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

Section 6.13    *Preparation of Environmental Reports*.  At the request of the Required Lenders based on a reasonable belief that a Hazardous Material release not otherwise identified on Schedule 5.09 has occurred at any property owned or operated by any Loan Party, which condition could reasonably be expected to have a Material Adverse Effect, but no more than one time for any property during the term of this Agreement unless a subsequent Hazardous Material release or incident occurs, provide to the Lenders within 60 days after such request (unless a Default shall have occurred and be continuing, during which time no limitation shall apply), at the expense of Borrowers, a written environmental site assessment report for any of its properties described in such request, prepared by an environmental consulting firm acceptable to the Required Lenders, indicating the presence or absence of Hazardous Materials in excess of remedial standards under Environmental Laws and the estimated cost of any compliance, removal or remedial action required under Environmental Laws in connection with any such Hazardous Materials on such properties; without limiting the generality of the foregoing, if the Required Lenders determine at any time that a material risk exists that any such report will not be provided within the time referred to above, then the Required Lenders may direct the Administrative Agent, after providing Borrowers 30 days prior written notice and an opportunity to cure, to retain an environmental consulting firm to prepare such report at the expense of Borrowers, and each Borrower hereby grants and agrees to cause any of its Subsidiaries that owns any property described in such request to grant at the time of such request to the Administrative Agent, the Lenders, such firm and any agents or representatives thereof an irrevocable non-exclusive license, subject to the rights of landlords and tenants, to enter onto their respective properties to undertake such an assessment.

Section 6.14    *Further Assurances*.  Promptly upon request by the Administrative Agent, or any Lender through the Administrative Agent, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and reregister any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable law, subject any Loan Party's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents or Section 6.11, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so.  Notwithstanding anything to the contrary herein or in any other Loan Document, no Loan Party nor any of its Subsidiaries shall be required to record the Liens in IP Rights granted under the Collateral Documents outside the United States.

Section 6.15    *Advisors*. Subject to Bankruptcy Court approval, the Loan Parties shall continue at all times the retention of Alvarez & Marsal pursuant to the agreement between such financial advisors and the Loan Parties entered into prior to the Petition Date (or other financial advisors reasonably acceptable to the Required Lenders).

ARTICLE 7.
NEGATIVE COVENANTS

From and after the Closing Date, so long as any Lender shall have any Term Commitment hereunder, any Term Loan or other Obligation (other than contingent indemnification obligations not yet due and payable) hereunder shall remain unpaid or unsatisfied, Holdings shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly:

Section 7.01    *Liens*.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    (i) Liens pursuant to any Prepetition Loan Document, (ii) Liens pursuant to any Loan Document, (iii) Liens pursuant to any ABL Loan Document and (iv) Liens on the Collateral securing Indebtedness permitted by Sections 7.03(a)(ii) and (a)(iii), *provided* that the Liens on the Collateral securing Indebtedness permitted by Sections 7.03(a)(ii) and (a)(iii) are subject to the terms of the ABL Intercreditor Agreement;

(b)    Liens existing on the Petition Date and listed on <u>Schedule 5.08</u>;

(c)    Liens for taxes, assessments and other governmental charges not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in

accordance with GAAP or which are not otherwise required to be paid in accordance with Section 6.04;

(d)    carriers', warehousemen's, mechanics', materialmen's, repairmen's, suppliers', landlords', or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 60 days or which are being contested in good faith and by appropriate proceedings diligently conducted or with respect to the Loan Parties, as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)    pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(f)    deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g)    easements, rights-of-way, restrictions and other similar encumbrances affecting real property which do not materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(h)    Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(h) or securing appeal or other surety bonds related to such judgments;

(i)    Liens securing Indebtedness permitted under Section 7.03(d); *provided* that in the case of Liens securing purchase money Indebtedness and Capital Leases, (A) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, and (B) the Indebtedness secured thereby does not exceed the cost of the property being acquired on the date of acquisition, improvements thereto and related expenses;

(j)    precautionary filings in respect of operating leases; and leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of Holdings or any of its respective Subsidiaries or (ii) secure any Indebtedness;

(k)    Liens in favor of custom and revenue authorities arising as a matter of law to secure payment of non-delinquent customs duties in connection with the importation of goods;

(l)    Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(m)    Liens arising out of conditional sale, consignment, title retention or similar arrangements for the sale of goods entered into by Holdings or any of its Subsidiaries in the ordinary course of business;

(n)    Liens (i) of a collection bank arising under Section 4-210 of the UCC on items in the course of collection; (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business; and (iii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(o)    Deposits made in the ordinary course of business to secure liability to insurance carriers;

(p)    (i) any lease, license, sublease, sublicense or other contractual obligation (including the provision of software or the licensing of other intellectual property rights) and terminations thereof, relating to any IP Rights entered into in the ordinary course of business or for the use of IP Rights that are not material to the conduct of the businesses of Holdings or any of its Subsidiaries and (ii) any interest of title of a lessor, sublessor, licensor or sub licensor under leases, subleases, licenses or sublicenses entered into by Holdings or any of its Subsidiaries in the ordinary course of business;

(q)    to the extent the rights and obligations described in this Section 7.01(q) would be considered a Lien, Liens arising out of consignment agreements entered into by Holdings or any of its Subsidiaries in the ordinary course of business, the rights of each consignee with respect to each such consignment agreement in a portion of the proceeds received with respect to the sale of inventory subject to such consignment agreement; and

(r)    Liens in favor of the Prepetition Indebtedness Holders as adequate protection granted pursuant to the Interim Bankruptcy Court Order.

Section 7.02    _Investments_.  Make any Investments, except:

(a)    Investments held by Holdings or any of its Subsidiaries in the form of cash and Cash Equivalents;

(b)    Investments (i) existing on the Closing Date in Subsidiaries existing on the Closing Date and (ii) in Borrowers or any Subsidiaries of Holdings that are Loan Parties (including those formed or acquired after the Closing Date so long as Holdings, Borrowers and their Subsidiaries comply with the applicable provisions of Section 6.11);

(c)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(d)    Investments in fixed assets or real property that constitute Capital Expenditures in the ordinary course of business of the Loan Parties; _provided_ that the aggregate

amount of Investments made by the Loan Parties pursuant to this clause (e) shall not exceed $4,500,000;

(e)      Guarantees permitted by Section 7.03;

(f)      other Investments; *provided* that in no event shall the aggregate amount of Investments allowed pursuant to this Section 7.02(f) during the term of this Agreement (net of any returns of capital on such Investments) exceed $1,000,000;

(g)      Investments received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business; and

(h)      Investments consisting of licensing or contribution of IP Rights pursuant to joint marketing arrangements with other Persons in the ordinary course of business.

Section 7.03    *Indebtedness*.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)      Indebtedness under (i) the Loan Documents, (ii) the Prepetition Loan Documents, and (iii) the ABL Loan Documents;

(b)      Indebtedness outstanding on the Petition Date and listed on <u>Schedule 7.03</u>;

(c)      Guarantees of any Loan Party in respect of Indebtedness otherwise permitted hereunder of any other Loan Party;

(d)      Indebtedness (i) of Holdings or any Subsidiary of Holdings in respect of Capital Leases and purchase money obligations for fixed or capital assets, in accordance with the terms of the Budget;

(e)      Indebtedness of Holdings or any Subsidiary thereof owing to Holdings or any Subsidiary thereof, which Indebtedness shall (i) in the case of Indebtedness owed to a Loan Party, constitute Pledged Notes under the Prepetition Term Loan Collateral Agreement and (ii) if such Indebtedness is owed by a Loan Party to a non-Loan Party, be expressly subordinated in right of payment to the Obligations pursuant to the Intercompany Subordination Agreement;

(f)      Indebtedness of Holdings or any of its Subsidiaries consisting of obligations to pay insurance premiums or take-or-pay obligations contained in supply arrangements incurred in the ordinary course of business;

(g)      Indebtedness in respect of overdraft facilities, automatic clearinghouse arrangements, employee credit card programs and other business cash management arrangements in the ordinary course of business; and

(h)      Indebtedness representing deferred compensation to employees of Holdings or any of their Subsidiaries incurred in the ordinary course of business.

Section 7.04  *Fundamental Changes*.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person except that, so long as (i) no Default exists or would result therefrom and (ii) no approval of the Bankruptcy Court is required (or such approval is required and shall have been received):

(i)      any Subsidiary of Holdings may merge with (i) a Borrower, *provided* that such Borrower shall be the continuing or surviving Person and (ii) any other Subsidiary, *provided* that (A) when any wholly-owned Subsidiary is merging with another Subsidiary, the wholly-owned Subsidiary shall be the continuing or surviving Person, (B) when any Subsidiary of Holdings that is a Loan Party is merging with another Subsidiary, the continuing or surviving Person shall be a Loan Party and (C) no Subsidiary of a Borrower may merge with a Subsidiary of Holdings that is not also a Subsidiary of a Borrower unless such Subsidiary of a Borrower is the surviving Person;

(ii)      any Subsidiary of Holdings may effect any Permitted Acquisition; *provided* that (i) in any such transaction involving a Borrower, such Borrower shall be the continuing or surviving Person and (ii) in any such transaction involving a Subsidiary of Holdings that is a Loan Party, the continuing or surviving Person shall be a Loan Party; and

(iii)      any Subsidiary of Holdings may Dispose of all or substantially all of its assets (upon voluntary liquidation, dissolution or otherwise) (i) to a Borrower or to a Subsidiary of Holdings that is a Loan Party, (ii) if the transferor is not a Loan Party, to any Subsidiary of Holdings; *provided* in each case, that if the transferor in such a transaction is a wholly-owned Subsidiary of a Borrower, then the transferee must either be a Borrower or a wholly-owned Subsidiary of a Borrower or (iii) if the transferor is Anchor Canada or any of its Subsidiaries, to Holdings so long as Holdings promptly contributes or otherwise transfers such assets to any of its Subsidiaries.

Section 7.05  *Dispositions*.  Make any Disposition, except:

(a)      Dispositions of damaged, obsolete or worn out property, or property no longer used or usable in the business, whether now owned or hereafter acquired, in the ordinary course of business;

(b)      Dispositions of inventory in the ordinary course of business and terminations of leases and licenses in the ordinary course of business;

(c)      Dispositions of equipment or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar or related replacement property used or usable in the business or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such similar or related replacement property used or usable in the business;

(d)      Dispositions of property by any Subsidiary of Holdings to any Subsidiary of Holdings; *provided* that if the transferor of such property is a Loan Party, the transferee thereof must either be a Loan Party;

(e)    Dispositions or discounts without recourse of accounts receivable in connection with the compromise or collection thereof;

(f)    Dispositions of investment securities and Cash Equivalents in the ordinary course of business;

(g)    Dispositions permitted by Section 7.04;

(h)    Leases, subleases, licenses or sublicenses (including of IP Rights) and terminations thereof, in each case in the ordinary course of business that do not materially interfere with the business of Holdings and its Subsidiaries (taken as a whole);

(i)    With the consent of  Required Lenders, abandonment or other Disposition of IP Rights that are no longer material to the conduct of the businesses of Holdings and its Subsidiaries (taken as a whole);

(j)    Dispositions of non-core assets acquired in connection with Permitted Acquisitions or other Investments; *provided* that the aggregate amount of such sales shall not exceed 50% of the fair market value of the acquired entity or business and (ii) each such sale is in an arm's-length transaction (or no less favorable to such Subsidiary than an arm's-length transaction) and such Subsidiary receives at least fair market value;

(k)    Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements or similar binding agreements; and

(l)    The unwinding of any Swap Contract.

Section 7.06    *Restricted Payments*.  Declare or make, directly or indirectly, any Restricted Payment, except that, so long as no Default shall have occurred and be continuing at the time of any action described below or would result therefrom:

(a)    (x) Subsidiaries of Borrowers may make Restricted Payments to Borrowers, any Subsidiary of a Borrower that is a Loan Party and any other Person that owns an Equity Interest in such Subsidiaries, ratably according to their respective holdings of the type of Equity Interest in respect of which such Restricted Payment is being made, notwithstanding the existence of any Default or Event of Default, and (y) Subsidiaries of Anchor Canada may make Restricted Payments to Anchor Canada, any Subsidiary of Anchor Canada and any other Person that owns an Equity Interest in such Subsidiaries, as applicable, ratably according to their respective holdings of the type of Equity Interest in respect of which such Restricted Payment is being made, notwithstanding the existence of any Default or Event of Default;

(b)    Investments permitted pursuant to Section 7.02(c);

(c)    Holdings and its Subsidiaries may (or, may make Restricted Payments to allow Holdings or any direct or indirect parent of Holdings to) make Restricted Payments in an aggregate amount equal to the amount required for Holdings and Parent to pay customary fees to members of its board of directors, payments in respect of insurance coverage or for

indemnification obligations under any law, indenture, contract or agreement to any director or officer of Holdings, Parent or any of its Subsidiaries, in each case, notwithstanding the existence of any Default or Event of Default;

(d)       payments of Permitted Tax Distributions;

(e)       Holdings and its Subsidiaries may (or may make Restricted Payments to allow Holdings or any direct or indirect parent of Holdings to) make Restricted Payments in an aggregate amount equal to the amount required for Holdings and Parent to make payments required under its swap or hedging agreements and leases, which are incurred in the ordinary course of business and not for speculative purposes;

(f)       Holdings and its Subsidiaries may (or may make Restricted Payments to allow Holdings or any direct or indirect parent of Holdings to) make Restricted Payments to pay cash in lieu of fractional Equity Interests in connection with any dividend, split or combination thereof, any redemption, conversion or exchange thereof (including the redemption or exercise of warrants or options in respect thereof), any Permitted Acquisition or any vesting of Equity Interests; and

(g)       Holdings, Borrowers and Anchor Canada may make such other Restricted Payments that have been approved in writing by the Required Lenders.

Section 7.07    *Change in Nature of Business; Permitted Activities of Holdings*.  Engage in any material line of business substantially different from those lines of business conducted by Holdings and its Subsidiaries on the Closing Date or any business reasonably related or ancillary thereto.  With respect to Holdings, (i) incur any Indebtedness whatsoever other than (A) the Indebtedness and obligations under this Agreement, the other Loan Documents, the Prepetition Loan Documents to which Holdings is a party, the ABL Loan Documents to which Holdings is a party and other Indebtedness expressly permitted pursuant to Section 7.03, and (B) Guarantees of the obligations of any Subsidiary that is a Loan Party in connection with leases otherwise permitted hereby entered into by any Subsidiary that is a Loan Party, (ii) engage in any business operating activity other than (A) holding the Equity Interests of Borrowers and Anchor Canada and other Investments expressly permitted pursuant to Section 7.02; (B) performing its obligations and activities incidental thereto under the Loan Documents and other Indebtedness and liens, guarantees and Investments permitted hereunder; (C) issuing its own Equity Interests subject to the terms hereof and performing its obligations and undertaking activities incidental thereto; (D) filing Tax reports and paying Taxes in the ordinary course (and contesting any Taxes); (E) preparing reports to Governmental Authorities and to its shareholders; (F) holding director or shareholder meetings, preparing its books and records and performing other actions and activities required to maintain its separate structure or to comply with applicable requirements of Law, or its Organization Documents; and (G) making Restricted Payments to the extent Restricted Payments are permitted to be made by or to Holdings pursuant to Section 7.06; or (iii) permit any Liens on the Equity Interests of Borrowers or Anchor Canada other than (A) Liens granted under any Loan Document, and (B) any permitted pursuant to Section 7.01(a)(iii), (c), (h) and (j).

Section 7.08    *Transactions with Affiliates*.  Enter into any transaction of any kind with any Affiliate of Holdings, whether or not in the ordinary course of business, other than on fair and reasonable terms no less favorable to Holdings or such Subsidiary, as applicable, than would be obtainable by Holdings or such Subsidiary, as applicable, at the time in a comparable arm's length transaction with a Person other than an Affiliate, *provided* that the foregoing restriction shall not apply to:

(a)    transactions between or among Holdings and its Subsidiaries;

(b)    the payment of reasonable fees, expenses and compensation (including customary equity compensation) to and insurance provided on behalf of current, former and future officers and directors of Parent or Holdings or any Subsidiaries of Holdings and indemnification agreements entered into by Holdings or any of its Subsidiaries;

(c)    reasonable employment and severance arrangements with current, former and future officers and employees and transactions pursuant to stock option plans and employee benefit plans and arrangements;

(d)    entering into the transactions contemplated thereby, including, to the extent approved by the Bankruptcy Court, reimbursement of expenses pursuant to the terms thereof;

(e)    transactions listed on Schedule 7.08.

(f)    Restricted Payments permitted under Section 7.06;

(g)    loans and other transactions among Holdings and its Subsidiaries and joint ventures (to the extent any such joint venture is only an Affiliate as a result of Investments by Holdings and/or any of its Subsidiaries in such joint venture) to the extent otherwise permitted under this Article 7;

(h)    any other transactions by Holdings and its Subsidiaries permitted under an express provision (including any exceptions thereto) of this Article 7;

(i)    payments by Holdings or any of its Subsidiaries pursuant to any Tax sharing agreements with any direct or indirect parent of Holdings to the extent attributable to the ownership or operation of Holdings and its Subsidiaries that comply with the requirements of Section 7.06(d); and

(j)    any intercompany leases, subleases, licenses or sublicenses relating to any IP Rights.

Section 7.09    *Burdensome Agreements*.  Enter into any Contractual Obligation after the Closing Date (other than this Agreement, any other Loan Document, any Prepetition Loan Document or any ABL Loan Document or any agreements with respect to Indebtedness permitted pursuant to Section 7.03(a)(ii)) that (a) limits the ability (i) of any Subsidiary of Holdings to make Restricted Payments to any Subsidiary of Holdings that is a Loan Party or to otherwise transfer property to Holdings or any Subsidiary of Holdings that is a Loan Party, (ii) of

any Subsidiary of Holdings that is a Guarantor to Guarantee the Indebtedness of Holdings or any Borrower hereunder or (iii) of Holdings or any of its Subsidiaries to create, incur, assume or suffer to exist Liens on property of such Person to secure the Obligations; *provided*, *however*, that clauses (i) and (iii) shall not prohibit any negative pledge or similar provision, or restriction on transfer of property, incurred or provided in favor of any holder of Indebtedness permitted under Section 7.03(d) (solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness); or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person. Notwithstanding the foregoing, this Section 7.09 will not restrict or prohibit:

(a)    restrictions imposed pursuant to an agreement that has been entered into in connection with a transaction permitted pursuant to Section 7.05 with respect to the property that is subject to that transaction;

(b)    restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Section 7.03 to the extent that such restrictions apply only to the property or assets securing such Indebtedness;

(c)    restrictions binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Subsidiary;

(d)    restrictions that arise in connection with any Lien permitted by Section 7.01 and related to the property subject to such Lien;

(e)    customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto;

(f)    customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(g)    restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(h)    restrictions or conditions imposed by law;

(i)    customary restrictions or conditions contained in agreements relating to the sale of a Subsidiary pending such sale, *provided* such restrictions and conditions apply only to the Subsidiary that is sold and such sale is permitted hereunder; or

(j)    provisions restricting subletting or assignment of Contractual Obligations.

Section 7.10    *Right of Subrogation*    Assert any right of subrogation or contribution against any other Loan Party.

Section 7.11    *Budget Covenant.*

(a)        With respect to the Budget, commencing with April 15, 2015 and on every Wednesday thereafter (each such day, a "**Budget Testing Date**"), for the four-week period ending on a Saturday immediately preceding such Budget Testing Date (or with respect to the Budget Testing Date on each of April 15, 2015, April 22, 2015 and April 29, 2015, for the period from and including the Sunday prior to the Petition Date through the Saturday immediately preceding such Budget Testing Date) (each such four-week or shorter period, the "**Budget Testing Period**"), the Loan Parties shall not have permitted the actual disbursements during the Budget Testing Period to be more than the Permitted Disbursement Variation of the budgeted amount of "Projected Disbursements" in the Budget for such period.

(b)        On each Budget Testing Date, the Loan Parties shall not have permitted the aggregate amount of the actual receipts during the Budget Testing Period to be less than the Permitted Receipts Variation of the budgeted amount of "Projected Receipts" set forth in the Budget for such period.

Section 7.12    *Amendments or Waivers of Organization Documents*.  Amend, modify, waive or change in any manner any term or condition of any of its Organization Documents  or the ABL Credit Agreement except as required by the Bankruptcy Court or with the written consent of the Required Lenders.

Section 7.13    *Fiscal Year*. Make any change in its Fiscal Year.

Section 7.14    *Prepayments of Indebtedness*. Make any payment of principal or interest or otherwise on account of any Prepetition Obligations or payables under the Prepetition Term Loan Documents, other than payments made in compliance with the Budget, payments under the ABL Credit Agreement and other  payments agreed to in writing by the Required Lenders and, if necessary, authorized by the Bankruptcy Court.

Section 7.15    *Sale-Leaseback Transactions*.  Enter into any sale-leaseback transaction in which any Loan Party is the seller or the lessee unless the disposition of assets is permitted under Section 7.05, the incurrence of indebtedness is permitted by Section 7.03 and the Net Cash Proceeds thereof are applied as required by Section 2.03(b)(i).

Section 7.16    *Chapter 11 Modifications*.  Except as permitted pursuant to the terms of this Agreement, the ABL Credit Agreement and the ABL Intercreditor Agreement:

(a)        Make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to the Bankruptcy Court Orders.

(b)        Incur, create, assume or suffer to exist or permit any other DIP Superpriority Claim which is pari passu with or senior to the claims of the Administrative Agent and the Lenders hereunder, except for the Carve Out and claims in respect of the ABL Facility Indebtedness.

Section 7.17    *Segregated Operating Account.*

(a)    Create, incur, assume or suffer to exist any Lien upon the Segregated Operating Account in favor of the ABL Agent or any ABL Lender.

(b)    Make or permit to be made any payment of principal or interest or otherwise on account of the ABL Facility Indebtedness with funds to be kept in or disbursed from the Segregated Operating Account.

ARTICLE 8.
EVENTS OF DEFAULT AND REMEDIES

Section 8.01    *Events of Default*.  Each of the following shall constitute an Event of Default (each, an "**Event of Default**"):

(a)    *Non-Payment*.  Any Loan Party shall fail to pay any principal of or interest on the Term Loan, or any fee, indemnity or other amount payable under this Agreement or any other Loan Document when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise);

(b)    *Specific Covenants*.  Any Loan Party or any of Subsidiary of a Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.03(a), 6.04(a) (solely with respect to Borrowers) or Article 7; or

(c)    *Other Defaults*.  Any Loan Party or any Subsidiary of a Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues 10 days; or

(d)    *Representations and Warranties*.  Any representation, warranty or certification, when taken as a whole, made or deemed made by any Loan Party herein, in any other Loan Document, shall be false or incorrect, when taken as a whole, in any material respect, as of the date made or deemed made; or

(e)    *Cross-Default*.  A breach or default, other than in connection with or as a result of the Chapter 11 Cases, by any Loan Party or Subsidiary with respect to Indebtedness having an aggregate principal amount of more than the Threshold Amount (subject to any grace period set forth therein); or

(f)    *Budget*. The proceeds of any Term Loan shall have been expended in a manner, or a Withdrawal shall be for a purpose, which is not in accordance with the Budget; or

(g)    *Judgments*.  There is entered against any Loan Party or any of its Subsidiaries one or more final judgments or orders for the payment of money in an aggregate amount (as to all such judgments or orders then outstanding at such time) exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer does not deny coverage) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of 60 consecutive days; or

(h)      *ERISA*.  An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or would result in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount which would result in a Material Adverse Effect or (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan that would result in liability to any Loan Party in an aggregate amount which would result in a Material Adverse Effect; or

(i)      *Invalidity of Loan Documents*.  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted hereunder) or as a result of acts or omissions by the Administrative Agent or any agent or subagent thereof, any Lender or any of their respective Affiliates or as a result of satisfaction in full of all the Obligations (other than contingent obligations not yet due and payable), ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document or the validity or priority of a Lien as required by the Collateral Documents on a material portion of the Collateral; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of satisfaction in full of the Obligations other than in accordance with its terms), or purports in writing to revoke, terminate or rescind any Loan Document (other than in accordance with its terms); or

(j)      *Change of Control*.  A Change of Control shall occur; or

(k)      *Collateral Documents*.  The Interim Bankruptcy Court Order and the Final Bankruptcy Court Order, as applicable, shall cease to create a valid and perfected Lien with such priority required by this Agreement, subject to Permitted Liens, on a material portion of the Collateral purported to be covered thereby; or

(l)      *Entry of Order*.  The Final Bankruptcy Court Order Entry Date shall not have occurred within 35 days after the Interim Bankruptcy Court Order Date; or

(m)      *Entry of the Joint Disclosure Statement and Plan Confirmation Hearing.* (i) Entry of a final order by the Bankruptcy Court scheduling the Join Disclosure and Plan Confirmation Hearing shall not have occurred within 5 Business Days after the Petition Date and (ii) the Joint Disclosure Statement and Plan Confirmation Hearing shall not have been commenced by the Bankruptcy Court within 45 days after the Petition Date; or

(n)      *Conversion to Chapter 7*. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a Chapter 7 case; or

(o)      *Alternate Financing*. Any Loan Party shall file a motion in the Chapter 11 Cases without the express written consent of Required Lenders, to obtain additional financing from a party other than Lenders under Section 364(d) of the Bankruptcy Code or to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code; or

(p)     *Prepetition Claims*. Any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition claim other than (x) as provided for in the "first-day orders" and included in the Budget or (y) otherwise consented to by the Required Lenders in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $[____] in the aggregate or to permit other actions that would have a material adverse effect on the Loan Parties or their estates, or (iii) except with respect to the Prepetition Obligations as provided in the Bankruptcy Court Orders, approving any settlement or other stipulation not approved by the Required Lenders and not included in the Budget with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor; or

(q)     *Appointment of Trustee or Examiner*. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Loan Party, any Subsidiary of a Loan Party, or any Affiliate of a Loan Party shall file an application for an order with respect to any Chapter 11 Case seeking the appointment of, (i) a trustee under Section 1104, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(r)     *Dismissal of Chapter 11*. An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the total Term Commitment, and payment in full of all Obligations of the Loan Parties hereunder and under the other Loan Documents upon entry thereof; or

(s)     *Order With Respect to Chapter 11 Cases*. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent), (i) to revoke, reverse, stay, modify, supplement or amend any of the Bankruptcy Court Orders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Administrative Agent and the Lenders in respect of the Obligations (other than the Carve Out) or (iii) to grant or permit the grant of a Lien on the Collateral (other than Permitted Liens); or

(t)     *Application for Order By Third Party*. An application for any of the orders described in clauses (q) through (s) above shall be made by a Person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or the relief requested is not withdrawn, dismissed or denied within 30 days after filing or any Person obtains a final order under § 506(c) of the Bankruptcy Code against the Administrative Agent or obtains a final order adverse to the Administrative Agent or the Lenders or any of their respective rights and remedies under the Loan Documents or in the Collateral; or

(u)     *Right to file Chapter 11 Plan.* The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a Chapter 11 plan

pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders; or

      (v)    *Liens*.  (i) Any Loan Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the Administrative Agent and/or the Lenders, claims or rights against such Person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any Lien or security interest created by Collateral Documents or the Bankruptcy Court Orders with respect to Collateral shall, for any reason, cease to be valid or (iii) any action is commenced by the Loan Parties which contests the validity, perfection or enforceability of any of the Liens and security interests of the Administrative Agent and/or the Lenders created by any of the Bankruptcy Court Orders, this Agreement, any Collateral Document or any other security agreement; or

      (w)    *Invalidation of Claims*.  Any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Loan Party) any other person's motion to, disallow in whole or in part the Lenders' claim in respect of the Obligations or contest any material provision of any Loan Document or any material provision of any Loan Document shall cease to be effective; or

      (x)    *Public Announcements*. Any Loan Party files or publicly announces its intention to file a chapter 11 plan that contains terms and conditions that are inconsistent in any material respect with the Approved Plan of Reorganization or any exhibit or supplement attached thereto, without the prior written consent of the Required Lenders; or

      (y)    *Modifications*. The Approved Plan of Reorganization or the Confirmation Order is amended, supplemented or otherwise modified without the prior written consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent, the Administrative Agent); or

      (z)    *Withdrawal or Termination of Reorganization Plan*.  The withdrawal or termination of the Approved Plan of Reorganization; or

      (aa)    *Amendment of Bankruptcy Court Orders*.  The Interim Bankruptcy Court Order or the Final Bankruptcy Court Order is amended, supplemented, reversed, vacated or otherwise modified without the prior written consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent, the Administrative Agent); or

      (bb)    *Payments*. Any Loan Party or any of their Affiliates shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered, an order approving a payment to any Person that would be materially inconsistent with the treatment of any such Person under the Approved Plan of Reorganization, without the prior written consent of the Required Lenders; or

      (cc)    *Confirmation Order*.  The entry of the Confirmation Order, in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the

rights or duties of the Administrative Agent, the Administrative Agent), shall not have occurred by the date that is 50 days after the Petition Date; or

(dd)    *Plan Effective Date*.  The effective date of the Approved Plan of Reorganization shall not have occurred by the date that is 75 days after the Petition Date, or such later date to which the Required Lenders have consented in writing; or

(ee)    *Liquidation*.  The determination of the Holdings or any of its Subsidiaries, whether by vote of such Person's board of directors or otherwise, to suspend the operation of such Person's business in the ordinary course, liquidate all or substantially all of such Person's assets, or to conduct any sales of all or substantially all of such Person's assets, or the filing of a motion or other application in the Chapter 11 Cases, seeking authority to do any of the foregoing; or

(ff)    *Restructuring Support Agreement*. The Restructuring Support Agreement is terminated, other than in accordance with its terms.

Section 8.02    *Remedies Upon Event of Default*.  If any Event of Default occurs and is continuing, the Administrative Agent shall, at the direction of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)    declare the commitment of each Lender to make Term Loan to be terminated, whereupon such commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of the outstanding Term Loan, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Borrower (to the extent permitted by applicable law); and

(c)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or at applicable law.

Section 8.03    *Application of Funds*.  After the exercise of remedies provided for in Section 8.02, any amounts received on account of the Obligations and such other proceeds remaining in the DIP Term Loan Funding Account shall be applied by the Administrative Agent *first*, if amounts available in the Segregated Operating Account are insufficient to pay the Allowed Professional Fees and fund the Post Carve Out Trigger Notice Cap then due and payable and then only to the extent of such unpaid amounts or shortfall, as applicable, to pay any amount then due and payable pursuant to Section 10.05(e), *second*, to pay incurred and unpaid fees and expenses of the Administrative Agent under the Loan Documents (including without limitation any such fees or expenses due under Section 2.07 and Section 12.04), *third*, to pay incurred and unpaid fees and expenses of the other Secured Parties under the Loan Documents and *fourth*, to repay each Lender in the amount of such Lender's ratable portion of the remaining amount (based on such Lender's Applicable Percentage in respect of the relevant Term Facility).

ARTICLE 9.
ADMINISTRATIVE AGENT

Section 9.01    *Appointment and Authority*.

(a)    Each of the Lenders hereby irrevocably appoints Wilmington Trust, National Association to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and no Borrower or any other Loan Party shall have rights as a third-party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law.  Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (in its capacities as a Lender) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or in trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article 9 and Article 12 (including Section 12.04(c)), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents, as if set forth in full herein with respect thereto.  Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto (including the ABL Intercreditor Agreement), as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by the Administrative Agent shall bind the Lenders.

Section 9.02    *Rights as a Lender*.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity as a Lender.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Borrower or any Subsidiary or other Affiliate thereof as if such Person

were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.  The Lenders acknowledge that, pursuant to such activities, the Administrative Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall not be under any obligation to provide such information to them.

Section 9.03    *Exculpatory Provisions*.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except (in the case of the Administrative Agent) discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

Neither the Administrative Agent nor any of its Related Parties shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 8.02 and 12.01) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until it shall have received written notice from a Lender or Borrower Agent referring to this Agreement, describing such Default and stating that such notice is a "notice of default."

Neither the Administrative Agent nor any of its Related Parties shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity,

enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority (or the continuation of such perfection or priority) of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral or (vi) the satisfaction of any condition set forth in Article 4 or elsewhere herein, other than, in the case of the Administrative Agent, to confirm receipt of items expressly required to be delivered to the Administrative Agent.  The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender; and nothing in this Agreement or in any other Loan Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein.  Anything contained herein to the contrary notwithstanding, the Administrative Agent shall not have any liability arising from confirmations of the amount of the outstanding Term Loan or any components thereof.

Section 9.04    _Reliance_.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of the Term Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Term Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.05    _Delegation of Duties_.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 9.06    _Resignation of Administrative Agent_.  The Administrative Agent may at any time give notice of its resignation to the Lenders and Borrowers.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, so long as no Event of Default has occurred and is continuing, with Borrowers' consent (such consent not to be unreasonably

withheld or delayed), to appoint a successor, which shall be a financial institution, and the Administrative Agent's resignation shall become effective on the earlier of (i) the acceptance of such successor Administrative Agent by Borrowers and the Required Lenders or (ii) the fifteenth Business Day after such notice of resignation.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 15 Business Days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders appoint a successor Administrative Agent meeting the qualifications set forth above; *provided* that if the Administrative Agent shall notify Borrower Agent and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) except for any indemnity payments owed to the retiring Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent (other than any rights to indemnity payments owed to the retiring or removed Administrative Agent), and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrowers and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 12.04 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

Section 9.07    *Non-Reliance on Administrative Agent and Other Lenders*.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 9.08    *No Other Duties, Etc*.  Anything herein to the contrary notwithstanding, the Administrative Agent shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder.

Section 9.09    *Administrative Agent May File Proofs of Claim*.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relating to any Loan Party, the Administrative Agent (irrespective of whether the principal of the Term Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on Borrowers) shall be entitled and empowered (but not obligated), by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Term Loan and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.07 and 12.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.07 and 12.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 9.10    *Collateral and Guaranty Matters*.  Each Lender irrevocably authorizes the Administrative Agent, at its option and in its discretion:

(a)    to release any Lien to the extent securing the Obligations on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Aggregate Term Commitments and payment in full of all Obligations (other than contingent indemnification obligations not yet due and payable), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder to a Person that is not a Loan Party or under the Loan Documents or (iii) if approved, authorized or ratified in writing in accordance with Section 12.01;

(b)    to release any Guarantor from its Guarantee of the Obligations under the Loan Documents (i) upon termination of the Aggregate Term Commitments and payment in full of all Obligations (other than contingent indemnification obligations not yet due and payable) or (ii) if approved, authorized or ratified in writing in accordance with Section 12.01;

(c)    to release any Guarantor from its Guarantee of the Obligations under the Loan Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder (unless such Person continues to guarantee the ABL Credit Agreement); and

(d)    establish intercreditor arrangements in connection with other Indebtedness as contemplated by this Agreement.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of Collateral, or to release any Guarantor from its Guarantee of the Obligations under the Loan Documents pursuant to this Section 9.10.  In each case as specified in this Section 9.10, the Administrative Agent will, at Borrowers' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Loan Documents or to subordinate its interest in such item, or to release such Guarantor from its Guarantee of the Obligations under the Loan Documents, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

The Administrative Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Loan Party or is cared for, protected or insured or that the Liens granted to the Administrative Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Administrative Agent in this Section 9.10 or in any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Administrative Agent may act in any manner it may deem appropriate, in its sole discretion, given the Administrative Agent's own interest in the Collateral and that Administrative Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

Section 9.11    _Indemnification of Administrative Agent_.  Whether or not the transactions contemplated hereby are consummated, each Lender shall indemnify upon demand the Administrative Agent and its Related Parties (to the extent not reimbursed by or on behalf of Borrowers and without limiting the obligations of Borrowers to do so pursuant to Section 12.04) on a pro rata basis (determined as of the time that the applicable payment is sought based on each Lender's outstanding Term Loan at such time) and hold harmless the Administrative Agent and its Related Parties against any and all Indemnified Liabilities incurred by it; _provided_ that no Lender shall be liable for payment to the Administrative Agent or its Related Parties of any portion of such Indemnified Liabilities to the extent determined in a final, nonappealable judgment of a court of competent jurisdiction to have resulted from the Administrative Agent's or its Related Parties' own gross negligence or willful misconduct (and no action taken in accordance with the directions of the Required Lenders or any other appropriate group of Lenders pursuant to Section 12.01 shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.11).  In the case of any investigation, litigation or

proceeding giving rise to any Indemnified Liabilities, this Section 9.11 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.

Section 9.12    *Certain Rights of the Administrative Agent*.  Notwithstanding anything herein to the contrary, the Administrative Agent shall be entitled to refrain from any act or the taking of any action (including the failure to act or take an action) unless and until the Administrative Agent shall have received written instructions from the Required Lenders (or such other number or percentage of the Lenders as the Administrative Agent shall believe in good faith to be necessary hereunder or under the other Loan Documents); and the Administrative Agent shall not incur liability to any Lender by reason of so refraining.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Required Lenders (or such other number or percentage of the Lenders as the Administrative Agent shall believe in good faith to be necessary hereunder or under the other Loan Documents).

Section 9.13    *[Reserved]*.

Section 9.14    *Delivery of Information*.  The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Loan Party, any Subsidiary, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Loan Document except (i) as specifically provided in this Agreement or any other Loan Document and (ii) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written communication received by and in the possession of the Administrative Agent at the time of receipt of such request and then only in accordance with such specific request.

Section 9.15    *Withholding*.  To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any withholding Tax applicable to such payment.  Without limiting or expanding the provisions of Section 3.01, each Lender shall indemnify and hold harmless the Administrative Agent against, within ten days after written demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent as a result of the failure of the Administrative Agent to properly withhold any Tax from amounts paid to or for the account of such Lender for any reason (including, without limitation, because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding Tax ineffective).  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.15.  The agreements in this Section 9.15 shall survive the resignation and/or replacement of the Administrative Agent, and assignment of rights by, or the replacement of, a Lender, the termination of the Aggregate Term Commitments and the repayment, satisfaction or discharge of all other Obligations.

ARTICLE 10.

SECURITY AND PRIORITY

Section 10.01 *Prepetition Obligations*.  Each of the Loan Parties hereby acknowledges, confirms and agrees that the Borrowers and certain of their Subsidiaries (including the Loan Parties) are indebted to the Prepetition Indebtedness Holders for the Prepetition Obligations, as of the Petition Date, (a) in an aggregate principal amount of not less than $[_____] plus accrued and unpaid interest of at least $[_____], plus fees, costs, and expenses incurred in connection therewith, in respect of Prepetition Obligations under the Prepetition Term Loan Agreement and (b) in an aggregate principal amount of not less than plus accrued and unpaid interest of at least $[_____], plus fees, costs, and expenses incurred in connection therewith, in respect of Prepetition Obligations under the ABL Credit Agreement, in each case, plus indemnities, reimbursement obligations and other charges now or hereafter owed by the Borrowers and certain of its Subsidiaries (including the Loan Parties) to the Prepetition Indebtedness Holders pursuant to the terms of the Prepetition Term Loan Agreement and the ABL Credit Agreement, all of which are unconditionally owing by the Borrower and its Subsidiaries to the Prepetition Indebtedness Holders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

Section 10.02 *Acknowledgment of Security Interests*.  As of the Petition Date, each of the Loan Parties hereby acknowledges, confirms and agrees (and hereby agrees that it will not dispute, challenge or otherwise contest) that the Prepetition Term Agent and the Prepetition Term Lenders have valid, enforceable and perfected first priority and senior liens (subject only to "Permitted Liens" (as defined in the Prepetition Term Loan Agreement) upon and security interests in all of the Collateral (as defined in the Prepetition Term Loan Agreement) granted pursuant to the Prepetition Term Loan Documents and the other "Collateral Documents" (as defined in the Prepetition Term Loan Agreement) as in effect on the Petition Date to secure all of the Prepetition Obligations and (ii) such Liens are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

Section 10.03 *Binding Effect of Documents*.  Each of the Loan Parties hereby acknowledges, confirms and agrees (and hereby agrees that it will not dispute, challenge or otherwise contest) that (a) each of the Prepetition Term Loan Documents and the other "Collateral Documents" (as defined in the Prepetition Term Loan Documents) to which it is a party is in full force and effect as of the date hereof, (b) the agreements and obligations of the Borrowers,  Holdings and each of its Subsidiaries contained in the Prepetition Term Loan Documents and the other "Collateral Documents" (as defined in the Prepetition Term Loan Documents) constitute the legal, valid and binding obligations of each of the Borrowers, Holdings and its Subsidiaries enforceable against each of them in accordance with their respective terms and none of the Borrowers, Holdings or any of its Subsidiaries has any valid defense, offset or counterclaim to the enforcement of such obligations and (c) the Prepetition Term Agent and the Prepetition Term Lenders are and shall be entitled to all of the rights, remedies and benefits provided for in the Prepetition Term Loan Documents and the other "Collateral Documents" (as defined in the Prepetition Term Loan Documents), except to the

extent clauses (b) and (c) above are subject to the automatic stay under the Bankruptcy Code upon commencement of the Chapter 11 Cases.

Section 10.04  *Collateral; Grant of Lien and Security Interest*.

(a)  Pursuant to the Bankruptcy Court Orders and in accordance with the terms thereof, as security for the full and timely payment and performance of all of the Obligations, the Loan Parties hereby, assign, pledge and grant to the Secured Parties, a security interest in and to and, subject to Section 10.05, a Lien on all of the Collateral.

(b)  Notwithstanding anything herein to the contrary (i) all proceeds received by the Administrative Agent and the Lenders from the Collateral subject to the Liens granted in this 10.04 and in each other Loan Document and by the Bankruptcy Court Orders shall be subject to the Carve Out, and (ii) no Person entitled to amounts in respect of the Carve Out shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

Section 10.05  *Priority and Liens Applicable to Loan Parties.*

(a)  Upon entry of the Interim Bankruptcy Court Order or Final Bankruptcy Court Order and subject to the terms thereof, as the case may be, the Obligations, Liens and security interests in favor of the Administrative Agent referred to in 10.04(a) hereof shall, subject to the Carve Out, at all times:

(i)  pursuant to Bankruptcy Code Sections 364(c)(1), 503 and 507, all of the Obligations and the ABL Facility Indebtedness shall constitute allowed superpriority administrative expense claims ("**DIP Superpriority Claims**"), which DIP Superpriority Claims in respect of the Term Loan and the ABL Facility Indebtedness shall rank pari passu with each other and superior to all other claims; (i) the DIP Superpriority Claims in respect of the Term Loan and the DIP Superpriority Claims in respect of the ABL Facility Indebtedness shall rank equally in priority and share on a 50%/50% basis with respect to all amounts payable in respect of such superpriority administrative expense claims and (ii) upon the entry of the Final Bankruptcy Court Order, the DIP Superpriority Claims shall attach to and encumber claims and causes of action under Chapter 5 of the Bankruptcy Code and similar laws, and any proceeds thereof and property received thereby whether by judgment, settlement or otherwise;

(ii)  pursuant to Bankruptcy Code Section 364(c)(2), a first priority lien on and security interest in all unencumbered assets of the Loan Parties other than Excluded Assets (now or hereafter acquired and all proceeds thereof); provided that such liens shall rank equally in priority and share on a 50%/50% basis with the Liens in respect of the ABL Facility Indebtedness on any unencumbered assets of the Loan Parties granted pursuant to the Interim Bankruptcy Court Order (but excluding, for the avoidance of doubt, the Segregated Operating Account);

(iii)  pursuant to Bankruptcy Code Section 364(c)(2), a first priority lien on the Segregated Operating Account, the funds maintained in such account and all proceeds thereof;

(iv)    pursuant to Bankruptcy Code Section 364(c)(3), a junior lien on and security interest in all assets of the Loan Parties encumbered by a first priority lien under ABL Facility Indebtedness (now or hereafter acquired and all proceeds thereof) (the "**ABL Collateral**"); *provided* that such lien on the ABL Collateral shall be junior in priority and subordinate to the Liens in respect of ABL Facility Indebtedness and senior in priority to any other lien on the ABL Collateral (including without limitation, the Liens in respect of the Prepetition Obligations under the Prepetition Term Loan Documents) securing any other indebtedness of the Loan Parties; and

(v)    pursuant to Bankruptcy Code Section 364(d), a first priority priming lien on and security interest in (the "**Priming Liens**") all assets of the Loan Parties encumbered by a first priority lien under the Prepetition Term Loan Documents not otherwise described in clauses (i) through (iv) above (now or hereafter acquired and all proceeds thereof) that were subject to a lien as of the Petition Date; *provided* that such Priming Liens shall be senior in priority to the Liens in respect of the Prepetition Obligations under the Prepetition Term Loan Documents and the Liens in respect of ABL Facility Indebtedness;

(b)    The Priming Liens shall prime all of the liens securing the Prepetition Indebtedness with respect to the Term Loan Documents, but the liens so created as described in clauses (ii), (iv), and (v) above shall be subject to "Permitted Liens" (as such term is defined under the Prepetition Term Loan Agreement) as of the Petition Date.

(c)    The Liens to be granted by the Bankruptcy Court shall cover all property of the Loan Parties (now or hereafter acquired and all proceeds thereof), including property or assets that do not secure the Prepetition Indebtedness, except until entry of the Final Bankruptcy Court Order, claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (the "**Avoidance Actions**"), and as otherwise agreed to by the Required Lenders in their sole discretion.

(d)    As used in the Interim Bankruptcy Court Order and the Final Bankruptcy Court Order, the "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Loan Parties pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") at any time before or on the first business day following delivery by the Administrative Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $750,000 incurred after the first business day following delivery by the Administrative Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice

delivered by email (or other electronic means) by the Administrative Agent to the Loan Parties, their lead restructuring counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the Obligations hereunder pursuant to Section 8.02, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(e)     On the day on which a Carve Out Trigger Notice is given by the Administrative Agent to the Borrower Agent, with a copy to its lead restructuring counsel, the U.S. Trustee and the ABL Agent and its lead restructuring counsel (the "**Termination Declaration Date**"), (i) if amounts available in the Segregated Operating Account are insufficient to pay the Allowed Professional Fees then due and payable and then only to the extent of such unpaid amounts in respect of such Allowed Professional Fees the Borrower Agent may deliver a Notice of Withdrawal to the Administrative Agent (which Notice of Withdrawal the Administrative Agent shall be entitled to rely upon, and shall be fully protected in relying upon), specifying the then unpaid amounts of the Allowed Professional Fees to be Withdrawn, and on the first business day after receipt of such Notice of Withdrawal, the Administrative Agent shall disburse funds from the DIP Term Loan Funding Account in an amount equal to the amount specified in such Notice of Withdrawal and (ii) the Carve Out Trigger Notice shall also constitute a demand to the Loan Parties to utilize all cash on hand as of such date and any available cash thereafter held by any Loan Party to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Borrowers shall deposit and hold such amounts in the Segregated Operating Account in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims.  On the Termination Declaration Date, if the amounts available in the Segregated Operating Account are insufficient to fund the amount of the Post Carve Out Trigger Notice Cap and then only to the extent of such shortfall, the Borrower Agent may deliver a Notice of Withdrawal to the Administrative Agent (which Notice of Withdrawal the Administrative Agent shall be entitled to rely upon, and shall be fully protected in relying upon), specifying the amount of the Post Carve Out Trigger Notice Cap to be Withdrawn, and on the first Business Day after receipt of such Notice of Withdrawal, the Administrative Agent shall disburse funds from the DIP Term Loan Funding Account in an amount equal to the amount specified in such Notice of Withdrawal.  The Loan Parties shall deposit and hold such amounts in the Segregated Operating Account in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims. The Administrative Agent shall fund the Carve Out Reserves from the DIP Term Loan Funding Account in accordance with this Section 10.05(e), notwithstanding anything in this Agreement or the Interim Bankruptcy Court Order to the contrary, including with respect to the existence of a Default or Event of Default, the failure of the Borrowers to satisfy any or all of the conditions precedent for Withdrawals under this Agreement, any termination of this Agreement following an Event of Default, or the occurrence of the Maturity Date.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used by the Borrowers first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**"), and then to pay the Post-Carve Out Trigger Notice Cap, until each is paid in full. All funds in the Post-Carve Out Trigger Notice Reserve shall be used by the Borrowers first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "**Post-Carve Out Amounts**").  Notwithstanding anything to the contrary in this Agreement or

the Bankruptcy Court Orders, following delivery of a Carve Out Trigger Notice, the Administrative Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Loan Parties until the Carve Out Reserves have been fully funded in accordance with this Section 10.05(e).  The Loan Parties hereby grant, and the Administrative Agent, on its behalf and on behalf of the Lenders, shall have, a first priority security interest in any residual interest in the Carve Out Reserves held in the Segregated Operating Account.  Further, notwithstanding anything to the contrary in the Interim Bankruptcy Court Order, except in respect of the ABL Agent and the ABL Lenders, (i) disbursements by the Borrowers from the Carve Out Reserves shall not constitute the Term Loan or increase or reduce the Term Commitment, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, (iii) in no way shall the Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Borrowers, and (iv) the Administrative Agent shall have no obligation to fund any amount in excess of the amounts then held in the DIP Term Loan Funding Account.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in any other order of the Bankruptcy Court, or in the Prepetition Term Loan Documents, or in the Loan Documents, except for the ABL Collateral, the Carve Out shall be senior to all liens and claims securing the Term Facility and the adequate protection in respect of the Prepetition Obligations under the Prepetition Term Loan Documents, and any and all other forms of adequate protection, liens, or claims securing the Term Loan or the Prepetition Obligations under the Prepetition Term Loan Documents.

(f)     All of the liens described herein with respect to the assets of the Obligors shall be effective and perfected as of the Interim Bankruptcy Court Order Entry Date and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements.

Section 10.06  *Grants, Rights and Remedies*.  The Liens and security interests granted pursuant to Section 10.04(a) hereof and the administrative priority and lien priority granted pursuant to Section 10.05 hereof may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into.  This Agreement, the Bankruptcy Court Orders and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Administrative Agent and the Lenders hereunder and thereunder are cumulative.

Section 10.07  *No Filings Required*.  The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, and entry of the Interim Bankruptcy Court Order shall have occurred on or before the date of the Term Borrowing.  The Administrative Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office, take possession or control of any Collateral, or take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, or any other Loan Document.

Section 10.08  *Survival*.  The Liens, lien priority, administrative priorities and other rights and remedies granted to the Administrative Agent and the Lenders pursuant to this Agreement,

the Bankruptcy Court Orders and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Borrowers (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

      (a)   except with respect to the Carve-Out as set forth in Section 10.05, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Administrative Agent and the Lenders against the Borrowers in respect of any Obligation;

      (b)   the Liens in favor of the Administrative Agent and the Lenders set forth in Section 10.04(a) hereof shall constitute valid and perfected first priority Liens and security interests, and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever (subject to Section 10.05 and any action required under foreign law with respect to the Capital Stock of Foreign Subsidiaries solely to the extent that such foreign law is applicable); and

      (c)   the Liens in favor of the Administrative Agent and the Lenders set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Administrative Agent file financing statements or mortgages, take possession or control of any Collateral, or otherwise perfect its Lien under applicable non-bankruptcy law.

ARTICLE 11.
GUARANTEE

Section 11.01  *Guarantee.*

      (a)    Each of the Guarantors hereby, jointly and severally, unconditionally and irrevocably, guarantees, as primary obligor and not as surety merely, to the Administrative Agent, for the ratable benefit of the Secured Parties and their respective successors and permitted assigns, the prompt and complete payment and performance by Borrowers and by each other Guarantor when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations.

      (b)   Each Guarantor shall be liable under its guarantee set forth in Section 11.01(a), without any limitation as to amount, for all present and future Obligations, including specifically all future increases in the outstanding amount of the Term Loan or other Obligations and other future increases in the Obligations, whether or not any such increase is committed, contemplated or provided for by the Loan Documents on the date hereof. Notwithstanding any other provision hereof, the right of recovery against each Guarantor under Article 11 hereof shall not exceed $1.00 less than the lowest amount which would

render such Guarantor's obligations under Article 11 hereof void or voidable under applicable Law, including, without limitation, fraudulent conveyance law. To effectuate the foregoing intention, the Administrative Agent and the Guarantors hereby irrevocably agree that the Obligations of each Guarantor under the guarantee set forth in Article 11 hereof at any time shall be limited to the maximum amount as will result in the Obligations of such Guarantor under the guarantee set forth in Article 11 hereof not constituting a fraudulent transfer or conveyance after giving full effect to the liability under the guarantee set forth in Article 11 hereof and its related contribution rights but before taking into account any liabilities under any other guarantee by such Guarantor. For purposes of determining the net worth of any Guarantor in connection with the foregoing, all guarantees of such Guarantor other than the guarantee under Article 11 hereof will be deemed to be enforceable and payable after the guaranty under Article 11 hereof.

(c)   Each Guarantor agrees that the Obligations may at any time and from time to time be incurred or permitted in an amount exceeding the maximum liability of such Guarantor under Section 11.01(b) without impairing the guarantee contained in this Article 11 or affecting the rights and remedies of any Secured Party hereunder.

(d)   The guarantee contained in this Article 11 shall remain in full force and effect until the earlier to occur of (i) the date on which the Obligations (other than contingent indemnification obligations not yet due and payable) are paid in full or otherwise satisfied, (ii) as to any Guarantor, the sale or other disposition of all of the Equity Interests of such Guarantor permitted under this Agreement or (iii) as to any Guarantor, such Guarantor becomes an Excluded Subsidiary not in contravention of the terms of this Agreement.

(e)   No payment made by Borrowers, any of the Guarantors, any other guarantor or any other Person or received or collected by any Secured Party from Borrowers, any of the Guarantors, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder which shall, notwithstanding any such payment, remain liable for the Obligations up to the maximum liability of such Guarantor hereunder until the earlier to occur of (i) the date the Obligations (other than contingent indemnification obligations not yet due and payable) are paid in full or otherwise satisfied, (ii) the sale or other disposition of all of the Equity Interests of such Guarantor permitted under this Agreement or (iii) as to any Guarantor, such Guarantor becomes an Excluded Subsidiary not in contravention of the terms of this Agreement.

Section 11.02   *Rights of Reimbursement, Contribution and Subrogation.* In case any payment is made on account of the Obligations by any Loan Party or is received or collected on account of the Obligations from any Loan Party or its property:

(a)   If such payment is made by a Borrower or from its property, then, if and to the extent such payment is made on account of the Obligations arising from or relating to the Term Loan made to such Borrower, such Borrower shall not be entitled, until the Obligations (other than contingent indemnification obligations not yet due and payable) are paid in full or otherwise satisfied, (A) to demand or enforce reimbursement or contribution

in respect of such payment from any other Loan Party or (B) to be subrogated to any claim, interest, right or remedy of any Secured Party against any other Person, including any other Loan Party or its property.

(b)   If such payment is made by a Guarantor or from its property in respect of Obligations of Borrowers or another Guarantor, such Guarantor shall be entitled, subject to and upon payment in full or satisfaction of the Obligations (other than contingent indemnification obligations not yet due and payable), (A) to demand and enforce reimbursement for the full amount of such payment from any Borrower or such other Guarantor, as applicable and (B) to demand and enforce contribution in respect of such payment from each other Guarantor which has not paid its fair share of such payment, as necessary to ensure that (after giving effect to any enforcement of reimbursement rights provided hereby) each Guarantor pays its fair share of the unreimbursed portion of such payment. For this purpose, the fair share of each Guarantor as to any unreimbursed payment shall be determined based on an equitable apportionment of such unreimbursed payment among all  Guarantors based on the relative value of their assets and any other equitable considerations deemed appropriate by the court.

(c)   If and whenever (after payment in full or satisfaction of the Obligations (other than contingent indemnification obligations not yet due and payable)) any right of reimbursement or contribution becomes enforceable by any Loan Party against any other Loan Party under Sections 11.02(a) and 11.02(b), such Loan Party shall be entitled, subject to and upon payment in full or satisfaction of the Obligations (other than contingent indemnification obligations not yet due and payable), to be subrogated (equally and ratably with all other Loan Parties entitled to reimbursement or contribution from any other Loan Party as set forth in this Section 11.02) to any security interest that may then be held by the Administrative Agent upon any Collateral granted to it in this Agreement. Such right of subrogation shall be enforceable solely against the Loan Parties, and not against the Secured Parties, and neither the Administrative Agent nor any other Secured Party shall have any duty whatsoever to warrant, ensure or protect any such right of subrogation or to obtain, perfect, maintain, hold, enforce or retain any Collateral for any purpose related to any such right of subrogation. If subrogation is demanded by any Loan Party, then (after payment in full or satisfaction of the Obligations (other than contingent indemnification obligations not yet due and payable)) the Administrative Agent shall deliver (at the Loan Parties' sole expense) to the Loan Parties making such demand, or to a representative of such Loan Parties or of the Loan Parties generally, an instrument reasonably satisfactory to the Loan Parties transferring, on a quitclaim basis without any recourse, representation, warranty or obligation whatsoever, whatever security interest the Administrative Agent then may hold in whatever Collateral may then exist that was not previously released or disposed of by the Administrative Agent.

(d)   All rights and claims arising under this Section 11.02 or based upon or relating to any other right of reimbursement, indemnification, contribution or subrogation that may at any time arise or exist in favor of any Loan Party as to any payment on account of the Obligations made by it or received or collected from its property shall be fully subordinated in all respects to the prior payment in full or satisfaction of all of the Obligations (other than contingent indemnification obligations not yet due and payable). Until payment in full or satisfaction of the Obligations (other than contingent indemnification

obligations not yet due and payable), no Loan Party shall demand or receive any collateral security, payment or distribution whatsoever (whether in cash, property or securities or otherwise) on account of any such right or claim. To the extent permitted by law, if any such payment or distribution is made or becomes available to any Loan Party in any bankruptcy case or receivership, insolvency or liquidation proceeding, such payment or distribution shall be delivered by the person making such payment or distribution directly to the Administrative Agent, for application to the payment of the Obligations. If any such payment or distribution is received by any Loan Party, it shall be held by such Loan Party in trust, as trustee of an express trust for the benefit of the Secured Parties, and shall forthwith be transferred and delivered by such Loan Party to the Administrative Agent, in the exact form received and, if necessary, duly endorsed.

(e)    The obligations of the Loan Parties under the Loan Documents, including their liability for the Obligations and the enforceability of the security interests granted thereby, are not contingent upon the validity, legality, enforceability, collectability or sufficiency of any right of reimbursement, contribution or subrogation arising under this Section 11.02. The invalidity, insufficiency, unenforceability or uncollectability of any such right shall not in any respect diminish, affect or impair any such obligation or any other claim, interest, right or remedy at any time held by any Secured Party against any Guarantor or its property. The Secured Parties make no representations or warranties in respect of any such right and shall have no duty to assure, protect, enforce or ensure any such right or otherwise relating to any such right.

(f)    Each Loan Party reserves any and all other rights of reimbursement, contribution or subrogation at any time available to it as against any other Loan Party, but (i) the exercise and enforcement of such rights shall be subject to Section 11.02(d) and (ii) neither the Administrative Agent nor any other Secured Party shall ever have any duty or liability whatsoever in respect of any such right, except as provided in Section 11.02(c).

Section 11.03 _Amendments, etc. with respect to the Obligations._ Each Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, any demand for payment of any of the Obligations made by any Secured Party may be rescinded by such Secured Party and any of the Obligations continued, and the Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, increased, extended, amended, modified, accelerated, compromised, waived, surrendered or released by any Secured Party, in each case, in accordance with the terms of this Agreement or the other Loan Documents, and this Agreement and the other Loan Documents and any other documents executed and delivered in connection therewith or with any of the other Obligations may be amended, modified, supplemented or terminated, in whole or in part, as the Administrative Agent (or the Required Lenders or all Lenders, as the case may be) may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by any Secured Party for the payment of the Obligations may be sold, exchanged, waived, surrendered or released. No Secured Party shall have any obligation to protect, secure, perfect or insure any Lien at any time

held by it as security for the Obligations or for the guarantee contained in this Article 11 or any property subject thereto.

Section 11.04 _Guarantee Absolute and Unconditional_. Each Guarantor waives, to the maximum extent permitted by applicable law, any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by any Secured Party upon the guarantee contained in this Article 11 or acceptance of the guarantee contained in this Article 11; each of the Obligations, and any obligation contained therein, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in this Article 11; and all dealings between Borrowers and any of the other Guarantors, on the one hand, and the Secured Parties, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in this Article 11. Each Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon Borrowers or any of the other Guarantors with respect to the Obligations.

Each Guarantor understands and agrees that the guarantee contained in this Article 11 shall be construed as a continuing, absolute and unconditional guarantee of payment and performance and not of collection without regard to (a) the validity or enforceability of this Agreement or any other Loan Document, any of the Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by any Secured Party, (b) any defense, set-off or counterclaim (other than a defense of payment or performance or release hereunder) which may at any time be available to or be asserted by Borrowers or any other Person against any Secured Party, or (c) any other circumstance whatsoever, other than payment or performance or release hereunder, (with or without notice to or knowledge of any Borrower or such other Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of any Borrower or any other Loan Party for the Obligations, or of such other Guarantor under the guarantee contained in this Article 11.

When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, any Secured Party may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against any Borrower, any other Guarantor or any other Person or against any collateral security or guarantee for the Obligations or any right of offset with respect thereto, and any failure by any Secured Party to make any such demand, to pursue such other rights or remedies or to collect any payments from any Borrower, any other Guarantor or any other Person or to realize upon any such collateral security or guarantee or to exercise   any such right of offset, or any release of any Borrower, any other Guarantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve any Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of any Secured Party against any Guarantor. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

Section 11.05 _Reinstatement_.  The guarantee contained in this Article 11 shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by any Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of any

Borrower or any other Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, any Borrower or any other Guarantor or any substantial part of its property, or otherwise, all as though such payments had not been made.

Section 11.06 _Payments_.  Each Guarantor hereby guarantees that payments hereunder will be paid to the Administrative Agent without set-off or counterclaim in Dollars in immediately available funds at the Administrative Agent's office as specified in <u>Schedule 12.02</u>.

ARTICLE 12.
MISCELLANEOUS

Section 12.01 _Amendments, Etc._  No amendment or waiver of any provision of this Agreement or any other Loan Document (including, without limitation, the ABL Intercreditor Agreement), and no consent to any departure by any Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or signed by the Administrative Agent on behalf of and with the consent of the Required Lenders) and Borrowers or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent (which acknowledgment shall be made by the Administrative Agent at the direction of the Required Lenders), and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; _provided_, _however_, that no such amendment, waiver or consent shall:

(a)    extend or increase the Term Commitment of any Lender without the written consent of each such Lender;

(b)    postpone any date fixed by this Agreement or any other Loan Document for any payment (excluding mandatory prepayments) of principal, interest, fees or other amounts (other than default interest) due to the Lenders (or any of them) hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby;

(c)    reduce the principal of, or the rate of interest specified herein on, the Term Loan, or any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby; _provided_, _however_, that only the consent of the Required Lenders shall be necessary (i) to amend the definition of "Default Rate" or to waive any obligation of Borrowers to pay interest at the Default Rate or (ii) to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on the Term Loan or to reduce any fee payable hereunder;

(d)    change Section 8.04 hereof in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender directly affected thereby or (ii) the definition of "Applicable Percentage," the order of application or pro rata nature of application of any reduction in the Term Commitments or any prepayment of the Term Loan within or among the Term Facility from the application thereof set forth in the applicable provisions of Sections 2.03(a) or 2.03(b), or other provisions in respect of the pro rata application of payments or offers hereunder under Section 2.10 or 2.11 in any manner that

materially and adversely affects any Lender under the Term Facility without the written consent of such Lender;

(e)     change (i) any provision of this Section 12.01 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

(f)     release all or substantially all of the value of the Guarantees of the Obligations in any transaction or series of transactions without the written consent of each Lender, except to the extent the release of any Guarantor is permitted pursuant to Section 9.10 (in which case such release may be made by the Administrative Agent acting pursuant to the authorization set forth in Section 9.10 and/or with confirmation from the Required Lenders); and

(g)     release all or substantially all of the Collateral in any transaction or series of related transactions without the written consent of each Lender, except to the extent the release of any Collateral is permitted pursuant to Section 9.10 (in which case such release may be made by the Administrative Agent acting pursuant to the authorization set forth in Section 9.10 and/or with confirmation from the Required Lenders).

and, *provided*, *further*, that no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document.

In addition, notwithstanding anything in this Section 12.01 to the contrary:

(a)     if the Administrative Agent and Borrowers shall have jointly identified an obvious error or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and Borrowers shall be permitted to amend such provision, and, in each case, such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders to the Administrative Agent within five Business Days following receipt of notice thereof;

(b) [Reserved]

(c) [Reserved]

(d) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent, and Borrowers (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loan and the accrued interest and fees in respect thereof and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders; and

(e) guarantees, collateral security documents and related documents executed by the Loan Parties or the Subsidiaries in connection with this Agreement may be in a form reasonably

determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of Borrowers without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel and (ii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

Section 12.02  *Notices; Effectiveness; Electronic Communication*.

(a)    *Notices Generally*.  Except as provided in subsection (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows:

(i)    if to Borrowers or the Administrative Agent, to the address, facsimile number, or electronic mail address specified for Borrower Agent or the Administrative Agent, as applicable, on Schedule 12.02; and

(ii)    if to any other Lender, to the address, facsimile number, or electronic mail address specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)    *Electronic Communications*.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article 2 if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or Borrower Agent may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at

its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     *The Platform*.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to any Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of Borrowers' or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; *provided*, *however*, that in no event shall any Agent Party have any liability to any Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     *Change of Address*, *Etc*. Each Borrower and the Administrative Agent may change its address or facsimile for notices and other communications hereunder by notice to the other parties hereto.  Each Lender may change its address or facsimile for notices and other communications hereunder by notice to Borrower Agent and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain MNPI with respect to a Borrower or its securities for purposes of United States Federal or state securities laws.

(e)     *Reliance by Administrative Agent and Lenders*.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic notices) believed in good faith to be given by or on behalf of Borrowers even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  Borrowers shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them for all losses, costs, expenses and liabilities

resulting from the reliance of such Person on each notice purportedly given by or on behalf of Borrowers.

Section 12.03 *No Waiver; Cumulative Remedies; Enforcement*.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders and, in respect of the Collateral Documents, any other Secured Party; *provided, however*, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 12.08 (subject to the terms of Section 2.11), or (c) any Secured Party from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law and *provided, further*, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.11, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 12.04 *Expenses; Indemnity; Damage Waiver*.

(a)    *Costs and Expenses*.  Borrowers shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent (including the reasonable and documented fees and disbursements of external counsel (but limited to one counsel for the Administrative Agent and, if necessary, one local counsel in each relevant jurisdiction (which may include a single special counsel acting in multiple jurisdictions))), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent (including the fees and disbursements of external counsel (but limited to one counsel for the Administrative Agent and one counsel for the Lenders taken as a whole and, if necessary, one local counsel for the Administrative Agent and one local counsel for the Lenders in each relevant jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and, if necessary, a single counsel for each relevant specialty (and, solely in the case of an actual

conflict of interest, one other firm of counsel for each group of similarly affected parties))), in connection with the enforcement or protection of its rights or remedies this Agreement and the other Loan Documents, including without limitation, all such expenses incurred during any legal proceeding, including any proceeding in connection with any Debtor Relief Law.

(b)    *Indemnification by Borrowers.*  Each Borrower shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable and documented out-of-pocket fees and disbursements of external counsel (but limited to one counsel for all Indemnitees taken as a whole and, if necessary, one local counsel in each relevant jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and, if necessary, a single special counsel for each relevant specialty (and, solely in the case of an actual conflict of interest, one other firm of counsel for each group of similarly affected parties))), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents (including in respect of any matters addressed in Section 3.01), (ii) the Term Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on, through, under or from any property currently or formerly owned, leased or operated by a Loan Party or any of its Subsidiaries, or any Environmental Claim related in any way to any of the Loan Parties or any of their respective Subsidiaries or (iv) any actual or prospective claim, litigation, investigation or proceeding (a "**Proceeding**") relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto (collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such obligations, penalties, demands, judgments, suits, costs, losses, claims, damages, liabilities or related expenses are (w) determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, (x) arising or resulting from, as determined by a court of competent jurisdiction by final and nonappealable judgment, a material breach of any Loan Documents by such Indemnitee, or (y) arising or resulting from, any dispute solely among Indemnitees, in each case other than any claims (including claims by any Lender or any Related Party of any Lender) against an Indemnitee in its capacity as an administrative agent, collateral agent or other agent or any similar role hereunder or under the Loan Documents and other than any claims arising out of any act or omission of Holdings, Borrowers, or any of their Affiliates.  Borrowers and each other Loan Party shall have no obligation to reimburse any Indemnitee for fees and expenses unless such Indemnitee provides Borrowers an undertaking in which such Indemnitee agrees to refund and return any and all amounts paid by or on behalf of Borrowers (or any other Loan Party) to such Indemnitee to the extent any of the foregoing items in clause (w) through (y) above occurs.  No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement except to the extent

- 115-

any such damages have resulted from the gross negligence or willful misconduct of such Indemnitee (or its officers, directors, employees or Affiliates).  No Indemnitee, Loan Party or any Subsidiary have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date); it being agreed that this sentence shall not limit the indemnification obligations of Borrowers under this Section.

Borrowers and each other Loan Party shall not be liable for any settlement of any Proceeding effected without Borrowers' written consent (which consent shall not be unreasonably withheld or delayed), but if settled with Borrowers' written consent, or if there is a final nonappealable judgment for the plaintiff against an Indemnitee in any such Proceeding, Borrowers agrees to indemnify and hold harmless each indemnified person in the manner set forth above.  Borrowers shall not, without the prior written consent of an Indemnitee (which consent shall not be unreasonably withheld or delayed) effect any settlement of any pending or threatened Proceeding against an Indemnitee in respect of which indemnity could have been sought hereunder by such Indemnitee unless (a) such settlement includes an unconditional release of such Indemnitee from all liability or claims that are the subject matter of such Proceeding or (b) such settlement does not include any statement as to, or any admission of, fault or culpability of such Indemnitee.

(c)     *Reimbursement by Lenders*.  To the extent that any Borrower for any reason fails to indefeasibly pay any amount required under Section 2.07 or subsection (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.10(c).

(d)     *Waiver of Consequential Damages, Etc*. To the fullest extent permitted by applicable law, Borrowers shall not assert, and hereby waive, any claim against any Indemnitee, and each of the Administrative Agent, each Lender and each Related Party agrees not to assert or permit any of their respective subsidiaries to assert any claim against any Loan Party or any of their respective directors, officers, employees, attorneys, agents or advisors, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, the Term Loan or the use of the proceeds thereof; *provided* that nothing contained in this paragraph shall limit Borrowers' indemnity obligations under this Section.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or

thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)     *Payments*.  All amounts due under this Section shall be payable not later than ten Business Days after receipt of a written invoice therefor.

(f)     *Survival*.  The agreements in Section 2.10, Article 9, and Section 12.02(e), 12.04 and 12.16 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Term Commitments and the repayment, satisfaction or discharge of all the other Obligations.

Section 12.05  *Payments Set Aside*.  To the extent that any payment by or on behalf of Borrowers is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 12.06  *Successors and Assigns*.

(a)     *Successors and Assigns Generally*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Indemnitees and the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      *Assignments by Lenders*.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Term Commitment and the Term Loan at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)      *Minimum Amounts*.

(A)      In the case of an assignment of the entire remaining amount of the assigning Lender's Term Loan, no minimum amount need be assigned; and

(B)      in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Term Commitment (which for this purpose includes the Term Loan outstanding thereunder) or, if the Term Commitment is not then in effect, the principal outstanding balance of the Term Loan of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000 unless each of the Administrative Agent and, so long as no Event of Default under Section 8.01(a) has occurred and is continuing, Borrower Agent otherwise consents (each such consent not to be unreasonably withheld or delayed); *provided*, *however*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)      *Proportionate Amounts*.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Term Loan or the Term Commitment assigned;

(iii)      *Required Consents*.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)      the consent of Borrower Agent (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default under Section 8.01(a) has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; *provided* that Borrower Agent shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within ten Business Days after having received notice thereof; and

(B)      the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to

a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv)    *Assignment and Assumption*.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), together with a processing and recordation fee in the amount of $3,500; *provided*, *however*, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)    *No Assignment to Certain Persons*.  No such assignment shall be made to any Borrower or any of its Affiliates or Subsidiaries.

(vi)    *No Assignment to Natural Persons*.  No such assignment shall be made to a natural person.

(vii)    [Reserved]

(c)    *Register*.  The Administrative Agent, acting solely for this purpose as an agent of Borrowers (and such agency being solely for tax purposes), shall maintain at the Administrative Agent's Office (which office shall be in the United States) a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Term Commitments of, and principal amounts (and stated interest) of the Term Loan owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest or demonstrable error, and Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by any Borrower and any Lender (with respect to such Lender's entry), at any reasonable time and from time to time upon reasonable prior notice.

(d)    *Participations*.  Any Lender may at any time, without the consent of, or notice to, Borrowers or the Administrative Agent, sell participations to any Person (other than a natural person, any Borrower or any of its Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Term Commitment and/or the Term Loan); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) Borrowers, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (iv) no such participation shall be made to any Borrower or any of its Affiliates or Subsidiaries.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such

agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 12.01 that affects such Participant.  Subject to subsection (e) of this Section, each Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section.  To the extent permitted by law, each Participant shall also be entitled to the benefits of Section 12.08 as though it were a Lender, *provided* such Participant agrees to be subject to Section 2.11 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of Borrowers (such agency being solely for tax purposes), maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Term Loan or other obligations under the Loan Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest or demonstrable error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)    *Limitations upon Participant Rights*.  A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with Borrowers' prior written consent or except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(f)    *Certain Pledges*.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 12.07 *Treatment of Certain Information; Confidentiality*.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify Borrower Agent as soon as practicable in the event of any

such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify Borrower Agent as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential) in, or any prospective assignee of or Participant (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential) in, any of its rights or obligations under this Agreement or any Eligible Assignee invited to be a Lender or (ii) any actual or prospective counterparty (or its advisors) (it being understood that the Person to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential) to any swap or derivative transaction relating to Borrowers and their respective obligations, (g) with the consent of Borrower Agent or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or obligation of confidentiality owed to any Borrower, its Subsidiaries or their respective Affiliates or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a non-confidential basis from a source other than a Borrower or any other Loan Party (so long as such source is not known (after due inquiry) to the Administrative Agent, such Lender, or any of their respective Affiliates, as applicable, to be bound by confidentiality obligations to a Borrower, any Subsidiary thereof or any of their respective Affiliates).

For purposes of this Section, "**Information**" means all information received from a Loan Party or any Subsidiary or Affiliate thereof relating to a Loan Party or any Subsidiary or Affiliate thereof or any of their respective businesses other than any such information that is publically available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by a Loan Party thereof other than as a result of a breach of this Section or any other confidentiality obligation owed to any Loan Party or their Affiliates.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include MNPI concerning a Loan Party or a Subsidiary thereof, as the case may be, (b) it has developed compliance procedures regarding the use of MNPI and (c) it will handle such MNPI in accordance with applicable Law, including United States Federal and state securities Laws.

Section 12.08 *Right of Setoff*.  If an Event of Default shall have occurred and be continuing, each Lender and each of its respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) (other than escrow, payroll, petty cash or tax accounts) at any time owing by such Lender or any such Affiliate to or for the credit or the account of Borrowers against any and all of the obligations of Borrowers now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of Borrowers may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender and its respective Affiliates under this Section are in addition to all other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have under applicable Law or otherwise.  Each Lender agrees to notify Borrower Agent and the Administrative Agent promptly after any such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.  No amounts set off from any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.

Section 12.09 *Interest Rate Limitation*.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the unpaid principal of the Term Loan or, if it exceeds such unpaid principal, refunded to Borrowers.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or any Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude optional prepayments and the effects thereof and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 12.10 *Counterparts; Integration; Effectiveness*.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 12.11 *Survival of Representations and Warranties*.  All covenants, representations and warranties made hereunder and in any other Loan Document or other

document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of the Credit Extension, and shall continue in full force and effect as long as the Term Loan or any other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations not yet due and payable).

Section 12.12 *Severability*. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, then, to the fullest extent permitted by law, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 12.13 *Replacement of Lenders*. If any Lender requests compensation under Section 3.04, or if Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender shall have not consented to any proposed amendment, modification, termination, waiver or consent requiring the consent of all Lenders or all affected Lenders as contemplated by Section 12.01 and the consent of the Required Lenders has been obtained, then Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 12.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if such Lender accepts such assignment), *provided* that:

(a)    Borrowers shall have paid to the Administrative Agent the assignment fee specified in Section 12.06(b);

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Term Loan, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrowers (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)    such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrowers to require such assignment and delegation cease to apply.  Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender, as assignor, any Assignment and Assumption necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section 12.13.

Section 12.14  *Governing Law; Jurisdiction; Etc*.

(a)     *Governing Law*.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ALL CLAIMS OR CAUSES OF ACTION (WHETHER IN CONTRACT, TORT OR OTHERWISE) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE IN ANY WAY HERETO OR THERETO OR THE NEGOTIATION, EXECUTION AND PERFORMANCE THEREOF OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, UNLESS OTHERWISE EXPRESSLY SET FORTH THEREIN, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)     *Submission to Jurisdiction*.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT.  EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AGENT AT ITS ADDRESS FOR NOTICES AS SET FORTH HEREIN.  THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH

IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

(c)      *Waiver of Venue*.  EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)      *Service of Process*.  EACH OF THE PARTIES HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 12.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 12.15 *Waiver of Jury Trial*.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH OF THE PARTIES HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 12.16 *No Advisory or Fiduciary Responsibility*.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Borrower acknowledges and agrees that:  (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent are arm's-length commercial transactions between Borrowers and their Affiliates, on the one hand, and the Administrative Agent, on the other hand, (B) Borrowers have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate, and (C) Borrowers are capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) Administrative Agent is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for Borrowers or any of their Affiliates, or any other Person and (B) the Administrative Agent has no obligation to Borrowers or any of their Affiliates with

respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and its Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of Borrower and their respective Affiliates, and the Administrative Agent has no obligation to disclose any of such interests to Borrowers or their Affiliates.  To the fullest extent permitted by law, each Borrower hereby waives and releases any claims that it may have against the Administrative Agent with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 12.17 *Electronic Execution of Assignments and Certain Other Documents*.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 12.18 *USA PATRIOT Act*.  Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Borrowers that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**"), it is required to obtain, verify and record information that identifies each Borrower and each Guarantor, which information includes the name and address of each Borrower and each Guarantor and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Borrower and each Guarantor in accordance with the Act.  Each Borrower shall, and shall cause each Guarantor to, promptly following a reasonable request by the Administrative Agent (on its behalf of or on behalf of any Lender), provide all documentation and other information that the Administrative Agent or such Lender (through the Administrative Agent) requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

Section 12.19 *Judgment Currency*.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligations of Borrowers in respect of any such sum due from it to the Administrative Agent or any Lender hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent or such Lender, as the case may be, of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent or such Lender, as the case may be, may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the

Administrative Agent or any Lender from Borrowers in the Agreement Currency, Borrowers agree, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or such Lender, as the case may be, against such loss.

Section 12.20 *ABL Intercreditor Agreement*.  The provisions of this Agreement are in all respects subject to the terms and provisions of the ABL Intercreditor Agreement, including the relative rights, obligations and priorities with respect to Collateral.


[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**ANCHOR HOCKING, LLC,**
as Borrower Agent and Borrower

By: _____
    Name:
    Title:

**ONEIDA LTD.,**
as Borrower

By: _____
    Name:
    Title:

**UNIVERSAL TABLETOP, INC.**,
as Holdings

By: _____
    Name:
    Title:

**BUFFALO CHINA, INC.**
**DELCO INTERNATIONAL, LTD.**
**SAKURA, INC.**
**THC SYSTEMS, INC.**
**KENWOOD SILVER COMPANY, INC.**
**ONEIDA SILVERSMITHS, INC.**
**ONEIDA INTERNATIONAL INC.**
**ONEIDA FOOD SERVICE, INC.**
as Guarantors

By: _____
    Name:
    Title:

[EveryWare DIP Agreement Signature Page]

**WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Administrative Agent

By: _____
      Name:
      Title:

## SCHEDULES[1]

| | |
|---|---|
| 1.01(a)-1 | Immaterial Subsidiaries |
| 1.01(a)-2 | Real Property Subject to Mortgages |
| 2.01 | Commitments |
| 5.06 | Litigation |
| 5.08(a) | Liens |
| 5.08(b) | Owned Real Property |
| 5.09 | Environmental Matters |
| 5.13 | Subsidiaries; Other Equity Investments |
| 6.17 | Post-Closing Actions |
| 7.03 | Existing Indebtedness |
| 7.08 | Transactions with Affiliates |
| 12.02 | Administrative Agent's Office; Certain Addresses for Notices |

---

[1] Subject to review by Borrowers.

SCHEDULE 1.01(a)-1
IMMATERIAL SUBSIDIARIES

None.

SCHEDULE 1.01(a)-2
REAL PROPERTY SUBJECT TO MORTGAGES

<u>Owned Real Property Subject to Mortgages</u>

| **Entity** | **Property** |
| --- | --- |
| Anchor Hocking, LLC | 400 9th Street, Monaca Borough, Beaver County, PA 15061 |
| Anchor Hocking, LLC | 1115 W. Fifth Avenue, Lancaster, Fairfield County, OH 43130 |

<u>Leased Property Subject to Leasehold Mortgage</u>

None.

1.01(a)-2-1

SCHEDULE 2.01
COMMITMENTS

LENDER                                    APPLICABLE PERCENTAGE OF
                                              TERM COMMITMENT

[_____]                                            [___]%

2.01-1

SCHEDULE 5.06

LITIGATION

1.      The items listed on Schedule 5.09 herein are incorporated by reference.

SCHEDULE 5.08

(a) LIENS

[_____]

SCHEDULE 5.08(b)

OWNED REAL PROPERTY

| Record Owner | Owned Real Property |
|---|---|
| Anchor Hocking, LLC | 1115 West Fifth Avenue<br>Lancaster, OH |
| | 400 Ninth Street<br>Monaca, PA |
| | Certain vacant parcels (approx. 50 acres)<br>surrounding 2893 and 2891 W. Fair Avenue,<br>Lancaster, OH |
| Oneida Silversmiths Inc. | Portion of Former Knife Plan (approx. 2 acres)<br>3960 Kenwood Road<br>Oneida, NY 13421 |
| | Portion of Former Main Plant Site (approx. 12<br>acres) Sherrill, NY |

For each of Buffalo China, Inc., Delco None. International, Ltd., Kenwood Silver Company, Inc., Oneida Food Service, Inc., Oneida International Inc., Sakura, Inc., THC Systems, Inc. and Universal Tabletop, Inc.

#4829-5338-7298v12

SCHEDULE 5.09

ENVIRONMENTAL MATTERS

**ONEIDA LTD. ENVIRONMENTAL DISCLOSURES**

1.     Buffalo China, Inc., Buffalo NY
       Lead & Hazardous Substances Investigation/Brownfields Cleanup Program

The Company subsidiary Buffalo China, Inc. ("Buffalo China") historically manufactured ceramics at a former facility in Buffalo, NY for approximately 70 years. The former Buffalo China site is improved with an approximately 4-acre manufacturing building, which is connected to a former warehouse to the east. A warehouse building (the "Harrison Street Warehouse"), which was historically used for the manufacture of mirrors, is located on the northwest portion of the site. Soil contamination was first discovered in 2004 during a Phase II investigation conducted in conjunction with Buffalo China's sale of the property to Niagara Ceramics, and a Supplemental Site Investigation was conducted at the site in 2006. These investigations identified the presence of VOCs and lead in on-site soils, particularly, in an area located near the south side of the Harrison Street Warehouse, and the presence of TCE and its degradation byproducts in groundwater (TCE has been detected at maximum concentration approximately 80,000 times the applicable groundwater standard). Buffalo China enrolled the site into the New York Department of Environmental Conservation ("NYSDEC") Brownfield Cleanup Program ("BCP") in May 2007. Conestoga-Rovers & Associates ("CRA") has been managing the cleanup on behalf of the Company. CRA has established a vapor mitigation system for one off-site residence. One additional off-site residence remains to be sampled for soil vapor; however, CRA has not been able to procure access to the off-site location because of a recent sale of that property. The Company received a Certificate of Completion ("COC") from the NYSDEC, dated December 18, 2012, stating that the Company has satisfactorily completed the remedial program at the former Buffalo China site. The Company is now eligible for Brownfield tax credits (NYS refundable tax credits) which are currently being assessed. The Company maintains a reserve of approximately $306,000 for this matter.

#4829-5338-7298v12

2.    Oneida Ltd. Knife Plant, Sherrill,
       NY Brownfields Cleanup Program

Oneida formerly used the Sherrill Knife Plant for silverware manufacturing from approximately 1914 until 2006. Materials used at the site included various petroleum products, as well as TCE to clean oily parts. Soil and groundwater impacts were first discovered in 2005 during a Phase II investigation conducted by Haley & Aldrich. Two subsequent investigations were conducted by Haley & Aldrich and Plumley Engineering ("Plumley") in 2006, which investigations identified several areas of concern, including TCE impacts to soil and groundwater; a widespread area of oily impacts; a small area of polychlorinated biphenyl (PCB) impacted soils; an area of soils impacted by low levels of SVOCs and metals; and the presence of TCE in sediment within the adjacent Oneida Creek. In addition, VOCs were detected in sub-slab vapor samples at concentrations exceeding state screening levels. Oneida enrolled the site into the NYSDEC BCP in December 2009. In May of 2012, the Company submitted the final Remediation Alternatives Report (RAR) outlining recommended clean-up alternatives. The RAR was accepted by the NYSDEC in November of 2012. The NYSDEC has accepted the Company's plan for remediation and on May 6, 2013 the Company's Remedial Work Action Plan was submitted to the NYSDEC. The Company maintains a reserve of approximately $1.5MM for this matter.

3.    Leavens Awards, Inc., Attleboro MA

On April 18, 2005, Oneida received an invitation from the U.S. Environmental Protection Agency"(EPA") under the Resource Conservation and Recovery Act to participate in a potential cleanup of Leavens Awards, Inc. ("Leavens Awards"), whose facility the Company's wholly owned subsidiary Leavens Manufacturing Company, Inc. ("Leavens Manufacturing") owned from 1973 to 1984. Leavens Awards purchased the assets of Leavens Manufacturing in 1984 and sometime thereafter performed a cleanup pursuant to a consent order issued by the Massachusetts Department of Environmental Protection. Both Leavens Manufacturing and Leavens Awards were dissolved in 1998. The Company responded to the EPA request that it was not a potentially responsible party ("PRP") based on the fact that it had no relationship to the site other than as the prior owner of the shares of the now-defunct Leavens Manufacturing. There has been no further communication with EPA on this matter.

4.    Shpack Landfill Superfund Site — Norton/Attleboro MA

On May 18, 2004, Oneida received a Request for Information ("RFI") pursuant to Section 104 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") from EPA regarding the Shpack Landfill site. The EPA sought to determine whether Leavens Manufacturing, the dissolved, former Oneida subsidiary, may be a PRP relative to that site for waste which might have been sent to the landfill. Oneida filed its response to the RFI on August 14, 2004, pointing to the fact that the landfill had operated between 1946 and 1965, closing 7 years before Oneida purchased its subsidiary Leavens Manufacturing. There has been no further communication with EPA on this matter.

5.      H&M Drum Site (The Ledge Site), Dartmouth MA

On December 22, 2005, the Company's outside counsel received correspondence requesting $4,000 for *de minimis* contribution to the cleanup of the H&M Drum Site. It was alleged that Leavens Manufacturing sent 4 drums indirectly through Resolve, Inc. to the H&M Drum Site. For the same reason Oneida declined to participate in any Leavens Awards cleanup, Oneida did not participate in the Ledge Site cleanup because it was not a PRP with respect to the H&M Drum Site or the Ledge Site.

It appears that cleanup began in 2006 by the Trustees of the H&M Drum Site Trust Fund and the PRP Group and that the Ledge Site is now in the compliance monitoring stage. No further communication with respect to this site has been received by Oneida.

6.      Tannery Road Municipal Landfill—Rome, NY

The Tannery Road Landfill was closed and finally capped in late 1997. In October, 2001, Oneida received an RFI from DEC regarding any waste it may have disposed of at the landfill. On November 9, 2001, Oneida provided a response to the RFI, providing evidence that Oneida did not dispose of any hazardous wastes at the site. On November 21, 2001, Oneida wrote to the NYS Attorney General ("AG") reiterating that it did not dispose of hazardous wastes at the landfill and was, therefore, not a PRP. Following several conversations with the NYSDEC subsequent to the submission of the response to the RFI, in December 2001, the NYSDEC verbally informed Oneida that it would not be pursued as a PRP. No further communication with respect to this site has been received by Oneida.

7.      Oneida Main Plant, Sherrill NY

Oneida's main manufacturing facility covered approximately 92 acres in Sherrill, NY. Based on environmental site assessments between 1992 and 1994, in 1994, the DEC issued "no further action" letters regarding two lagoons at the facility that had been listed on New York State's Registry of Inactive Hazardous Waste Disposal Sites. In December 2004, a Phase I Site Assessment was conducted by Haley & Aldridge. The bulk of the assets were subsequently sold to Sherrill Manufacturing, Inc. in 2005. The Asset Purchase Agreement ("APA") contained a general short-term environmental indemnity (3 years) that is no longer in effect and an indefinite indemnity for a potential TCE issue described in the 2004 Phase 1. Oneida has not received any claims regarding this issue and there have been no reportable events or other notifications.

Oneida retained approximately 12 acres of the site along the northern boundary. The area was retained to provide access and buffer to land leased by the Company to the Sterling Power Partners co-generation facility, which land was subsequently sold to Sterling's owner in 2010. There have been no claims or reportable events with respect to the retained acreage, however, it may be the site of another historic landfill which was also described in the 2004 Phase 1. This land and the 2-acre Knife Plant site are held in title by Oneida Silversmiths.

8.      EPA Information Request — Lancaster OH

On February 29, 2012, the Company received a request from U.S. EPA Region V to provide information pursuant to Section 114 of the Clean Air Act ("CAA") relating to the Company's

manufacturing facility in Lancaster, OH. U.S. EPA requested information to determine whether the Lancaster facility's emission sources comply with the CAA. Specifically, U.S. EPA requested information regarding the glass melting furnaces at the Lancaster facility and any modifications that have been made to the furnaces since 1990.

The Company responded to the information request on April 30, 2012 and May 30, 2012. On November 15, 2012, Anchor received from U.S. EPA an additional Section 114 information reqUue.Ss.t. EPA requested additional information related to CAA compliance, and required an air emission stack test on one of the facility's glass melting furnaces. The Company responded to the request on December 17, 2012, and conducted the stack testing on January 31, 2013.

The stack test demonstrated compliance with permit limits for all species. The Lancaster facility was previously investigated by U.S. EPA Region V in 2005 regarding the installation of furnace #3 done in 1993 when the facility was owned and operated by Newell-Rubbermaid. That previous investigation concluded with a "No Further Action" determination by U.S. EPA in February 2006. The Company is not aware of any significant changes to the Lancaster facility's furnaces other than the 1993 installation furnace #3 for which a No Further Action determination was made. Accordingly, although the ultimate outcome and costs are unknown at this time, the Company does not currently anticipate material capital costs or penalties associated with the current EPA information request.

SCHEDULE 5.13

SUBSIDIARIES; OTHER EQUITY INVESTMENTS

*Domestic Subsidiaries of Universal Tabletop, Inc.*

| Name | Jurisdiction Incorporation | Date of Incorporation | Ownership Percentage |
|---|---|---|---|
| Oneida Ltd. | Delaware | 1880 (in New York, (reincorporated in Delaware in 2006) | 100% |
| Anchor Hocking, LLC | Delaware | March 5, 2007 | 100% |

*Direct and Indirect Domestic Subsidiaries of Oneida Ltd.*

| Name | Jurisdiction Incorporation | Date of Incorporation | Holder[2] | Ownership Percentage |
|---|---|---|---|---|
| Buffalo China, Inc. | NY | 10/3/40 | | 100% |
| Delco International, Ltd. | NY | 11/12/52 | | 100% |
| Kenwood Silver Company, Inc. | NY | 1/2/62 | | 100% |
| Oneida Food Service, Inc. | NY | 6/27/02 | Buffalo China, Inc. | 100% |
| Oneida International Inc. | DE | 9/22/88 | | 100% |
| Oneida Silversmiths Inc. | NY | 7/12/02 | | 100% |
| Sakura, Inc. | NY | 5/12/00 | | 100% |
| THC Systems, Inc. | NY | 8/26/96 | | 100% |

*Foreign Subsidiaries*

| Name | Jurisdiction Incorporation | Date of Incorporation | Holder[3] | Ownership Percentage |
|---|---|---|---|---|
| Anchor Hocking Canada, Inc. | Canada | 4/12/07 | Universal Tabletop, Inc. | 100% |
| Oneida Canada, Limited | Canada | 12/15/72 | | 100% |
| Ceramica de Juarez SA de CV | Mexico | 9/30/87 | Buffalo China, Inc.[4] | 100% |
| Oneida Italy, S.r.l. (to be | Italy | 12/21/98 via me | Oneida | 100% |

---

[2] Oneida Ltd., unless otherwise noted.
[3] Oneida Ltd., unless otherwise noted.
[4] 497 shares held by Buffalo China, Inc. 3 shares held by Oneida Ltd.

#4829-5338-7298v12

| dissolved) | | | International Inc. | |
|---|---|---|---|---|
| Oneida, S.A. de CV. | Mexico | 6/23/99 | | 100%[5] |
| Oneida U.K. Limited | U.K. | 5/24/00 | | 100% |
| Oneida (Guangzhou) Foodservice Co., Ltd. | China | 8/1/08 | | 100% |
| BT Partner Participacoes Societarias LTDA | Brazil | 9/16/13 | Universal Tabletop, Inc. | 60% |

---

[5] 1 share of Series A held by Kerri Love.

#4829-5338-7298v12

SCHEDULE 7.03

EXISTING INDEBTEDNESS

| Lender | Debtor | Date of N | Amount of Not |
|---|---|---|---|
| Oneida Ltd. | Pension Benefit Guaranty Corporation (PBGC) | 9/15/06 | $3,000,000 at issuance, current balance $300,000 |

7.03-1

SCHEDULE 7.08

TRANSACTIONS WITH AFFILIATES

None.

SCHEDULE 12.02

ADMINISTRATIVE AGENT'S OFFICE; CERTAIN ADDRESSES FOR NOTICES

IF TO THE ADMINISTRATIVE AGENT:

> Wilmington Trust, National Association
> 50 South Sixth Street, Suite 1290
> Minneapolis, Minnesota 55402
> Attention: Jeffery T. Rose
> Telephone: (612) 217-5630
> Facsimile: (612) 217-5651

With a copy (which shall not constitute notice) to:

> Ropes & Gray LLP
> 1211 Avenue of the Americas
> New York, New York 10036
> Attention: Mark R. Somerstein
> Telephone: (212) 596-9000
> Facsimile: (212) 596-9090

IF TO THE BORROWER:

> Universal Tabletop, Inc.,
> Anchor Hocking, LLC, and
> Oneida Ltd.
> 519 North Pierce Avenue
> Lancaster, OH 43170
> Attention: Eric Schoenberger
> Telephone: (740) 681-6417
> Facsimile: (740) 681-6455

With a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP

> 300 North La Salle
> Chicago, Illinois 60654
> Attention: Richard W. Porter, P.C.;
> David Milligan
> Telephone: (312) 862-7045
> Telecopy: (312) 862-2200

#4829-5338-7298v12

**EXHIBITS**

|   | *Form of* |
|---|---|
| A | Committed Loan Notice |
| B | Notice of Withdrawal |
| C | Prepayment Notice |
| D | Budget |
| E | Assignment and Assumption |
| F | [Reserved] |
| G-1 | U.S. Tax Compliance Certificate |
| G-2 | U.S. Tax Compliance Certificate |
| G-3 | U.S. Tax Compliance Certificate |
| G-4 | U.S. Tax Compliance Certificate |
| H | Closing Certificate |
| I | Exit Term Sheet |
| J | Interim Bankruptcy Court Order |

**EXHIBIT A**

<u>Form of Committed Loan Notice</u>

[to be attached.]

**EXHIBIT B**

<u>Form of Notice of Withdrawal</u>

Wilmington Trust, National Association,
as Administrative Agent
50 South Sixth Street, Suite 1290
Minneapolis, Minnesota 55402
Attention: Jeffery T. Rose
Telephone: (612) 217-5630
Facsimile: (612) 217-5651

[Date]

Ladies and Gentlemen:

Reference is made to the Debtor-in-Possession Term Loan Agreement dated as of April [__], 2015 (as amended, modified or supplemented from time to time, the "<u>DIP Term Loan Agreement</u>") among Anchor Hocking, LLC, a Delaware limited liability company, as debtor and debtor-in-possession ("<u>Anchor</u>" or "<u>Borrower Agent</u>"), Oneida Ltd., a Delaware corporation, as debtor and debtor-in-possession ("<u>Oneida</u>" and together with Anchor, each individually a "<u>Borrower</u>" and collectively, "<u>Borrowers</u>"), Universal TableTop, Inc., a Delaware corporation, as debtor and debtor-in-possession ("<u>Holdings</u>") and certain of its subsidiaries party hereto, each as debtor and debtor-in-possession (together with Holdings, the "<u>Guarantors</u>"), each lender from time to time party hereto (collectively, the "<u>Lenders</u>" and individually, a "<u>Lender</u>") and Wilmington Trust, National Association, as Administrative Agent (the "<u>Administrative Agent</u>"). Capitalized terms defined in the DIP Term Loan Agreement and not otherwise defined herein have, as used herein, the respective meanings provided for therein.  This notice constitutes a Notice of Withdrawal pursuant to Section [2.02(d)][10.05(e)] of the DIP Term Loan Agreement.

1.      The date of the withdrawal from the DIP Term Loan Funding Account shall be [April 10, 2015 or such other date following the entry of the Interim Bankruptcy Court Order] [May 1, 2015] [the earlier of July 10, 2015 and the date of the Confirmation Order] [one Business Day following the Termination Declaration Date] (the "<u>Withdrawal Date</u>").

2.      The aggregate principal amount of the Withdrawal shall be [$17,500,000][1] [$5,000,000][2] [$12,000,000][3] [$[●]][4] (the "<u>Withdrawal</u>").

3.      The account to be credited with the proceeds of the Withdrawal is:

> Wire instructions for [_____]
> Beneficiary: [Anchor Hocking, LLC, as Borrower

---

[1] Amount to be up to $17,500,000 for the Withdrawal on or about April 10, 2015.

2 Amount to be up to $5,000,000  for the Withdrawal on May 1, 2015.

3 Amount to be up to $12,000,000  for the Withdrawal on the earlier of July 10, 2015 and the date of the Confirmation Order.

4 Amount to equal the Post-Carve Out Trigger Notice Cap [and the then unpaid amounts of the Allowed Professional Fees as specified in Section 10.05(e)].

#4829-5338-7298v12

Agent]
Account Number: [_____]
ABA Number: [_____]

4.      [The Borrower Agent hereby represents and warrants, on behalf of the Borrowers, that the conditions to the Withdrawal on the Withdrawal Date set forth in Sections 4.02 and 4.03 are satisfied. ]$^5$

5.      The Withdrawal requested herein complies, and the application of the funds so disbursed to the Borrowers will comply, with the terms of the DIP Term Loan Agreement, including without limitation the Budget, in all respects.

*[Signature page follows]*

---

$^5$ To be deleted if the Notice of Withdrawal is submitted in accordance with Section 10.05(e) following a Termination Declaration Date.

Exhibit B-2

**ANCHOR HOCKING, LLC,**
as Borrower Agent and Borrower


By: _____
    Name:
    Title:

Exhibit B-3

**EXHIBIT C**

Form of Prepayment Notice

[to be attached.]

Exhibit C-1

**EXHIBIT C**

<u>Budget</u>

[to be attached.]

**EXHIBIT E**

<u>Form of Assignment and Assumption</u>

[to be attached.]

#4829-5338-7298v12

**EXHIBIT G-1 – G-4**

<u>Forms of U.S. Tax Compliance Certificate</u>

[to be attached.]

**EXHIBIT H**

<u>Form of Closing Certificate</u>

[to be attached.]

Exhibit H-1

**EXHIBIT I**

<u>Exit Term Sheet</u>

[to be attached.]

Exhibit I-1

**EXHIBIT J**

Form of Interim Bankruptcy Court Order

[to be attached.]

**EXHIBIT 2**

**Ratification Amendment Agreement (DIP ABL Credit Facility)**

<u>RATIFICATION AND AMENDMENT AGREEMENT</u>

This RATIFICATION AND AMENDMENT AGREEMENT (the "Ratification Agreement") dated as of April __, 2015, is by and among Wells Fargo Bank, National Association, a national banking association, in its capacity as administrative agent acting for and on behalf of the parties to the Loan Agreement (as defined below) as lenders (in such capacity, "Administrative Agent") and its capacity as collateral agent acting on behalf of the parties to the Loan Agreement as Lenders and the other Secured Parties, in such capacity, the "Collateral Agent", sometimes the Collateral Agent and Administrative Agent are referred to herein, collectively,  as the "Agent"), the parties to the Loan Agreement as lenders (each individually, a "Lender" and collectively, "Lenders"), Oneida Ltd., a Delaware corporation, as Debtor and Debtor-in-Possession (the "Oneida"), Anchor Hocking, LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("Anchor", and together with Oneida, each, individually a "Borrower" and collectively, "Borrowers"), Universal Tabletop, Inc., a Delaware corporation, as Debtor and Debtor-in-Possession ("Parent"), and each other Subsidiary of Parent party thereto, as Debtor and Debtor-in-Possession (together with Parent, each a "Guarantor", and collectively, "Guarantors").

<u>W I T N E S S E T H</u>:

WHEREAS, Borrowers and each Guarantor (collectively, the "Debtors") has commenced a case under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, and each Borrower and each Guarantor has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession;

WHEREAS, prior to the commencement of the Chapter 11 Cases (as defined below), Agent and Lenders made loans and advances and provided other financial or credit accommodations to Borrowers secured by substantially all assets and properties of Borrowers and Guarantors as set forth in the Existing Loan Documents (as defined below) and the Existing Guarantor Documents (as defined below);

WHEREAS, the Bankruptcy Court (as defined below) has entered a Financing Order (defined below) pursuant to which Agent and Lenders may make post-petition loans and advances, and provide other financial accommodations, to Borrowers secured by substantially all the assets and properties of Borrowers and Guarantor as set forth in the Financing Order and the Loan Documents (as defined below);

WHEREAS, the Financing Order provides that as a condition to the making of such post-petition loans, advances and other financial accommodations, Borrowers and Guarantors shall execute and deliver this Ratification Agreement;

WHEREAS, Borrowers and Guarantor desire to reaffirm their obligations to Agent and Lenders pursuant to the Existing Loan Documents and acknowledge their continuing liabilities to Agent and Lenders thereunder in order to induce Agent and Lenders to make such post-petition loans and advances, and provide such other financial accommodations, to Borrowers; and

WHEREAS, Borrowers and Guarantors have requested that Agent and Lenders make post-petition loans and advances and provide other financial or credit accommodations to Borrowers and make certain amendments to the Loan Agreement (as defined below), and Agent and Lenders are willing to do so, subject to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent, Lenders, Borrowers and Guarantors mutually covenant, warrant and agree as follows:

1.    DEFINITIONS.

1.1    Additional Definitions.  As used herein, the following terms shall have the respective meanings given to them below and the Loan Agreement and the other Loan Documents shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

(a)    "Bankruptcy Court" means the United States Bankruptcy Court or the United States District Court for the District of Delaware

(b)    "Bankruptcy Code" means the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

(c)    "Budget" means the fourteen (14) week budget delivered to Agent in accordance with Section 5.3 of the Ratification Agreement (a summary of which is attached hereto as Exhibit A), in form and substance satisfactory to Administrative Agent, together with any subsequent or amended budgets thereto delivered to Administrative Agent and Lenders, in form and substance satisfactory to Administrative Agent, in accordance with the terms and conditions hereof.

(d)    "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Loan Parties and any affiliated debtors-in-possession pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") at any time before or on the first business day following delivery by the DIP Term Loan Agent  of a Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $750,000 incurred after the first business day following delivery by the DIP Term Loan Agent of the Carve-Out Trigger Notice,

to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap").

        (e)     "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Term Loan Agent to the Loan Parties and any affiliated debtors-in-possession, their lead restructuring counsel, the U.S. Trustee and Administrative Agent, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the obligations under the Loan Agreement and/or under the DIP Term Loan Credit Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

        (f)     "Chapter 11 Cases" means the Chapter 11 cases of Borrowers and Guarantors which are being jointly administered under the Bankruptcy Code and are pending in the Bankruptcy Court.

        (g)     "Debtors" means, collectively, Borrowers and Guarantors, each as Debtor and Debtor-in-Possession in the Chapter 11 Cases.

        (h)     "DIP Term Loan Agent" means Wilmington Trust, National Association, in its capacity as administrative agent pursuant to the DIP Term Loan Documents, and its successors, assigns or any replacement agent appointed pursuant to the terms of the DIP Term Loan Agreement.

        (i)     "DIP Term Loan Agreement" means the Term Loan Agreement, dated of even date herewith, among Anchor, as borrower agent, Oneida, as borrower, the subsidiaries of Anchor and Oneida, parties thereto as guarantors, the lenders from time to time parties thereto, and DIP Term Loan Agent, as administrative agent, as it may be amended, restated, refinanced, replaced or otherwise modified from time to time.

        (j)     "DIP Term Loan Debt" means the "Secured Obligations" of the Loan Parties under and as defined in the DIP Term Loan Agreement.

        (k)     "DIP Term Loan Documents" means the DIP Term Loan Agreement and each other agreement, certificate, document, or instrument executed or delivered by Parent or its Subsidiaries to DIP Term Loan Agent or any DIP Term Loan Lender in connection therewith, whether prior to, on, or after the closing of the DIP Term Loan Agreement, and any and all renewals, extensions, amendments, modifications, refinancings or restatements of any of the foregoing.

        (l)     "DIP Term Loan Facility" means the term loan credit facility evidenced by the DIP Term Loan Agreement.

        (m)     "DIP Term Loan Funding Account" has the meaning ascribed to such term in the DIP Term Loan Agreement (as in effect on the date hereof).

        (n)     "DIP Intercreditor Agreement" means the Intercreditor Agreement, dated as of May 21, 2013, by and among Administrative Agent on behalf of itself and the other Secured Parties, and the Term Loan Agent, on behalf of itself and the Term Loan Lenders, as

amended by the Financing Order with the consent of the Agent (as further amended, restated, supplemented or otherwise modified from time to time in accordance with its terms); all references in the Existing Loan Agreement and Existing Loan Documents to the "Intercreditor Agreement", are hereby deemed references to the "DIP Intercreditor Agreement."

(o)     "DIP Term Loan Lenders" means each of the lenders party to the DIP Term Loan Agreement, as "Lenders" from time to time.

(p)     "Existing Loan Documents" means the Loan Documents (as defined in the Existing Loan Agreement), including, without limitation, the Existing Guarantor Documents (as defined below), in each instance, as in effect immediately prior to the Petition Date.

(q)     "Existing Guarantor Documents" means the Second Amended and Restated Guaranty, dated as of May 21, 2013, by each Guarantor in favor of Agent for the benefit of Agent and the other Secured Parties, Existing Loan Agreement and any other documents executed by any Guarantor, in each case, as in effect immediately prior to the Petition Date.

(r)     "Existing Loan Agreement" means the Second Amended and Restated Loan and Security Agreement, dated as of May 21, 2013, by and among Borrowers, Guarantors, Agent and Lenders, as amended by Amendment No. 1 to the Second Amended and Restated Loan and Security Agreement, dated as of May 14, 2014, Amendment No. 2 to the Second Amended and Restated Loan and Security Agreement, dated as of May 30, 2014, Amendment No. 3 to the Second Amended and Restated Loan and Security Agreement, dated as of  June 30, 2014, Amendment No. 4 to the Second Amended and Restated Loan and Security Agreement, dated as of July 15, 2014, Amendment No. 5 to the Second Amended and Restated Loan and Security Agreement, dated as of July 22, 2014, and Amendment No. 6 to the Second Amended and Restated Loan and Security Agreement, dated as of July 30, 2014, as in effect immediately prior to the Petition Date.

(s)     "Financing Order" means the Interim Financing Order, the Permanent Financing Order and such other orders relating thereto or authorizing the granting of credit by Agent and Lenders to Borrowers on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Cases.

(t)     "Guarantor Documents" means, collectively, the Existing Guarantor Documents, as amended by this Ratification Agreement, in each instance, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(u)     "Interim Financing Order" shall have the meaning set forth in Section 9.9 hereof.

(v)     "Permanent Financing Order" shall have the meaning set forth in Section 9.11 hereof.

(w)    "Petition Date" means the date of the commencement of the Chapter 11 Cases.

(x)    "Post-Petition Collateral" means, collectively, all now existing and hereafter acquired real and personal property of each Debtor's estate, wherever located, of any kind, nature or description, including any such property in which a lien is granted to Agent and Lenders pursuant to the Loan Documents, the Financing Order or any other order entered or issued by the Bankruptcy Court, and shall include, without limitation (excluding, in each case, any Excluded Assets):

(i)    all of the Pre-Petition Collateral;

(ii)    all Accounts;

(iii)    all general intangibles, including, without limitation, all Intellectual Property;

(iv)    all goods, including, without limitation, all Inventory and all Equipment;

(v)    all Real Property and fixtures;

(vi)    all chattel paper, including, without limitation, all tangible and electronic chattel paper;

(vii)    all instruments, including, without limitation, all promissory notes;

(viii)    all documents;

(ix)    all deposit accounts;

(x)    all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

(xi)    all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including, without limitation, (A) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (B) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (C) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (D) deposits by and property of account debtors or other persons securing the obligations of account debtors;

(xii)    all (A) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or

commodity accounts) and (B) monies, credit balances, deposits and other property of any Borrower or Guarantor now or hereafter held or received by or in transit to Administrative Agent, Collateral Agent, any Lender or their respective Affiliates or at any other depository or other institution from or for the account of any Borrower or Guarantor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xiii)    all commercial tort claims;

(xiv)    to the extent not otherwise described above, all Receivables;

(xv)    all claims, rights, interests, assets and properties (recovered by or on behalf of each Borrower and Guarantor or any trustee of such Borrower or Guarantor (whether in the Chapter 11 Cases or any subsequent case to which any of the Chapter 11 Cases is converted), including, without limitation, all property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to Sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code;

(xvi)    all Records; and

(xvii)    all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral;

provided, that, the Collateral shall not include the DIP Term Loan Funding Account and the Segregated Operating Account and amounts deposited therein.

(y)    "Post-Petition Obligations" means all Obligations (as defined in the Existing Loan Agreement) arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Cases, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Cases, and whether arising under or related to this Ratification Agreement, the Loan Agreement, the Guarantor Documents, the other Loan Documents, a Financing Order, by operation of law or otherwise, and whether incurred by such Borrower or Guarantor as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, debtor-in-possession facility fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

(z)    "Pre-Petition Collateral" means, collectively, (i) all "Collateral" as such term is defined in the Existing Loan Agreement as in effect immediately prior to the Petition Date, (ii) all "Collateral" and "Pledged Collateral" as such terms are defined in each of the other Existing Loan Documents as in effect immediately prior to the Petition Date, and (iii) all other security for the Pre-Petition Obligations as provided in the Existing Loan Agreement, the Existing Guarantor Documents and the other Existing Loan Documents immediately prior to the Petition Date.

(aa)    "Pre-Petition Obligations" means all Obligations (as such term is defined in the Existing Loan Agreement) arising at any time before the Petition Date.

(bb)    "Ratification Agreement" means this Ratification and Amendment Agreement by and among Borrowers, Guarantors, Agent and Lenders, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(cc)    "Special Reserve" means a reserve against the Borrowing Base in the amount of $7,500,000, provided, that, at all times upon and after the entry of the Interim Financing Order and receipt by Administrative Agent of evidence of Borrowers' right to draw the proceeds of the DIP Term Loan, a reserve against the Borrowing Base in the amount of $9,000,000.

(dd)    "Segregated Operating Account" shall have the meaning ascribed to such term in the DIP Term Loan Agreement (as in effect on the date hereof).

(ee)    "Term Loan Lenders" means each of the lenders party to the Term Loan Agreement, as "Lenders" from time to time.

### 1.2    Amendments to Definitions.

(a)    Adjusted Availability.  The definition of "Adjusted Availability" in the Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Adjusted Availability' means the lesser of (a) the amount of the Borrowing Base and (b) the Maximum Revolver Amount minus the Aggregate Revolver Outstandings."

(b)    Applicable Margin.  The definition of "Applicable Margin" in the Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Applicable Margin' means, with respect to Base Rate Revolving Loans, two percent (2.00%) and LIBO Rate Revolving Loans, three percent (3.00%), in each case on a per annum basis.

(c)    Availability.  The definition of "Availability" in the Loan Agreement is hereby deleted in its entirety and the following substituted therefor

" 'Availability' means, at any time, (a) the less of (i) the amount of the Borrowing Base or (ii) the Maximum Revolver Amount minus (b) the Aggregate Revolver Outstandings."

(d)    Borrowing Base.  Clause (b) in the definition of "Borrowing Base" in the Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

"(b) the following reserves (i) all reserves which the Administrative Agent or the Collateral Agent deems necessary in the exercise of its Reasonable Credit Judgment to maintain with

respect to any Borrower or the Collateral, including without limitation reserves for any amounts which either Agent or any Lender may be obligated to pay in the future for the account of any Borrower, (ii) the amount of the Special Reserve, (iii) the Bank Product Reserve Amount, and (iv) reserves as may be applicable under the circumstances in connection with the Chapter 11 Case, including reserves in respect of (A) the amount of any senior Liens or claims in or against the Collateral that, in Administrative Agent's or Collateral Agent's good faith determination, have priority over the liens and claims of Administrative Agent and Lenders, and (B) the amount of priority or administrative expense claims that, in Administrative Agent's good faith determination, require payment during the Chapter 11 Case."

(e)     Collateral.  All references to the term "Collateral" in the Loan Agreement or the other Loan Documents, or any other term referring to the security for the Pre-Petition Obligations, shall be deemed, and each such reference is hereby amended to mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.

(f)     Debtors.  All references to Debtors, including, without limitation, to the terms "Borrower," "Borrowers," "Guarantor" or "Guarantors" in the Loan Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean and include the Debtors as defined herein, and their successors and assigns (including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(g)     Eligible Inventory.  Clause (h) of the definition of "Eligible Inventory" in the Loan Agreement is hereby amended by replacing the reference to "$7,500,000" with "$5,000,000."

(h)     Loan Documents.  All references to the term "Loan Documents" in the Loan Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to include, in addition and not in limitation, this Ratification Agreement and all of the Existing Loan Documents, as ratified, assumed and adopted by each Borrower and Guarantor pursuant to the terms hereof, as amended and supplemented hereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(i)     Letter of Credit Sublimit.  The definition of "Letter of Credit Sublimit" in the Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Letter of Credit Sublimit' means $12,500,000."

(j)      Loan Agreement.  All references to the term "Loan Agreement" in the Loan Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean the Existing Loan Agreement, as amended by this Ratification Agreement and as ratified, assumed and adopted by each Borrower and Guarantor pursuant to the terms hereof and the Financing Order, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(k)      Material Adverse Effect.  All references to the term "Material Adverse Effect," "material adverse effect" or "material adverse change" in the Loan Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to add at the end thereof:  "provided, that, the commencement of the Chapter 11 Cases and the events and conditions related and/or leading up to and effects thereof shall not constitute a Material Adverse Effect".

(l)      Obligations.  All references to the term "Obligations" in the Loan Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean both the Pre-Petition Obligations and the Post-Petition Obligations.

(m)      Permitted Liens.  The following clauses (x) and (y) are hereby added to the definition of "Permitted Liens":

"(x) Liens on the Collateral granted in favor of the DIP Term Loan Agent to secure the DIP Term Loan Debt, so long as such Liens are subject to the DIP Intercreditor Agreement; and

(y) Liens on the Collateral in respect of the Carve-Out; provided, that, any such Lien on the ABL Priority Collateral, is at all times junior and subordinate in priority and right of payment to the Liens of Administrative Agent in the ABL Priority Collateral securing all Obligations."

(n)      Termination Date.  The definition of "Termination Date" in the Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Termination Date' means the earliest to occur of (a) July 31, 2015, (b) thirty (30) days after the entry of the Interim Financing Order if the Permanent Financing Order has not been entered prior to the expiration of such thirty (30) day period (or such longer period if consented to in writing by the Agent), (c) the effective date of a plan of reorganization filed in the Chapter 11 Cases pursuant to an order entered by the Bankruptcy Court; provided, that, relative to the treatment of the liens and claims of each the Loan Agreement and the Existing Loan Agreement, such plan and the order confirming such plan are acceptable the Administrative Agent, (d) the acceleration of the DIP Term Loan Debt or the termination of any commitment thereunder prior to the

funding of the DIP Term Loan, (e) the date the Bankruptcy Court orders the conversion of the bankruptcy case of any Debtor to a Chapter 7 liquidation, (f) the date the Maximum Revolver Amount is terminated either by the Borrowers pursuant to Section 4.2 or Section 13.1 or by the Required Lenders pursuant to Section 12.2 or Section 13.1, (g) the date this Agreement is otherwise terminated for any reason whatsoever (including pursuant to Section 12.2) pursuant to the terms of this Agreement and (h) the acceleration of the Obligations or termination of the Commitments hereunder, including without limitation, as a result of the occurrence of an Event of Default."

(o)     <u>Threshold Amount</u>.  The definition of "Threshold Amount" in the Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Threshold Amount' means $5,000,000."

1.3     <u>Interpretation</u>.

(a)     For purposes of this Ratification Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Loan Agreement.

(b)     All references to the terms "Agent," and "Lenders" shall include their respective successors and assigns.

(c)     All references to the terms "Borrowers", "Guarantors" or "Debtors" in any of the Existing Loan Documents shall be deemed and each such reference is hereby amended to mean and include (as applicable) the Debtors, each as defined herein, and their successors and assigns (including any trustee or other fiduciary hereafter appointed as any Debtor's legal representative, as applicable, or with respect to any Debtor the property of the estate of such Debtor whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case or cases and its successor upon conclusion of the Chapter 11 Case of such Debtor, as the case may be).

(d)     All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular unless the context of such usage requires otherwise.

(e)     All terms not specifically defined herein which are defined in the Uniform Commercial Code, as in effect in the State of New York as of the date hereof, shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

2.      ACKNOWLEDGMENT.

2.1     Pre-Petition Obligations.  Each Borrower and Guarantor hereby acknowledges, confirms and agrees that, as of April [__], 2015, Borrowers are indebted to Agent and Lenders in respect of all Pre-Petition Obligations in the aggregate principal amount of not less than $_____, consisting of (a) Revolving Loans to each Borrower made pursuant to the Existing Loan Documents in the aggregate principal amount of not less than $_____, together with interest accrued and accruing thereon, and (b) Letter of Credit Obligations in the amount of $_____, together with interest accrued and accruing thereon, and all costs, expenses, fees (including attorneys' fees and legal expenses) and (d) other charges now or hereafter owed by Borrowers to Agent and Lenders, all of which are unconditionally owing by Borrowers to Agent and Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

2.2     Guaranteed Obligations.  Each Guarantor hereby acknowledges, confirms and agrees that:

(a)     all obligations of such Guarantors under the Guarantor Documents are unconditionally owing by such Guarantor to Agent and Lenders without offset, defense or counterclaim of any kind, nature and description whatsoever, and

(b)     the absolute and unconditional guarantee of the payment of the Pre-Petition Obligations by such Guarantor pursuant to the Guarantor Documents extends to all Post-Petition Obligations, subject only to the limitations set forth in the Guarantor Documents.

2.3     Acknowledgment of Security Interests.  Each Borrower and Guarantor hereby acknowledges, confirms and agrees that Agent, for the benefit of itself and the other Lenders, has and shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to Agent and Lenders pursuant to the Existing Loan Documents as in effect immediately prior to the Petition Date to secure all of the Obligations, as well as valid and enforceable first priority and senior security interests in and liens upon all Post-Petition Collateral granted to Agent, for the benefit of itself and the other Lenders, under the Financing Order or hereunder or under any of the other Loan Documents or otherwise granted to or held by Agent and Lenders, in each case, subject only to liens or encumbrances expressly permitted by the Loan Agreement (including, without limitation, Permitted Liens) and any other liens or encumbrances expressly permitted by the Financing Order that may have priority over the liens in favor of Agent and Lenders.

2.4     Binding Effect of Documents.  Each Borrower and Guarantor hereby acknowledges, confirms and agrees that: (a) each of the Existing Loan Documents to which it is a party was duly executed and delivered to Agent and Lenders by such Borrower or Guarantor and each is in full force and effect as of the date hereof, (b) the agreements and obligations of such Borrower or Guarantor contained in the Existing Loan Documents constitute the legal, valid and binding obligations of such Borrower or Guarantor enforceable against it in accordance with the terms thereof, and such Borrower or Guarantor has no valid defense, offset or counterclaim to the enforcement of such obligations, and (c) Agent and Lenders are and shall be entitled to all

of the rights, remedies and benefits provided for in (i), subject to the entry and terms of the Financing Orders, the Loan Documents and (ii) the Financing Order.

3.     ADOPTION AND RATIFICATION.

Each Borrower and Guarantor hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Existing Loan Documents to which it is a party and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Existing Loan Documents, as amended by this Ratification Agreement, and in accordance with the Financing Order.  All of the Existing Loan Documents are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Borrowers and Guarantors, each as Debtor and Debtor-in-Possession, and considered as agreements between such Borrowers or Guarantors, on the one hand, and Agent and Lenders, on the other hand.  Each Borrower and Guarantor hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Existing Loan Documents, as amended and supplemented pursuant hereto and the Financing Order, and each Borrower and Guarantor agrees to be fully bound, as Debtor and Debtor-in-Possession, by the terms of the Loan Documents to which such Borrower or Guarantor is a party.

4.     GRANT OF SECURITY INTEREST.

As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), Borrowers and Guarantors, each as Debtor and Debtor-in-Possession, hereby grant, pledge and assign to the Collateral Agent, for the benefit of itself and the other Secured Parties, and also confirm, reaffirm and restate the prior grant to Collateral Agent and the other Secured Parties of, continuing security interests in and liens upon, and rights of setoff against, all of the Collateral.

5.     ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS.

In addition to the continuing representations, warranties and covenants heretofore and hereafter made by Borrowers and Guarantors to Agent and Lenders, whether pursuant to the Loan Documents or otherwise, and not in limitation thereof, each Borrower and Guarantor hereby represents, warrants and covenants to Agent and Lenders the following (which shall survive the execution and delivery of this Ratification Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition of the making of Revolving Loans by Agent and Lenders:

5.1     Financing Order.  The Interim Financing Order (and, following the expiration of the Interim Financing Period defined therein, the Permanent Financing Order) has been duly entered, is valid, subsisting and continuing and has not been vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by Agent) and is not subject to any pending appeal or stay.

5.2     Use of Proceeds.  All Revolving Loans and Letters of Credit provided by Administrative Agent or any Lender to Borrowers pursuant to the Financing Orders, the Loan Agreement or otherwise, shall be used by Debtors and their Subsidiaries and for general operating and working capital purposes in the ordinary course of business of the Debtors and

their Subsidiaries in accordance with the Budget pursuant to Section 5.3 of this Ratification Agreement; for the avoidance of doubt, no proceeds of the Revolving Loans or any Letters of Credit shall be used to fund or ensure that adequate funds are set aside for or available to fund the Carve-Out obligations.  Unless authorized by the Bankruptcy Court and approved by Agent in writing, no portion of any administrative expense claim or other claim relating to the Chapter 11 Cases shall be paid with the proceeds of such Revolving Loans or Letters of Credit provided by Agent and Lenders to Borrowers, other than those administrative expense claims and other claims relating to the Chapter 11 Cases directly attributable to the operation of the business of any Borrower or Guarantor in the ordinary course of such business in accordance with the Loan Documents.

   5.3 <u>Budget</u>.

   (a) Borrowers have prepared and delivered to Administrative Agent and Lenders a fourteen (14) week post-petition Budget.  The Budget has been thoroughly reviewed by the Borrowers and their management and sets forth, for the periods covered thereby, projected weekly cash receipts, disbursements, net cash flow, net sales, eligible accounts, eligible inventory, payable float, loans and availability for each week of the fourteen (14) consecutive week period commencing with the week ending April [__], 2015.

   (b) Not later than 11:59 p.m. (Eastern time) on the Wednesday of each week commencing on April [__], 2015, Borrowers shall furnish to Administrative Agent, in form and substance satisfactory to Administrative Agent, a report in form satisfactory to the Administrative Agent (the "Budget Compliance Report") that (i) sets forth for the immediately preceding week and on a cumulative, weekly roll-forward basis through the end of such week the actual results for the following items: (A) net cash flow, (B) excess availability, and (C) loan balance, noting therein variances from values set forth for such periods in the Budget, and (ii) an explanation for all material variances, certified by the chief financial officer of the Borrowers. Such report/reconciliation shall also note any variances with values set forth in the Budget as of the day of such report/reconciliation.

   (c) Each Debtor acknowledges, confirms and agrees that, for each period measured in a Budget Compliance Report in accordance with Section 5.3(b) of this Ratification Agreement, the actual "Net Cash Flow (Deficit)" excluding "Bankruptcy Professional Fees" (measured on a cumulative, weekly roll-forward basis) shall not vary more than fifteen percent (15%) from the "Net Cash Flow (Deficit)" excluding "Bankruptcy Professional Fees" set forth in the Budget in respect of such period (measured on a cumulative, weekly roll-forward basis).

   (d) Each Debtor hereby confirms, acknowledges and agrees that, unless waived in writing by Administrative Agent, (i) a failure to maintain the deviations in the Budget in an amount equal to or less than the percentage set forth in Section 5.3(c) hereof shall constitute a material deviation from the Budget and an additional Event of Default (each, a "Material Budget Deviation") and (ii)  the failure to deliver any reports with respect to any Budget, in form and substance satisfactory to Administrative Agent, as provided in Section 5.3(b) hereof shall constitute an Event of Default.  Notwithstanding any approval by Administrative Agent or any Lender of the Budget or any subsequent or amended Budget(s),

Agent and Lenders will not, and shall not be required to, provide any Revolving Loans or Letters of Credit to Borrower pursuant to the Budget, but shall only provide Revolving Loans and Letters of Credit in accordance with the terms and conditions set forth in the Loan Agreement as amended by this Ratification Agreement, the other Loan Documents and the Financing Order. Agent and Lenders are relying upon the Borrowers' delivery of, and compliance with, the Budget in accordance with this Section 5.3 in determining to enter into the post-petition financing arrangements provided for herein.

(e)　　Notwithstanding any projected amounts set forth in the Budget relating to the costs and expenses of Agent and the other Secured Parties that are reimbursable by Borrowers or any other amounts owing by Borrowers to Agent and the Secured Parties (including, without limitation reasonable attorneys and consulting fees and expenses) in accordance with the Loan Agreement and the other Loan Documents, such projections shall not limit, impair, modify or waive the Loan Parties' obligation to pay the actual amounts due to Agent and/or the other Secured Parties in respect of such costs, expenses and other amounts owing to Agent and Lenders in accordance with the Loan Agreement and the other Loan Documents.

5.4　　[Reserved].

5.5　　Ratification of Deposit Account Control Agreement.　To the extent Agent deems it necessary in its reasonable discretion and upon Agent's request, Borrowers and Guarantor shall promptly provide Agent with evidence, in form and substance satisfactory to Agent, that the Deposit Account Control Agreement (as defined in the Financing Order) and other deposit account arrangements provided for under Section 6.9 of the Loan Agreement have been ratified and amended by the parties thereto, or their respective successors in interest to reflect the commencement of the Chapter 11 Cases, that each Borrower and each Guarantor, as Debtor and Debtor-in-Possession, is the successor in interest to such Borrower or Guarantor, that the Obligations include both the Pre-Petition Obligations and the Post-Petition Obligations, that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for.

5.6　　ERISA.　Each Borrower and Guarantor hereby represents and warrants with, to and in favor of Agent and Lenders that (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of any Borrower or Guarantor arising under ERISA, whether held by the Pension Benefit Guaranty Corporation (the "PBGC") or the contributing sponsor of, or a member of the controlled group thereof, any pension benefit plan of any Borrower or Guarantor and (b) no notice of lien has been filed by the PBGC (or any other Person) pursuant to ERISA against any assets or properties of any Borrower or Guarantor.

5.7　　Carve-Out.　The Carve-Out shall be junior and subordinate in priority and the right of payment to the right to payment and liens granted to Administrative Agent and Lenders in the ABL Priority Collateral securing all Obligations.

6.    DIP FACILITY FEE.

Borrowers shall pay to Agent, for the account of Lenders on a pro rata basis according to their respective Commitments, a debtor-in-possession financing facility fee, in the amount of $90,000, on account of the financing provided by Agent and Lenders to Borrowers in the Chapter 11 Cases, which fee shall be fully earned and due and payable on the date hereof and which may be charged directly to the loan account of any Borrower maintained by Agent.

7.    AMENDMENTS.

7.1    Increase in Maximum Revolver Amount.  Section 2.5 of the Loan Agreement is hereby by deleted in its entirety and the following substituted therefor:

"2.5    Increase in Maximum Revolver Amount.  Intentionally deleted."

7.2    Limits and Sublimits.  Section 2 of the Loan Agreement is hereby amended by adding the following new Section 2.6 at the end of such Section:

"2.6    Limit and Sublimit Construction.  All limits and sublimits set forth in this Agreement, and any formula or other provision to which a limit or sublimit may apply, shall be determined on an aggregate basis considering together both the Pre-Petition Obligations and the Post-Petition Obligations."

7.3    Payments.  Section 4.4 of the Loan Agreement is hereby amended by adding the following at the end of such Section:

"Without limiting the generality of the foregoing, Administrative Agent may, in its discretion, apply any such payments or proceeds first, to the Pre-Petition Obligations until such Pre-Petition Obligations are paid and satisfied in full and second, to the Post-Petition Obligations until such Post-Petition Obligations are paid and satisfied in full."

7.4    Appraisals.  Section 6.5 of the Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

"Section 6.5    Appraisals.    Not more frequently than three (3) times (with respect to each category of Collateral) during any twelve (12) month period at the Agents' request, the Loan Parties shall, at their expense and upon such Agent's request, provide the Agents with appraisals or updates for each category of the Collateral from credentialed appraisers, and prepared in a form and on a basis, reasonably satisfactory to the Agents, such appraisals and updates to include, without limitation, information required by Requirements of Law and by the internal policies of the Agents and Lenders, and such other appraisals as Agents may request at any time an Event of Default exists or has occurred and is

continuing at the expense of Loan Parties or otherwise at any other times at the expense of Agents and Lenders."

7.5    <u>Field Examinations</u>.  Section 6.6(a) of the Loan Agreement is hereby amended by deleting the fourth sentence thereof and the following substituted therefor:

"The Collateral Agent shall have the right, at any time, in the Collateral Agent's name or in the name of a nominee of the Collateral Agent, (i) to verify the validity, amount, or any other matter relating to the Accounts, Inventory, or other Collateral, by mail, telephone, or otherwise of up to (10) Accounts each month and (ii) to conduct not more than three (3) field examinations (in addition to the appraisals referred to in Section 6.5) in any twelve (12) month period at the expense of Borrowers; except, that, (A) at any time that an Availability Trigger Event has occurred and is continuing (other than due to the occurrence of an Event of Default), the Collateral Agent may conduct not more than four (4) field examinations during any twelve (12) month period at the expense of Borrowers, (B) at any time an Event of Default exists or has occurred and is continuing Agents may conduct as many field examinations at the expense of Loan Parties, as Agents may require; provided, that, notwithstanding the limitations set forth in clauses (A) and (B) above Agents may conduct more than the number of field examinations provided therein at Agents and Lenders expense.  Notwithstanding anything to the contrary set forth in Sections 6.5 and 6.6 hereof, Agents shall have the right to conduct at least one field examination and one appraisal during the Chapter 11 Case, at the expense of Borrowers."

7.6    <u>Collection of Accounts; Payments</u>.  The first sentence of Section 6.9(a) of the Loan Agreement is hereby deleted and the following substituted therefor:

"The Borrowers shall maintain a Payment Account (the "Payment Account") with Wells Fargo Bank, National Association into which all Account collections of the Loan Parties and proceeds of the ABL Priority Collateral shall be deposited, and shall also establish and maintain all zero balance, payroll and credit card accounts with Wells Fargo Bank, National Association (together with the Primary Payment Account, the "Primary Accounts")."

7.7    <u>Additional Financial Reporting Requirements</u>.  Section 7.2 of the Loan Agreement is hereby amended by adding the following new Sections 7.2(m) and (n):

"(m)  Each Loan Party shall also provide Administrative Agent and Lenders with copies of all financial reports, schedules and other materials and information at any time furnished by or on

behalf of any Loan Party to the Bankruptcy Court, or the U.S. Trustee or to any creditors' committee or such Loan Party's shareholders, substantially concurrently with the delivery thereof to the Bankruptcy Court, creditors' committee, U.S. Trustee or shareholders, as the case may be and

(n) Borrowers shall provide Administration Agent with copies of each Committed Loan Notice (as such term is defined in the DIP Term Loan Agreement) and each Withdrawal Notice (as such term is defined in the DIP Term Loan Agreement) delivered by Loan Parties under the DIP Term Loan Agreement."

7.8     <u>Mergers, Consolidations, Sales, Acquisitions.</u>  Notwithstanding anything to the contrary contained in Section 10.1 of the Loan Agreement or any other provision of the Loan Agreement or any of the other Loan Document, the Loan Parties will not, and will not be permitted to engage in any of the mergers, consolidations, sales, acquisitions, dispositions or other transactions otherwise permitted pursuant to clauses 10.1(a) through (j) thereof (other those permitted pursuant to clauses (d)(i), (vi) through (ix), (xiv), (e) and (f), to the extent such transactions are specifically set forth in the Budget and subject to the terms of the DIP Intercreditor Agreement.

7.9     <u>Distributions; Restricted Investments.</u>  Notwithstanding anything to the contrary contained in Section 10.2 of the Loan Agreement or any other provision of the Loan Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to make any Distribution or Investment permitted in Section 10.2 of the Loan Agreement, except for Distributions permitted by Subsections 10.2(a)(viii), (xi)(so long as any such Distributions are not made to Holdings) and (xvii)(A) and (B), to the extent specifically set forth in the Budget.

7.10     <u>DIP Term Loan Debt</u>.  Section 10.5(w) of the Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

"(w) Debt incurred under the DIP Term Loan Facility in an aggregate principal amount at any time outstanding not to exceed $40,000,000, all on the terms and conditions set forth in the DIP Term Loan Documents (as in effect on the date hereof); provided, that all amounts repaid may not be reborrowed and the DIP Intercreditor Agreement is in full force and effect."

7.11     <u>Debt</u>.  Notwithstanding anything to the contrary contained in Section 10.5 of the Loan Agreement or any other provision of the Loan Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to, create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Debt for Borrowed Money (other than Debt incurred pursuant to the Loan Agreement and the other Loan Documents and DIP Term Loan Debt pursuant to Section 10.5(w) of the Loan Agreement and subject to the DIP Intercreditor Agreement), without in each case the prior written consent of Administrative Agent and Collateral Agent (and no such consent shall be implied, from any other action, inaction or

acquiescence by Administrative Agent, Collateral Agent or any Lender); for the avoidance of doubt, the outstanding principal amount of the Term Loan Debt on the date hereof is $_____, an no additional Debt other than fees and expenses may be incurred under the Term Loan Documents after the date hereof.

      7.12    Liens.  Notwithstanding anything to the contrary contained in Section 10.10 of the Loan Agreement or any other provision of the Loan Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to, create, incur, assume or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom (other than (a) Permitted Liens existing on the Petition Date and (b) Liens securing the Obligations, without in each case the prior written consent of  the Administrative Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any other Secured Party).

      7.13    Prepayments and Amendments.  Notwithstanding anything to the contrary contained in Section 10.6 of the Loan Agreement or any other provision of the Loan Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to make any payment on account of, or optionally prepay, redeem, defease, purchase, or otherwise acquire, Debt (other than (i) the Obligations and (ii) regularly scheduled payments of interest and principal in respect of the DIP Term Loan Debt in accordance with the DIP Term Loan Agreement, in accordance with the Budget and subject to the DIP Intercreditor Agreement) without in each case the prior written consent of the Administrative Agent and the Collateral Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Administrative Agent, the Collateral Agent or any Lender).

      7.14    Capital Expenditures.  Section 10.13 of the Loan Agreement is hereby deleted in its entirety and the following substituted thereof:

         "10.13    Capital Expenditures.  On or after the effective date of the Ratification Agreement, no Loan Party shall make or become legally obligated to make any Capital Expenditure, except for Capital Expenditures not exceeding, in the aggregate for all Loan Parties and their Subsidiaries, an amount equal to the lesser of (a) $2,300,000 and (b) capital expenditures set forth in the Budget through the Termination Date."

      7.15    Fixed Charge Coverage Ratio.  Section 10.14 of the Loan Agreement is hereby by deleted in its entirety and the following substituted therefor:

         "10.14    Fixed Charge Coverage Ratio.  Intentionally deleted."

      7.16    Events of Default.  Section 10.1 of the Loan Agreement is hereby amended as follows:

(a)     Section 12.1(d) of the Loan Agreement is hereby by deleted in its entirety and the following substituted therefor:

"(d)     (i) Any Loan Party (A) fails to make any payment when due, after lapse of all applicable grace, cure or notice periods (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise), in respect of any Debt (other than Debt under the Loan Documents and Debt under Swap Contracts) having an aggregate original principal amount of more than the Threshold Amount or (B) fails to observe or perform any other agreement or condition relating to any such Debt or contained in any instrument or agreement evidencing or securing such Debt, or any other event occurs, in each case, and continues, after any applicable grace, cure or notice period, the effect of which default or other event is to cause, or to permit, after lapse of all applicable grace, cure or notice periods, the holder or holders of such Debt (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice if required, such Debt or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Debt to be made, in each case, prior to its stated maturity; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined, or as such comparable term may be used and defined, in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which any Borrower or any of its Subsidiaries is the "Defaulting Party" (as defined, or as such comparable term may be used and defined, in such Swap Contract) or (B) any "Termination Event" (as defined, or as such comparable term may be used and defined, in such Swap Contract) under such Swap Contract as to which any Borrower or any of its Subsidiaries is an Affected Party (as defined, or as such comparable term may be used and defined, in such Swap Contract) and, in either event, the Swap Termination Value owed by such Borrower or such Subsidiary as a result thereof is greater than the Threshold Amount."

(b)     Section 12.1(e) of the Loan Agreement are hereby amended to delete all references to "any Loan Party" and substitute "any obligor (other than Debtors)" therefor.

(c)     Section 12.1 of the Loan Agreement is hereby amended by (i) deleting the reference to the word "or" at the end of Section 10.1(o), (ii) replacing the period appearing at the end of Section 12.1(p) with a semicolon, and (iii) adding the following:

"(q)  the occurrence of any condition or event which permits Administrative Agent and Lenders to exercise any of the remedies set forth in the Financing Order, including, without

limitation, any "Event of Default" (as defined in any Financing Order);

(r)  the termination or non-renewal of the Loan Documents as provided for in any Financing Order;

(s) any Loan Party suspends or discontinues or is enjoined by any court or governmental agency from continuing to conduct all or any material part of its business, or a trustee or examiner with expanded powers is appointed for any Loan Party, or any of their respective properties;

(t)  any act, condition or event occurring after the Petition Date that has or would reasonably expect to have a Material Adverse Effect upon the assets of the Loan Parties (taken as a whole), or the Collateral or the rights and remedies of Administrative Agent and Lenders under the Loan Agreement or any other Loan Documents or any Financing Order;

(u)  conversion of any Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code;

(v)  dismissal of any Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

(w)  grant of a lien on or other interest in any property of any Loan Party, other than a Permitted Lien or a lien or encumbrance permitted by any Financing Order, which is superior to or ranks in parity with any Agent's security interest in or lien upon the Collateral;

(x) the grant of an administrative expense claim in any Chapter 11 Case which is superior to or ranks in parity with the rights of the Administrative Agent (other than administrative expense claim permitted by any Financing Order or the Ratification Agreement, the Carve-Out and the claims under the DIP Term Loan Credit Facility to the extent set forth herein);

(y)  the failure of Borrowers or Guarantors to comply with any Financing Order or any Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Administrative Agent (and no such consent shall be implied from any other authorization or acquiescence by Administrative Agent or any Lender);

(z)  the appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(aa)  the appointment of an examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code;

(bb)  the filing of a plan of reorganization or liquidation by or on behalf of any Loan Party, to which Administrative Agent has not consented in writing, which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein;

(cc) the confirmation of any plan of reorganization or liquidation in the Chapter 11 Case of any Loan Party, to which Administrative Agent has not consented to in writing, which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein;

(dd) the filing of a motion by any Debtor (or any Affiliate) that is not dismissed or denied within thirty (30) days after the date of filing such motion seeking, or the entry of any order permitting, recovery from any portion of the Collateral (or from Agent or any of the Lenders directly) any costs or expenses of preserving or disposing of the Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or otherwise);

(ee) if, for whatever reason and at any time, the Board of Directors of any Debtor as of the Petition Date should fail to have the full and exclusive right and control over the business and affairs of such Debtor and all decisions affecting the business and affairs of such Debtor, in each case subject only to (a) the power and authority of the Bankruptcy Court in the Chapter 11 Cases and (b) any provision of applicable law that limits the director or directors of such Debtor from having the full and exclusive right or control;

(ff) any Material Budget Deviation, as defined in Section 5.3(d) of the Ratification Agreement;

(gg)  a determination by the DIP Term Loan Agent or otherwise in accordance with the DIP Term Loan Documents, after delivery by Borrowers of a Notice of Withdrawal (as such term is defined in the DIP Term Loan Agreement, as in effect on the date hereof) that Borrowers have failed to satisfy the conditions set forth in the DIP Term Loan Agreement required with respect to any periodic Withdrawal (as such term is defined in the DIP Term Loan Agreement in effect on the date hereof) of funds from the DIP Term Loan Funding Account;

(hh) any future proceedings which may develop out of any such cases, including liquidation in bankruptcy, shall have been entered within five (5) days after the commencement of the Chapter 11 Case and be in full force and effect and not have been vacated, reversed, modified, amended or stayed and not be subject to a pending appeal or motion for leave to appeal or other proceeding to set aside such order or challenge to the relief provided for in it, except as consented to in writing by Administrative Agent; or

(ii) the Term Borrowing (as such term is defined in the DIP Term Loan Agreement, as in effect on the date hereof) shall not have been deposited into the DIP Term Loan Funding Account within two (2) Business Days following the earlier of (1) the delivery of the Committed Loan Notice as such term is defined in the DIP Term Loan Agreement (as in effect on the date hereof) by the Borrower and (2) two (2) Business Days after the entry of the Interim Financing Order. "

7.17    Right to Cure.  Section 12.3 of the Loan Agreement is hereby by deleted in its entirety and the following substituted therefor:

"12.3  Right to Cure.  Intentionally deleted."

7.18    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver. Section 16.3(a) of the Loan Agreement is hereby amended by deleting the period and adding the following at the end thereof:

"EXCEPT TO THE EXTENT THAT THE PROVISIONS OF THE BANKRUPTCY CODE ARE APPLICABLE AND SPECIFICALLY CONFLICT WITH THE FOREGOING."

7.19    Notices.  Section 16.8 of the Loan Agreement is hereby amended by adding that any notices, requests and demands also be sent to the following parties:

| | |
|---|---|
| If to Agent: | Wells Fargo Bank, National Association |
| | 100 Park Avenue, 14th Floor |
| | New York, NY 100017 |
| | Attention:  Portfolio Manager -- Everyware |
| | Telephone No.: 212-840-2000 |
| | Telecopy No.: [_____] |
| with a copy to: | Otterbourg P.C. |
| | 230 Park Avenue |
| | New York, New York  10169 |
| | Telephone No.:  212-661-9100 |
| | Facsimile No.:  212-682-6104 |

Attn: Jonathan N. Helfat, Esq.

8.    <u>RELEASE</u>.

8.1    <u>Release of Pre-Petition Claims</u>.

(a)    Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, in consideration of the agreements of Agent and Lenders contained herein and the making of any Revolving Loans by Agent and Lenders, each Loan Party, pursuant to the Loan Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, on behalf of itself and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Agent, each Lender and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Agent, each Lender and all such other parties being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Pre-Petition Released Claim" and collectively, "Pre-Petition Released Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which any Borrower or Guarantor, or any of their respective successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of this Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Loan Agreement, as amended and supplemented through the date hereof, and the other Loan Documents.

(b)    Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, each Loan Party, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Borrower and Guarantor pursuant to this Section 8.1. If any Loan Party violates the foregoing covenant, Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

8.2    <u>Release of Post-Petition Claims</u>. Upon (a) the receipt by Agent, on behalf of itself and the other Lenders, of payment in full of all Obligations in cash or other immediately available funds, plus cash collateral or other collateral security acceptable to Agent to secure any Obligations that survive or continue beyond the termination of the Loan Documents, and (b) the termination of the Loan Documents (the "Payment Date"), in consideration of the agreements of Agent and Lenders contained herein and the making of any Revolving Loans by Agent and

Lenders, each Loan Party hereby covenants and agrees to execute and deliver in favor of Agent and Lenders a valid and binding termination and release agreement, in form and substance satisfactory to Agent.  If any Loan Party violates such covenant, Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

        8.3    Releases Generally.

        (a)    Each Loan Party understands, acknowledges and agrees that the releases set forth above in Sections 8.1 and 8.2 hereof  may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

        (b)    Each Loan Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 8.1 hereof and, when made, Section 8.2 hereof.

        9.    CONDITIONS PRECEDENT.

In addition to any other conditions contained herein or the Loan Agreement, as in effect immediately prior to the Petition Date, with respect to the Revolving Loans and other financial accommodations available to Borrowers (all of which conditions, except as modified or made pursuant to this Ratification Agreement shall remain applicable to the Revolving Loans and be applicable to other financial accommodations available to Borrowers), the following are conditions to Agent's and Lenders' obligation to extend further loans, advances or other financial accommodations to Borrowers pursuant to the Loan Agreement:

        9.1    Borrowers and Guarantors shall furnish to Agent and Lenders all financial information, projections, budgets, business plans, cash flows and such other information as Agent and Lenders shall reasonably request from time to time;

        9.2    as of the Petition Date, the Existing Loan Documents shall not have been terminated;

        9.3    Loan Parties shall have commenced a voluntary case under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware by no later than April [__], 2015.  Loan Parties shall have complied in full with the notice and other requirements of the Bankruptcy Code in a manner reasonably acceptable to Agent and its counsel, with respect to the Interim Financing Order) and Agent shall have received such evidence thereof as it shall reasonably require.  All of the first day orders entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Case shall be in form and substance reasonably satisfactory to Agent;

        9.4    no trustee or examiner with expanded powers shall have been appointed or designated with respect to any Borrower or Guarantor, as Debtor and Debtor-in-Possession, or its respective business, properties and assets and no motion or proceeding shall be pending seeking such relief;

9.5     the Interim Financing Order or other Order(s) of the Bankruptcy Court shall ratify and amend the cash management arrangements of Borrowers and Guarantors to reflect the commencement of the Chapter 11 Cases, that each Debtor, as Debtor and Debtor-in-Possession, is the successor in interest to such Borrower or Guarantor, as the case may be, that the Obligations include both the Pre-Petition Obligations and the Post-Petition Obligations, that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for in this Ratification Agreement;

9.6     the execution and delivery of this Ratification Agreement to be delivered in connection herewith by Borrowers and Guarantors in form and substance satisfactory to Agent;

9.7     the execution or delivery to Agent and Lenders of all other Loan Documents, and other agreements, documents and instruments which, in the good faith judgment, of Agent are necessary or appropriate.  The implementation of the terms of this Ratification Agreement and the other Loan Documents, as modified pursuant to this Ratification Agreement, all of which contains provisions, representations, warranties, covenants and Events of Default, as are satisfactory to Agent and its counsel;

9.8     satisfactory review by counsel for Agent of legal issues attendant to the post-petition financing transactions contemplated hereunder;

9.9     Each Borrower and Guarantor shall comply in full with the notice and other requirements of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to any relevant Financing Order in a manner prescribed by the Bankruptcy Code and the applicable Bankruptcy Rules, and an Interim Financing Order shall have been entered by the Bankruptcy Court (the "Interim Financing Order") acceptable to Agent and its counsel, and the Interim Financing Order authorizing the secured financing under the Loan Documents as ratified and amended hereunder on the terms and conditions set forth in this Ratification Agreement and, among other things, modifying the automatic stay, authorizing and granting the senior security interest in liens in favor of Agent and Lenders described in this Ratification Agreement and in the Interim Financing Order, the Permanent Financing Order and granting super-priority expense claims to Agent and Lenders with respect to all obligations due Agent and Lenders, subject to no priority claim or administrative expenses of the Chapter 11 Case or any other entity (other than the Carve-Out and the super-priority administrative claim in respect of the DIP Term Loan Facility to the extent provided in the Ratification Agreement).  The Financing Orders shall authorize post-petition financing under the terms set forth in this Ratification Agreement in an amount acceptable to Administrative Agent and Lenders, in their sole discretion, and it shall contain such other terms or provisions as Administrative Agent and its counsel shall require;

9.10    Reserved;

9.11    with respect to further credit after expiration of the Interim Financing Order, on or before the expiration of the Interim Financing Order, the Bankruptcy Court shall have entered a Permanent Financing Order authorizing the secured financing on the terms and conditions set forth in this Ratification Agreement, granting to Agent and Lenders the senior security interests and liens described above and super-priority administrative expense claims

described above (except as otherwise specifically provided in the Interim Financing Order), and modifying the automatic stay and other provisions required by Agent and its counsel ("Permanent Financing Order").  Neither Agent nor any Lender shall provide any Revolving Loans (or other financial accommodations) other than those authorized under the Interim Financing Order unless, on or before the expiration of the Interim Financing Order, the Permanent Financing Order shall have been entered, and there shall be no appeal or other contest with respect to either the Interim Financing Order or the Permanent Financing Order and the time to appeal to contest such order shall have expired;

9.12    other than the voluntary commencement of the Chapter 11 Cases, no material impairment of the priority of Agent's and Lenders' security interests in the Collateral shall have occurred from the date of the latest field examinations of Agent and Lenders to the Petition Date;

9.13    Borrowers shall have delivered to Agent, on terms and conditions satisfactory to Agent, a plan of reorganization which provides for, among other things, either (i) the conversion of the Loan Agreement (as amended by this Ratification Agreement) into an exist facility on terms and conditions acceptable to the Borrowers, the Agent and the Lenders, on terms and conditions acceptable to Agent and Lenders or (ii) the indefeasible payment in full of all of the obligations owing to Agent and Lenders.

9.14    Receipt by Agent, each in form and substance satisfactory to Agent, of (i) the initial Budget, (ii) an income statement and balance sheet as of the end of the most recent fiscal month for each of the Borrowers, and a comparison of such information to information for the same period in the immediately preceding year, each in form and substance satisfactory to Agent, provided that if the Chapter 11 Case commences on or prior to the twelfth (12th) business day of any calendar month, such income statement and balance sheet may be as of the end of the fiscal month immediately preceding the most recent fiscal month, (iii) projected monthly balance sheets, income statements, statements of cash flows and availability of Borrowers and Guarantors for the period through the end of the Loan Agreement, in each case as to the projections, with the results and assumptions set forth in all of such projections in form and substance satisfactory to Agent, (iv) any updates or modifications to the projected financial statements of Borrowers and Guarantors previously received by Agent, in each case in form and substance satisfactory to Agent, and (v) copies of satisfactory interim unaudited financial statements for each month ended since the last audited financial statements for which financial statements are available;

9.15    Borrowers and Guarantors shall have executed and delivered all of the documents necessary to consummate the DIP Term Loan Facility as described in the Term Sheet for Proposed Debtor-in-Possession Financing, dated March 31, 2015 (the "DIP Term Loan Facility Term Sheet"), issued by certain of the Pre-Petition Term Loan Lenders, providing for a super-priority, priming term loan in an aggregate principal amount of not less than $40,000,000 minus the amount of fees set forth in Section 2.07(c) of the DIP Term Loan Agreement, and (i) Administrative Agent shall have received a copy of the Committed Loan Notice (as such term is defined in the DIP Term Loan Agreement) delivered by Borrower to DIP Term Loan Agent on the date hereof effecting the Term Borrowing (as such term is defined in the DIP Term Loan Agreement, as in effect on the date hereof), and (ii) Borrowers shall have the ability to draw

down the proceeds of the DIP Term Loan in accordance with the terms of the DIP Term Loan Agreement following the date on which the Interim Financing Order has been entered to fund the expenses and disbursements set forth in the Budget.

9.16    The Financing Orders shall confirm the following lien priorities: (a) with respect to the Term Priority Collateral, *first*, subject to the payment of Allowed Professional Fees subject to the Carve-Out, the DIP Term Loan Agent and Term Loan Lenders to secure the DIP Term Loan Debt, *second*, the Term Loan Agent and Term Loan Lenders to secure the Term Loan Debt, and *third*, Agent and the other Secured Parties to secure the Obligations, and (b) with respect to the ABL Priority Collateral, *first*, Agent and the other Secured Parties to secure the Obligations, *second*, subject to the payment of Allowed Professional Fees subject to the Carve-Out, the DIP Term Loan Agent and the DIP Term Loan Lenders to secure the DIP Term Loan Debt, and *third*, the Term Loan Agent and the Term Loan Lenders to secure the Term Loan Debt.

9.17    Agent, for the benefit of itself and the other Secured Parties, shall hold perfected, priority security interests in and liens upon the ABL Priority Collateral and no less than a third priority (exclusive of the Carve-Out but only to the extent such claims extend or apply to the proceeds of the Term Priority Collateral) security interest in the Term Loan Priority Collateral (including without limitation the DIP Term Loan Funding Account, to the extent that the DIP Term Loan Funding Account is property of the estate of any Debtor whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case or cases) and Agent shall have received such evidence thereof as it requires;

9.18    Agent shall have received (i) an update of the existing field examinations of the business and collateral of Borrowers and Guarantors so as to obtain current results within 5 days prior to closing consistent with Agent's customary procedures and practices and as otherwise required by the nature and circumstances of the businesses of Borrowers and Guarantors (and including current agings of receivables, current perpetual inventory records and/or rollforwards of accounts and inventory through the date of closing, together with reasonable supporting documentation) and (ii) an updated written appraisal as to the Inventory in form, scope and methodology acceptable to Agent and by an appraiser acceptable to Agent, addressed to Agent and upon which Agent and Lenders are expressly permitted to rely;

9.19    Borrowers shall have (i) engaged a financial advisor with authority and duties satisfactory to Agent, who shall, among other things, assist Borrowers in the preparation of and compliance with, on an ongoing basis, the Budget and compliance with, on and ongoing basis, the terms and conditions set forth in the Loan Documents, (ii) engaged an investment banking firm with authority and duties reasonably satisfactory to Agent, and the foregoing engagements under clauses (i) and (ii) shall each have been approved under the Interim Financing Order, and (iii) have provided such consultants, financial advisor and investment banking firm with such information as they may require;

9.20    Borrowers and Guarantors shall have established a cash management system in form and substance reasonably satisfactory to Agent, including blocked accounts for collections and the transfer thereof to Agent, and subject to control agreements by the banks at which such accounts are maintained, which shall be in form and substance acceptable to Agent;

9.21    No material adverse change in the business, operations, property or financial condition of Borrowers (taken as a whole) shall have occurred since March __, 2015[1] (it being understood that the commencement of the Chapter 11 Case, any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement thereof, reduction in payment terms by suppliers, and reclamation claims shall not be deemed a material adverse change).  No material misstatements in or omissions from the materials previously furnished to Agent by Borrowers and Guarantors taken as a whole shall have been made.  Agent and Lenders shall have received the payment of all fees required to be paid to each of them, at, or prior to, closing in connection with the DIP ABL Credit Facility; and

9.22    no Default or Event of Default shall have occurred or be existing under any of the Loan Documents, as modified pursuant hereto, and assumed by Borrowers and Guarantor.

10.    <u>MISCELLANEOUS</u>.

10.1    <u>Amendments and Waivers</u>.  Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

10.2    <u>Further Assurances</u>.  Each Borrower and Guarantor shall, at its expense, at any time or times duly execute and deliver, or shall use its best efforts to cause to be duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional security agreements, collateral assignments, UCC financing statements or amendments or continuations thereof, landlord's or mortgagee's waivers of liens and consents to the exercise by Agent and Lenders of all the rights and remedies hereunder, under any of the other Loan Documents, any Financing Order or applicable law with respect to the Collateral, and do or use its best efforts to cause to be done such further acts as may be reasonably necessary or proper in Agent's opinion (other than any Excluded Action) to evidence, perfect, maintain and enforce the security interests of Agent and Lenders, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Ratification Agreement, any of the other Loan Documents or the Financing Order.  Upon the request of Agent, at any time and from time to time, each Borrower and Guarantor shall, at its cost and expense, do, make, execute, deliver and record, register or file updates to the filings of Agent and Lenders with respect to the Intellectual Property with the United States Patent and Trademark Office, the financing statements, mortgages (with respect to each parcel of real property with a fair market value of greater than $1,000,000), deeds of trust, deeds to secure debt, and other instruments, acts, pledges, assignments and transfers (or use its best efforts to cause the same to be done) and will deliver to Agent and Lenders such instruments evidencing items of Collateral as may be requested by Agent (other than any Excluded Actions).

10.3    <u>Headings</u>.  The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

---

[1] This should be the date of the last field examination

10.4     Counterparts.  This Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement.  In making proof of this Ratification Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto.  Delivery of an executed counterpart of this Ratification Agreement by telefacsimile or other means of electronic transmission shall have the same force and effect as delivery of an original executed counterpart of this Ratification Agreement.  Any party delivering an executed counterpart of this Ratification Agreement by telefacsimile or other means of electronic transmission also shall deliver an original executed counterpart of this Ratification Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Ratification Agreement as to such party or any other party.

10.5     Additional Events of Default.  The parties hereto acknowledge, confirm and agree that the failure of any Borrower or Guarantor to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by such Borrower or Guarantor in connection herewith shall constitute an Event of Default under the Loan Documents.

10.6     Costs and Expenses.  Borrowers shall pay to Agents and Lenders on demand all costs and expenses that Agents or Lenders pay or incur in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Ratification Agreement and the other Loan Documents and the Financing Order, including, without limitation: (a) reasonable attorneys' and paralegals' fees and disbursements of counsel to, and reasonable fees and expenses of consultants, accountants and other professionals retained by, Agent and Lenders; (b) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) for any amendment, supplement, waiver, consent, or subsequent closing in connection with this Ratification Agreement, the other Loan Documents, the Financing Order and the transactions contemplated thereby; (c) taxes, fees and other charges for recording any agreements or documents with any governmental authority, and the filing of UCC financing statements and continuations, and other actions to perfect, protect, and continue the security interests and liens of Agent and Lenders in the Collateral; (d) sums paid or incurred to pay any amount or take any action required of Borrowers and Guarantor under the Loan Documents or the Financing Order that Borrowers and Guarantor fail to pay or take; (e) costs of appraisals, inspections and verifications of the Collateral and including travel, lodging, and meals for inspections of the Collateral and the Debtors' operations by Agent or its agent and to attend court hearings or otherwise in connection with the Chapter 11 Cases; (f) costs and expenses of preserving and protecting the Collateral; (g) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Agent during the course of periodic field examinations of the Collateral and Debtors' operations, plus a per diem charge at the rate of $1,000 per person per day for Agent's examiners in the field and office; and (h) costs and expenses (including attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Obligations, enforce the security interests and liens of Agent and Lenders, sell or otherwise realize upon the Collateral, and otherwise enforce the provisions of this Ratification Agreement, the other Loan Documents and the Financing Order, or to defend any claims made or threatened against Agent or any Lender arising out of the transactions contemplated hereby (including, without limitation, preparations for and consultations concerning any such matters).  The

foregoing shall not be construed to limit any other provisions of the Loan Documents regarding costs and expenses to be paid by Borrowers.  All sums provided for in this Section 10.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Loan Documents.  Agent is hereby irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by Agent with respect to any Borrower or Guarantor.

       10.7    <u>Effectiveness</u>.  This Ratification Agreement shall become effective upon the execution hereof by Agent and Lenders and the entry of the Interim Financing Order.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

3624660.7

IN WITNESS WHEREOF, the parties hereto have caused this Ratification Agreement to be duly executed as of the day and year first above written.

<u>AGENT</u>

WELLS FARGO BANK, NATIONAL ASSOCIATION, as Administrative Agent, Collateral Agent, Issuing Bank and  Lender

By:_____
Name:
Title:

[SIGNATURES CONTINUED ON NEXT PAGE]

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

BORROWERS:

ONEIDA LTD.

By :_____
Name:
Title:

ANCHOR HOCKING, LLC

By: _____
Name:
Title:


GUARANTORS:

UNIVERSAL TABLETOP, INC.

By: _____
Name:
Title:

BUFFALO CHINA, INC.
DELCO INTERNATIONAL, LTD.
SAKURA, INC.
THC SYSTEMS, INC.
KENWOOD SILVER COMPANY, INC.
ONEIDA SILVERSMITHS INC.
ONEIDA INTERNATIONAL INC.
ONEIDA FOOD SERVICE, INC.


By: _____
Name:
Title:

EXHIBIT A
to
<u>RATIFICATION AGREEMENT</u>

<u>Summary of Budget</u>

**EXHIBIT 3**

**Budget**

EveryWare Global
DIP Summary

| Week Ending - USD'000 | BK FILING 10-Apr-15 | Week 2 17-Apr-15 | Week 3 24-Apr-15 | Week 4 1-May-15 | Week 5 8-May-15 | Week 6 15-May-15 | Week 7 22-May-15 | Week 8 29-May-15 | Week 9 5-Jun-15 | Week 10 12-Jun-15 | Week 11 19-Jun-15 | Week 12 26-Jun-15 | Week 13 3-Jul-15 | Week 14 10-Jul-15 | 14-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Projected Receipts* | 5,693 | 7,206 | 5,429 | 8,364 | 8,358 | 6,474 | 6,209 | 6,086 | 6,537 | 6,147 | 6,361 | 6,504 | 6,782 | 5,544 | 91,695 |
| *Total Disbursements Excluding Bankruptcy Professional Fees* | (11,160) | (10,845) | (11,546) | (9,900) | (7,024) | (6,577) | (6,635) | (5,805) | (8,140) | (6,075) | (7,068) | (5,652) | (6,531) | (6,264) | (109,223) |
| *Bankruptcy Professional Fees* | (1,450) | - | - | - | (163) | - | (150) | - | (325) | - | - | (2,030) | (325) | (10,895) | (15,338) |
| **Total Disbursements** | (12,610) | (10,845) | (11,546) | (9,900) | (7,187) | (6,577) | (6,785) | (5,805) | (8,465) | (6,075) | (7,068) | (7,682) | (6,856) | (17,159) | (124,561) |
| *Net Cash Flow (Deficit)* | (6,917) | (3,639) | (6,117) | (1,536) | 1,171 | (104) | (576) | 281 | (1,928) | 73 | (707) | (1,177) | (74) | (11,616) | (32,866) |
| **Total Liquidity** | 34,473 | 30,834 | 24,717 | 23,181 | 23,181 | 23,181 | 23,181 | 23,181 | 22,025 | 22,025 | 21,391 | 20,214 | 20,140 | 8,224 | 8,224 |